



IN THE UNITED STATES DISTRICT COURT FOR THE

CENTRAL DISTRICT OF CALIFORNIA

[UNDER SEAL],

        v.

[UNDER SEAL].

Filed in Camera and Under Seal

CV14-08961-PA (SSx)

Civil Action No.

**COMPLAINT**
**JURY TRIAL REQUESTED**

**DO NOT PLACE ON PACER**
**DO NOT SERVE DEFENDANTS**
**DO NOT PLACE IN PRESS BOX**

# FILED UNDER SEAL

2:14CV08961-C0001



1
WATERS, KRAUS & PAUL
2
Michael Armitage (SBN 152740)
armitage@waterskraus.com
3
Louisa Kirakosian (SBN 271983)
lkirakosian@waterskraus.com
4
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California 90245
5
PH: 310-414-8146
6
7
EISENBERG, GILCHRIST & CUTT, P.C.
Robert D. Sherlock (Utah Bar No. 02942)
8
     (Pro Hac Vice forthcoming)
rsherlock@egclegal.com
9
215 South State, Suite 900
Salt Lake City, Utah 84111
10
PH: 801-366-9100

11
ATTORNEYS FOR PLAINTIFF-RELATOR
DAVID VATAN, M.D.
12

FILED
CLERK, U.S. DISTRICT COURT
NOV 19 2014
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

13
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
14

15

16
CV14-08961-PA(SSx)

17
UNITED STATES OF AMERICA,                    Case No. 14-
18
*ex. rel.*
DAVID VATAN, M.D.                            **COMPLAINT**
19
                Plaintiff-Relator,
                                             **Jury Trial Requested**
20
       v.
                                             **FILED UNDER SEAL**
21
QTC MEDICAL SERVICES, INC;
22
LOCKHEED-MARTIN                              **Pursuant to the False Claims Act,**
CORPORATION, JOHN DOES #1-
23
10, FICTICIOUS NAMES                         **31 U.S.C. § 3730** *et seq.*
                Defendants.
24

25

26
PAID
NOV 19 2014
Clerk, US District Court
COURT 9622
27

False Claims Act Complaint

ORIGINAL

**INTRODUCTION**

1. On behalf of the United States of America, pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, Plaintiff Relator David Vatan, M.D., files this *qui tam* Complaint against Defendants for treble damages and civil penalties arising from Defendants' conduct in violation of the Federal Civil False Claims Act.

2. This action concerns false, improper, and unlawful billing by Defendant QTC to the U.S. Veterans Administration (hereinafter sometimes referred to as the "VA"). In an attempt to increase its profile and generate profits, Defendant QTC created and implemented a number of schemes to knowingly and intentionally submit false claims to the VA for services purportedly performed under contracts with the VA.

3. The contracts between the VA and Defendant QTC required QTC to perform substantive reviews of veterans' medical records to determine if the veterans qualified for benefits. The universe of veterans' medical records encompassed previously filed and denied claims where new breakthroughs in science later link the veterans' ailments to exposure to Agent Orange. QTC was contracted to isolate those veterans' medical claim file records whose denials were erroneous based on new scientific breakthroughs and in accordance with specific criteria set forth by the VA. After isolating and setting aside those veterans' medical records that had erroneous denials, QTC was to advise the VA so that the veterans could obtain further medical review by a health care provider and if applicable, obtain their owed benefits.

4. These reviews were required of the VA, as further detailed below, due to court orders as well as statutes and regulations governing veterans and any harm to them due to exposure to Agent Orange. Due to the immense scope of review, the VA delegated this task contractually to QTC. QTC failed to competently provide reviews, and instead focused solely

upon the speed with which the reviews were purported to be completed and the number of files each claim file analyst "completed" in a day in order to fraudulently increase billings to the U.S. government.

## I. JURISDICTION AND VENUE

5. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

6. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants can be found in and transact business in this District. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C.§ 3732(a).

7. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

8. Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

9. To the extent that there has been a public disclosure unknown to the Relator, Relator is "original source[s]" and meets the requirements under 31 U.S.C. § 3730(e)(4)(B). To the extent there has been a public disclosure of any facts or other matters relevant to this Complaint, Relator's allegations herein are based on his knowledge that is independent of and materially adds to publicly disclosed allegations or transactions (if any) and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).

## II. PARTIES

### A. Relator

10. Plaintiff Relator David Vatan is a Medical Doctor who, as of the date of this Complaint, is working as a Claims File Analyst for QTC Services in its VA Services department in Diamond Bar, California. He obtained his undergraduate degree in Chemistry and Biology from Ryerson University in Toronto, Canada in 1995, and his M.D. from Spartan Health Sciences University, Saint Lucia, West Indies, in 2008. He performed third and fourth year clinical rotations at hospitals in Chicago, Illinois, and has passed the examinations of the Educational Commission for Foreign Medical Graduates (ECFMG) in 2010, as well as the Medical Council of Canada Evaluating Examination in 2010. Relator has been employed by QTC since March 11, 2013.

11. As a result of his direct involvement in the processes and events described herein, Relator Vatan has direct and independent knowledge of the false statements and claims that comprised the schemes under which Defendants submitted claims, or caused claims to be submitted, to the Federal Government.

### B. Defendants:

12. **Defendant "QTC":   QTC Holdings Inc. and QTC Medical Services, Inc.:** Defendant QTC Holdings, Inc. is a Delaware Corporation doing business in the State of California as the parent corporation of, and indistinguishable from, QTC Medical Services, Inc.

13. Defendant QTC Medical Services, Inc. is a California Corporation operating as a wholly-owned subsidiary of QTC Holdings, Inc. QTC Medical Services, Inc. does business and is now fully headquartered at Diamond Bar, California. QTC Medical Services, Inc. provides services as the largest private contract provider of medical disability valuation and

medical record reviews, particularly under contract to government agencies including but not limited to the VA. It is believed after investigation, therefore alleged, that QTC Medical Services Inc. is the entity through which the services described herein were contracted to be provided. Both Defendant QTC Holdings and Defendant QTC Medical are collectively referred to herein as QTC.

14. **Defendant Lockheed Martin Corporation:** Lockheed Martin Corporation is a Maryland corporation, formed in 1995 by the merger of Lockheed with Martin Marietta Corporation. It maintains its principal executive office at 6801 Rockledge Drive, Bethesda, Maryland 20817. It also maintains major operations in Los Angeles County, California.

15. In 2011, Defendant Lockheed Martin acquired QTC Holdings and all its subsidiaries. All of the medical records, reviews, etc., described herein as the "*Nehmer Department*" or "*Nehmer* project" were performed at Lockheed Martin's facilities in Diamond Bar, California. Lockheed Martin operates QTC entities as a single component of its enterprise, merged with other components for its accounting purposes, operations purposes, and otherwise. There is no corporate distinction between the management of QTC and that of Defendant Lockheed Martin.

16. **John Does #1-10, fictitious names**, are unknown co-conspirators who together with the Named Defendants also participated in and/or conspired to perpetuate the scheme described herein. To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals described herein as John Does #1-10, fictitious names, the term "Defendants" shall also refer to John Does #1-10.

## III. FACTUAL BACKGROUND

### A. Agent Orange

17. The facts leading to this lawsuit date back to the United States involvement in the Vietnam War. During Operation Ranch Hand, a U. S. military operation during the war, the United States government conducted herbicidal warfare in order to kill crops or defoliate vast areas of South Vietnam in an attempt to deprive the Viet Cong of food and vegetation cover. One of the principal components of that herbicidal warfare program, which lasted from 1962 to 1971, was the defoliant that came to be known as "Agent Orange." Operation Ranch Hand involved the spraying of an estimated 20 million gallons of defoliant and herbicide. Agent Orange was used indiscriminately, and as a defoliant and herbicide, it contained highly toxic chemicals including the highly toxic chemical Dioxin.

18. In addition to civilian exposures the United States military suffered a large number of exposures to this chemical including to its ground troops in the area, troops entering areas previously sprayed, and support troops loading or handling the chemicals. Since its use Agent Orange has been statistically and scientifically linked with the occurrence of many diseases in those exposed, including (with effective date):

(a) *AL Amyloidosis*--Caused when an abnormal protein enters organs (May 7, 2009)

(b) *Chronic B-cell Leukemias*-- A type of cancer which affects white blood cells (August 31, 2010)

(c) *Chronic lymphocytic leukemia—CLL* (October 16, 2003)

(d) *Chloracne* -- A skin condition that occurs soon after exposure to chemicals and looks like common forms of acne seen in teenagers (prior to 1985)

(e) *Diabetes Mellitus Type 2* -- High blood sugar levels resulting from the body's inability to respond properly to the hormone insulin (May 8, 2001)

(f) *Hodgkin's Disease* -- A malignant lymphoma (cancer) (February 13, 1994)

(g) *Ischemic Heart Disease* --Characterized by a reduced supply of blood to the heart (August 31, 2010)

(h) *Multiple Myeloma* --A cancer of plasma cells, a type of white blood cell in bone marrow (June 9, 1994)

(i) *Non-Hodgkin's Lymphoma* -- A group of cancers that affect the lymph glands (May 19, 1993)

(j) *Parkinson's Disease* --A progressive disorder of the nervous system (August 31, 2010)

(k) *Peripheral Neuropathy, Early-Onset* -- A nervous system condition that causes numbness, tingling, and motor weakness. Under the VA's rating regulations, it must be at least 10 percent disabling within one year of herbicide exposure (November 7, 1996)

(l) *Porphyria Cutanea Tarda* -- A disorder characterized by liver dysfunction and thinning and blistering of the skin in sun-exposed areas (February 13, 1994)

(m) *Prostate Cancer* (November 7, 1996)

(n) *Respiratory Cancers* (includes lung cancer) -- Cancers of the lung, trachea, and bronchus (June 9, 1994)

(o) *Soft Tissue Sarcomas* -- A group of different types of cancers in body tissues (August 31, 2010)

## B. Legal and Regulatory History

19. Following the Vietnam War, many veterans believed that their exposure to Agent Orange, "one of the mostly highly toxic substances known to the scientific community,"[1] caused them to contract debilitating or deadly diseases. Many veterans (or their surviving kin) sought compensation from the VA, claiming that diseases they developed after service in Vietnam were related to their exposure to Agent Orange during military service.

20. In response to the controversy over Agent Orange, Congress in 1984 enacted the Veterans' Dioxin and Radiation Exposure Compensation Standards Act ("the Dioxin Act"). The purpose of the Act was "to ensure that disability compensation is provided to veterans 'for all disabilities arising after [service in Vietnam] that are connected, based on sound scientific and medical evidence, to such service.' " Id. (citation omitted). The Dioxin Act regulations and the "presumptive conditions" were embodied in 38 C.F.R. § 3.311(a)(d).

21. However, in February 1987, a group of veterans filed a class action suit challenging 38 C.F.R. § 3.311(a)(d) on a variety of grounds. That case was *Nehmer v. U.S. Veterans' Admin.*, 712 F.Supp.1404 (N.D.Cal.1989). After considering the parties' cross-motions for summary judgment, the Court, in May of 1989, (1) invalidated 38 C.F.R. § 3.311a(d), on the grounds that the VA had used too restrictive a standard to determine whether a disease is sufficiently linked to Agent Orange to qualify as service-connected, and (2) "void[ed] all benefit decisions made under 38 C.F.R. § [3.]311[a] (d)." *Nehmer*, 712 F.Supp. at 1409, 1416–18.

22. After the district court invalidated the VA regulation, Congress enacted the Agent Orange Act on February 6, 1991. The Agent Orange Act requires the Secretary of the VA to conduct new rulemaking proceedings to determine which diseases are sufficiently associated

---

[1] *Nehmer v. U.S. Veterans' Admin.*, 712 F. Supp. 1404, 1407, n. 1 (N.D.Cal.1989)

with exposure to Agent Orange so that veterans with approved diseases receive **a presumption of service connection (SC)**, thus entitling them to veterans' compensation under 38 U.S.C. § 1116.

23. Furthermore, under the Act, when the Secretary received a report from the National Academy of Sciences he was required to determine within 60 days "whether a presumption of service connection is warranted for each disease covered by the report," and if he determined that a "presumption is warranted," he was required to issue proposed regulations within 60 days setting forth his determination and to issue final regulations within 90 days after proposing them.

24. As a result, there are many veterans who, during the time period when the *invalid* regulation was in effect, or subsequently, filed a claim for service-connected benefits based on a disease that the VA did not *then* recognize as linked to Agent Orange, but which the VA *now* recognizes is so linked pursuant to its continuously-revised Agent Orange regulations. Those claims were, of course, all denied at the time they were filed. In addition, a claim, when filed, may not have been filed to include a now- recognized presumptive condition simply because the condition was not on the list. Earlier medical records may have noted symptoms and related conditions but not have specifically used the diagnostic words now recognized. In both of these situations, re-adjudication by the VA is mandated. This re-adjudication requires a re-review of the "claim file," including medical records from the veteran's active-duty service records as well as subsequent treatment.

### C. Expansion of Service Connection Presumption to Some "Blue Water" Sailors

25. In addition, the class of individuals entitled to a *Nehmer* presumption of service connection and thus compensation consideration was further expanded to include certain "blue water" Navy personnel in the definition of "service in Vietnam." Specifically, many

"blue water" sailors whose ships deployed to the seas and waters surrounding Vietnam nonetheless made port calls, entered estuaries, and as part of their deployment came in close proximity to the highly contaminated areas. The VA, in order to implement this broader definition, has published extensive lists of ships that, on specific dates, from their deployment records, entered areas where a presumption of exposure would apply. Sailors on board those ships on those dates who developed a linked condition were nonetheless considered to be part of the *Nehmer* class even though they had not set "boots on the ground." This expanded definition would, in some cases also require re-adjudication of previously denied claims.

26. As can be seen, each time a new disease is added to the list of presumptive diseases and other conditions, the VA is tasked with re-examining previously filed claims to look for these diseases. It is required to examine a veteran's claim file (including medical records, service medical records, and previously filed and adjudicated claims) to determine whether or not evidence exists to support an inference of service connection for a now-covered disease. The veteran need not even have articulated that precise disease in order to fall into the *Nehmer* class. Rather, the VA is tasked with *sua sponte* review to see if such a medical condition previously existed. Thus, the re-examination obligation placed on the Veterans' Administration was, and is, monumental. To accomplish the most time-intensive part of this review (the actual review of the claims file and determination of the existence of evidence of the new condition and service in Vietnam), the VA turned to a contractor.

**D. QTC.**

27. QTC has for a number of years, has been one of the largest, if not the largest, single contractor for the VA. QTC services has been contracted to provide compensation and pension examinations ("C&P") for VA under contract. Specifically, the VA contracted with QTC to provide these examinations, including exams for *Nehmer* class beneficiaries. QTC

Services has continued under a number of contracts to provide services that have been estimated to exceed $600 million for the VA. In 2011, QTC Services was acquired by Lockheed Martin Corporation and operates at this time as a wholly-owned subsidiary of Lockheed Martin.

28. As part of its range of services for the VA, QTC Services has also performed retrospective claim reviews under the *Nehmer* requirements for the VA. Relator was hired as a "claims file analyst" to work on the *Nehmer* re-review by QTC for a determination of initial potential eligibility for compensation and pension retroactive payments under the newly recognized "Agent Orange" review criteria. This initial project involved some 65,000 records from VA regional offices, sent to QTC's headquarters and processing operation in Diamond Bar, California.

29. Significantly, the review requires the claims file analyst to determine whether other medical information existed that could potentially indicate the existence of a covered condition or a similar condition (i.e. an "inferred" claim for the condition). It also required the claim file analyst to determine eligibility under the *Nehmer* class conditions – now expanded to include some 'blue water' sailors. As part of the review, in addition to the claim file analysts' review, licensed physicians were hired by QTC to provide a second "set of eyes" and also to sign off on the completeness and accuracy of the review and performed by the claims file analysts.

30. This initial review project was to determine those cases that may be eligible for new or additional compensation, or additional lengths of time for compensation for three newly-added conditions to the "Agent Orange" induced disease list: ischemic heart disease, Parkinson's disease, and B-cell/Hairy cell leukemia ("IHD/PD/BCL"). This project included "review" of approximately 65,000 veteran's claim files.

31. Following the completion of this initial project, the VA tasked QTC with an additional project consisting of the review of another 95,000 files for eligibility for the newly listed condition of "peripheral neuropathy" (PN). This review is under way as of the time of this filing and the same truncated, cursory, and defective process is being used with respect to peripheral neuropathy that took place with the earlier IHD/PD/BCL project.

32. While the final determination of entitlement to compensation and pension from the VA remained with the VA, as did the final disability rating determination, the Department sought to contract out the time-consuming upfront portions of re-reviewing the actual medical records as well as prior determinations relating to some 65,000 veterans under the IHD/PD/BCL review, and some 95,000 veterans under a review for peripheral neuropathy (PN). Due to the guidance embedded in federal regulations as well as the *Nehmer* stipulation and the VA's own guidance, these reviews, of necessity, required a knowledgeable review of the veterans' entire medical record, and not simply a cursory review of past determinations.

33. The Relator is informed and believes that QTC received between $300 and $350 per claim file reviewed. The value of the *Nehmer* review contracts to QTC, therefore was (and is) estimated by Relator to be between $48 million and $56 million.

34. As quickly became evident to the Relator, QTC's process was not focused on accuracy, completeness or competency of the reviews. It was focused solely on the volume of files reviewed and signed off by each analyst and a physician during each work day. At the time of his hiring, QTC believed they would need 40 to 60 analysts to complete the project. However, during Relator's entire tenure, QTC has never hired more than 20 analysts to perform these reviews.

35. Relator is informed and believes, and after investigation alleges, that the contracts under which Defendants performed the services described herein were prepared in compliance

with the requirements of the *Nehmer* settlement and the embodied federal regulations described above. In other words, a full substantive review of the claim files to determine possible or probable entitlement to further potential compensation or pension consideration was expected, anticipated and required under the terms of the contract.

36. In conscious disregard of these requirements, and solely in order to maximize its profits and speed of performance of the "piece rate" contract, Defendants created, established, fostered, rewarded and received payment from the government for performance that was in complete disregard of the substantive contractual requirements, and otherwise false and deceptive.

37. Defendants created and manipulated this scheme with full knowledge that the certifications, records and documents created by Defendants in purported performance of the reviews would be relied upon by the VA to either further develop a claim affecting a veteran's entitlement to compensation for Agent Orange exposure diseases, or (if QTC said there was no such evidence) simply shelve a record and take no further action. Thus, every representation in every folder returned to the VA was absolutely material to the government's decision not only to pay money to Defendants for the purportedly performed reviews, but also whether to take further action to fulfill its obligation to the veterans themselves.

38. As is further detailed in this complaint, Relator is informed and believes that the contract issued to QTC or the statement of work/work statement under which these claim files are reviewed is in compliance with the requirements of the VA, court orders, statutes and the review requirements embedded in CFR 410 *et seq*. However, the review process undertaken under the contract by QTC fails in every material respect to comply with the requirements of these re-reviews, thus victimizing not only the United States government but tens of thousands of potentially eligible veterans and their families.

## IV. STATUTORY, REGULATORY, JUDICIAL PROVISIONS RELEVANT
## TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS
### A. THE FEDERAL FALSE CLAIMS ACT

39. Pursuant to the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) *et. seq.*, a cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

40. As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. No proof of specific intent to defraud is necessary.

41. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than $5,500 and up to $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and receive a portion of the Government recovery in the case, as well as attorneys' fees and costs incurred in pursuit of the action.

### B. THE DIOXIN ACT

42. The Veterans' Dioxin and Radiation Exposure Compensation Standards Act ("the Dioxin Act"), Pub.L. 98–542 (HR 1961), 99 Stat. 2725, 98th Cong.2d Sess., was passed in 1984 "to ensure that disability compensation is provided to veterans 'for all disabilities arising after [service in Vietnam] that are connected, based on sound scientific and medical evidence, to such service.' " Id. (citation omitted). The Dioxin Act regulations and the "presumptive conditions" were embodied in 38 C.F.R. § 3.311(a) (d).

## C. THE NEHMER CASE

43. In February 1987, a group of veterans filed a class action challenging the Dioxin Act regulations on a variety of grounds. This case is *Nehmer v. U.S. Veterans' Admin.*,712 F.Supp.1404 (N.D.Cal.1989) After considering the parties' cross-motions for summary judgment, the Court, in May of 1989, (1) invalidated 38 C.F.R. § 3.311a (d), on the grounds that the VA had used too restrictive a standard to determine whether a disease is sufficiently linked to Agent Orange to qualify as service-connected, and (2) "void[ed] all benefit decisions made under 38 C.F.R. § [3.]311[a](d)." *Nehmer*, 712 F.Supp. at 1409, 1416–18.

## D. AGENT ORANGE ACT OF 1991

44. The Agent Orange Act of 1991, Pub.L. No. 102-4, 105 Stat. 11 (1991), 38 U.S.C. § 1116,[2] was enacted after the district court invalidated the VA regulations under the Dioxin Act. The Agent Orange Act requires the Secretary of the VA to conduct new rulemaking proceedings to determine which diseases are sufficiently associated with exposure to Agent Orange so that veterans with approved diseases receive a presumption of service-connection, thus entitling them to Veterans' Compensation,   38 U.S.C. § 1116.

Section 1116(b) states that:

> *(1) Whenever the Secretary determines, on the basis of sound medical and scientific evidence, that a positive association exists between (A) the exposure of humans to an herbicide agent, and (B) the occurrence of a disease in humans, the Secretary shall prescribe regulations providing that a presumption of service connection is warranted for that disease for the purposes of this section . . . .*

## E. NEHMER CONSENT DECREE

---

[2] The Agent Orange Act was originally codified at 38 U.S.C. § 316, but six months later Congress renumbered § 316 of title 38 as § 1116. See 38 U.S.C.A. § 1116 (2002); Department of Veterans Affairs Codification Act of 1991, Pub.L. No. 102-83, § 5(a), 105 Stat. 378 (1991).

45. Congress enacted the Agent Orange Act on February 6, 1991. Shortly thereafter, the parties in *Nehmer* agreed to a Final Stipulation and Order ("Stip. & Order") which resolved the remaining issues of injunctive and monetary relief for the class. On May 17, 1991, the district court entered the decree, "setting forth VA's ongoing responsibilities for further rulemaking and disability payments to class members." *Nehmer III*, 284 F.3d at 1160. With respect to injunctive relief, the Stipulation & Order set forth the VA's responsibilities with regard to further rulemaking concerning Agent Orange.

46. Under Paragraph 2 of the Stipulation and Order, after reviewing the Advisory Committee's analysis of diseases, the Secretary was to initiate rulemaking in order to determine whether they were service-connected, or alternatively, to defer rulemaking if the information was insufficient. Paragraphs 3 and 5 established the VA's obligation to readjudicate veterans' disability claims whenever the VA in the future finds new diseases to be service-connected under the procedures set forth in 38 U.S.C. § 316(b) (renumbered subsequently at 38 U.S.C. § 1116(b), and to pay retroactive benefits based on the date that a veteran filed his claim or became disabled, whichever is later. As result of the VA's rulemaking, the VA has found that a large number of cancers and other chronic illnesses are linked to Agent Orange using the appropriate standard and, as a result, they have been accorded service-connected status.

## F.     VA POLICY AND GUIDANCE

47. In order to accurately process the reviews required under *Nehmer* and its CFR sections, the VA produced documents relevant to the thoroughness required of these reviews. On September 28, 2010 the VA issued two documents. The first was Training Letter 10-04, disseminated to all VA regional offices, with an accompanying *Nehmer* Training Guide (Exhibit A). This manual was further revised on February 10, 2011. (Exhibit B) The second

was Fast Letter 10-41 *"Processing of Claims for Ischemic Heart Disease (IHD), Parkinsons Disease (PD), Hairy-Cell Leukemia and Other Chronic B-cell Leukemias (HCL/BCL), and Other Diseases Under Nehmer"*. This guidance letter also contained a detailed checklist for use in evaluating *Nehmer* eligibility under newly-listed conditions. (Exhibit C)

48. In disseminating this training guide to regional offices, the Director of Compensation and Pension services, among other things, stated:

> *Resource Centers and Regional Offices, who are responsible for the adjudication/readjudication of Nehmer claims, must strictly comply with the instructions set forth in this letter and the attached Training Guide. It is critical the Nehmer claims be handled expeditiously and correctly. The processing of Nehmer claims requires VA to operate under court-imposed deadlines. Failure to comply with instructions could result in court-ordered sanctions against VA and /or VA officials.*

## G. "INFERRED" CLAIMS

49. The VA also clearly recognizes its retroactive re-review obligation each time a new disease is determined to be service-connected, and its obligation to substantively review the medical record for evidence of a condition which could infer a claim for that condition. VA Training Letter 10-04 (Nehmer Manual) (VA TL 10-04), states:

> *The Nehmer Court has held that the stipulation requires VA to readjudicate all cases in which VA previously denied a class member's claim of service connection for a new presumptive disease. **A prior denial based on lack of diagnosis rather than lack of nexus falls within the scope of the stipulation's requirement for readjudication.** This differs from claims in which there was no prior claim or class member status (i.e., no in-country Vietnam service, no "Veteran" status, etc.).* [Emphasis added]

50. The examples set forth in the VA manual further demonstrate what the agency considers a proper review and disposition of sample cases. For example, on page 21 of the guide, illustrating the issue of "diagnosis of presumptive disability," the example states:

Example 2: *A review of the claims folder shows that an original claim was filed on April 5, 1995, for service connection for heart disease (not IHD) and high cholesterol. The medical evidence for the period March 1993 and April 1995 showed a diagnosis of high cholesterol and a history of heart disease. Development action(s) was not undertaken and the SC [service connection] claim was denied in June 1996. Based on these facts, VA failed to confirm a diagnosis and the Nehmer stipulation requires that we readjudicate claims for new presumptive conditions that were previously denied.*

51. It is evident, therefore, that in order to properly determine whether the case should be readjudicated, a substantive review of the medical record, with sufficient knowledge of medical conditions, terminology, and documentation is necessary.

Likewise, on page 29 of the same guide, the example states:

Example 4: *The Veteran filed a claim for hypertension and the medical evidence of record indicated treatment for a heart condition with medication. The claim was denied for hypertension only. In this situation, there is an indication that the Veteran had a heart condition. Based on these facts, the Veteran would be considered a Nehmer class member and readjudication of the claim is required.*

52. Each of these scenarios would give rise to a referral for further development or re-adjudication, and each illustrates an expectation of a thorough review of the record to determine whether medical evidence in the possession of the VA would give rise to the need for further review for the newly listed condition.

## V. DESCRIPTION OF FRAUDULENT SCHEME AND PRACTICES

53. As previously noted, in order to deal in a timely manner with the expanded definition of "covered disease" entitled both to compensation and presumptive service-connection from Agent Orange exposure, and due in part to the expanded workload the VA has faced due to disability claims arising from the Iraq and Afghanistan conflicts, the VA contracted with QTC to perform retrospective chart reviews for the more recently designated Agent Orange exposure conditions.

54. The contracted services were specifically designed to perform a time-consuming up front portion of the disability review process, namely the review of the claim file (including the service treatment record) for a determination of the following:

    (a) Vietnam service entitling the veteran to a presumption of service-connection;

    (b) a review of previous claim file submissions and rating decisions on those claims to determine if a previous claim for a now-included condition was granted or denied, and the circumstances surrounding that;

    (c) a new *sua sponte* review of the medical record by a claims file analyst to determine whether or not medical or lay evidence exists in the record to support the possible existence of the now-covered condition(s) at any time either during service or subsequent to service sufficient to justify a referral for further adjudication by the VA itself;

    (d) medical review verification by a licensed medical doctor confirming the results of the review and data analyzed by the claims file analyst.

### A.    RELATOR'S EXPERIENCES AT QTC

55. Relator Dr. David Vatan was interviewed for a position as a claims file analyst on February 22, 2013, at Defendant QTC's main office. He was interviewed for the position by Ms. Felishka Ashley, Operations Manager at the "*Nehmer*" Department of QTC, and Ms. Beronica Ramos, who has since been promoted to the *Nehmer* Department manager position. During the interview, QTC informed Relator that the *Nehmer* "C-files" ("claims files") are similar to medical charts. The claims files, which include the medical records of post-service treatment and evaluation, supporting documents, and the service treatment record (from when the veteran was on active duty) vary in size and thickness from under 3 inches to many volumes comprising 10 or more inches in thickness.

56. Ms. Ashley informed the Relator that the *Nehmer* project was new to QTC and that there were about 10 people on the project at that time. They were expecting to hire an extra 50-60 more claims file analysts for the project. (Other claims file analysts confirmed to Relator that the expectation was that there would be an extra 50 more analysts added to the department.) The added personnel never materialized and the number of claims file analysts at any time remained about 20.

57. More recently, however, in an effort to complete the current (Peripheral Neuropathy) review project as quickly as possible, QTC has expanded its staff of claims file analysts. This expansion has been accomplished by reassigning other QTC employees to the "Nehmer Project," regardless of the actual medical qualifications of these personnel. The current "Nehmer Project" staff is believed to exceed 30 personnel, many of whom have no experience or ability to substantively review old medical records for symptoms of complex diseases.

58. Ms. Ashley told Relators that QTC had been receiving files from the VA for about a month. She said that the expectation was that a claims file analyst would review about 7-10 files per day. This requirement was consistent with a reasonable expectation of workload to review a claim file and develop a claim. Because proper review of each of these files required examination of the previous medical records and claims filed in their entirety, the proper completion of the contract, statutory and regulatory requirements required both a review of the file and a determination of whether the conditions were reasonably linkable to a presumptive *Nehmer* condition.

59. The time necessary to complete such a review was considerable, as evidenced by the original QTC expectations. For example, on January 29, 2008, QTC's senior vice

president of operations, Dr. Margie Shahani, testified to the House Committee on Veterans

Affairs, as follows:

> *Currently, the VA goal for each rating specialist is to rate an average of 3-4 cases per day. In 2006, QTC interviewed experienced claims examiners and asked them to break down the process and allocate time for each step in the rating process, assuming 7 claimed conditions. The four steps of the rating process and allotted times were:*
>
> *1. Initial review of the c-file: 20 minutes.*
> *2. Linking the evidence in the file to the claimed conditions: 85 minutes.*
> *3. Determining the severity of the condition and if each is service-connected: 40 minutes.*
> *4. Writing the rating decision: 65 minutes.*
> *The total time to examine a veteran's claim is 210 minutes or 3.5 hours. It becomes evident that a rating specialist cannot meet a target of 3-4 cases per day in one 8-hour workday. In fact, the actual average number of cases a rating specialist can process in one day is 2-3 cases.*[3]

60. While the QTC reviewers would not be responsible for accomplishing all of the elements of this rating chain, in order to properly accomplish their portion of it, they nonetheless would be required to undertake a detailed review of the claim file (Step 1, 20 minutes), locate evidence in the file to link it to the claimed conditions (part of Step 2, approximately 40 minutes), and determine some level of service connection (part of Step 3, approximately 20 minutes). Based upon Dr. Shahani's testimony on behalf of QTC, a typical proper *Nehmer* review, such as those that claims file analysts like Relator were expected to carry out, would require between 60 and 90 minutes, plus time to enter the data into the QTC electronic tracking system.

61. As a result, the stated estimate of seven or eight case files reviewed by a claims file analyst in a typical workday per claims file analyst is a reasonable expectation. This, in fact, is

---

[3] *The Use of Artificial Intelligence to Improve the U.S. Department of Veterans Affairs' Claims Processing System,* Hearing Before The SUBCOMMITTEE ON DISABILITY ASSISTANCE AND MEMORIAL AFFAIRS, U.S. HOUSE COMMITTEE ON VETERANS' AFFAIRS, 110 Cong. 66 (2008)(Statement of Marjie Shahani, M.D., Senior Vice President, Operations QTC Management, Inc., Diamond Bar, CA )

in the range of expectations communicated to the Relator and other early-hired claim file analysts for QTC.

62. Relator began work on March 11, 2013. Aside from Ms. Ashley, there was a supervisor, Mr. Steve Park who supervised the daily activities and scheduling. Mr. Park told Relator that only 5-7 claim files were expected to be delivered as reviewed by a claims file analyst per day. Other analysts who were part of the initial hiring were also told that at their 3 month point they were expected to review and deliver 7 files per day.

63. Mr. Park was replaced by Mr. Preetideep Singh. Mr. Singh is a Foreign Medical Graduate similar to Relator.

64. The *Nehmer* Department is organized into 4 mini-teams. Each mini-team has a mentor/leader. Ms. An Tanag was the team mentor for Relator's team.

65. Shortly after commencing work as one of the earliest hired claims file analysts, Relator learned, however, that Defendant QTC had created a system, produced guidance, and created workload expectations that were focused solely upon the speed with which a veteran's claim file could be returned as "completed" to the VA, and thereby maximize compensation to Defendant QTC. For instance, Relator soon realized that the actual QTC expectation was that a claims file analyst would review up to 20-25 files per day, and some CFAs purported to do so. In furtherance of this scheme, Defendant QTC (in order to maximize its payment and minimize the amount of time it took to perform the contractual obligations), engaged in the conduct described herein.

66. As a result, the entire *Nehmer* review project (including the IHD/PD/BCL review and the PN review) comprising some 160,000 VA claim files lacks any integrity and the value paid to QTC by the VA for the services expected. The VA, without their knowledge, is completely unable to rely upon the review for compliance with the *Nehmer* court orders,

federal law or federal regulation. Thus, the entire project is without any value to the government.

**B. DEFENDANTS' CONDUCT AND ACTIONS IN FURTHERANCE OF THE SCHEME**

67. The specific types of conduct underlying the scheme include each of the following categories.

**(1) QTC produced and disseminated review guidance that knowingly truncated, omitted, and misstated VA requirements for reviews.**

68. Claims file analysts were not provided copies or working instructions for either of the VA manuals. Rather, claims file analysts were provided a document entitled *"Nehmer Reference Manual"* that was prepared by QTC on July 16, 2013. (Exhibit D). QTC utilized this document as an official instruction manual provided to all claims file analysts. This document provides substantive, material guidance to claims file analysts on the completion of the checklists and processes in the original engagement, i.e., IHD/PD/BCL.

69. Along with this reference manual prepared by QTC, claims file analysts were required to complete an "Agent Orange Screening Checklist" for IHD/PD/BCL. (Exhibit E). This checklist focused almost entirely on a review of previous rating decisions by the VA, not a new review of the actual medical chart or evidence.

70. Prior rating decisions, of course, were never intended to cover the newly-added conditions. In fact, the newly-added conditions may not have even been identified by a claimant because at the time the claim was filed those conditions were not considered to be medically caused by exposure to Agent Orange.

71. Further, the QTC guide advises the claims file analysts that the answer to Checklist Question 6, "was the entire claims folder reviewed" will always be "yes." Specifically, the manual provides:

> *Through the process of elimination the entire c-file is reviewed. Service treatment records in c-files are not required to be reviewed, but they can be used to substantiate a diagnosis.*

It should be noted that, by VA definition, the service treatment record is always part of the claim file.

72. As a result, virtually all Agent Orange screening checklists were certified as reviewed and returned to the regional offices with no further analysis.

73. The guide and checklist were created by QTC solely for the purpose of expediting the review process by only actually requiring the time-saving review of prior rating decisions—printed on colored paper in the file and thus easily locatable-- rather than compliance with the VA's own mandate (as well as a mandate discussed elsewhere in the QTC guide) that

> *For Nehmer purposes medical evidence can result in an award without a formal claim being filed. They do not constitute a claim by themselves, but if we have such medical records at the time we receive a separate service connection claim the condition shown by the medical record is part of that claim.*

74. For the peripheral neuropathy review project, no similar "*Nehmer* Manual" was provided to the claims file analysts, nor were the claims file analysts provided copies of any VA guidance or training in the list of possible symptoms the claims analysts must seek out. The claims file analysts were, however, instructed to work with the "Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist" (Exhibit F) to complete these PN reviews. This checklist differed significantly from the IHD project checklist.

75. The checklist presumed that the reviewers, many of them lacking in any medical training, had knowledge of the symptoms and related indications of peripheral neuropathy, access to very early medical records from the Vietnam war and post-Vietnam era, and were

able to accurately interpret diagnostic tests. It, nevertheless, required certification that there was an appropriate complete review of the claim file and medical record.

76. The PN Checklist was slightly amended during the course of the project. Despite this amendment, no re-review of any charts was accomplished, and no training was provided to any reviewers on the substantive medical aspects of peripheral neuropathy and its etiology. The same claims file analysts remained in the project, and the speed of chart review remained high.

77. Thus, QTC was and is aware of its obligation to actually substantively review the entire medical record for evidence of the conditions newly determined to be presumptively service-connected, and to further appropriately adjudicate veterans' claims for exposure. This evidence could be submerged in a diagnostic study, medical note written in many different ways and at different times including during the Veteran's active duty service. However, the checklist itself obviates the need for that review by only creating eligibility for claims filed after the effective date of *Nehmer*, or 1985, and the described flow will <u>invariably</u> result in the lack of a need to review the medical record <u>despite affirmative certification by the claim file analyst and the reviewing physician that the entire file was reviewed.</u>

**(2) QTC produced checklists for claim file review that did not comply with VA regulatory requirements.**

78. While there are a number of critical discrepancies, omissions and thus fatally deficient differences between the reviews anticipated by the VA in TL 10-04 and its *Nehmer* training guide, perhaps the most glaring is the difference between the requirements set forth by the VA on pages 10 and 16 of its guide, and the actual "Agent Orange Screening Checklist" promulgated and used by Defendant QTC to actually conduct those reviews.

79. The QTC checklist for its claims file reviewers focuses only upon prior decisions and at the critical question defaults to an exclusion of claims prior to 1985 as well as uses a review sequence that omits most, if not all, claims.

80. The VA guidance, however, makes clear the requirement for a thorough, complete review of records themselves, not prior rating decisions:

> *Effective date: . . . "The date the original claim was filed or arose, whichever is later, even if it was before the effective date of applicable regulatory presumption, and without regard to finality of prior denial(s) . . . ."*

> *Need to File Claim: . . . "The claimant need not file a new claim or a claim for earlier effective date when new presumptive condition is added. VA must search its records to find eligible claimants and award benefits, without action on the claimant's part. Medical records noting the existence of a condition later made presumptively service-connected can in some instances, result in an award without a formal claim ever being filed . . . ."*

> VA TL-10-04 and Nehmer Manual, page 10

Thus, the VA requirements for a complete and thorough review of medical records to determine medical conditions were completely ignored in QTC's development of its processes and training of its claims file analysts. This deliberate disregard of the VA's own articulated obligations was an integral part of QTC's emphasis on speed of reviews and maximization of profits for each workday of each claim file analyst.

**(3) QTC knowingly failed to provide adequate training to claims file analysts to enable CFAs to perform the reviews.**

81. During Relator's entire tenure at QTC, and particularly prior to his assuming actual substantive review of veterans' medical files, Relator and all other claims file analysts received no substantive training on the completion of the project, how to review the medical records, medical terminologies that may have been used or archaic terminologies that may

appear in a service treatment record, nor any other substantive guidance on the actual review process necessary to comply with either Federal law or the VA's regulatory requirements. Instead, training focused heavily on the electronic data entry process itself and how to speed processes through in order to maximize the number of veterans' claims files that could be claimed by QTC to have been processed during a workday. Some training related to other areas of work within QTC, so that analysts could be moved to other areas when work was slow.

82. Thus, such 'training' as QTC provided was not relevant to the review process. It was primarily focused on the QTC "eProcess" and Operations. The purpose was to expose the analysts to other areas of work at QTC. At times the delivery of c-files from the VA to QTC was slow so during such times claims file analysts were assigned duties in other departments. There were no other trainings relating to *Nehmer* review.

**(4) QTC encouraged, rewarded, and monitored only the speed and volume of "reviews," not completeness nor accuracy.**

83. At the core of this scheme was a concerted and knowing process of encouraging, rewarding and monitoring only the speed with which the reviews were performed and the number of files "cleared" each day with no regard to the accuracy or completeness of the review. In its effort to maximize revenue from the *Nehmer* Review projects, defendant QTC, with the full knowledge and support of its senior management, undertook numerous programs to give incentives, rewards, and encourage maximum speed in analyst review of charts, incentivizing and rewarding large numbers of charts reportedly "cleared" each day without regard to the quality of those reviews. Accuracy and completeness of the reviews were never incentivized, rewarded, reviewed, or monitored.

84. For example, throughout the months of December and January, 2013-2014, the claims file analysts purported to "review" up to 38 charts per day. A review of performance statistics clearly reflects a "completion rate" and "racing form" mentality that could not reasonably be achieved if the claim file analyst actually performed the required medical review of the file.

85. In order to maximize numbers, the project supervisor, Ms. Felishka Ashley, routinely distributed daily and weekly performance statistics for each individual and each "team."

(a) For example, on December 12, 2013, compilation of results and quotas, it was noted that each team had an expected goal. On that day, the publication of the goals, achievements, and next day's goals also reflected that there was "a minimum individual goal of 15" and highlighted in yellow "those not met by individual analysts." On that day, one claims file analyst reported to have properly reviewed 31 files in the work day.

86. The same system of direct and indirect incentives for speed of performance unrelated to quality and thoroughness continued into the peripheral neuropathy review project as well.

(a) For example, on August 12, 2014, the vice president of operations for VA services emailed the VA service team to note that the group had completed a large number of files in a single day, and states, "Very good, keep it up. Thank you."

(b) In preparation for the Labor Day weekend 2014, the claims file analysts were informed that if they increased production to double their daily numbers they could take a 3 day weekend during the Labor Day holiday. If they could not

double their daily numbers, they were required to come in on the Saturday of the Labor Day weekend to continue reviewing files.

87. In addition to the speed emphasis for the claims file analysts, the reviewing physicians, who were supposed to check the work of the claims file analysts, were also lured into the work by a promise of easy work and high earning capacity. It was not uncommon for review physicians to sign off on 40 or more files per day. Physicians were encouraged and rewarded by a piece rate (per file signed off) compensation system which incentivized them to simply sign off on as many checklists as possible without spending much (or any) time to review them.

      (a) For example, under the review system established by QTC, a 1 page case assignment sheet, barcoded for tracking, is attached to each claim file. The checklist itself and the case assignment sheet are attached together.

      (b) During June, 2014, Relator learned from a coworker that the coworker accidently mixed up case assignment sheets and attached incorrect/non-matching checklists for 10-15 cases that were given to physician reviewers for final review. Much to this analyst's surprise, all of those files were signed by the provider without any issue whatsoever, and were signed by various providers. No provider noticed the checklist they were signing did not relate to the claim file attached to it, and none of those claim files could have actually been reviewed much less approved without noticing the error.

      (c) During June, 2014, Relator submitted 3 cases with accompanying claim files each totaling in excess of 2,500 pages of medical records for final physician review. All of them were signed and returned to the Relator by the physician reviewer in less than 10 minutes. At no point in this review process was there

any back check, systematic review of random cases, or other process in place to ensure the quality and completeness of these reviews.

(d) In a similar event, on August 8, 2014, the Relator reviewed a claim file containing nearly 2,500 pages or 10 inches of paper equivalent. This review took him 4 hours to complete. He then submitted the checklist to the physician reviewer for confirmation. Five minutes later, Dr. Harry Eisenbach, M.D., contacted the Relator to ask him to "scan the barcode" on the case assignment sheet. (Without scanning the barcode the provider has no access to the electronic case file including the medical records.) The Relator scanned the barcode and returned it to the physician reviewer immediately. At 12:20 p.m., or 5 minutes later, the checklist was signed by the physician and returned to Relator for processing. Obviously, no actual review of the file could have been performed during that time.

**(5) QTC knowingly required claims file analysts to make material statements and certifications without regard to the truth or falsity of those statements and certifications.**

88. As part of the claims review process, the guidance provided by QTC to claims file analysts required the claims file analysts to sign and certify review of the underlying records to the effect that the "entire claims folder was reviewed" (IHD checklist, question 6). However the guidance provided to claims file analysts, many weeks into the project, simply instructed claims file analysts to always mark that question "yes."

**(6) QTC Took Affirmative Steps to Conceal the Fraudulent Non-Processing of Claims and Fraudulent Activities of Their Employed Physician Reviewers in Approving Reviews**

89. In addition to the previously described actions to conceal the underlying fraudulent activity surrounding the review and documentation of review of claim files, Defendants have taken affirmative action to conceal such activities from other employees (including Relator) and to threaten, harass, and marginalize employees who point out Defendant's knowing support and endorsement of the fraudulent activity. For example, during the month of September 2014, several claims file analysts' desks were in close proximity to the "physician reviewers."

90. During the course of his duties, a co-worker of the Relator, Daniel Lanuza, witnessed one of the physician reviewers, Dr. Harry Eisenbach, simply signing off checklists without even opening the service treatment records for the peripheral neuropathy review. As a co-worker and friend, Mr. Lanuza informed the Relator of this event. Later, on October 2, 2014, Mr. Lanuza confronted Dr. Eisenbach and reminded him he needed to pay attention to the review process and that he (Lanuza) had personally witnessed Eisenbach skipping steps.

91. The next day, Friday, October 3, 2014, a meeting was held in which the supervisor, Ms. Ramos, indicated that the claim files would not be put on floors and that the physician reviewers would be moved to the end of the row where CFAs could not observe their activity. In apparent retaliation for the conversation between Lanuza and Eisenbach of Thursday, October 2nd, the employed physician (Eisenbach) made a complaint about Lanuza to management claiming that Lanuza had referred to Dr. Eisenbach by his first name (Harry) instead of by his title (Dr. Eisenbach). That same afternoon (October 3rd) Ms. Ogie Ubungen, QTC's Vice President of Operations, confronted Lanuza and strongly counseled him about allegedly referring to Eisenbach by his first name. Not coincidentally, the same day, Mr. Lanuza received a letter threatening disciplinary action because of his "productivity performance."

92. The next work day, Monday, October 6, 2014, Relator forwarded to appropriate individuals within QTC his concerns about the review process of the medical records and the failure of the physicians to actually review the files. The recipients of his concern included Jason Schibel, CEO of QTC Management; Frenorgin Ubungen, Vice President of Operations at QTC Management; Kerrie Schuster, an Ethics Officer at Lockheed Martin; and Donna Brown, the human resource director for QTC Management.

93. Relator received two direct responses to his concern. First, the CEO of QTC, Mr. Jason Seibel, responded within 15 minutes. His response stated,

> ... For the record your continued focus on responsibilities outside your job description is representative of creating a disruptive work environment—including for your peer, functional and clinical staff. Given the volume and focus intensity for others outside your position scope, I have concerns about your ability to effectively deliver high quality reliable work on behalf of our customers. I kindly ask you, focus on the job at hand. Please permit our processes to review the STR concern you have raised.

94. Secondly, Relator received a response from Kerrie Schuster, ethics officer for Lockheed Martin. This cursory and pro forma email stated:

> "Mr. Vatan, thank you for letting me know about this. I have verified that appropriate individuals are addressing the matters you described below. I will continue to follow this situation and advise leadership and HR as warranted. Again, thank you for bringing these concerns forward".

95. However, not coincidentally, on Thursday, October 9th, Relator received an email and letter from Ms. Ramos, advising him that he was placed on a productivity improvement plan, counseling him that he must meet a minimum expectation of delivering 12 cases for every 8 hours worked. If this did not happen, i.e., if he did not "improve his performance," disciplinary action was threatened. Further, the email accompanying the subject letter stated

that "a claims file analyst should be able to deliver, on average, between 12 and 15 cases per 8 hours worked. "

96. The communication chain from the top levels of QTC indicate a strong desire to silence Relator and co-workers who may point out the defective processes, to hide the fraudulent "clearance" of files from each other's eyes, and to intimidate employees from raising any concerns to outside entities or even QTC / Lockheed corporate management. Indeed, the President of QTC informed Relator that he was creating a "disruptive work environment" by even attempting to point out these deficiencies. As such, Defendants have engaged in a deliberate, willful, and conscious disregard of the claim review obligations and attempted to silence those who have tried to point out these deficiencies as well as keep the entire scheme hidden.

## VI. EXAMPLES OF SPECIFIC FRAUDULENT REVIEWS BY DEFENDANTS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT

97. Beginning shortly before Relator's employment commenced, Defendant QTC began receiving the "*Nehmer* re-review claim files" for the IHD/PD/BCL conditions. The claim files were all sent to the "*Nehmer* Department," which had been newly established at QTC headquarters at Diamond Bar, California. The claim files were sent from various VA regional offices around the country. The claim files ranged in size from under three inches in thickness to many volumes over six inches in thickness. Some of the files contained service treatment records, while some did not. QTC instructed its claims file analysts to apply different "codes" to their reviews depending on whether the code for the claim file reviewed was under three inches thick or more than three inches thick.

98. Under the first "project," i.e., the IHD/PD/BCL review, the claim file analysts purportedly performed reviews of the claim files. These reviews were supposedly completed, and the QTC checklist inserted into the record. Those records were then returned to the VA regional office from which they had been received with a cover sheet certifying that the chart had been screened.

99. When the second review project, i.e., for peripheral neuropathy (PN), commenced, some of the records that had been previously reviewed under the IHD project were again reviewed by the QTC *Nehmer* Department in Diamond Bar, California because the VA record needed a further re-review for the PN diagnosis. As a result, in the ordinary course of Relator's work, he received for PN review some files that had been reviewed by other CFA's at QTC under the IHD project. These files had not been further processed by the VA since that time because the earlier review found no evidence to prompt further development of the claim. Documentation to that effect remained in the file, as signed by both the CFA and reviewing physician.

100. In the course of Relator's review of these claim files, and in investigation of the facts that lead to this complaint, Relator (from his perspective as a knowledgeable reviewer) undertook a further review of the file to determine whether the earlier review by QTC for IHD/PD/BCL was accurate. In the course of these re-reviews by Relator, he found uniformly that evidence had not been reviewed, developed, recognized, or noted that would have entitled the veteran to further development of their claim under the IHD/PD/BCL review criteria. The following are specific examples of these cases; [4]

---

[4] The precise identity of these Veterans contains potentially protected individually information under 38 U.S.C. § 5701(a) , 7332. In order to protect the privacy of the claimants, they will be referred to by alphabetical identifiers. The actual information has been provided to the U.S. Attorney with this Complaint.

**(a) Veteran D.J.B**. This veteran should have been deemed Service Connected (SC) for Coronary Artery Disease *secondary to Diabetes (DM)* effective 01/10/2006. The evidence in the claim file shows that he had complained of chest pressure and a Cardiology consult confirmed this diagnosis on 10/09/2003. The QTC reviewers missed this evidence and did not refer this case to VA for further adjudication as they should have given Veteran D.J.B.'s symptoms. Veteran D.J.B. is potentially entitled to over two years of additional compensation and the case clearly should have been referred for further development.

**(b) Veteran D.A.V**. This veteran was Service Connected (SC) for Atherosclerotic Heart Disease (ASHD) *secondary to Diabetes II (DM)* with an effective date of 08/21/2002. The evidence shows heart-related workups previously received by the VA on 01/19/1993. The Veteran is potentially entitled to over 10 years additional compensation and this case clearly had not been reviewed because the claims file analyst and the physician review falsely certified that there was *no medical evidence received* showing ASHD prior to 08/21/2002.

**(c) Veteran K. J. U**. This veteran was Service Connected (SC) for MI with Coronary Artery S/P PICA with entitlement effective of 04/01/2007. The evidence shows that the Veteran submitted that claim a whole year earlier. The QTC reviewers missed the notice that the Veteran claimed for a heart condition.

**(d) Veteran L.L.V**. This veteran was Service Connected (SC) for Coronary Artery Disease secondary to another condition with a date effective as of 10/17/2005. The checklist completed by the VA's rating decision was dated on 05/12/2006, more than one year earlier. Also no evidence of PD or BCL was found during review. However the claim file was missing the service treatment record, and thus there was no way to

determine an earlier potential entitlement in the case. It should have been referred to the VA for further investigation.

(e) **Veteran J.R.M**. This veteran was Service Connected (SC) for Coronary Artery Disease S/P stent effective 03/31/2006. There was no medical evidence received showing any evidence of Coronary Artery Disease or stent. There was evidence showing abnormal cardiovascular problems and some other evidence showing that he had "chest pain that comes and goes, will last for 30 seconds" since 02/21/1981, or over 20 years earlier. The evidence was missed by the QTC reviewers and did not get referred to the VA for further adjudication.

(f) **Veteran N.E.P**. This veteran was Service Connected (SC) for Coronary Artery Disease effective 09/14/2012. However, there is evidence (including 10+ pages of medical records) clearly showing symptoms of Parkinson's disease. The Veteran's claim form claiming Parkinson's disease dates to 12/12/2012, but at that time the VA rating decision denied service connection for Parkinson's Disease. The QTC reviewers missed the evidence in the medical records, and then improperly failed to review other relevant parts of the file for further adjudication. The case should have been sent to the VA for further adjudication.

(g) **Veteran E.L.I**. This veteran was Service Connected (SC) for Coronary Artery Disease, *secondary to Diabetes* with an entitlement effective January 10, 2008. In the HID/PD/BCL review, the claims file analyst marked "no" on question #7, meaning that there was no evidence in the record to support an earlier date based on Coronary Artery Disease/Ischemic heart disease earlier than the existing date as a condition secondary to diabetes. However the medical record (which should have been reviewed as part of the new review) noted that there was Coronary Artery Disease

and a stent placed on 8/30/2007. The claim form for this condition was received by the VA on 9/27/2007. Thus, under a proper review the veteran should have been entitled to, potentially, five or more months of addition backdated compensation. It is evident that the medical record had simply not been carefully reviewed during the earlier review. The case not reviewed by VA due to the checklist completion by QTC.

(h) **Veteran G.A.R.** This veteran was Service Connected (SC) for Coronary Artery Disease with entitlement effective August 2006. On question #7 the claim file analysis (and as approved by the physician reviewer) said there was no medical evidence received showing any Coronary Artery Disease prior to the date of the claim establishing entitlement in 2006. It stated that there was no other evidence of other conditions found during the review. However, there is evidence actually in the case dated Feb 1999, and received by the VA with a stamped date in Jan 2001, showing cardiovascular impairment with ankle swelling. There is also evidence of a chest x-ray in 1999, received by the VA in Jan 2001, where a radiologist M.D. (VA hospital) noted the overall impression of the report showing atherosclerotic heart disease. Because of the missed evidence in this case, and the marking of "no" on question #7 of the checklist, the VA made no further adjudication. This veteran potentially had a valid claim under the new condition for compensation for an additional five years.

101. In each of these exemplar cases a thorough review of the medical record would have revealed that the veteran may have been entitled to a longer duration of compensation, or prevented a denial of compensation altogether, or that there were other conditions clearly material to a need for a re-review or correction. These subsequent failures deprived the veteran of entitled compensation, and resulted in false claims to the VA.

102. By contrast, the VA did, in fact, fully rely upon the screenings performed by QTC in determining whether to perform further review and adjudication on the initially screened files. In the course of Relator's duties, he also encountered a file sent for peripheral neuropathy review that had been identified for further adjudication in the IHD/PD/BCL review (Checklist Question #7 marked "Yes"). As a result the veteran was readjudicated for the newly added conditions, and awarded additional compensation:

> **(i) Veteran R.L.B. :** The checklist was completed based on VA's Rating Decision (RD) dated 10/06/2000. The veteran was Service Connected (SC) for CAD with entitlement effective 05/27/1999. In the QTC review, the remarks on Question #7 reflected as follows: *YES – Evidence found Borderline EKG minimal voltage criteria for LVH (Left Ventricular Hypertrophy) dated 06/29/1993.* **Action & Outcome by the VA:** Special Determination - A new Rating Decision issued dated 01/13/2014 based on (QTC) Nehmer phase II review and the checklist dated 05/31/2013. The service connection for CAD entitlement date was changed from 05/27/1999 to an earlier entitlement date of 02/01/1993. This resulted in nearly six years of retroactive compensation for the veteran.

## VII. DEFENDANTS SUBMITTED CLAIMS UNDER FALSE CERTIFICATIONS OF COMPLIANCE WITH APPLICABLE CONTRACTS, STATUTES, AND REGULATIONS

103. Relator is informed and after investigation believes that, with respect to each of the reviews described in this complaint and all other similar cases constituting the fraudulent

scheme, defendants each submitted a claim for payment, directly or indirectly, to the VA or other government Agency or contractor to request money from the United States Government.

104. With respect to each of these requests for payment Defendants both expressly and impliedly certified that it had complied with the claim file review requirements contained in the contracts concerning the "Nehmer Reviews" and the requirements contained in the applicable statutes.

105. At the time each claim was submitted, Defendants had actual knowledge that such claim was false or acted in reckless disregard of the truth or falsity of the express and implied certifications connected therewith. Defendants knowingly and intentionally created a system to submit such bills to the government in knowing and intentional disregard of the truth or falsity of their compliance with both the specifics of the claim and the underlying transaction.

## VIII. SCOPE OF THE FRAUD

106. The Relator is informed and believes that QTC received between $300 and $350 per claim filed and reviewed. The value of the *Nehmer* review contracts to QTC, therefore was (and is) estimated to be between $48 million and $56 million. Because the fraudulent review process renders the services meaningless and of no value to the government, the entire value of the contract should be disgorged to the government.

## IX. CLAIMS FOR RELIEF

### COUNT I –VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

107. Relator incorporates by reference all paragraphs of this Complaint as though the same were set forth herein at length.

108. In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly and/or recklessly presented, or caused to be

presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

109. Specifically, Defendants submitted claims to the United States Government and its VA for performing claim file reviews under the "*Nehmer* Project" claim file review contract when such claim file reviews fail to comply, in any reasonable manner, with the requirements of court orders in the *Nehmer* litigation, the U.S. Code, VA policy or regulation. The claim file reviews did not actually review the medical evidence in the file, and failed to properly provide the VA a meaningful basis to determine which veterans' claim files needed further development or re-adjudication based on newly listed conditions.

110. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments, which resulted in its being damaged in an amount to be determined.

111. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth presented false and fraudulent claims for payment for devices and services provided to the VA. In submitting such claims Defendants expressly and impliedly certified to the VA that the claim was submitted for services performed in compliance with the *Nehmer* stipulation, statutes, regulation, VA policy, and its contractual obligations.

112. All of the representations and certifications, both express and implied, had a natural tendency to influence the VA decision whether to pay the claims and were material to payment of the claims. Further, had the VA known of Defendant's intentionally created scheme and the falsity of the statements contained therein, the VA would not have paid the claims.

113. As a result of these schemes, Defendants caused the VA to incur significant damage and those damages are continuing to accrue.

## COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

114. Relator realleges and incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

115. In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).

116. Specifically, Defendants made, used, and caused to be made a false record which remained in the veteran's claim file as a part of the "checklist." That false record included, in the IHD/PD/BCL review, certification that the entire claim file (which by its nature includes medical records in their entirety) had been reviewed, and similar certification as to the results of that review by both the claim file analysts and the physician reviewer. In the peripheral neuropathy (PN) review, the false certification included an affirmative statement that "a review of the evidence of record reveals no complaints, symptoms or diagnoses related to early onset peripheral neuropathy," and a notification accompanying the return of chart to the VA that "peripheral neuropathy review has been completed for this case and is being submitted for adjudication purposes."

117. In both cases, the review required by the VA was, in many cases, simply not performed. These records, included with the return of the file to the VA, constituted a false record and false statement in support of a claim for payment for the chart review.

118. The VA unaware of the falsity of the records and statements made or caused to be made by the Defendants, and in reliance on the accuracy of these claims and statements, paid for these services.

119. The representations and certifications, both express and implied, contained with respect to each bill to the Government, had a natural tendency to influence the Government decision whether to pay the claim and were material to the payment of the claim. Further, had the government known of the Defendants' intentionally created scheme and the falsity of the statements contained therein, the government would not have paid said claims.

120. As a result of these schemes, Defendants caused the government to incur significant damage and those damages are continuing to accrue.

### COUNT III – VIOLATION OF 31 U.S.C. 3729(a)(1)(C)

121. Relator incorporates by reference all paragraphs of this Complaint as though the same were set forth herein at length.

122. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to present and/or cause to be presented false and fraudulent claims for payment and approval for services delivered or purported to be delivered to the United States Government and its VA for performing claim file reviews under the "*Nehmer* Project" when such claim file reviews fail to comply, in any reasonable manner, with the requirements of court orders in the *Nehmer* litigation, the U.S. Code, VA policy or regulation, and/or contained and were based upon false certifications and false records, as described herein.

123. As a result of the conspiracy, Defendants caused the Government to incur significant damage and those damages are continuing to accrue.

### X. PRAYER FOR RELIEF

124. WHEREFORE, Plaintiff/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

False Claims Act Complaint

A. The amount of the United States' damages in an amount to be proven at trial;

B. Treble the amount of the United States' damages in an amount to be proven at trial;

C. Maximum civil penalties for each false claim submitted, especially in view of the fact that the Defendants' fraud is so egregious as to justify debarment from all federal health care programs;

C. The maximum allowed to Relators under 31 U.S.C. § 3730(d);

E. Reasonable costs and attorney's fees for bringing and pressing the claims under the Federal False Claims act;

F. Such other and further relief as this Court deems to be just and proper.

## XI. REQUEST FOR TRIAL BY JURY

125. Pursuant to Rule 38, Federal Rules of Civil Procedure, a jury trial is requested.

Respectfully submitted,

**WATERS, KRAUS & PAUL**

Michael Armitage
armitage@waterskraus.com
Louisa Kirakosian
lkirakosian@waterskraus.com
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California 90245
PH: 415-441-8669/888-503-8267

**EISENBERG, GILCHRIST & CUTT, P.C.**

Robert D. Sherlock (Pro Hac Vice forthcoming)
rsherlock@egclegal.com
215 South State Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
Fax: 801-350-0065
Attorneys for Plaintiff – Relator

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury as to all issues so triable.

DATED: November 14, 2014

**WATERS, KRAUS & PAUL**

_____

Michael L. Armitage, Bar. No. 152740
Louisa O. Kirakosian, Bar No. 271983
**Water, Kraus & Paul**
222 N. Sepulveda Blvd., Suite 1900
El Segundo, CA 90245
Tel. (310) 414-8146
Fax. (310) 414-8156

ROBERT SHERLOCK, ESQ
**Eisenberg, Gilchrist & Cutt, P.C.**
215 South State, Suite 900
Salt Lake City, Utah 84111
Tel: 801-366-9100

Attorneys for Plaintiff/Relator

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| **I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ ) | **DEFENDANTS** ( Check box if you are representing yourself ☐ ) |
|---|---|
| [SEALED] | [SEALED] |

| **(b)** County of Residence of First Listed Plaintiff <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant <br> *(IN U.S. PLAINTIFF CASES ONLY)* |
|---|---|

| **(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. <br> MICHAEL L. ARMITAGE, ESQ. - WATERS, KRAUS & PAUL <br> 222 N. SEPULVEDA BLVD., STE 1900, EL SEGUNDO, CA 90245 | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT: $**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
31 U.S.C. Section 3730 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **TORTS PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: CV14-08961

CV-71 (10/14)                    CIVIL COVER SHEET                    ORIGINAL    Page 1 of 3

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

[SEALED]

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

[SEALED]

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

**(c)** Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

MICHAEL L. ARMITAGE, ESQ. - WATERS, KRAUS & PAUL
222 N. SEPULVEDA BLVD., STE 1900, EL SEGUNDO, CA 90245

Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
31 U.S.C. Section 3730 et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☒ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influ-enced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Com-modities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accommodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: **CV14-08961**

☐ **ORIGINAL**

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| QUESTION A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes ☒ No | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action? | B.1. Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☒ Yes ☐ No | | ☒ NO. Continue to Question B.2. |
| | B.2. Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | | ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action? | C.1. Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| ☐ Yes ☐ No | | ☐ NO. Continue to Question C.2. |
| | C.2. Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* ➡ | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| QUESTION D: Location of plaintiffs and defendants? | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| D.1. Is there at least one answer in Column A? | D.2. Is there at least one answer in Column B? |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. Enter "Southern" in response to Question E, below, and continue from there. If "no," go to question D2 to the right. ➡ | If "yes," your case will initially be assigned to the EASTERN DIVISION. Enter "Eastern" in response to Question E, below. If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below. ⬇ |

| QUESTION E: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: ➡ | WESTERN ▾ |

| QUESTION F: Northern Counties? | |
|---|---|
| Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? | ☐ Yes ☒ No |

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court?**     ☒ NO     ☐ YES

If yes, list case number(s): _____

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court?**     ☒ NO     ☐ YES

If yes, list case number(s): _____

**Civil cases** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

☐ A. Arise from the same or a closely related transaction, happening, or event;

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY
(OR SELF-REPRESENTED LITIGANT):** _____     DATE: *11. 14. 14*

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |