WATERS, KRAUS & PAUL
Michael Armitage (SBN 152740)
armitage@waterskraus.com
Louisa Kirakosian (SBN 271983)
lkirakosian@waterskraus.com
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California  90245
PH: 310-414-8146

EISENBERG, GILCHRIST & CUTT, P.C.
Robert D. Sherlock (Utah Bar No. 02942)
(Admitted Pro Hac Vice)
rsherlock@egclegal.com
215 South State, Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
ATTORNEYS FOR PLAINTIFF-RELATOR
DAVID VATAN, M.D.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF
AMERICA,
*ex rel*.
DAVID VATAN, M.D.
Plaintiff-Relator,
          v.

QTC MEDICAL SERVICES,
INC; LOCKHEED-MARTIN
CORPORATION, JOHN
DOES #1-10, FICTICIOUS
NAMES
          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No. CV14-8961-PA (SSx)**

**FIRST AMENDED COMPLAINT**

**Jury Trial Requested**

**False Claims Act,**

**31 U.S.C. § 3730 *et seq*.**

# INTRODUCTION

1. On behalf of the United States of America, pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, Plaintiff Relator David Vatan, M.D., files this *qui tam* Complaint against Defendants for treble damages and civil penalties arising from Defendants' conduct in violation of the Federal Civil False Claims Act.

2. This action concerns false, improper, and unlawful billing by Defendant QTC to the U.S. Department of Veterans Affairs (hereinafter sometimes referred to as the "VA"). In an attempt to increase its profile and generate profits, Defendant QTC created and implemented a number of schemes to knowingly and intentionally submit false claims to the VA for services purportedly performed under contracts with the VA.

3. The contracts between the VA and Defendant QTC required QTC to perform competent substantive reviews of veterans' claims files, including but not limited to past claims for benefits, decisions on those benefits, and veterans' medical records to determine if the veterans qualified for benefits or for increased benefits due to earlier eligibility dates or previous conditions rated as "secondary" to another condition but now eligible to be rated as a "primary" condition. The universe of veterans' medical records to be reviewed encompassed not only previously overlooked entitlements but also previously

filed and denied claims where new breakthroughs in science later linked the veterans' ailments to exposure to Agent Orange.

4. QTC was contracted to isolate those veterans' medical and claim file records whose denials were erroneous based on scientific breakthroughs and in accordance with specific criteria set forth by the VA including but not limited to published federal regulations.

5. After isolating and setting aside those veterans' medical records that had erroneous denials, QTC was to advise the VA so that the veterans could obtain further medical review by a health care provider and, if applicable, obtain their owed benefits. These reviews were required of the VA, as further detailed below, due to court orders (the "*Nehmer*" cases) as well as statutes and regulations governing veterans and any harm to them due to exposure to Agent Orange.

6. These reviews were also covered by agreements between the Department of Veterans Affairs and the *Nehmer* class counsel, the National Veterans Legal Service Program, governing previously inadequate reviews of medical records and claims entitlements for the Ischemic Heart Disease/ Peripheral Neuropathy/Parkinson's Disease/Hairy Cell Leukemia (IHD/PD/HCL) review.

7. A separate review was the Peripheral Neuropathy ("PN") review. Due to a change in the VA definition of PN and its manifestations over time, a re-review of PN claims was required.

8. All of these were legally mandated requirements to be performed by the Department of Veterans Affairs. The Department of Veterans Affairs had no discretion in the scope of the requirements and no discretion in whether or not to perform the requirements to specifications.

9. Due to the immense scope of review, the VA delegated this task contractually to QTC. QTC failed to competently provide reviews. Instead, QTC focused solely upon the speed with which the purported reviews were to be completed and the number of files each claim file analyst "completed" in a day in order to fraudulently increase billings to the U.S. government.

## I. JURISDICTION AND VENUE

10. This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

11. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) because Defendants can be found in and transact business in this district. Additionally, this Court has personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. § 3729 occurred in this district. 31 U.S.C.§ 3732(a).

False Claims Act First Amended Complaint

12. Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this district and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this district.

13. Relator's claims and this Complaint are not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party, as enumerated in 31 U.S.C. § 3730(e)(3).

14. To the extent that there has been a public disclosure unknown to the Relator, Relator is "original source[s]" and meets the requirements under 31 U.S.C. § 3730(e)(4)(B). To the extent there has been a public disclosure of any facts or other matters relevant to this Complaint, Relator's allegations herein are based on his knowledge that is independent of and materially adds to publicly disclosed allegations or transactions (if any) and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).

## II. PARTIES

### A. Relator

15. **Plaintiff-Relator David Vatan** is a Medical Doctor who worked as a Claims File Analyst for QTC Services in its VA Services department in Diamond Bar, California. He obtained his undergraduate degree in Chemistry and Biology from Ryerson University in Toronto, Canada in 1995, and his M.D.

from Spartan Health Sciences University, Saint Lucia, West Indies, in 2008. He performed third and fourth year clinical rotations at hospitals in Chicago, Illinois, and has passed the examinations of the Educational Commission for Foreign Medical Graduates (ECFMG) in 2010, as well as the Medical Council of Canada Evaluating Examination in 2010. Relator was employed by QTC from March 11, 2013 until December 10, 2014.

16. As a result of his direct involvement in the processes and events described herein, Relator Vatan has direct and independent knowledge of the false statements and claims that comprised the schemes under which Defendants submitted claims, or caused claims to be submitted, to the Federal Government.

**B. Defendants**

17. **Defendant "QTC": QTC Holdings Inc. and QTC Medical Services, Inc.:** Defendant QTC Holdings, Inc. is a Delaware Corporation doing business in the State of California as the parent corporation of, and indistinguishable from, QTC Medical Services, Inc.

18. Defendant QTC Medical Services, Inc. is a California Corporation operating as a wholly-owned subsidiary of QTC Holdings, Inc. QTC Medical Services, Inc. does business and is now fully headquartered at Diamond Bar, California. QTC Medical Services, Inc. provides services as the largest private contract provider of medical disability valuation and medical record reviews,

particularly under contract to government agencies including but not limited to the VA. It is believed after investigation, therefore alleged, that QTC Medical Services Inc. is the entity through which the services described herein were contracted to be provided. Both Defendant QTC Holdings and Defendant QTC Medical are collectively referred to herein as QTC.

19. **Defendant Lockheed Martin Corporation:** Lockheed Martin Corporation is a Maryland corporation, formed in 1995 by the merger of Lockheed with Martin Marietta Corporation. It maintains its principal executive office at 6801 Rockledge Drive, Bethesda, Maryland 20817. It also maintains major operations in Los Angeles County, California.

20. In 2011, Defendant Lockheed Martin acquired QTC Holdings and all its subsidiaries. All of the medical record reviews described herein as the "*Nehmer* Department" or "*Nehmer* project" were performed at Lockheed Martin's facilities in Diamond Bar, California. Lockheed Martin operates QTC entities as a single component of its enterprise, merged with other components for its accounting purposes, operations purposes, and otherwise. There is no corporate distinction between the management of QTC and that of Defendant Lockheed Martin.

21. **John Does #1-10, fictitious names**, are unknown co-conspirators who, together with the Named Defendants, also participated in and/or conspired

to perpetuate the schemes described herein.  To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals described herein as John Does #1-10, fictitious names, the term "Defendants" shall also refer to John Does #1-10.

## III. FACTUAL BACKGROUND

### A. AGENT ORANGE

22. The facts leading to this lawsuit date back to the United States' involvement in the Vietnam War. During Operation Ranch Hand, a U. S. military operation during the war, the United States government conducted herbicidal warfare in order to kill crops or defoliate vast areas of South Vietnam in an attempt to deprive the Viet Cong of food and vegetation cover. One of the principal components of that herbicidal warfare program, which lasted from 1962 to 1971, was the defoliant that came to be known as "Agent Orange." Operation Ranch Hand involved the spraying of an estimated 20 million gallons of defoliant and herbicide. Agent Orange was used indiscriminately as a defoliant and herbicide, and it contained highly toxic chemicals including the highly toxic chemical Dioxin.

23. In addition to civilian exposures, the United States military suffered a large number of exposures to this chemical including to its ground troops in the area, troops entering areas previously sprayed, and support troops loading or

handling the chemicals. Since its use, Agent Orange has been statistically and scientifically linked with the occurrence of many diseases in those exposed, including (with effective date):

(a) *AL Amyloidosis*--Caused when an abnormal protein enters organs (May 7, 2009);

(b) *Chronic B-cell Leukemias*-- A type of cancer which affects white blood cells (August 31, 2010);

(c) *Chronic lymphocytic leukemia—CLL* (October 16, 2003);

(d) *Chloracne* -- A skin condition that occurs soon after exposure to chemicals and looks like common forms of acne seen in teenagers (prior to 1985);

(e) *Diabetes Mellitus Type 2* -- High blood sugar levels resulting from the body's inability to respond properly to the hormone insulin (May 8, 2001);

(f) *Hodgkin's Disease* -- A malignant lymphoma (cancer) (February 13, 1994);

(g) *Ischemic Heart Disease* --Characterized by a reduced supply of blood to the heart (August 31, 2010);

(h) *Multiple Myeloma* --A cancer of plasma cells, a type of white blood cell in bone marrow (June 9, 1994);

False Claims Act First Amended Complaint

(i) *Non-Hodgkin's Lymphoma* -- A group of cancers that affect the lymph glands (May 19, 1993);

(j) *Parkinson's Disease* --A progressive disorder of the nervous system (August 31, 2010);

(k) *Peripheral Neuropathy, Early-Onset* – Peripheral neuropathy is a nervous system condition that may be characterized by a wide range of symptoms including numbness, tingling or prickling in the toes or fingers in early stages. This may spread to the feet or hands and may cause burning, throbbing, or shooting pain – often worse at night. Other symptoms include pain equally in both sides of the body (in both hands or in both feet), muscle weakness, loss of balance or coordination, and extreme sensitivity to touch. In 1996, based on an Institutes of Medicine report, the VA presumed an association between herbicide exposure during service and "acute and subacute peripheral neuropathy." But the 1996 regulation contained a requirement that acute and subacute peripheral neuropathy appear "within weeks or months" after exposure and "resolve within two years." Under the VA's November 1996 rating regulations, the disease must have been at least 10 percent disabling and manifest within one year of herbicide exposure or one year after the last date

the veteran was in the Vietnam theater of operations.  However, in 2010 the Institute of Medicine concluded that there is evidence of an association between herbicide exposure and "early-onset peripheral neuropathy that may be persistent." Thus, the VA eliminated the requirement that acute and subacute peripheral neuropathy appear "within weeks or months" after exposure and "resolve within two years," and re-identified the condition as "early-onset peripheral neuropathy." This meant that a wide range of possible claims needed re-screening and re-adjudication. This screening task was also contracted to QTC. The final regulation took effect Sept. 6, 2013;

(l) *Porphyria Cutanea Tarda* -- A disorder characterized by liver dysfunction and thinning and blistering of the skin in sun-exposed areas (February 13, 1994);

(m) *Prostate Cancer* (November 7, 1996);

(n) *Respiratory Cancers* (includes lung cancer) -- Cancers of the lung, trachea, and bronchus (June 9, 1994);

(o) *Soft Tissue Sarcomas* -- A group of different types of cancers in body tissues (August 31, 2010);

False Claims Act First Amended Complaint

## B. LEGAL AND REGULATORY HISTORY

24. Following the Vietnam War, many veterans believed that their exposure to Agent Orange, "one of the mostly highly toxic substances known to the scientific community,"[1] caused them to contract debilitating or deadly diseases. Many veterans (or their surviving kin) sought compensation from the VA, claiming that diseases they developed after service in Vietnam were related to their exposure to Agent Orange during military service.

25. In response to the controversy over Agent Orange, Congress in 1984 enacted the Veterans' Dioxin and Radiation Exposure Compensation Standards Act ("the Dioxin Act"). The purpose of the Act was to ensure that disability compensation was provided to veterans "for all disabilities arising after [service in Vietnam] that are connected, based on sound scientific and medical evidence, to such service."  The Dioxin Act regulations and the "presumptive conditions" were embodied in 38 C.F.R. § 3.311(a)(d).

26. However, in February 1987, a group of veterans filed a class action suit challenging 38 C.F.R. § 3.311(a)(d) on a variety of grounds. That case was *Nehmer v. U.S. Veterans' Admin.*, 712 F.Supp.1404 (N.D.Cal.1989). After considering the parties' cross-motions for summary judgment, the Court, in May of 1989, (1) invalidated 38 C.F.R. § 3.311a(d) on the grounds that the VA had used too restrictive a standard to determine whether a disease was

---

[1] *Nehmer v. U.S. Veterans' Admin.,* 712 F. Supp. 1404, 1407, n. 1 (N.D.Cal.1989)

False Claims Act First Amended Complaint

sufficiently linked to Agent Orange to qualify as service-connected, and (2) "void[ed] all benefit decisions made under 38 C.F.R. § [3.]311[a] (d)." *Nehmer*, 712 F.Supp. at 1409, 1416–18.

27. After the district court invalidated the VA regulation, Congress enacted the Agent Orange Act on February 6, 1991. The Agent Orange Act requires the Secretary of the VA to conduct new rulemaking proceedings to determine which diseases are sufficiently associated with exposure to Agent Orange so that veterans with approved diseases receive a presumption of service connection thus entitling them to veterans' compensation under 38 U.S.C. § 1116.

28. Of particular significance is the precise definition of "service connection" and, within that definition, the term "manifest" with respect to these conditions. The competence with which the review was to be completed required, among other things, a thorough understanding of the regulatory term "manifest" as well as a thorough understanding of how these conditions may have been expressed at the early-symptom stages.

29. As stated in 38 CFR 3.307(c), the critical issue is whether the diseases were manifest, not whether they had been diagnosed or even noted in a record within that time frame:

False Claims Act First Amended Complaint

*(ii) The diseases listed at § 3.309(e) shall have become manifest to a degree of 10 percent or more at any time after service, except that ... acute and subacute peripheral neuropathy [subsequently redefined as "early onset" peripheral neuropathy] shall have become manifest to a degree of 10 percent or more within a year after the last date on which the veteran was exposed to an herbicide agent during active military, naval, or air service.   . . .*

*This will not be interpreted as requiring that the disease be diagnosed in the presumptive period, but only that there be then shown by acceptable medical or lay evidence characteristic manifestations of the disease to the required degree, followed without unreasonable time lapse by definite diagnosis. Symptomatology shown in the prescribed period may have no particular significance when first observed, but in  the light of subsequent developments it may gain considerable significance. Cases in which a chronic condition is shown to exist within a short time following the applicable presumptive period, but without evidence of manifestations within the period, should be developed to determine whether there was symptomatology which in retrospect may be identified and evaluated as*

*manifestation of the chronic disease to the required 10-percent*

*degree.*                                             *38 CFR 3.307 (c)*

30. In other words, the peripheral neuropathy review required a complete review of the medical record to determine whether there were symptoms showing that the condition was "manifest" within the time periods. It did *not* require evidence that the manifestation had been diagnosed, nor did it requires the manifestation to have been documented in the medical record within the 12 months after service. A cutoff date for review of the records of 12 months is facially incorrect and voids all such reviews[2].

31. Furthermore, under the Dioxin Act, when the Secretary received a report from the National Academy of Sciences he was required to determine within 60 days "whether a presumption of service connection is warranted for each disease covered by the report" and if he determined that a "presumption is

---

[2] A review of the medical record only up to and including one year post service or post-exposure may not have detected a valid peripheral neuropathy claim. The review required by federal regulation was a review of the medical record and the claim file to determine if there is evidence that the disease was *manifest* within one year. (i.e. showing some symptoms from the wide range of symptoms) – even though the symptoms may not have taken on significance at the time. It does not create a one-year cutoff for examining the records nor a one-year timeline for definitive diagnosis of the condition. Furthermore, the QTC obligation was NOT to determine the degree of impairment – that was an obligation of rating experts within the VA. QTC was charged with determining whether there was any medical or lay evidence of any symptoms.

warranted" he was required to issue proposed regulations within 60 days setting forth his determination and to issue final regulations within 90 days after proposing them.

32. As a result, there are many veterans who filed claims for service-connected benefits during the time period when the *invalid* or (as in the case of Peripheral Neuropathy) *inaccurate* regulations were in effect. These claims were based on a disease that the VA did not *then* properly and completely recognize as directly linked to Agent Orange, but which the VA *now* recognizes is so linked pursuant to its continuously-revised Agent Orange regulations. Those claims were, of course, all denied or, if granted, were granted only as secondary to some other condition, resulting in a mis-adjudication of the claim.

33. In addition, a claim, when filed, may not have been filed to include *a now- recognized presumptive condition* simply because the condition was not on the list. Earlier medical records may have noted symptoms and related conditions but not have specifically used the diagnostic words now recognized. In both of these situations, re-adjudication by the VA is mandated. This re-adjudication requires a re-review of the claim file, including medical records from the veteran's active-duty service records as well as subsequent treatment.

### C. Expansion of Service Connection Presumption to Some "Blue Water" Sailors

34. In addition, the class of individuals entitled to a *Nehmer* presumption of service connection and thus compensation consideration was further expanded to include certain "blue water" Navy personnel. Specifically, many "blue water" sailors whose ships deployed to the seas and waters surrounding Vietnam nonetheless made port calls, entered estuaries, and as part of their deployment came in close proximity to the highly contaminated areas. The VA, in order to implement this broader definition, has published extensive lists of ships that, on specific dates, from their deployment records, entered areas where a presumption of exposure would apply. Sailors on board those ships on those dates who developed a linked condition were nonetheless considered to be part of the *Nehmer* class even though they had not set boots on the ground. This expanded definition would, in some cases, also require re-adjudication of previously denied claims.

35. As can be seen, each time a new disease is added to the list of presumptive diseases and other conditions, the VA is tasked with re-examining previously filed claims to look for these diseases. It is required to examine a veteran's claim file (including medical records, service medical records, and previously filed and adjudicated claims) to determine whether or not evidence exists to support an inference of service connection for a now-covered disease.

36. The veteran need not even have articulated that precise disease in order to fall into the *Nehmer* class. Rather, the VA is tasked with *sua sponte* review to see if such a medical condition previously existed. Thus, the re-examination obligation placed on the Veterans Administration was, and is, monumental.  To accomplish the most time-intensive part of this review (the actual review of the claim file and determination of the existence of evidence of the new condition and service in Vietnam), the VA turned to a contractor.

### D. QTC

37.  QTC has, for a number of years,  been one of the largest, if not the largest, single contractor for the VA. QTC Services has been contracted to provide compensation and pension examinations ("C&P") for the VA under contract. Specifically, the VA contracted with QTC to provide these examinations, including exams for *Nehmer* class beneficiaries. QTC Services has continued, under a number of contracts, to provide services that have been estimated to exceed $600 million for the VA. In 2011, QTC Services was acquired by Lockheed Martin Corporation and operates at this time as a wholly-owned subsidiary of Lockheed Martin.

38. Defendant QTC has, throughout its existence, enjoyed a very close, highly accessible relationship with the Department of Veterans Affairs. VA personnel are, upon departure from government service (including retirement)

frequently employed in similar or related capacities by QTC. VA executive personnel are accessible to QTC leadership at the highest levels. For example, Anthony Principi, a former Navy officer and member of the Navy Judge Advocate Generals' Corps, served as Acting Secretary of Veterans Affairs from September 26, 1992 to January 20, 1993.  Mr. Principi was President of QTC Medical Services Inc. from 1999 through 2001 and was appointed directly from that position to be Secretary of Veterans Affairs, a position he held from January 23, 2001 to January 26, 2005.

39. As part of its range of services for the VA, QTC Services has also performed retrospective claim reviews under the *Nehmer* requirements for the VA. Relator was hired as a "claims file analyst" to work on the *Nehmer* re-review by QTC for a determination of initial potential eligibility for compensation and pension retroactive payments under the newly recognized "Agent Orange" review criteria, under a project referred to as "Nehmer Phase II," as more fully described later in this Amended Complaint.  This initial project involved some 65,000 records from VA regional offices sent to QTC's headquarters and processing operation in Diamond Bar, California.

40. Relator was one of the first hired of the claims file analysts. He was hired on March 13, 2013, just as the first QTC project, IHD/PD/HCl, was ramping up. However, during his on boarding as an employee, he received NO

substantive training on any aspect of the underlying skill set necessary to complete the actual tasks of a competent reviewer of these medical and claims records to comply with the *Nehmer* mandates and the requirements of the VA.

41. Significantly, the review requires the claims file analyst to determine whether other medical information existed that could potentially indicate the existence of a covered condition or a similar condition (i.e. an "inferred" claim for the condition). It also required the claims file analyst to determine eligibility under the *Nehmer* class conditions – now expanded to include some "blue water" sailors. As part of the review, in addition to the claims file analysts' review, licensed physicians were hired by QTC to provide a second set of eyes and also to sign off on the completeness and accuracy of the review and performed by the claims file analysts.

42. This initial review project was to determine those cases that may be eligible for new or additional compensation, or additional lengths of time for compensation for three newly-added conditions to the "Agent Orange" induced disease list: Ischemic heart disease, Parkinson's disease, and B-cell/Hairy cell leukemia ("IHD/PD/BCL"). This project included "review" of approximately 65,000 veteran's claim files.

43. Following the completion of this initial project, the VA tasked QTC with an additional project consisting of the review of another 95,000 files for

eligibility for the newly listed re-defined condition of peripheral neuropathy

("PN"). This review was under way as of the time of the original Complaint

filing. Relator is informed and believes that this project was completed during

the late spring or summer of 2015. Relator was terminated from employment

with Defendant QTC during the course of this project. Based on Relator's

knowledge prior to his termination, the same truncated, cursory, and defective

process is being used with respect to peripheral neuropathy that took place with

the earlier IHD/PD/BCL project.

44. While the final determination of entitlement to compensation and

pension from the VA remained with the VA, as did the final disability rating

determination, the Department sought to contract out the time-consuming

upfront portions of re-reviewing the actual medical records as well as prior

determinations relating to some 65,000 veterans under the IHD/PD/BCL review,

and some 95,000 veterans under a review for PN. Due to the guidance embedded

in federal regulations as well as the Nehmer stipulation and the VA's own

guidance, these reviews, of necessity, required a *knowledgeable* review of each

veteran's entire medical record, and not simply a cursory review of past

determinations.

45. The Relator is informed and believes that QTC received between

$300 and $350 per claim file reviewed. The value of the *Nehmer* review

contracts to QTC, therefore was is estimated by Relator to be between $48 million and $56 million.

46. Relator is informed and believes, and after investigation alleges, that the contracts under which Defendants performed the services described herein were likely prepared in compliance with the requirements of the *Nehmer* settlement and the embodied federal regulations described above. In other words, a full, substantive review of the claim files to determine possible or probable entitlement to further potential compensation or pension consideration was expected, anticipated, and required under the terms of the contract.

47. In conscious disregard of these requirements, and solely in order to maximize its profits and speed of performance of the piece rate contract, Defendants created, established, fostered, rewarded and received payment from the government for performance that was in complete disregard of the substantive contractual requirements and otherwise false and deceptive.

48. Defendants created and manipulated this scheme with full knowledge that the certifications, records and documents created by Defendants in purported performance of the reviews would be relied upon by the VA to either further develop a claim affecting a veteran's entitlement to compensation for Agent Orange exposure diseases, or (if QTC said there was no such evidence) simply shelve a record and take no further action. Thus, every representation in

every folder returned to the VA was absolutely material to the government's

decision not only to pay money to Defendants for the purportedly performed

reviews, but also whether to take further action to fulfill its obligation to the

veterans themselves.

49. As is further detailed in this complaint, Relator is informed and

believes that the contract issued to QTC or the statement of work/work statement

under which these claim files are reviewed is in compliance with the

requirements of the VA, court orders, statutes and the review requirements

embedded in CFR 410 *et seq*.  However, the review process undertaken under

the contract by QTC fails in every material respect to comply with the

requirements of these re-reviews, thus victimizing not only the United States

government but tens of thousands of potentially eligible veterans and their

families.

## IV. STATUTORY, REGULATORY, AND JUDICIAL PROVISIONS RELEVANT TO DEFENDANTS' FALSE CLAIMS ACT VIOLATIONS

### A. THE FEDERAL FALSE CLAIMS ACT

50. Pursuant to the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) *et.*

*seq*., a cause of action arises when any person knowingly presents, or causes to

be presented, a false or fraudulent claim for payment or approval.

51. As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information.  No proof of specific intent to defraud is necessary.

52. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than $5,500 and up to $11,000 for each such claim, and three times the amount of the damages sustained by the government. The Act empowers persons having information regarding a false or fraudulent claim against the government to bring an action on behalf of the government and receive a portion of the government recovery in the case, as well as attorneys' fees and costs incurred in pursuit of the action.

## B. THE DIOXIN ACT

53. The Veterans' Dioxin and Radiation Exposure Compensation Standards Act ("the Dioxin Act"), Pub.L. 98–542 (HR 1961), 99 Stat. 2725, 98th Cong.2d Sess., was passed in 1984 to ensure that disability compensation is provided to veterans "for all disabilities arising after [service in Vietnam] that are connected, based on sound scientific and medical evidence, to such service."

False Claims Act First Amended Complaint

The Dioxin Act regulations and the "presumptive conditions" were embodied in 38 C.F.R. § 3.311(a)(d).

## C. THE NEHMER CASE

54. In February 1987, a group of veterans filed a class action challenging the Dioxin Act regulations on a variety of grounds. This case is *Nehmer v. U.S. Veterans' Admin*.,712 F.Supp.1404 (N.D.Cal.1989). After considering the parties' cross-motions for summary judgment, the Court, in May of 1989, (1) invalidated 38 C.F.R. § 3.311(a)(d), on the grounds that the VA had used too restrictive a standard to determine whether a disease is sufficiently linked to Agent Orange to qualify as service-connected, and (2) "void[ed] all benefit decisions made under 38 C.F.R. § 3.311(a)(d)." *Nehmer*, 712 F.Supp. at 1409, 1416–18.

## D. AGENT ORANGE ACT OF 1991

55. The Agent Orange Act of 1991, Pub.L. No. 102-4, 105 Stat. 11 (1991), 38 U.S.C. § 1116,[3] was enacted after the district court invalidated the VA regulations under the Dioxin Act. The Agent Orange Act requires the Secretary of the VA to conduct new rulemaking proceedings to determine which diseases are sufficiently associated with exposure to Agent Orange so that

---

[3] The Agent Orange Act was originally codified at 38 U.S.C. § 316, but six months later Congress renumbered § 316 of title 38 as § 1116.   See 38 U.S.C.A. § 1116 (2002);  Department of Veterans Affairs Codification Act of 1991, Pub.L. No. 102-83, § 5(a), 105 Stat. 378 (1991).

veterans with approved diseases receive a presumption of service-connection, thus entitling them to compensation, 38 U.S.C. § 1116.

### E. NEHMER CONSENT DECREE

56. Congress enacted the Agent Orange Act on February 6, 1991. Shortly thereafter, the parties in *Nehmer* agreed to a Final Stipulation and Order ("Stip. & Order") which resolved the remaining issues of injunctive and monetary relief for the class. On May 17, 1991, the district court entered the decree, "setting forth VA's ongoing responsibilities for further rulemaking and disability payments to class members." *Nehmer III*, 284 F.3d at 1160. With respect to injunctive relief, the Stipulation & Order set forth the VA's responsibilities with regard to further rulemaking concerning Agent Orange.

57. Under Paragraph 2 of the Stipulation and Order, after reviewing the Advisory Committee's analysis of diseases, the Secretary was to initiate rulemaking in order to determine whether these diseases were service-connected, or alternatively, to defer rulemaking if the information was insufficient. Paragraphs 3 and 5 established the VA's obligation to readjudicate veterans' disability claims whenever the VA in the future finds new diseases to be service-connected under the procedures set forth in 38 U.S.C. § 316(b) (renumbered subsequently at 38 U.S.C. § 1116(b)), and to pay retroactive benefits based on the date that a veteran filed his claim or became disabled, whichever is later. As

result of the VA's rulemaking, the VA has found that a large number of cancers and other chronic illnesses are linked to Agent Orange using the appropriate standard and, as a result, these illnesses have been accorded service-connected status.

### F. VA POLICY AND GUIDANCE

58. In order to accurately process the reviews required under *Nehmer* and its CFR sections, the VA produced documents relevant to the thoroughness required of these reviews, whether those reviews were performed internally within the VA or outsourced to a contractor. The relevant, material criteria were not only related to the actual adjudication of disability ratings, but to the threshold screening of eligible potential recipients.

59. On September 28, 2010 the VA issued two documents. The first was Training Letter 10-04, disseminated to all VA regional offices, with an accompanying *Nehmer* Training Guide (Exhibit 1).  This manual was further revised on February 10, 2011 (Exhibit 2). The second was Fast Letter 10-41 entitled "*Processing of Claims for Ischemic Heart Disease (IHD), Parkinsons Disease (PD), Hairy-Cell Leukemia and Other Chronic B-cell Leukemias (HCL/BCL), and Other Diseases Under Nehmer.*" This guidance letter also contained a detailed checklist for use in evaluating *Nehmer* eligibility under newly-listed conditions (Exhibit 3).

False Claims Act First Amended Complaint

60. In disseminating this training guide to regional offices, the Director of Compensation and Pension services, among other things, stated:

*Resource Centers and Regional Offices, who are responsible for the adjudication/readjudication of Nehmer claims, must strictly comply with the instructions set forth in this letter and the attached Training Guide. It is critical the Nehmer claims be handled expeditiously and correctly. The processing of Nehmer claims requires VA to operate under court-imposed deadlines. Failure to comply with instructions could result in court-ordered sanctions against VA and /or VA officials.*

### G. "INFERRED" CLAIMS

61. The VA also clearly recognizes its retroactive re-review obligation each time a new disease is determined to be service-connected, and its obligation to substantively review the medical record for evidence of a condition which could infer a claim for that condition. VA Training Letter 10-04 (Nehmer Manual) (VA TL 10-04), states:

*The Nehmer Court has held that the stipulation requires VA to readjudicate all cases in which VA previously denied a class member's claim of service connection for a new presumptive disease.  **A prior denial based on lack of diagnosis rather than lack of nexus falls within the scope of the stipulation's requirement for readjudication.**  This differs from claims in*

*which there was no prior claim or class member status (i.e., no in-country*

*Vietnam service, no "Veteran" status, etc.).* [Emphasis added]

62. The examples set forth in the VA manual further demonstrate what the

agency considers a proper review and disposition of sample cases. For example,

on page 21 of the guide, illustrating the issue of "diagnosis of presumptive

disability," the example states:

> Example 2: *A review of the claims folder shows that an original claim*
> *was filed on April 5, 1995, for service connection for heart disease*
> *(not IHD) and high cholesterol.  The medical evidence for the period*
> *March 1993 and April 1995 showed a diagnosis of high cholesterol*
> *and a history of heart disease.  Development action(s) was not*
> *undertaken and the SC [service connection] claim was denied in June*
> *1996.  Based on these facts, VA failed to confirm a diagnosis and the*
> *Nehmer stipulation requires that we readjudicate claims for new*
> *presumptive conditions that were previously denied.*

63.  Likewise, on page 29 of the same guide, the example states:

> Example 4: *The Veteran filed a claim for hypertension and the*
> *medical evidence of record indicated treatment for a heart condition*
> *with medication.  The claim was denied for hypertension only.  In this*
> *situation, there is an indication that the Veteran had a heart*

*condition.  Based on these facts, the Veteran would be considered a*

*Nehmer class member and readjudication of the claim is required.*

64. It is evident, therefore, that in order to properly determine whether the case should be referred back to the VA for possible  readjudication,  a substantive review of the medical record, with sufficient knowledge of medical conditions, terminology, and documentation  is necessary.

65. Each of these scenarios would give rise to a referral for further development or re-adjudication, and each illustrates an expectation of a thorough review of the record to determine whether medical evidence in the possession of the VA would give rise to the need for further review for the newly listed condition.

66. None of these documents of guidance, however, were provided to, referenced by, or even alluded to during Relator's training and "on boarding" to the tasks at QTC. In fact, QTC provided no substantive training whatsoever to its claims file analysts, including Relator, on any substantive aspect of the *Nehmer* obligation, which would, of necessity have included the medical conditions' symptoms, related conditions, language to look for in the records, the *Nehmer* case itself, its mandates, any of the documents or guidance which the VA had developed for its *own* reviewers prior to the outsourcing of the critical and material portion of that review. QTC provided *no training on the substantive*

*knowledge database* necessary to read old medical records, current diagnostic terms, or symptomology relevant to these conditions, and the like.

67. Despite having actual knowledge of the existence of these training documents, actual specific training material for QTC from the VA, and ready access to the VA for any needed materials or documents, Defendant QTC made no reasonable effort to provide any material necessary training to its claims file analysts or the physician reviewers.

## V. DESCRIPTION OF FRAUDULENT SCHEME AND PRACTICES

68. As previously noted, in order to deal in a timely manner with the expanded definition of "covered disease" entitled both to compensation and presumptive service-connection from Agent Orange exposure, and due in part to the expanded workload the VA has faced due to disability claims arising from the Iraq and Afghanistan conflicts, the VA contracted with QTC to perform retrospective chart reviews for the more recently designated Agent Orange exposure conditions.

69. The contracted services were specifically designed to perform a time-consuming up front portion of the disability review process, namely the review of the claim file (including the service treatment record) for a determination of the following:

(a) Vietnam service entitling the veteran to a presumption of service-connection;

(b) a review of previous claim file submissions and rating decisions on those claims to determine if a previous claim for a now-included condition was granted or denied, and the circumstances surrounding that;

(c) a new *sua sponte* review of the medical record by a claims file analyst to determine whether or not medical or lay evidence exists in the record to support the possible existence of the now-covered condition(s) at any time either during service or subsequent to service sufficient to justify a referral for further adjudication by the VA itself;

(d) medical review verification by a licensed medical doctor confirming the results of the review and data analyzed by the claims file analyst.

## A. RELATOR'S EXPERIENCES AT QTC

70. Relator Dr. David Vatan was interviewed for a position as a claims file analyst on February 22, 2013, at Defendant QTC's main office. He was interviewed for the position by Ms. Felishka Ashley, Operations Manager at the "*Nehmer*" Department of QTC, and Ms. Beronica Ramos, who has since been promoted to *Nehmer* Department manager. During the interview, QTC informed Relator that the *Nehmer* claims files ("C-files") are similar to medical charts.

The claims files, which include the medical records of post-service treatment and evaluation, supporting documents, and the service treatment record (from when the veteran was on active duty) vary in size and thickness from under 3 inches to many volumes comprising 10 or more inches in thickness.

71. Ms. Ashley informed the Relator that the *Nehmer* project was new to QTC and that there were about 10 people on the project at that time. They were expecting to hire an additional 50-60 claims file analysts for the project. (Other claims file analysts confirmed to Relator that the expectation was that there would be an extra 50 more analysts added to the department.) The added personnel never materialized and the number of claims file analysts at any time remained about 20**.**

72. As quickly became evident to the Relator, QTC's process was not focused on accuracy, completeness, or competency of the reviews. It was focused solely on the volume of files reviewed and signed off by each analyst and a physician during each work day. As noted, at the time of Relator's hiring, QTC believed they would need 40 to 60 analysts to complete the project. However, during Relator's entire tenure, QTC never hired more than about 20 analysts to perform these reviews. Rather, QTC simply increased the required formal or informal "production quota" for each CFA.

73. In addition, Relator is informed and believes, and thereon alleges, that when QTC sought to rapidly complete the PN review project, it simply reassigned other QTC employees at the Diamond Bar facility to complete reviews. These other employees may have had little of no medical background and held completely unrelated administrative positions. These personnel also received no substantive training on the nuances of the actual substance of the required review.

74. Ms. Ashley told Relator that QTC had been receiving files from the VA for about a month. She said that the expectation was that a claims file analyst would review about 7-10 files per day.  This requirement was consistent with a reasonable expectation of workload to review a claim file and develop a claim. Because proper review of each of these files required examination of the previous medical records and claims filed *in their entirety*, the proper completion of the contractual, statutory, and regulatory requirements required both a review of the file and a determination of whether the conditions were reasonably linkable to a presumptive *Nehmer* condition.

75.  The time necessary to complete such a review was considerable, as evidenced by the original QTC expectations.  For example, on January 29, 2008, QTC's senior vice president of operations, Dr. Margie Shahani, testified to the House Committee on Veterans Affairs, that the VA's own  goal for each rating

specialist is to rate an average of 3-4 cases per day. In 2006, QTC interviewed experienced claims examiners to determine the time necessary to perform a competent review of a claim file. The initial review of the c-file took 20 minutes, the linking of any the evidence in the file to the claimed conditions took 85 minutes, and determining severity and service connection took 40 minutes. It took over an hour to write the rating decision. Thus, it took an experienced, competent VA reviewer 3.5 hours to perform these tasks.[4]

76. While the QTC reviewers would not be responsible for accomplishing all of these elements they nonetheless would be required to undertake a detailed review of the claim file (Step 1, 20 minutes), locate evidence in the file to link it to the claimed conditions (part of Step 2, approximately 40 minutes), and determine some level of service connection (part of Step 3, approximately 20 minutes). Based upon Dr. Shahani's testimony on behalf of QTC, a typical proper *Nehmer* review, such as those that claims file analysts like Relator were expected to carry out, would require between 60 and 90 minutes, plus time to enter the data into the QTC electronic tracking system.

_____

[4] *The Use of Artificial Intelligence to Improve the U.S. Department of Veterans Affairs' Claims Processing System,*     Hearing Before The  SUBCOMMITTEE ON DISABILITY ASSISTANCE AND MEMORIAL AFFAIRS,   U.S. HOUSE COMMITTEE ON VETERANS' AFFAIRS, 110 Cong. 66 (2008)(Statement of Marjie Shahani, M.D., Senior Vice President, Operations QTC Management, Inc., Diamond Bar, CA )

77. As a result, the stated estimate of seven or eight case files reviewed by a claims file analyst in a typical workday was a reasonable expectation. This, in fact, is in the range of expectations communicated to the Relator and other early-hired claim file analysts for QTC.

78. Relator began work on March 11, 2013. Aside from Ms. Ashley, there was a supervisor, Mr. Steve Park, who supervised the daily activities and scheduling. Mr. Park told Relator that *only 5 to 7 claim files were expected to be delivered as reviewed by a claims file analyst per day.* Based upon Relator's personal knowledge and conversations with other early-hired CFA's, other analysts who were part of the initial hiring were also told that at their 3 month point they were expected to review and deliver 7 files per day.

79. Mr. Park was replaced by Mr. Preetideep Singh. Mr. Singh is a Foreign Medical Graduate similar to Relator.

80. The *Nehmer* Department is organized into 4 mini-teams. Each mini-team has a mentor/leader. Ms. An Tanag was the team mentor for Relator's team.

81. Shortly after commencing work as one of the earliest-hired claims file analysts, Relator learned, however, that Defendant QTC had created a system, produced guidance, and created workload expectations that were focused solely

upon the *speed* with which a veteran's claim file could be returned as "completed" to the VA, and thereby maximize compensation to Defendant QTC.

82. For instance, Relator soon realized that the *actual QTC expectation* was that a claims file analyst would review up to 20-25 files per day, and some CFAs purported to do so. In furtherance of this scheme, Defendant QTC (in order to maximize its payment and minimize the amount of time it took to perform the contractual obligations), engaged in the conduct described herein.

83. As a result, the entire *Nehmer* review project (including the IHD/PD/BCL review and the PN review) comprising some 160,000 VA claim files lacks any integrity. The Government  is completely unable to rely upon the review for compliance with the *Nehmer* court orders, federal law, or federal regulation. Thus, the entire project is without any value to the government.

**B. DEFENDANTS' CONDUCT AND ACTIONS IN FURTHERANCE OF THE SCHEME**

84. The specific types of conduct underlying the scheme include each of the following categories.

**(1) QTC produced and disseminated review guidance that knowingly truncated, omitted, and misstated VA requirements for reviews.**

(a) The IHD/PD/BCL Review

85. In April 2012, the National Veterans Legal Service Program (NVLSP), *Nehmer* class counsel, complained to the Department of Justice that VA's process

to identify *Nehmer* class members was flawed because VA failed to search for veterans who had been granted, rather than denied, service connection for one of the 3 new presumptive conditions prior to October 13, 2009.  In May 2012, in response to NVLSP's complaint, the VA identified additional eligible cases for Vietnam veterans who were *granted* service connection for IHD, PD, or BCL between September 25, 1985 and October 13, 2009, but were not among the initial 150,000 cases reviewed under the *Nehmer* court orders. These veterans might be entitled to additional compensation under *Nehmer* under several situations. This could occur in a variety of circumstances, including but not limited to the following: (a) the veteran had filed an even earlier explicit claim that had been denied, or (b) service-connection was originally granted because the condition was aggravated by another service-connected condition, but the evaluation and compensation was discounted to represent only the level of aggravation.

86. The VA eventually determined that there were 64,425 newly identified Nehmer class members entitled to the Phase II review as described above. These cases were those sent to QTC to screen for potential entitlement to *Nehmer* benefits. The VA originally anticipated that only 10 to15% of these cases would require *Nehmer* readjudication. However 243 cases were screened by QTC between August 9, 2012 and December 7, 2012. Of those cases, 73 were identified

by QTC to be forwarded to VA for readjudication. This actually resulted in a "positive identification" rate of not 10 to15%, but of 30.04%. [5]

87. In addition to the previously described VA guidance documents, the Department of Veterans Affairs also produced specific guidance for the Nehmer Phase II review performed by QTC. This document, entitled "Department of Veterans Affairs, Veterans Benefits Administration (VBA), Nehmer Training Guide for QTC," (Exhibit 4) specifically described the Phase II review, and was provided to QTC to guide their performance of the review. In addition, it was provided to the Nehmer class counsel as a representation of the review undertaken under the direction of the Department of Veterans Affairs in compliance with the agreed upon Nehmer requirements. Among the contents of this document were detailed descriptions of the conditions under review, as well as specific, question-by-question guidance for properly completing the review and its accompanying checklist.

88. The checklist, "Agent Orange Screening Checklist" for IHD/PD/BCL (Exhibit 5), assumed that the reviewers had knowledge of the symptoms and related indications of complex medical conditions (such as ischemic heart

---

[5] This sample of cases can be statistically extrapolated to the entire "population" of 64,425 cases. Using a random sample size of 243 and a positive occurrence rate of 30%, there is a 90% probability that the true rate of positive identification for readjudication should fall between 20% and 40%, NOT 10 to15%. (RatStats Statistical Program, Department of Health and Human Services, 2010 version).

disease or related conditions, Parkinson's disease and other neurological disorders, and leukemia, in addition to peripheral neuropathy). It also presumed access to very early medical records from the Vietnam war and post-Vietnam era, and ability to accurately interpret diagnostic tests. It also required certification that there was an appropriate and complete review of the claim file and medical record.

89. Claims file analysts were not provided copies or working instructions for either of the VA manuals, or even the specific guidance provided by the VA to QTC (i.e. Exhibit 4). Rather, claims file analysts were provided a document entitled "*Nehmer* Reference Manual" that was prepared by QTC on July 16, 2013, (Exhibit 6). QTC utilized this document as an official instruction manual provided to all claims file analysts. This document provides substantive, material guidance to claims file analysts on the completion of the checklists and processes in the IHD/PD/BCL.

90. Along with this reference manual prepared by QTC, claims file analysts were required to complete the previously discussed "Agent Orange Screening Checklist" for IHD/PD/BCL (Exhibit 5).

91. Prior rating decisions, of course, were never intended to cover the *newly-added* conditions or *newly-redefined* conditions. These prior decisions were also not intended to cover, or were in error in covering, the reviews that

False Claims Act First Amended Complaint

were mandated by the NVLSP–VA agreement described above, which resulted in the very review process undertaken by QTC. In fact, it was the defective review and screening that necessitated the new review process.

92. A simple comparison of a single part of the actual VA guide for QTC against the QTC guidance provided to their own reviewers demonstrates the gross and intentional misrepresentation of the review undertaken by QTC. The VA Nehmer training guide for QTC, in discussing question 6 on the checklist ("Was the entire claim folder reviewed?") states:

> *The entire Claims Folder should be reviewed to ensure the documents in the file are in chronological order, and then the volumes with evidence or correspondence dated September 25, 1985 to the present must be thoroughly reviewed to determine if there is a potential basis for entitlement to additional benefits based on the presumptions of service connection for IHD, PD, and HCL/BCL. Service Treatment Record envelopes would not need to be opened and reviewed by QTC staff, as they are not relevant to this review.*

93. Further, the QTC guide advises the CFA that the answer to checklist question 6, "was the entire claims folder reviewed" will always be "yes." Specifically, the manual provides:

*Through the process of elimination the entire c-file is reviewed. Service treatment records in c-files are not required to be reviewed, but they can be used to substantiate a diagnosis.* [6]

94. As a result, a very high percentage of the IHD/PD/BCL Agent Orange screening checklists were certified as reviewed and returned to the regional offices with no further analysis.

95. The guide and checklist were used by QTC solely for the purpose of expediting the review process by only actually requiring the time-saving review of prior rating decisions which were printed on colored paper in the file and thus easily locatable, rather than complying with the VA's own mandate (as well as a mandate discussed elsewhere in the QTC guide) that:

*For Nehmer purposes medical evidence can result in an award without a formal claim being filed. They do not constitute a claim by themselves, but if we have such medical records at the time we receive a separate service*

---

[6] It should be noted that, by VA definition, the service treatment record is part of the claim file, but the claim file (c-file) includes ALL evidence in the possession of the VA. This includes: military administration, compensation and pension (C&P) exams, any records pertaining or C&P exams, VA medical records,  military medical records,  private medical records,  entrance and separation exams, ratings decisions and statements of the case, statements in support of a claim, hearing transcripts, Social Security Administration records, and any other miscellaneous information.

*connection claim the condition shown by the medical record is part of that claim.* QTC Nehmer Reference Manual, Checklist Guide, page 8.

96. QTC was and is aware of its obligation to actually substantively review the medical record for evidence of the conditions newly determined to be presumptively service-connected, and to further appropriately adjudicate veterans' claims. This evidence could be submerged in diagnostics studies, medical notes written in many different ways and at different times, including during the veteran's active duty service or afterward. However, the checklist itself obviates the need for that review by only creating eligibility for claims filed after the effective date of *Nehmer*, or 1985, and the described flow will *invariably* result in the lack of a need to review the medical record despite affirmative certification by the claim file analyst and the reviewing physician that the entire file was reviewed.

### (b) The Peripheral Neuropathy Review

97. The Peripheral Neuropathy review project, while also requiring a review of veterans' claims files, was substantively different than the IHD/PD/BCL review. As previously described, this review was necessitated by a regulatory re-definition of the disease itself, its onset, etiology, symptomology, and progression. Peripheral neuropathy may be characterized by a wide range of symptoms. When the VA eliminated the requirement that acute and subacute

peripheral neuropathy appear "within weeks or months" after exposure and "resolve within two years," and re-identified the condition as "early-onset peripheral neuropathy" a wide range of possible claims needed re-screening and re-adjudication. This screening task was also contracted to QTC and involved some 95,000 veterans' claims files.

98. However, for the peripheral neuropathy review project, no similar "*Nehmer* Manual" was provided to the claims file analysts, nor were the claims file analysts provided copies of any VA guidance or training in the list of possible symptoms the claims analysts were required to seek out. The claims file analysts were, however, instructed to work with the "Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist" (Exhibit 7) to complete these PN reviews. This checklist differed significantly from the IHD project checklist.

99. The necessary substantive review requirement, including but not limited to the process underlying the completion of the PN checklist and its express certifications, presumed that the reviewers, most of them lacking in any medical training, had knowledge of the symptoms and related indications of peripheral neuropathy, access to very early medical records from the Vietnam war and post-Vietnam era, and were able to accurately interpret diagnostic tests, subtle clinical symptoms, and the like. The process, and the completion of the

review, required express certification to the government that there was an

appropriate and complete review of the claim file and medical record.

100. The required review, as expressly stated in the Peripheral Neuropathy

Screening Checklist as well as in the QTC contractual obligation, stated among

other requirements,:

> *Is there any objective or lay evidence in the Claims Folder that*
>
> *suggests  PN manifested itself during military service within 1 year of*
>
> *last exposure and/or prior to May 8, 1976 (whichever is earliest)?*
>
> . . .
>
> > • *If NO, then you are certifying that a review of the evidence*
> >
> > *of record reveals no complaints, symptoms, or diagnoses that*
> >
> > *may be related to Early-Onset PN.*
>
> *a. Date of Symptom Onset or Diagnosis:_____*
>
> *b. Diagnosis from Evidence in Folder: _____*
>
> *c. Source of Objective Evidence, (e.g., facility name): _____*
>
> d. *Other Evidence, (e.g., lay statements): ___ _____ _*
>
> *Potential for Eligibility for Presumptive Consideration?*
>
> *NOTE: If the answer to #6 is YES for evidence in folder,*
>
> *then you must choose YES below for potential*
>
> *presumptive eligibility. Also, if PN that began during*

*military service, within one year of last exposure and/or*

*prior  to May 8, 1976 is chosen in #5c, then you must choose YES*

*for potential presumptive eligibility.*

101. The PN Checklist also required a specific certification, quoted below, and specifically referred to VA TL 10-04.

*8. SUMMARY OF CASE REVIEW: Use this section to supplement*

*the information provided above and note any special circumstances*

*present in this case. This includes any special or unusual factors*

*that relate to whether the individual in question qualifies for*

*consideration as a Nehmer class member based on the*

*manifestation of PN during service, within 1 year of last exposure*

*and/or prior to May 8, 1976 (whichever is earliest). In addition,*

*this section may include a detailed statement setting forth an*

*explanation for whether this case meets criteria for further review*

*under Nehmer pursuant to the Nehmer Training Guide Addendum*

*for Early Onset Peripheral Neuropathy (addendum to TL 10-04).*

Despite requiring this specific certification, VA TL 10-04 (or any addendum) was never provided to the CFAs, nor was any training or other guidance on its material contents provided to CFAs.

102. The PN Checklist was slightly amended during the course of the project. This amendment actually emphasized what kind of subtle evidence may exist to warrant referral for possible adjudication – including a specific need to be alert to what the early symptoms of PN could be even in the absence of a specific diagnosis:

> *Is there any objective or lay evidence in the Claims Folder that suggests PN manifested itself during military service* ***which, for example, could include PN  symptoms or a PN diagnosis*** *within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest*)?*                              [Amendment added the bold text]

103. Despite this amendment, no additional or updated  training was provided to any reviewers on the substantive medical aspects of peripheral neuropathy and its etiology despite a specific reference to PN symptoms. The same claims file analysts remained in the project and the speed of chart review remained high.

104. The VA guidance for Nehmer reviews, which was not only known by QTC to be relevant and pertinent to their reviews but also was specifically referenced in the Peripheral Neuropathy checklists and certifications, makes clear the requirement for a thorough, complete review of records themselves, *not* simply prior rating decisions:

> *Effective date: . . . The date the original claim was filed or arose,*
> *whichever is later, even if it was before the effective date of applicable*
> *regulatory presumption, and without regard to finality of prior denial(s)*
> *. . . .*
>
> *Need to File Claim: . . . The claimant need not file a new claim or*
> *a claim for earlier effective date when new presumptive condition is*
> *added. VA must search its records to find eligible claimants and award*
> *benefits, without action on the claimant's part. Medical records noting the*
> *existence of a condition later made presumptively service-connected can*
> *in some instances, result in an award without a formal claim ever being*
> *filed . . . .*   VA TL-10-04 and Nehmer Manual, page 10

This requirement for a complete and thorough review of medical records to determine medical conditions was completely ignored in QTC's development of its processes and training of its claims file analysts.

**(2) QTC knowingly failed to provide adequate training to claims file analysts to enable CFAs to perform the reviews.**

105. As noted previously, during Relator's entire tenure at QTC, and particularly prior to his assuming actual substantive review of veterans' medical files, Relator and all other claims file analysts received no substantive training on the completion of the project, how to review the medical records, medical terminologies that may have been used or archaic terminologies that may appear

False Claims Act First Amended Complaint

48

in a service treatment record, nor any other substantive guidance on the actual review process necessary to comply with either federal law or the VA's regulatory requirements. Instead, training focused heavily on the electronic data entry process itself and how to speed processes through in order to maximize the number of veterans' claims files that could be claimed by QTC to have been processed during a workday. Some of the training provided related to other areas of work within QTC, so that analysts could be moved to other areas when work was slow.

106. Thus, such 'training' as QTC provided was not relevant to the review process. It was primarily focused on the QTC eProcess and operations. The purpose was to expose the analysts to other areas of work at QTC. At times the delivery of c-files from the VA to QTC was slow, so during such times claims file analysts were assigned duties in other departments. There were no other trainings or guidance relating to *Nehmer* review.

**(3) QTC encouraged, rewarded, and monitored only the speed and volume of "reviews," not completeness nor accuracy.**

107. At the core of this scheme was a concerted and knowing process of encouraging, rewarding, and monitoring only the speed with which the reviews were performed and the number of files cleared each day with no regard to the accuracy or completeness of the review.  In its effort to maximize revenue from the *Nehmer* Review projects, defendant QTC, with the full knowledge and

False Claims Act First Amended Complaint

support of its senior management, undertook numerous programs to give incentives, rewards, and encourage maximum speed in analyst review of charts, incentivizing and rewarding large numbers of charts reportedly "cleared" each day without regard to the quality of those reviews. Accuracy and completeness of the reviews were never incentivized, rewarded, reviewed, or monitored.

108. For example, throughout the months of December 2013 and January 2014, the claims file analysts purported to "review" up to 38 charts per day. A review of performance statistics clearly reflects a completion rate and racing form mentality that could not reasonably be achieved if the claims file analyst actually performed the required medical review of the file.

109. In order to maximize numbers, the project supervisor, Ms. Felishka Ashley, routinely distributed daily and weekly performance statistics for each individual and each team.

(a) For example, on December 12, 2013, compilation of results and quotas, it was noted that each team had an expected goal. On that day, the publication of the goals, achievements, and next day's goals also reflected that there was "a minimum individual goal of 15" and highlighted in yellow "those not met by individual analysts." On that day, one claims file analyst reported to have properly reviewed 31 files in a work day.

110. The same system of direct and indirect incentives for speed of performance unrelated to quality and thoroughness continued into the peripheral neuropathy review project as well.

(a) For example, on August 12, 2014, the vice president of operations for VA services emailed the VA service team to note that the group had completed a large number of files in a single day, and states, "Very good, keep it up. Thank you."

(b) In preparation for the Labor Day weekend 2014, the claims file analysts were informed that if they increased production to double their daily numbers they could take a 3 day weekend during the Labor Day holiday. If they could not double their daily numbers, they were required to come in on the Saturday of the Labor Day weekend to continue reviewing files.

111. The chart completion checklists, contained explicit certifications of substantive review of the subject chart, and a signature block not only for the claims file analysts but also for a physician reviewer. This physician reviewer requirement block was present on both the IHD/ PD /HCl review and the PN review checklists. By signing this sheet, the physician reviewer was certifying the actual work of the claims file analysts and its conclusions, and certifying that the physician concurred therewith.

False Claims Act First Amended Complaint

112. Relator is informed and believes that the physician reviewer requirement and signature block was, directly or indirectly, a requirement of the VA contract for the reviews by QTC, and would have a natural tendency to create an appearance of  authority for the competence and medical accuracy of the review. The presence of the physician signature would have a natural tendency to influence the decision to pay for the review of the chart, as evidence of its completion, and was this material to the contract. It further represented a certification that the physician had, in fact, at least substantively checked the claims file analysts work for accuracy, and would have been so understood by both the Department of Veterans Affairs and the veteran him/herself.

113. Thus, the physician reviewer's signature would have a natural tendency to influence not only the Department of Veterans Affairs concerning a payment for completion of that chart, but certainly a natural tendency to influence the actual beneficiary of the contract, i.e. the veteran. The signature of the physician concerning the review was designed and intended (in the best case) to certify a knowledgeable medical conclusion concerning entitlements. In the worst case, it nonetheless created an air of apparent authority to the conclusion reached by the claims file analyst.

False Claims Act First Amended Complaint

114. Thus, the physician reviewer's signature would have a natural tendency to influence an objective reviewer whether to pay for the chart review, and was thus material to the claim.

115. In addition to the speed emphasis for the claims file analysts, the reviewing physicians, who were supposed to check the work of the claims file analysts, were also lured into the work by a promise of easy work and high earning capacity. However, the original solicitation for physician reviewers placed by QTC on April 13, 2013 (on the USA Doc Jobs website)(Exhibit 8) reflected QTC's knowledge of a requirement for the physician reviewers to perform actual substantive quality/completeness reviews, albeit after the claims file analyst had located relevant portions in the file. Under no circumstance was there an expectation that the Physician Reviewer would simply rubber stamp a file:

> *QTC was recently asked by the VBA to assist with a yearlong project. This project is very different then our normal exams that we currently do for the Department of Veteran Affairs.*
>
> *NEHMER Agent Orange Case File Review*
>
> *We are looking for providers that can work 4 - 8 hours at a time. We have a need providers [sic] to start as soon as possible. You would come to our QTC Bridge Gate building in Diamond Bar, CA and*

*complete these case file reviews in a secured room. All pertinent*

*information has been tabbed by one of our claims file analysts*

*beforehand.*

*Fees: OTC will pay you per case file reviewed. You can see anywhere*

*between 4 to 6 cases an hour (you will pick up speed). If you are able*

*to work a full 8 hour day QTC will ensure you make a minimum of*

*$600 a day. If you see 5 cases an hour, 8 hrs a day you could make at*

*least $1000. . . .*

116. It was not uncommon for review physicians to sign off on 60-80 or

more files per day. Physicians were encouraged and rewarded by a piece rate

(per file signed off) compensation system which incentivized them to simply

sign off on as many checklists as possible without spending much (or any) time

to review them.

    (a) For example, under the review system established by QTC, a 1

        page case assignment sheet, barcoded for tracking, was attached to

        each claim file. The checklist itself and the case assignment sheet

        were attached together.

    (b) During June, 2014, Relator learned from a coworker that the

        coworker accidently mixed up case assignment sheets and attached

        incorrect/non-matching checklists for 10-15 cases that were given

to physician reviewers for final review. Much to this analyst's surprise and dismay, all of those files were signed by the provider without any issue whatsoever, and were signed by various providers. No provider noticed the checklist they were signing did not relate to the claim file attached to it, and none of those claim files could have actually been reviewed much less approved without noticing the error.

(c) During June 2014, Relator submitted 3 cases with accompanying claim files each totaling in excess of 2,500 pages of medical records for final physician review. All of them were signed and returned to the Relator by the physician reviewer in less than 10 minutes.

(d) In a similar event, on August 8, 2014,  Relator reviewed a claim file containing nearly 2,500 pages or 10 inches of paper equivalent. This review took him 4 hours to complete. He then submitted the checklist to the physician reviewer for confirmation. Five minutes later, Dr. Harry Eisenbach, M.D., contacted the Relator to ask him to scan the barcode on the case assignment sheet. (Without scanning the barcode the provider has no access to the electronic case file including the medical records.)  Relator scanned the

barcode and returned it to the physician reviewer immediately. At

12:20 p.m., or 5 minutes later, the checklist was signed by the

physician and returned to Relator for processing. Obviously, no

actual review of the file could have been performed during that

time.

At no point in this review process was there any back check, systematic

review of random cases, or other process in place to ensure the quality and

completeness of these reviews.

**(4) QTC knowingly required claims file analysts to make material statements and certifications without regard to the truth or falsity of those statements and certifications.**

117. As part of the claims review process, the guidance provided by QTC

to claims file analysts required the claims file analysts to sign and certify review

of the underlying records to the effect that the "entire claims folder was

reviewed" (IHD checklist, question 6). However the guidance provided to claims

file analysts, many weeks into the project, simply instructed claims file analysts

to always mark that question "yes."

118. During the later phases of Relator's employment at QTC, however, a

number of purportedly reviewed files had been returned to regional offices of the

Department of Veterans Affairs. Upon cursory examination of the checklist,

these regional offices discovered  at least 184 charts where the checklists had

been signed as completed yet material blocks on the checklist were not even marked or filled out.

119. On November 13, 2014, Relator and others within the *Nehmer* project received an e-mail from Mary Ann Umali-Abitria, a  Senior Quality Assurance ("QA") Specialist for QTC, concerning the VA's discovery of incomplete Peripheral Neuropathy checklists in files returned to the VA as completed. The email stated:

> *"CFAs and QAs- REMINDER: please make sure the PNR*
>
> *checklist is completed properly especially **Question #7-***
>
> ***FYI-** VA has sent a list of 184 cases that has* [sic] *incomplete*
>
> *checklist that were delivered since June up to November 6.- **All of***
>
> ***them have Q# 7 blank.***
>
> *- For no Vietnam service- checklist was entirely blank. the checklist*
>
> *has to be marked NO for #5, 6, and 7.*
>
> *- Several checklists showed on the summary that there was a claim*
>
> *for PN but Q# 5 is blank.*
>
> *Let us make sure that the checklist is consistent and complete.*
>
> [Emphasis and italics in original]

120. This communication also shows that the checklists were not only incompetently completed but were not even reviewed by the physician reviewer,

since these lists (had they been reviewed by the second reviewer) would have been noticed as incomplete. Nonetheless, they were returned to the VA in this condition after passing *both* reviewers.

### (5) QTC Took Affirmative Steps to Conceal the Fraudulent Non-Processing of Claims and Fraudulent Activities of Their Employed Physician Reviewers in Approving Reviews

121. In addition to the previously described actions to conceal the underlying fraudulent activity surrounding the review and documentation of review of claim files, Defendants have taken affirmative action to conceal such activities from other employees (including Relator) and to threaten, harass, and marginalize employees who point out Defendants' knowing support and endorsement of the fraudulent activity. For example, during the month of September 2014, several claims file analysts' desks were in close proximity to the physician reviewers.

122. During the course of his duties, a co-worker of  Relator, Daniel Lanuza, witnessed a physician reviewer, Dr. Harry Eisenbach, simply signing off checklists without even opening the service treatment records for the peripheral neuropathy review. As a co-worker and friend, Mr. Lanuza informed Relator of this event. Later, on October 2, 2014, Mr. Lanuza confronted Dr. Eisenbach and reminded him he needed to pay attention to the review process and that he (Lanuza) had personally witnessed Eisenbach skipping steps.

123. The next day, Friday, October 3, 2014, a meeting was held in which the supervisor, Ms. Ramos, indicated that the claim files would not be put on floors and that the physician reviewers would be moved to the end of the row where CFAs could not observe their activity.  In apparent retaliation for the conversation between Lanuza and Eisenbach of Thursday, October 2nd, the employed physician (Eisenbach) made a complaint about Lanuza to management claiming that Lanuza had referred to Dr. Eisenbach by his first name (Harry) instead of by his title (Dr. Eisenbach). That same afternoon (October 3rd) Ms. Ogie Ubungen, QTC's Vice President of Operations, confronted Lanuza and strongly counseled him about allegedly referring to Eisenbach by his first name. Not coincidentally, the same day, Mr. Lanuza received a letter threatening disciplinary action because of his productivity performance.

124. The next work day, Monday, October 6, 2014, Relator forwarded to appropriate individuals within QTC his concerns about the review process of the medical records and the failure of the physicians to actually review the files. The recipients of his concern included Jason Schibel, CEO of QTC Management; Frenorgin Ubungen, Vice President of Operations at QTC Management;  Kerrie Schuster, an Ethics Officer at Lockheed Martin;  and Donna Brown, the human resource director for QTC Management.

125. Relator received two direct responses to his concern. First, the CEO of QTC, Mr. Jason Seibel, responded within 15 minutes (Exhibit 9) His response stated,

> . . . *For the record your continued focus on responsibilities outside your job description is representative of creating a disruptive work environment—including for your peer, functional and clinical staff. Given the volume and focus intensity for others outside your position scope, I have concerns about your ability to effectively deliver high quality reliable work on behalf of our customers. I kindly ask you, focus on the job at hand. Please permit our processes to review the STR concern you have raised.*

126. Secondly, Relator received a response from Kerrie Schuster, ethics officer for Lockheed Martin. (Exhibit 10). This cursory and pro forma email stated:

> *Mr. Vatan, thank you for letting me know about this. I have verified that appropriate individuals are addressing the matters you described below. I will continue to follow this situation and advise leadership and HR as warranted. Again, thank you for bringing these concerns forward.*

127. However, not coincidentally, on Thursday, October 9th, Relator received an email and letter from Ms. Ramos, advising him that he was placed

on a productivity improvement plan, counseling him that he must meet a minimum expectation of delivering 12 cases for every 8 hours worked. If this did not happen, i.e., if he did not "improve his performance," disciplinary action was threatened. Further, the email accompanying the subject letter stated that "a claims file analyst should be able to deliver, on average, between 12 and 15 cases per 8 hours worked" (Exhibit 11).

128. The communication chain from the top levels of QTC indicate a strong desire to silence Relator and co-workers who pointed out the defective processes,  to hide the fraudulent clearance of files, and to intimidate employees who raised concerns to outside entities or to QTC/Lockheed corporate management. Indeed, the President of QTC informed Relator that he was creating a "disruptive work environment" by even attempting to point out these deficiencies. As such, Defendants have engaged in a deliberate, willful, and conscious disregard of the claim review obligations and attempted to silence those who have tried to point out these deficiencies as well as keep the entire scheme hidden.

## VI. EXAMPLES OF SPECIFIC FRAUDULENT REVIEWS BY DEFENDANTS WHICH VIOLATE THE FEDERAL FALSE CLAIMS ACT

129. Beginning shortly before Relator's employment commenced, Defendant QTC began receiving the "*Nehmer* re-review claim files" for the

IHD/PD/BCL conditions. The claim files were all sent to the "*Nehmer* Department*," which had been newly established at QTC headquarters at Diamond Bar, California. The claim files were sent from various VA regional offices around the country. The claim files ranged in size from under three inches in thickness to many volumes over six inches in thickness. Some of the files contained service treatment records, while some did not. QTC instructed its claims file analysts to apply different "codes" to their reviews depending on whether the code for the claim file reviewed was under three inches thick or more than three inches thick.

130. Under the IHD/PD/BCL review, the claim file analysts purportedly performed reviews of the claim files. These reviews were supposedly completed, and the QTC checklist inserted into the record. Those records were then returned to the VA regional office from which they had been received with a cover sheet certifying that the chart had been screened.

131. When the peripheral neuropathy (PN) review commenced, some of the records that had been previously reviewed under the IHD project were again reviewed by the QTC *Nehmer* Department in Diamond Bar, California, because the VA record needed a further re-review for the PN diagnosis. As a result, in the ordinary course of Relator's work, he received for PN review some files that had been reviewed by other CFA's at QTC under the IHD project. These files

had not been further processed by the VA since that time because the earlier review found no evidence to prompt further development of the claim. Documentation to that effect remained in the file, as signed by both the CFA and reviewing physician.

132.  In the course of Relator's review of these claim files, and in investigation of the facts that lead to this complaint, Relator (from his perspective as a medical doctor and thus a knowledgeable reviewer) undertook a further review of the file to determine whether the earlier review by QTC for IHD/PD/BCL was accurate. In the course of these re-reviews by Relator, he found uniformly that evidence had not been reviewed, developed, recognized, or noted that would have entitled the veteran to further development of their claim under the IHD/PD/BCL review criteria. The following are specific examples of these cases; [7]

(a) **Veteran D.J.B**. This veteran should have been deemed Service Connected (SC) for Coronary Artery Disease *secondary to Diabetes (DM)* effective 01/10/2006. The evidence in the claim file shows that he had complained of chest pressure and a Cardiology consult confirmed this diagnosis on 10/09/2003. The QTC reviewers missed this evidence

---

[7] The precise identity of these Veterans contains potentially protected individually information under 38 U.S.C. § 5701(a) , 7332.  In order to protect the privacy of the claimants, they will be referred to by alphabetical identifiers. The actual information has been provided to the U.S. Attorney with this Complaint.

and did not refer this case to VA for further adjudication as they should have given Veteran D.J.B.'s symptoms. Veteran D.J.B. is potentially entitled to over two years of additional compensation and the case clearly should have been referred for further development.

**(b) Veteran D.A.V**. This veteran was Service Connected (SC) for Atherosclerotic Heart Disease (ASHD) *secondary to Diabetes II (DM)* with an effective date of 08/21/2002. The evidence shows heart-related workups previously received by the VA on 01/19/1993. The Veteran is potentially entitled to over 10 years additional compensation and this case  clearly had not been reviewed because the claims file analyst and the physician review falsely certified that there was *no medical evidence received* showing ASHD prior to 08/21/2002.

**(c)  Veteran K. J. U**. This veteran was Service Connected (SC) for MI with Coronary Artery S/P PICA with entitlement effective of 04/01/2007. The evidence shows that the Veteran submitted that claim a whole year earlier. The QTC reviewers missed the notice that the Veteran claimed for a heart condition.

**(d) Veteran L.L.V**. This veteran was Service Connected (SC) for Coronary Artery Disease secondary to another condition with a date effective as of 10/17/2005. The checklist completed by the VA's rating decision was

dated on 05/12/2006, more than one year earlier. Also no evidence of PD or BCL was found during review. However the claim file was missing the service treatment record, and thus there was no way to determine an earlier potential entitlement in the case. It should have been referred to the VA for further investigation.

**(e) Veteran J.R.M**. This veteran was Service Connected (SC) for Coronary Artery Disease S/P stent effective 03/31/2006. There was no medical evidence received showing any evidence of Coronary Artery Disease or stent. There was evidence showing abnormal cardiovascular problems and some other evidence showing that he had "chest pain that comes and goes, will last for 30 seconds" since 02/21/1981, or over 20 years earlier. The evidence was missed by the QTC reviewers and did not get referred to the VA for further adjudication.

**(f) Veteran N.E.P**. This veteran was Service Connected (SC) for Coronary Artery Disease effective 09/14/2012. However, there is evidence (including 10+ pages of medical records) clearly showing symptoms of Parkinson's disease. The Veteran's claim form claiming Parkinson's disease dates to 12/12/2012, but at that time the VA rating decision denied service connection for Parkinson's Disease. The QTC reviewers missed the evidence in the medical records, and then improperly failed to

review other relevant parts of the file for further adjudication. The case should have been sent to the VA for further adjudication.

(g) **Veteran E.L.I.** This veteran was Service Connected (SC) for Coronary Artery Disease, *secondary to Diabetes* with an entitlement effective January 10, 2008. In the HID/PD/BCL review, the claims file analyst marked "no" on question #7, meaning that there was no evidence in the record to support an earlier date based on Coronary Artery Disease/Ischemic heart disease earlier than the existing date as a condition secondary to diabetes. However the medical record (which should have been reviewed as part of the new review) noted that there was Coronary Artery Disease and a stent placed on 8/30/2007. The claim form for this condition was received by the VA on 9/27/2007. Thus, under a proper review the veteran should have been entitled to, potentially, five or more months of addition backdated compensation. It is evident that the medical record had simply not been carefully reviewed during the earlier review. The case not reviewed by VA due to the checklist completion by QTC.

(h) **Veteran G.A.R.** This veteran was Service Connected (SC) for Coronary Artery Disease with entitlement effective August 2006. On question #7 the claim file analysis (and as approved by the physician reviewer) said

there was no medical evidence received showing any Coronary Artery Disease prior to the date of the claim establishing entitlement in 2006. It stated that there was no other evidence of other conditions found during the review. However, there is evidence actually in the case dated Feb 1999, and received by the VA with a stamped date in Jan 2001, showing cardiovascular impairment with ankle swelling. There is also evidence of a chest x-ray in 1999, received by the VA in Jan 2001, where a radiologist M.D. (VA hospital) noted the overall impression of the report showing atherosclerotic heart disease. Because of the missed evidence in this case, and the marking of "no" on question #7 of the checklist, the VA made no further adjudication. This veteran potentially had a valid claim under the new condition for compensation for an additional five years.

133. In each of these exemplar cases a thorough review of the medical record would have revealed that the veteran may have been entitled to a longer duration of compensation,  prevented a denial of compensation altogether, or revealed that there were other conditions clearly material to a need for a re-review or correction. These subsequent failures deprived the veteran of entitled compensation, and resulted in false claims to the VA.

134. By contrast, the VA did, in fact, fully rely upon the screenings performed by QTC in determining whether to perform further review and

adjudication on the initially screened files. In the course of Relator's duties, he also encountered a file sent for peripheral neuropathy review that had been identified for further adjudication in the IHD/PD/BCL review (Checklist Question #7 marked "Yes"). As a result the veteran was readjudicated for the newly added conditions, and awarded additional compensation:

> **(i) Veteran R.L.B.** The checklist was completed based on VA's Rating Decision (RD) dated 10/06/2000. The veteran was Service Connected (SC) for CAD with entitlement effective 05/27/1999. In the QTC review, the remarks on Question #7 reflected as follows: *YES – Evidence found Borderline EKG minimal voltage criteria for LVH (Left Ventricular Hypertrophy) dated 06/29/1993.* Action & Outcome by the VA: Special Determination - A new Rating Decision issued dated 01/13/2014 based on (QTC) Nehmer phase II review and the checklist dated 05/31/2013. The service connection for CAD entitlement date was changed from 05/27/1999 to an earlier entitlement date of 02/01/1993.  This resulted in nearly six years of retroactive compensation for the veteran.

## VII.  DEFENDANTS SUBMITTED CLAIMS UNDER FALSE CERTIFICATION OF COMPLIANCE WITH APPLICABLE CONTRACTS, STATUTES, AND REGULATIONS

135. Relator is informed and after investigation believes that, with respect to each of the reviews described in this complaint and all other similar cases

constituting the fraudulent scheme, Defendants each submitted a claim for payment, directly or indirectly,  to the VA or another government agency or contractor to request money from the United States Government.

136. With respect to each of these requests for payment, Defendants both expressly and impliedly certified that they had complied with the claim file review requirements contained in the contracts concerning the *Nehmer* reviews and the requirements contained in the applicable statutes.

137. At the time each claim was submitted, Defendants had actual knowledge that such claims were false or acted in reckless disregard of the truth or falsity of the express and implied certifications connected therewith. Defendants knowingly and intentionally created a system to submit such bills to the government in knowing and intentional disregard of the truth or falsity of their compliance with both the specifics of the claim and the underlying transaction.

## VIII. DEFENDANTS' RETALIATION AGAINST RELATOR

138. Relator began his employment as a claims file analyst at QTC on or about March 11, 2013. Shortly after commencing work as a claims file analyst, Relator learned of QTC's scheme to render meaningless services of no value to the government.

False Claims Act First Amended Complaint

139. On Monday, October 6, 2014, Relator communicated his concerns regarding the review process to appropriate individuals within QTC, including Jason Schibel, CEO of QTC Management; Frenorgin Ubungen, Vice President of Operations at QTC Management; Kerrie Schuster, Ethics Officer at Lockheed Martin; and Donna Brown, the human resource director for QTC Management.

140. In response to Relator's communication, the President of QTC informed Relator that he was creating a "disruptive work environment." Just three days later on Thursday, October 9, 2014, Relator was placed on a productivity improvement plan, counseling him to deliver 12 cases for every 8 hours worked. If this expectation was not met, further disciplinary action was threatened.

141. In November 2014, QTC released a report indicating that the VA had returned 184 checklists, which were erroneously or incompletely marked. Upon learning of the report and believing the report supported his earlier concerns, Relator again communicated his concern regarding the review process to appropriate individuals.

142. In early December 2014, Relator was informed by QTC HR of an investigation against Relator for alleged events occurring months earlier in September 2014. Relator was informed that his case would be referred to a committee at Lockheed for a potential disciplinary action. When Relator denied the allegations of the investigation and suggested that the investigation was an attempt

False Claims Act First Amended Complaint

to deflect attention from Relator's concerns surrounding the review process, QTC CEO sent Relator an email accusing him of being sarcastic and unprofessional.

143. On December 4, 2014, Relator was placed on paid administrative leave pending the investigation. On December 10, 2014, Relator received notice from QTC CEO, Jason Seibel, that his employment with QTC Management, Inc. was being terminated.

## IX. SCOPE OF THE FRAUD

144. The Relator is informed and believes that QTC submitted claims under its contract based on the completion of each chart, and received payment from the government based on the number of charts "completed" and returned. Relator is informed and believes, and thereon alleges, that QTC received between $300 and $350 per claim filed and reviewed. The value of the *Nehmer* review contracts to QTC, therefore is estimated to be between $48 million and $56 million. Because the fraudulent review process renders the services meaningless and of no value to the government, the entire value of the contract should be disgorged to the government.

## X. CLAIMS FOR RELIEF

## COUNT I –VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

145. Relator incorporates by reference all paragraphs of this Amended Complaint as though the same were set forth herein at length.

146. In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly and/or recklessly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

147. Specifically, Defendants submitted claims to the United States Government and its VA for performing claim file reviews under the "*Nehmer* Project" claim file review contract when such claim file reviews failed to comply, in any reasonable manner, with the requirements of court orders in the *Nehmer* litigation, the U.S. Code, VA policy or regulation. The claim file reviewers did not adequately review the medical evidence in the files, and failed to properly provide the VA a meaningful basis to determine which veterans' claim files needed further development or re-adjudication based on newly listed conditions.

148. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damaged in an amount to be determined.

149. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth, presented false and fraudulent claims for payment for devices and services provided to the VA. In submitting such claims, Defendants expressly and impliedly certified to the VA that the claim was submitted for

services performed in compliance with the *Nehmer* stipulation, statutes, regulation, VA policy, and its contractual obligations.

150. All of the representations and certifications, both express and implied, had a natural tendency to influence the VA's decision whether to pay the claims and were material to payment of the claims. Further, had the VA known of Defendants' intentionally created scheme and the falsity of the statements contained therein, the VA would not have paid the claims.

151. As a result of these schemes, Defendants caused the VA to incur significant damages.

### COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

152. Relator realleges and incorporates by reference all paragraphs of this Amended Complaint as if fully set forth herein.

153. In performing the acts described above, Defendants through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. §3729(a)(1)(B).

154. Specifically, Defendants made, used, and caused to be made a false record which remained in the veteran's claim file as a part of the "checklist." That false record included, in the IHD/PD/BCL review, certification that the entire claim file (which by its nature includes medical records in their entirety)

had been reviewed, and similar certification as to the results of that review by both the claims file analysts and the physician reviewer. In the peripheral neuropathy ("PN") review, the false certification included an affirmative statement that "a review of the evidence of record reveals no complaints, symptoms or diagnoses related to early onset peripheral neuropathy," and a notification accompanying the return of chart to the VA that "peripheral neuropathy review has been completed for this case and is being submitted for adjudication purposes."

155. In both instances, the review required by the VA was, in many cases, simply not performed. These records, included with the return of the file to the VA, constituted a false record and false statement in support of a claim for payment for the chart review.

156. The VA, unaware of the falsity of the records and statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and statements, paid for these services.

157. The representations and certifications, both express and implied, contained with respect to each bill to the government, had a natural tendency to influence the government's decision whether to pay the claim and were material to the payment of the claim. Further, had the government known of the

Defendants' intentionally created scheme and the falsity of the statements contained therein, the government would not have paid said claims.

158. As a result of these schemes, Defendants caused the government to incur significant damages.

## COUNT III – VIOLATION OF 31 U.S.C. 3729(a)(1)(C)

159. Relator incorporates by reference all paragraphs of this Amended Complaint as though the same were set forth herein at length.

160. Defendants knowingly, in reckless disregard and/or in deliberate ignorance of the truth, conspired between themselves, with their employees and administrators, and others, to present and/or cause to be presented false and fraudulent claims for payment and approval for services delivered or purported to be delivered to the United States Government and its VA  for performing claim file reviews under the "*Nehmer* Project" when such claim file reviews fail to comply, in any reasonable manner, with the requirements of court orders in the *Nehmer* litigation, the U.S. Code, VA policy or regulation, and/or contained and were based upon false certifications and false records,  as described herein.

161. As a result of the conspiracy, Defendants caused the Government to incur significant damages.

False Claims Act First Amended Complaint

## COUNT IV – VIOLATION OF 31 U.S.C. 3729(h) (RETALIATION)

162. Plaintiff re-alleges and incorporates by reference all paragraphs contained in this Amended Complaint as though the same were set forth fully herein.

163. Pursuant to 31 U.S.C. § 3730(h), the False Claims Act prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions of employment because of lawful acts done by the employee in furtherance of an action under the Act.

164. Relator expressly and clearly informed appropriate individuals at QTC and Lockheed Martin of the illegality under federal law of the conduct he observed. It was after that point that Relator was terminated.

165. Relator's act of challenging QTC's practices was lawful conduct "in furtherance of" a False Claims Act action.

166. As a result of Defendants' actions, Relator has suffered and continues to suffer substantial damages. Relator's damages include lost earnings and wages, interest on lost wages, and special damages in an amount to be proven at trial.

False Claims Act First Amended Complaint

# XI. PRAYER FOR RELIEF

167. WHEREFORE, Plaintiff/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

A. The amount of the United States' damages in an amount to be proven at trial;

B. Treble the amount of the United States' damages in an amount to be proven at trial;

C. Maximum civil penalties for each false claim submitted, especially in view of the fact that the Defendants' fraud is so egregious as to justify debarment from all federal government contracts;

D.  The maximum allowed to Relators under 31 U.S.C. § 3730(d);

E. Reasonable costs and attorney's fees for bringing and pressing the claims under the Federal False Claims act;

F.  Such other and further relief as this Court deems to be just and proper.

168. On Count IV of this Complaint, Relator demands and prays judgment for all proper compensatory damages, special damages, and punitive damages in favor of Relator as a result of Defendants' retaliation and retaliatory discharge of

Relator in violation of 31 U.S.C. § 3730(h), including but not limited to the following:

A. Double back pay;

B. Interest on the back pay;

C. Compensation for loss of pension, health and other employment benefits;

D. Compensation for all special damages, including emotional distress, mental suffering and anguish; humiliation; damage to his reputation; and inconvenience;

E. Attorneys' fees and costs; and

F. Such other and further relief as the Court deems just and proper as a result of Defendants' retaliation and wrongful discharge.

## XII. DEMAND FOR TRIAL BY JURY

169. Pursuant to Rule 38, Federal Rules of Civil Procedure, a jury trial is demanded.


//

//

//

//

False Claims Act First Amended Complaint

Respectfully submitted,

**WATERS, KRAUS & PAUL**

_____

Michael Armitage
armitage@waterskraus.com
Louisa Kirakosian
lkirakosian@waterskraus.com
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California  90245
PH: 415-441-8669/888-503-8267

**EISENBERG, GILCHRIST & CUTT, P.C.**

/s/
_____

Robert D. Sherlock *(Admitted Pro Hac Vice)*
rsherlock@egclegal.com
215 South State Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
Fax: 801-350-0065
Attorneys for Plaintiff – Relator

# EXHIBIT  1

## VA Training Letter 10-04



**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Benefits Administration**
**Washington, DC 20420**

September 28, 2010

Director (00/21)                                 In Reply Refer To: 211A
All VA Regional Offices                     Training Letter 10-04

SUBJ: Training Guide for the readjudication of Claims for Ischemic Heart
Disease (IHD), Parkinson's Disease (PD), Hairy Cell Leukemia (HCL) and other
Chronic B-cell Leukemias, and other Diseases Under *Nehmer*

## BACKGROUND INFORMATION

On October 13th, 2009, Secretary Shinseki announced his intent to establish
presumptive service connection for IHD, PD, and HCL for Veterans who served
in the Republic of Vietnam. This decision was based on the Institute of
Medicine's seventh biennial update, *"Veterans and Agent Orange: Committee to
Review the Health Effects in Vietnam Veterans and Exposure to Herbicides."*
Under the court order of the U.S. District Court for the Northern District of
California (the "Court") in *Nehmer v. U.S. Department of Veterans Affairs*, 712 F.
Supp. 1404, 1409 (N.D. Cal. 1989), VA must readjudicate previously denied
claims for IHD, PD, or HCL filed by *Nehmer* class members (Vietnam Veterans
and their survivors) and provide retroactive benefits pursuant to 38 C.F.R §
3.816. This requirement involves claims filed or denied from September 25,
1985, to August 31, 2010, the date VA published the final regulation establishing
a presumption of service connection for the foregoing diseases. Such claims may
not be finally adjudicated until VA's regulation change at 38 C.F.R. § 3.309(e) is
final, which will add these three diseases to the list of diseases associated with
herbicide exposure.

## ACCOUNTABILITY

Resource Centers and Regional Offices, who are responsible for the adjudication
/readjudication of *Nehmer* claims, must strictly comply with the instructions set
forth in this letter and the attached Training Guide. It is critical that *Nehmer*
claims be handled expeditiously and correctly. The processing of *Nehmer* claims
requires VA to operate under court-imposed deadlines. Failure to comply with
instructions could result in court-ordered sanctions against VA and/or VA
officials.

## Regulatory Guidance

A proposed regulation was recently published in the Federal Register Vol. 75, 14391 (March 25, 2010) that would amend 38 C.F.R. § 3.309(e) by adding IHD, PD, and HCL to the list of diseases presumptively associated with exposure to herbicides in Vietnam.  Publication of the final rule is expected in the near future.

## Whom to Contact for Help

If you have questions or need additional information, e-mail your inquiry to the Q&A mailbox at VAVBAWAS/CO/NEHMER.


/S/
Thomas J. Murphy
Director
Compensation and Pension Service



Enclosures:
   *Nehmer* Training Guide

# EXHIBIT  2

## Revised VA Training Letter 10-04
## *Nehmer* Training Guide

# DEPARTMENT OF VETERANS AFFAIRS

## Veterans Benefits Administration (VBA)



# *Nehmer* Training Guide

**September 28, 2010**
Revised

# Table of Contents

**Background Information**............................................... **Error! Bookmark not defined.**

**Accountability** ......................................... **Error! Bookmark not defined.**

**Purpose and Objectives** ............................................................... 5

**Background** ............................................................................. 5

**References** ............................................................................ 6

***Nehmer*** **vs. Traditional Claims Processing**........................................ 7

    **Comparison Chart**........................................................... 7

    ***Nehmer*** **vs. 38 C.F.R. § 3.114(a)** ...................................10

**New Presumptive Conditions**.............................................. 11

    **Definition of Ischemic Heart Disease**........................................11

    **Definition of Chronic B-Cell Leukemia** ...................................11

    **Definition of Parkinson's Disease** ..........................................12

**Adjudication/Readjudication Requirements under the** *Nehmer* **Court Order** ........ 13

**Class Members under the** *Nehmer* **Court Order** ................................. 13

**Eligibility Requirements for Retroactive Payment Purposes** ................................. 13

**Effective Dates for Rating Purposes** ......................................... 14

**Service in the Republic of Vietnam**........................................ 14

**Claims for Benefits**.................................................... 15

    **Examples of Claims** ........................................................17

**Diagnosis of Presumptive Disabilities** ......................................... 19

***Nehmer*** **Databases** ................................................... 20

**End Product Control** ..................................................... 20

**Claims Folder Review** .................................................... 21

**Development**.......................................................... 22

    **Medical Evidence** ...........................................................22
    Example ..........................................................................22

    **Service** ..........................................................................23

    **Dependency**......................................................................23

    **Continuous Cohabitation** ...................................................24

    **Common Law Marriage** ....................................................24

    **Payee** ............................................................................24

    **Military Pay** ....................................................................25

    **Burial**............................................................................25

**Rating** ............................................................... 26

    **Memorandum for the Record** ...............................................26
    Examples of Memorandums for the Record: ................................27

**Confirmed and Continued Rating** ..................................................................**28**
Examples .......................................................................................................28

**Coded Ratings** ..............................................................................................**28**
Total Disability Based on Individual Unemployability (TDIU) .......................28

**Claims for Service Connection** ...................................................................**29**
Evidence and Evidentiary Basis ...................................................................29
Coding and Assigning a Percentage ............................................................30
Special Monthly Compensation ....................................................................30
Effective Date ...............................................................................................31

**Claims for Service-Connected Death** .......................................................**31**
Evidence .......................................................................................................32
Issue(s), Decision(s), and Reasons for Decision .........................................32
Effective Date ...............................................................................................32
Dependents Educational Assistance (DEA) - Chapter 35 .............................32

**Claims for Service Connection and Service-Connected Death** ...............**32**
Coding Considerations ..................................................................................32
Issue(s), Decision(s), and Reasons for Decision .........................................33

**Authorization** .................................................................................................**33**

**Live Veterans Claims** ...................................................................................**33**
Dependents ...................................................................................................34
Kicker / Public Law 101-508 .........................................................................34
Liesegang, et al v. Secretary of Veterans Affairs ........................................34
Withholding for Military Pay ..........................................................................34

**DIC Claims** ....................................................................................................**35**
Additional Allowances ..................................................................................35
Death Prior to December 31, 1992 ...............................................................35
Withholding for SBP Payments .....................................................................36
Remarriage of the Surviving Spouse ............................................................36
Month of Death Payment ..............................................................................36

**Burial Claims** ...............................................................................................**36**
Burial Claims Prior to the Current December 1, 2001, Rate .........................36
Prior Payments of NSC Burial ......................................................................37

**Retroactive Benefits** ...................................................................................**37**

**Award Annotation** .........................................................................................**37**

**Notification Letter** ........................................................................................**37**

**SME Quality Reviews** ...................................................................................**38**

**Sending Documents to OGC** .......................................................................**38**

**Appendices** ....................................................................................................**39**

**Appendix 1 – List of Presumptive Conditions in 38 C.F.R. § 3.816** ..........**40**

**Appendix 2 – Information on Vietnam Naval Operations** ..........................**41**

**Appendix 3 – Naval and Coast Guard Development** ..................................**47**

**Appendix 4 – List of APOs for Verification of RVN Service** ....................**49**

**Appendix 5 – Workflow for Processing *Nehmer* Claims** .........................**58**

**Appendix 6 – Contact Information for Processing *Nehmer* Claims** ........**59**

**Appendix 7 – Example Rating Decisions** ...................................................................60

**Appendix 8 – Disability Benefit Questionnaires** ........................................................81

**Appendix 9 – Rating Schedule** ....................................................................................88

**Appendix 10 – Example Notification Letters** ..............................................................89

**Appendix 11 – The Cardiovascular System in 38 C.F.R § 4.100 (Prior to January 12, 1998)**.............................................................................................................................102

**Appendix 12 – MAP-D Notification/Development Paragraphs for *Nehmer*** ...............110

**Appendix 13 – *Nehmer* Readjudication (EP 687) Review Worksheet 1** .......................112

**Appendix 14 – *Nehmer* Readjudication Data Collection for EP 687** ...........................124

**Appendix 15 – *Nehmer* Adjudication (EP 681) Review Worksheet 2** ..........................127

**Appendix 16 – *Nehmer* Adjudication (EP 681) Data Collection for EP 687** ...............137

**Appendix 17 – *Nehmer* SME Checklist and Instructions**...........................................140

**Appendix 18 – Footnote 1: Need for Amendment to 38 C.F.R. § 3.816 Regarding *Nehmer* Claims**....................................................................................................................145

**Appendix 19 – VSR and SVSR Responsibilities**........................................................150

**Appendix 20 – Training Guide Revisions** ..................................................................151

**Training Case Scenarios** ...................................................................................... **153**

**VSR Scenario 1** ........................................................................................................154

**VSR Scenario 2** ........................................................................................................155

**VSR Scenario 3** ........................................................................................................156

**VSR Scenario 4** ........................................................................................................157

**VSR Scenario 5** ........................................................................................................158

**RVSR Scenario 1** ......................................................................................................159

**RVSR Scenario 2** ......................................................................................................160

**RVSR Scenario 3** ......................................................................................................161

**RVSR Scenario 4** ......................................................................................................162

**RVSR Scenario 5** ......................................................................................................163

## PURPOSE AND OBJECTIVES

The purpose of this training guide is to provide users with the information necessary to review, develop, rate, and authorize *Nehmer* claims for the three new presumptive conditions – hairy cell leukemia and other chronic B-cell leukemias (HCL), Parkinson's disease (PD), ischemic heart disease (IHD), and any other presumptive conditions involving **in-country** Vietnam service.

This guide will enable you to:

1. Review the claims folder and readjudicate all claims that previously denied a class member's claim for service connection for a new presumptive disease
2. Identify the eligibility requirements that qualify a Veteran or survivor for retroactive awards of benefits under *Nehmer*
3. Identify what constitutes a prior claim of benefits for conditions presumptively related to herbicide exposure under *Nehmer*
4. Identify the three new and current presumptive conditions associated with herbicide exposure
5. Identify and correctly apply effective date rules for a *Nehmer* claim
6. Determine what type of development, if any, is needed for rating or authorization
7. Determine requirements for authorization of awards pursuant to *Nehmer*
8. Identify the requirements of the decision notice letter.

## BACKGROUND

The *Nehmer* court case originated in 1986 as a class-action lawsuit against the Department of Veterans Affairs (VA) by Vietnam Veterans and their survivors, who alleged that VA had improperly denied their claims for service-connected compensation for disabilities allegedly caused by exposure to the herbicide Agent Orange in service.  In 1989, the United States District Court for the Northern District of California (Court) ruled that VA's regulation was invalid because the causation standard that it used was inconsistent with the intent of Congress.  The Court invalidated VA's regulation and voided all benefit denials made under that regulation.

In May 1991, the *Nehmer* parties entered into a "Final Stipulation and Order" (Final Stipulation) outlining the actions to be taken in response to the Court's decision.  Among other things, the Final Stipulation provided: (1) that VA would issue new regulations in accordance with the Agent Orange Act of 1991; (2) that, after issuing such regulations, VA would readjudicate the claims where a prior denial was voided by the Court's 1989 order and would initially adjudicate all similar claims filed subsequent to the Court's order; and (3) that, if benefits were awarded upon such readjudication or adjudication, the effective date of the award

would be the later of the date the claim was filed or the date the disability arose. Ordinarily, if a claim is granted on the basis of a new regulation, the law states that the effective date of the award may not be any earlier than the date on which the regulation went into effect.

In a February 1999 decision, the Court clarified the scope of its 1989 decision.  It voided all VA decisions that were issued while the invalid regulation was in effect and which denied service connection for a Vietnam Veteran's disease that was later found to be associated with herbicide exposure under new regulations.  In December 2000, the Court provided further clarification when it concluded that VA must pay the full retroactive benefit to the estates of deceased class members.

On October 13, 2009, the VA announced Secretary Shinseki's decision to establish presumptive service connection for three additional illnesses associated with exposure to herbicides used in Vietnam based on an independent study conducted by the Institute of Medicine.  The illnesses affected by the recent decision are B-cell leukemias (such as hairy cell leukemia), Parkinson's disease, and ischemic heart disease.  A proposed rule adding these three conditions to VA's list of presumptive diseases was published in the Federal Register on March 25, 2010, 75 Fed. Reg. 14,391.

As of September 20, 2010, approximately 145,000 Vietnam Veterans and survivors were previously denied service-connection or filed new claims (number may include duplicates that will be removed from final total).  All of these claims must be adjudicated/readjudicated in order to comply with the Final *Nehmer* Stipulation.


## REFERENCES

The following references are useful in the review and adjudication of *Nehmer* claims:

- 38 U.S.C. § 503 – Administrative Error; Equitable Relief
- 38 U.S.C. § 5101 – Claims and Forms
- 38 U.S.C. § 5103 – Notice to Claimants of Required Information and Evidence
- 38 U.S.C. § 5110 – Effective Dates of Awards
- 38 U.S.C. § 5125 – Acceptance of Reports of Private Physician Examinations
- 38 C.F.R. § 3.114 – Change of Law or Department of Veterans Affairs Issue
- 38 C.F.R. § 3.150 – Forms to be Furnished
- 38 C.F.R. § 3.151 – Claims for Disability Benefits
- 38 C.F.R. § 3.155 – Informal Claims

- 38 C.F.R. § 3.303 – Principles Relating to Service Connection
- 38 C.F.R. § 3.304 – Direct Service Connection; Wartime and Peacetime
- 38 C.F.R. § 3.307 – Presumptive Service Connection for Chronic, Tropical or Prisoner-of-War Related Disease, or Disease Associated with Exposure to Certain Herbicide Agents; Wartime and Service on or after January 1, 1947
- 38 C.F.R. § 3.309(e) – Diseases Subject to Presumptive Service Connection
- 38 C.F.R. § 3.312 – Cause of Death
- 38 C.F.R. § 3.350 Special Monthly Compensation Ratings
- 38 C.F.R. § 3.400 – General Effective Dates
- 38 C.F.R. § 3.816 – Awards under the *Nehmer* Court Orders for Disability or Death Caused by a Condition Presumptively Associated with Herbicide Exposure
- 38 C.F.R. § 3.951 – Preservation of Disability Ratings
- 38 C.F.R. § 4.100 – The Cardiovascular System Prior to January 12, 1998
- M21-1MR III.ii.2.C.14.b – Applications for Death Benefits
- M21-1MR III.iii.5 – Relationship and Dependency
- M21-1MR III.iii.5.C.14.a – Recognition of Common Law Marriages by State
- M21-1MR, IV.iii.3.F.23 – General Information on the Effect of a Surviving Spouse's Remarriage
- M21-1MR IV.ii.1.H.28 – Developing Claims Based on Herbicide Exposure in the Republic of Vietnam (RVN)
- M21-1MR IV.ii.2.C.10 – Service Connection for Disabilities Resulting From Exposure to Herbicides or Based on Service in the Republic of Vietnam (RVN)
- M21-1 Part I, Appendix C – BDN Tables and Codes
- Fast Letter 10-XXXX – XXXXXXXXXXX (to be released at a later date)

## *NEHMER* VS. TRADITIONAL CLAIMS PROCESSING

### Comparison Chart

The comparison chart notes differences between the *Nehmer* claims workflow process and traditional claims processing.

| *Nehmer* vs. Traditional Claims Comparison | | |
|---|---|---|
| | **Traditional Claims** | ***Nehmer*** |
| **Definition** | All other claimants and all periods of service for benefits. | *Nehmer* class members are Vietnam Veterans who served **in-country** and have a covered herbicide disease, or the surviving spouse, child, or parent of a Vietnam Veteran who died from a covered herbicide disease. |
| **Effective Dates** | The date the claim resulting in award was filed or date entitlement arose, whichever is later, but in no event prior to the effective date or the regulatory presumption of service connection. | The date the original claim was filed or arose, whichever is later, even if it was before the effective date of applicable regulatory presumption, and without regard to finality of prior denial(s) (Contrary to 38 U.S.C. § 5110(g), 38 C.F.R. § 3.400).<br><br>Effective dates can go back as far as the date of claim that was pending on September 25, 1985 (The date the rules implementing "Veterans' Dioxin and Radiation Exposure Compensation Standards Act," Pub. L. 98-542 (Oct. 24, 1984) were effective in the Code of Federal Regulations). |
| **Need to File Claim** | The claimant must file original claim.  If claimant alleges earlier effective date, claimant must demonstrate that he or she made an earlier claim that did not become final. | The claimant need not file a new claim or a claim for earlier effective date when new presumptive condition is added.  VA must search its records to find eligible claimants and award benefits, without action on the claimant's part.<br><br>Medical records noting the existence of a condition later made presumptively service-connected can in some instances, result in an award without a formal claim ever being filed |

| *Nehmer* vs. Traditional Claims Comparison | | |
|---|---|---|
| | **Traditional Claims** | ***Nehmer*** |
| **Eligible Payees** | Veteran or surviving spouse, children or dependent parents of the Veteran can get accrued or owed benefits.<br><br>Benefits never go to the estate because the right to benefits ends with death of the entitled individual.<br><br>The one who bore the last expenses can claim reimbursement from benefits owed. | Veterans, surviving spouse, children, parents; or to the surviving spouse, children, parents, or estate of class members.<br><br>The right to benefits survives entitled member. (Contrary to 38 U.S.C. § 5121). Concepts relating to accrued benefits are not applicable in *Nehmer* cases<br><br>No right to reimbursement for the one who bore the last expenses. |
| **Payee Identification** | Payee information is generally in the Veteran's claims folder. | Payee may not be identified in Veteran's claims folder because the claim survives the Veteran and his spouse; requires further documentation for proof of entitlement (e.g., marriage certificate, birth certificate). VA must request those documents needed to establish eligibility. |
| **Unable to Identify Payee** | N/A | VA must notify class counsel if unable to identify payee. Class counsel utilizes a search firm that locates potential payees and class counsel provides the VA with information to contact those persons and establish eligibility. (See Payee Identification). |
| **Payment of Compensation/ Priority of Adjudication** | Payment is made when the benefit is granted in agency's course of business.<br><br>Priorities are decided nationally and locally based on Department's policies. | The timing of payments is governed by court order. Payment is required to be received within twenty-one days of receipt of information confirming entitlement (the twenty-one day period begins once the whereabouts of a class member is known).<br><br>*Nehmer* claims must be handled as a first priority, under court-ordered deadlines. |
| **Notice of Calculation of Compensation** | The VA provides notice of amounts payable under 38 U.S.C. § 1114. | The VA notice letter must include an explanation of how the amount was calculated. |

| *Nehmer* vs. Traditional Claims Comparison | | |
|---|---|---|
| | **Traditional Claims** | ***Nehmer*** |
| **Proof of Payment** | N/A | A copy of Treasury Inquiry screens indicating proof of payment may be provided to class counsel upon request. |
| **Time Limit** | If the applicant fails to provide requested information within one year, a decision is made on the available evidence. This decision is considered final. | There is no time limit imposed for submission of evidence by a claimant. |
| **Retired Pay / SBP Offset Issues** | Retired pay/SBP offset is determined by computer at DFAS in the normal course of business. | Because benefits may be owed from over 20 years ago, offset amount must be retrieved from DFAS database. |
| **Court Supervision** | The VA is subject to normal oversight by OIG and Congress. | Deadlines are court imposed, and class counsel oversees VA compliance.  When the timeline is not met, VA must provide a declaration signed under oath by the persons with knowledge setting forth the steps taken to meet the deadline, an explanation of the delay, and the date by which VA will provide payment/notice. |
| **EAJA Fees** | EAJA fees may be awarded in certain appeals of denied claims. | VA compensates class counsel for all its work on *Nehmer* claims. |
| **Processing** | Processing occurs within normal VA channels. | Virtually all *Nehmer* claims require special handling. |

**Nehmer* vs. 38 C.F.R. § 3.114(a)*

By definition, if a case falls under *Nehmer*, it means that the first claim of service connection for the condition at issue was received BEFORE the condition was added to the list of Agent Orange-related disabilities and the effective date for the grant of service connection will also be BEFORE the condition was added to the list of Agent Orange-related disabilities.  As a result, if a claim was received before the condition was added to 38 C.F.R. § 3.309(e), the case is a potential *Nehmer* case.  On the other hand if the claim was received after the disease was added to the presumptive list, it is not a *Nehmer* case.  In those cases 38 C.F.R. § 3.114(a) applies and the earliest effective date that can be granted under 38 C.F.R. § 3.114(a) is the date on which the liberalizing legislation was effective (i.e. the date on which the condition was added to 38 C.F.R. § 3.309(e) or one-year prior to date of claim, whichever is later).

Remember that in all cases, the condition must have been present on the date we grant service connection.  Occasionally, we receive a claim BEFORE the

condition is actually present, and neither *Nehmer* nor 38 C.F.R. § 3.114(a) allows for a grant of service connection prior to a confirmed diagnosis.

The *Nehmer* claims workflow process differs from the traditional claims processing that the reviewer normally sees.  Appendix 5 shows an overview of the "Workflow for Processing *Nehmer* Claims."

## NEW PRESUMPTIVE CONDITIONS

The three new presumptive conditions are:

1. Ischemic heart disease
2. Chronic B-cell leukemias, such as hairy cell leukemia
3. Parkinson's disease

**Definition of Ischemic Heart Disease**

According to Harrison's Principles of Internal Medicine (Harrison's Online, Chapter 237, Ischemic Heart Disease, 2008), ischemic heart disease is a condition in which there is an inadequate supply of blood and oxygen to a portion of the myocardium; it typically occurs when there is an imbalance between myocardial oxygen supply and demand.  Therefore, for purposes of this regulation, the term "ischemic heart disease" includes, but is not limited to, acute, subacute, and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable, and Prinzmetal's angina.  Since the term refers only to heart disease, it does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke.

The cardiovascular section of the rating schedule was revised effective January 12, 1998 (See the Rating section for further information).

**Definition of Chronic B-Cell Leukemia**

B-cell leukemia describes several different types of lymphoid leukemias and includes the following types:

- B-cell chronic lymphocytic leukemia/small lymphocytic lymphoma
- Acute lymphoblastic leukemia, mature B-cell type
- B-cell prolymphocytic leukemia
- Precursor B lymphoblastic leukemia
- Hairy cell leukemia

There are fourteen kinds of lymphomas involving B-cells.

- Diffuse large B-cell lymphoma
- Follicular lymphoma
- Mucosa-associated lymphatic tissue lymphoma (MALT)
- Small cell lymphocytic lymphoma (overlaps with the chronic lymphocytic leukemia)
- Mantle cell lymphoma (MCL)
- Burkitt lymphoma
- Mediastinal large B-cell lymphoma
- Waldenström macroglobulinemia
- Nodal marginal zone B-cell lymphoma (NMZL)
- Splenic marginal zone lymphoma (SMZL)
- Extranodal marginal zone B-cell lymphoma
- Intravascular large B-cell lymphoma
- Primary effusion lymphoma
- Lymphomatoid granulomatosis

**Definition of Parkinson's Disease**

Parkinson's disease (PD) belongs to a group of conditions called motor system disorders, which are the result of the loss of dopamine-producing brain cells. The four primary symptoms of PD are tremor, or trembling in hands, arms, legs, jaw, and face; rigidity, or stiffness of the limbs and trunk; bradykinesia, or slowness of movement; and postural instability, or impaired balance and coordination. As these symptoms become more pronounced, patients may have difficulty walking, talking, or completing other simple tasks. PD usually affects people over the age of 50.  Early symptoms of PD are subtle and occur gradually.  In some people the disease progresses more quickly than in others.  As the disease progresses, the shaking, or tremor, which affects the majority of PD patients may begin to interfere with daily activities.  Other symptoms may include depression and other emotional changes; difficulty in swallowing, chewing, and speaking; urinary problems or constipation; skin problems; and sleep disruptions.  There are currently no blood or laboratory tests that have been proven to help in diagnosing sporadic PD.  Therefore the diagnosis is based on medical history and a neurological examination.  The disease can be difficult to diagnose accurately. Doctors may sometimes request brain scans or laboratory tests in order to rule out other diseases.

**NOTE:** See Appendix 1 for the complete list of presumptive conditions associated with herbicide exposure.

## ADJUDICATION/READJUDICATION REQUIREMENTS UNDER THE *NEHMER* COURT ORDER

The *Nehmer* Court has held that the stipulation requires VA to readjudicate all cases in which VA previously denied a class member's claim of service connection for a new presumptive disease. A prior denial based on lack of diagnosis rather than lack of nexus falls within the scope of the stipulation's requirement for readjudication. This differs from claims in which there was no prior claim or class member status (*i.e.*, no in-country Vietnam service, no "Veteran" status, etc).

## CLASS MEMBERS UNDER THE *NEHMER* COURT ORDER

38 C.F.R. § 3.816 (b)(1) defines the class members as: (i) a Vietnam Veteran who has a covered herbicide disease; or (ii) a surviving spouse, child, or parent of a deceased Vietnam Veteran who died from a covered herbicide disease.

38 C.F.R. § 3.816 (f)(1) states that if a *Nehmer* class member entitled to retroactive benefits . . . dies prior to receiving payment of any such benefits, VA shall pay such unpaid retroactive benefits to the first individual or entity listed below that is in existence at the time of payment:

  (i)     The class member's spouse, regardless of current marital status
          • A spouse is the person who was legally married to the class member at the time of the class member's death
  (ii)    The class member's child(ren), regardless of age or marital status
          • If more than one child exists, payment of the retroactive benefits owed shall be divided into equal shares, and accompanied by an explanation of the division; this includes all children, regardless of age or marital status
  (iii)   The class member's parent(s), regardless of dependency
          • If both parents are alive, half the retroactive benefits owed shall be paid to each parent, and accompanied by an explanation of the division
  (iii)   The class member's estate

## ELIGIBILITY REQUIREMENTS FOR RETROACTIVE PAYMENT PURPOSES

If a *Nehmer* class member is entitled to disability compensation for a covered herbicide disease, eligibility requirements must be met. The eligibility requirements are**:**

  • The Veteran served in the Republic of Vietnam; **and**

- They have applied, were denied, or a claim was inferred (by class member or VA) for benefits for one of the three new presumptive conditions between September 25, 1985, or a date prior to September 25, 1985, if the claim was pending or on appeal on September 25, 1985, and August 31, 2010, the date VA published the final regulation; **and**
- They are diagnosed with one of the presumptive diseases, or a disease that reasonably may be construed as a covered herbicide disease.

## EFFECTIVE DATES FOR RATING PURPOSES

The effective date for retroactive claims must be one of the following dates:

- The later of the following:
  - The date VA received the claim, or a date prior to September 25, 1985, if the claim was pending or on appeal on September 25, 1985, or
  - The date the disability arose
- The day following the date of the class member's separation from active service, if filed within one year from the date of separation

The effective date for Dependency and Indemnity Compensation (DIC) claims must be one of the following dates:

- The date VA received the claim, or
- The first day of the month of the Veteran's death, if filed within one year from the date of the Veteran's death

**NOTE:**  If the class member's claim for DIC for the death was either pending before VA on May 3, 1989, or was received by VA between that date and the effective date of the statute or regulation establishing a presumption of service connection for the covered herbicide disease that caused death, the effective date of the award will be the later of the date such claim was received by VA or the death occurred (38 C.F.R. § 3.816(d)(2)).

**NOTE:**  38 U.S.C. § 5110(g) and 38 C.F.R. § 3.114(a) **do not apply** to *Nehmer* claims.

## SERVICE IN THE REPUBLIC OF VIETNAM

Veterans can establish proof of service in the Republic of Vietnam (RVN) if they were:

- On land in the RVN, **or**
- In the inland waterways of RVN, **or**

- In vessels docked at the ports of RVN, **or***
- In waters offshore of RVN, **if** the conditions of service involved duty, **or** visitation on the ground in RVN, **or**
- Other locations, **if** the conditions of service involved duty or visitation on the ground in RVN

***** For a list of vessels confirmed to have docked on the RVN shore or traveled on inland waterways, see Appendix 2.

There is no requirement for a specified length of service, duty, or visitation in RVN.  See 38 C.F.R. § 3.307(a)(6)(iii) for more information.

The following sources may be used to verify service in RVN If they served in RVN during the period beginning January 9, 1962, and ending on May 7, 1975:

- DD Form 214, *Certificate of Release or Discharge From Active Duty*
- DA Form 20, *Enlisted Qualification Record*
- VA Form 21-3101, *Request for Information*
- Service Treatment Records (STR)
  - Dental records found in STRs
- Military Personnel Records
- Army Post Office (APO) Numbers (See Appendix 4)
- Temporary Duty (TDY) Orders
- Shore leave granted in writing
- Other documented evidence that shows the Veteran physically set foot in RVN
- Defense Personnel Records Information Retrieval System (DPRIS) verifying in-country service
- Development to the Veteran (See Development section for details)

For a list of APOs that are verified by the Military Postal Service Agency as used for delivery to RVN, see Appendix 4.


## CLAIMS FOR BENEFITS

Veterans must have applied for or have been denied benefits for one of the three new presumptive conditions between September 25, 1985, (or a date prior to September 25, 1985, if the claim was pending or on appeal on September 25, 1985) and August 31, 2010, the date VA published the final regulation.

A claim meeting the eligibility requirements of *Nehmer* can be any of the following:

- A claim for Service Connection (SC)

- An informal claim
- A pension claim
- An inferred claim for SC
- A claim inferred by Veteran or VA during review
- Notice of Death
- A claim for burial benefits
- A claim for DIC, death pension or accrued benefits
- Social Security Administration - VA Form 21-4182, *Application for Dependency and Indemnity Compensation or Death Pension*
- VA Form 21-601, *Application for Accrued Amounts Due A Deceased Beneficiary*

Additional factors:

- A claim need not reference herbicide exposure (See Example 1)
  - In its February 11, 1999, *Nehmer* order, the Court held that a *Nehmer* class member's compensation claim need only have requested service connection for the presumptive condition in order to qualify as a *Nehmer* claim. It is not necessary that the class member assert the condition was caused by herbicide exposure
- An initial claim may lack specific details, which were clarified by later submissions (See Example 2)
- A prior claim must have involved one or more of the three new presumptive conditions, or one that reasonably may be construed as the same covered herbicide disease for which compensation has been awarded (See Examples 3 and 4)
- Live pension claims must be treated as SC claims (See Example 5)
  - Under 38 C.F.R. § 3.15 (a), "a claim by a Veteran for pension may be considered to be a claim for compensation." VA is not required by law to treat a Veteran's claim for pension as a claim for compensation, see *Stewart v. Brown*, 10 Vet. App. 15, 18 (1997), but may do so in appropriate circumstances. *Nehmer* is an appropriate circumstance
- Death pension claims must be treated as DIC claims (See Example 6)
- A claim of SC burial benefits must be treated as an informal DIC claim in certain circumstances. For more information, see the Rating section, subsection Claims for Service-Connected Death and for scenarios see Examples 7, 8 and 9 below.
  - An open claim:
    - An instance where VA failed to provide a decision notice letter to the claimant
    - An instance where VA failed to address a claim, such as an inferred or an informal claim (or failed to address an appeal)
    - An instance where VA failed to provide an application for benefits to a claimant

**Examples of Claims**

**Example 1**:  A Veteran who served in the Republic of Vietnam filed a claim in 1994, alleging that his IHD, PD, or HCL began while on active duty *following his service in Vietnam*.  VA denied the claim in 1995.  The Veteran reopens the claim in 2010, and service connection is granted based on VA's amended herbicide regulations.  On these facts, the effective date must relate back to the 1994 claim, even though the Veteran alleged a different basis for service connection.

**Example 2**:  In January 1987, a Veteran claimed compensation for lymphoma.  In developing that claim, VA obtained medical records indicating that the Veteran was diagnosed with HCL in February 1987.  Based on these facts, it would be reasonable to treat the January 1987 claim as a claim for service connection for HCL.  Under *Nehmer*, benefits may be paid retroactive to the date of that claim or the date the disability arose, whichever is later, as determined by the facts of the case.

**Example 3**:  In April 1995, a Veteran claimed compensation for anemia/leukemia.  Medical records obtained by VA indicate the Veteran did not have leukemia.  The claim was denied in 1995.  In 2001, the Veteran claimed compensation for HCL, submitting evidence that HCL was diagnosed in January 1996.  The Veteran did not file an appeal based on the 1995 decision and there was no activity from the Veteran until 2001.  Based on these facts, the 1995 claim and evidence submitted did not show a diagnosis of HCL or the presence of any type leukemia.  The 2001 submission of evidence was accepted as a reopened claim with a confirmed diagnosis.  Under these facts, the effective date would be 2001, as that is when VA received evidence documenting the diagnosed disability.

**Below are slightly different modifications of the above scenario that would change the outcome.**

For example, if the records diagnosing HCL existed during the pending 1995 claim, and the Veteran, in any manner, communicated to VA the existence of those records and VA failed to obtain them (possibly because VA assumed they would be of no help to the claim since there was no presumption at the time), then the effective date would be April 1995 because VA failed in their duty to obtain records identified by the claimant.

Another slight variation would exist if the Veteran actually submitted the records diagnosing HCL in 1996 to VA following such diagnosis.  The 1995 claim was properly disposed of in 1995, and VA received the 1996 records in 1997, but received no accompanying information from the Veteran regarding any intent to file a claim, then the proper effective date under the *Nehmer* review would be when VA received the records in 1997 rather than 2001.  Because the *Nehmer* review requires VA to readjudicate these claims "as if" the presumption existed in 1985, then submission of records confirming a diagnosis of the presumptive

condition must serve as a valid claim, despite VA's failure to act on such records and notwithstanding that no presumption existed when VA actually received the records.

**Example 4**: A Veteran filed a formal claim for service connection for IHD, PD, or HCL in November 1979 and VA denied the claim in January 1980. In May 1986, the Veteran submitted a letter stating, "please consider service connection for IHD, PD, or HCL," along with documentation showing a diagnosis for one of these conditions. On these facts, the May 1986 letter is an acceptable formal claim to reopen, and benefits must be paid retroactive to May 1986 under *Nehmer*.

**Example 5**: In 1994, a Veteran filed a claim for nonservice-connected (NSC) pension. After VA denied the claim, the Veteran filed a statement in 1995 stating, "I disagree with your decision denying pension." I also should be paid compensation for IHD, PD, or HCL." VA did not forward the claimant an application form and did not adjudicate any claim for service connection for IHD, PD, or HCL. On these facts, both the 1994 pension claim and the 1995 statement must be accepted as a claim for IHD, PD, or HCL.

**Example 6**: A Veteran died of IHD, PD, or HCL. In 1988, the surviving spouse filed a VA Form 21-534, *Application for DIC or Death Pension or Accrued Benefits by a Surviving Spouse or Child*, and marked "no" in response to the question "are you claiming that the cause of death was due to service?" Accordingly, VA adjudicated a claim for pension only. In 2009, the surviving spouse applies for DIC, which is granted. Under these circumstances, the award must be made retroactive to the 1988 application, because it must be treated as a DIC claim.

DIC claimants generally are not required to identify specific diseases in their applications. The absence of specific reference to IHD, PD, or HCL in a prior DIC application will not preclude assignment of a retroactive effective date under *Nehmer*, provided the evidence establishes that IHD, PD, or HCL caused or contributed to the Veteran's death.

**Example 7**: In 1995, a surviving spouse filed an application for burial benefits (VA Form 21-530, *Application for Burial Benefits*) and marked "yes" in response to the question "are you claiming that the cause of death was due to service?" VA forwarded the claimant an application for DIC (VA Form 21-534). The claimant returned the completed DIC application within one year. Based on these facts, the date of the 1995 application for burial benefits may be accepted as the date of the DIC claim for purposes of *Nehmer*.

**Example 8**: In 1995, a surviving spouse filed an application for burial benefits (VA Form 21-530) and marked "yes" in response to the question "are you claiming that the cause of death was due to service?" VA forwarded the claimant an application for DIC (VA Form 21-534), but the claimant failed to return the

completed DIC application. Based on these facts, the 1995 application for burial benefits should <u>not</u> be considered a claim for DIC.

**Example 9:**  In 1995, a surviving spouse filed an application for burial benefits (VA Form 21-530) and marked "yes" in response to the question "are you claiming that the cause of death was due to service?"  VA did not forward an application for DIC.  Based on these facts, DIC must be paid retroactive to the 1995 application for burial benefits, if otherwise in order.  The one-year period for filing a completed DIC application did not begin due to VA's failure to provide the application form.


## DIAGNOSIS OF PRESUMPTIVE DISABILITIES

The evidence must show a diagnosis of one of the presumptive conditions and the date of the diagnosis.  A prior denial of a claim for a presumptive disability based on lack of a diagnosis falls within the scope for readjudication, however the effective date for any disability cannot precede the diagnosis.

**Example 1:**
The Veteran submitted a claim for service connection for ischemic heart disease due to herbicide exposure on May 2, 1995.  He served in Vietnam; therefore, herbicide exposure is conceded.  Testing confirmed hypertensive vascular disease on April 5, 1995, but not ischemic heart disease, so a decision letter was sent to the Veteran denying service connection for ischemic heart disease.  On March 3, 2010, VA administratively reviewed the claims file due to ongoing *Nehmer* litigation.  The evidence on file showed VAMC treatment records with a diagnosis of ischemic heart disease on April 19, 1997.  The medical records did not have a date stamp or any other annotation showing when VA received them. The medical records were accepted as a reopened claim and resulted in a denial of service connection by rating dated May 15, 1998.   Based on these facts, the Veteran was granted service connection from April 19, 1997.  Although, the Veteran filed a claim on May 2, 1995, a diagnosis was not shown until April 19, 1997.  In addition, 38 C.F.R. § 3.816(c)(1) states that the effective date of the award will be the later of the date VA received the claim on which the prior denial was based or the date the disability arose.

**Example 2:**
A review of the claims folder shows that an original claim was filed on April 5, 1995, for service connection for *heart disease* (not IHD) and high cholesterol. The medical evidence for the period March 1993 and April 1995 showed a diagnosis of high cholesterol and a *history* of heart disease.  Development action(s) was not undertaken and the SC claim was denied in June 1996. Based on these facts, VA failed to confirm a diagnosis and the *Nehmer* stipulation requires that we readjudicate claims for new presumptive conditions that were previously denied.

**Example 3:**
A review of the claims folder shows that an original claim was filed on June 5, 1996, for service connection for IHD and high cholesterol.  The veteran served in-country Vietnam from 1969 to 1971.  The medical evidence of record for the period March 1993 and April 1996 showed a diagnosis of high cholesterol and a history of heart disease.  A VA examination dated September 7, 1996, showed a diagnosis of high cholesterol and IHD.   Based on these facts, the claim was denied SC June 1997.  The *Nehmer* stipulation requires that we readjudicate claims for new presumptive conditions that were previously denied.

## *NEHMER* DATABASES

The Phase I *Nehmer* Adjudication (EP 681) and the Phase II *Nehmer* Reajudication (EP 687) Databases facilitate the claims folder review by providing the user with questions that are necessary to process a *Nehmer* claim.  The information gathered not only enables the claims folder review process, but also provides a data collection mechanism that is used for reporting data to VBA, the Secretary of Veterans Affairs, the Office of General Counsel (OGC), the Department of Justice, and, if necessary, the Court.

It is imperative that the databases are utilized and all information is saved in the appropriate during the claims folder review.  In previous *Nehmer* readjudications, inaccurate reporting and failure to adequately track and document work resulted in the Court issuing "Show Cause" orders regarding why VA and VBA supervisors should not be held in contempt.

Upon completion of the adjudication/readjudication of the file in the database, the reviewer will be responsible for incorporating a printout of the completed worksheet into the claims folder.

## END PRODUCT CONTROL

For the purposes of tracking, separate EPs have been assigned to the *Nehmer* claims:  EP 687 for readjudication of previously denied claims and EP 681 for new claims received between the Secretary's original announcement and August 31, 2010.  The date of claim and end product will be established in the *Nehmer* database.  If a *Nehmer* claim is NOT in the database, notify Southern Area Office immediately.  Do NOT attempt to establish an EP until notified of the database modification and the correct date of claim.  ONLY then proceed to establish the EP and the correct date for date of claim.

The e-mail address for Southern Area Office can be found in Appendix 6.

## CLAIMS FOLDER REVIEW

A systematic review of the **entire** claims folder is required to determine if the individual is a *Nehmer* class member and if the eligibility requirements for retroactive payments under *Nehmer* are met.

If the individual is a *Nehmer* class member, the reviewer must ensure the following actions are taken:

- Prepare rating if SC is granted and assign an effective date
- Prepare award action(s)
- Prepare notification letter with appellate rights, and
- Update the database

If the individual is not a *Nehmer* class member, forward to the RVSR for a Memorandum for the Record.  For more information regarding Memorandums for the Record, see the Rating section.

Check the claims folder for medical evidence required for a rating decision.

For live cases, check for complete information of spouse (and prior marriages/divorces), children, step-children, adoption.  For cases involving death, verify proof of dependency and for proof of death.  For burial claims, verify there is an itemized funeral bill showing paid or receipts showing the funeral expenses were paid and who paid the funeral bill.

During the screening process, if medical evidence is sufficient to grant partial benefits, send to the RVSR.

**NOTE:** If no additional development is required, send the MAP-D Notification/Development Paragraphs for *Nehmer* to the class member (See Appendix 12).

**IMPORTANT:**  Detailed, but concise notes should be added in Modern Awards Processing – Development (MAP-D) throughout the claims review.  After completion of review, the data must be entered into the *Nehmer* database to track all actions associated with the claim.

Proceed with development if necessary information is not of record for making a decision and completing the claim.

## DEVELOPMENT

Development may be required following the claims folder review.  This may include development for medical evidence, service, dependency, payee, military pay, and/or burial information.  Use MAP-D to generate the development letters.  See Appendix 12 for the appropriate paragraphs to use in development letters.

Be sure to use considerate language when developing these claims, especially in death cases.  Most cases identified as *Nehmer* claims have been denied many years ago.

**NOTE:** Development for any evidence (including requests for information that are initiated to a claimant or any third party) that was not in the claims file will require a rating decision.  **Do not** dispose of the issues by a memorandum for the record.

Some *examples* of development where VA must generate a rating decision include:

- Viewing or printing CAPRI records
- Searching the internet for ships that may verify in-country RVN Service
- Requesting service information through DPRIS
- Developing to the claimant or private medical facility for evidence

**Medical Evidence**

Due to the inherent nature of *Nehmer* cases, it may be difficult to obtain a complete medical history of the Veteran.  The development of evidence in connection with claims for service connection will be accomplished when deemed necessary, but it should not be undertaken when evidence present is sufficient for this determination (38 C.F.R. § 3.304(c)).  When the evidence of record is sufficient to grant benefits, but a current assessment of the medical condition(s) is necessary, VAE may be appropriate.  Consult with the RVSR to determine if medical records are sufficient for rating.

Example

IHD with multiple heart attacks since denial ten years ago, and evidence in file would have warranted a 60 percent evaluation.

Medical evidence, lay evidence, or both may establish the factual basis for a decision.  Medical evidence should set forth the physical findings and symptomatology elicited by examination within the applicable period.  Lay evidence should describe the material and relevant facts as to the Veteran's

disability observed within such period, not merely conclusions based upon opinion.  *See* 38 C.F.R. § 3.307(b).

In order to pay DIC and burial benefits, a death certificate or other proof of death is required showing the date of death and the cause(s) of death.  See 38 C.F.R. § 3.211 for additional sources of proof of death.

**Service**

If unavailable in the Veteran's records, verification of service may be obtained by performing a Defense Personnel Records Information Retrieval System (DPRIS) request.

Verification of the Veteran's pay grade is required if the Veteran died prior to December 31, 1992.  Check the Veteran's DD Form 214 for pay grade.  If the evidence of record cannot determine the pay grade, request service records from the service department through DPRIS.

For more information on using DPRIS for service verification, please see the respective User Guides.

**Dependency**

Use the following table to determine what information is required to establish dependency.  Please note that this is not an all-inclusive list.

| Evidence Requirements for Dependency | |
|---|---|
| **Dependent** | **Evidence Required** |
| Spouse | • Date of marriage to Veteran<br>• Number of prior marriage(s)<br>• Name(s) of prior spouse(s)<br>• Date(s) and place(s) of termination of prior marriage(s) for both the Veteran and spouse<br>• Social Security Number (SSN)<br>• Continuous cohabitation<br>• Remarriage after death of the Veteran |
| Biological Child | • Date of birth<br>• SSN |
| Stepchild | • Date of birth<br>• Birth Certificate<br>• SSN<br>• Date child was in the household of the Veteran |

| Evidence Requirements for Dependency | |
|---|---|
| **Dependent** | **Evidence Required** |
| Adopted Child | • Date of birth<br>• SSN<br>• Adoption paperwork or revised birth certificate |
| Parent | • Birth certificate of the Veteran<br>• SSN<br>• Parent's financial information |

Children between ages 18 and 23 who are attending school at an approved institution may receive DIC benefits.  Before the claim can be processed, it may be necessary to gather information regarding school attendance dates and other information.  Additionally, information on Dependents' Educational Assistance (DEA) should be checked to prevent concurrent receipt of benefits.

Development of dependency information may be made over the telephone, through facsimile, or by letter.

For more information on developing for dependency see M21-1MR, Part III, Subpart iii, Chapter 5 (M21-1MR III.iii.5).

The right to benefits survives entitled member (contrary to 38 U.S.C. § 5121).

**Continuous Cohabitation**

The requirement that there must be continuous cohabitation from the date of marriage to the date of death of the Veteran will be considered as having been met when the evidence shows that any separation was due to the misconduct of, or procured by, the Veteran without the fault of the surviving spouse.  Temporary separations, including those caused for the time being through fault of either party, will not break the continuity of the cohabitation.

**Common Law Marriage**

To view a list of states that recognize common law marriage, please refer to "Recognition of Common Law Marriages by State" in M21-1MR III.iii.5.C.14.a.

**Payee**

As these are potentially old cases, it may be necessary to develop for payees for the retroactive benefits.  Send letters to all dependents of record requesting the names, addresses, and telephone numbers of all known survivors.

Additionally, proof of dependency is required before retroactive benefits may be paid.  Develop for birth certificates, marriage certificates, and other proof of dependency if necessary.

If payees cannot be identified, VA must make such reasonable inquiry as the information on file permits.  For example, if the claims folder identifies an authorized representative or a relative, it would be reasonable to contact such person to request information concerning the existence of a surviving spouse, child(ren), parent(s), or the executor/administrator of the class member's estate.

If any such payee cannot be identified or located:

- Complete VA Form 21-0820, *Report of General Information*, for the folder stating the reasons why the payment of retroactive *Nehmer* benefits was not payable to a beneficiary
- Notify *Nehmer* Project Manager by e-mail that no payee could be identified, including the claimant's name and file number in the message

**NOTE**:  Refer to the Eligibility Requirements section for a list of eligible payees and order of entitlement.

**Military Pay**

38 U.S.C. § 5305 prohibits, in some cases, Veterans from receiving full military retirement pay and VA compensation benefits at the same time.  In order to properly withhold benefits and prevent overpayments, DFAS has provided a database listing retired pay, severance and separation pay, and Survivor Benefit Plan (SBP) amounts and effective dates.

**NOTE**:  Before developing, verify the Veteran waived his or her military pay in lieu of compensation.  This can be found on VA Form 21-526, *Veteran's Application for Compensation and/or Pension*, or VA Form 21-651, *Election of Comp in Lieu of Retired Pay or Waiver of Retired Pay to Secure Comp from VA*.

**NOTE:**  A waiver may not be included on some versions of VA Form 21-526.  A copy of Form 21-651 must be of record or obtained from the class member.

**Burial**

The following information may need to be requested from the survivor, funeral home or cemetery:

- Proof of death
- Receipt showing the total cost of the funeral and who made payment
- Itemized list of funeral expenses
- Place of burial

**NOTE**:  Contacting the funeral home or cemetery for this information over the telephone may expedite the process.

**IMPORTANT REMINDER:**  Detailed notes should be entered into MAP-D.

After completion of Development, the *Nehmer* Database should be updated to track all actions associated with the individual's claim.

## RATING

### Memorandum for the Record

A memorandum for the record is used **only** when the individual is not a *Nehmer* class member (*i.e.*, no prior claim, no "Veteran" status, etc).  If it is determined the individual is not a *Nehmer* class member, then a memorandum for the record is required.  A notice letter is not sent to the individual.

A detailed explanation regarding why the individual is not a class member is required.  The explanation must be sufficient in detail for the reviewer to undertake a clear analysis as to why the case does not qualify for *Nehmer* readjudication. See Appendix 7 for sample memorandums for the record.

**NOTE:** The example memorandums for the record that appear in Appendix 7 are modifications of an actual form used in previous *Nehmer* readjudications. For the purposes of this *Nehmer* review, use the memorandums as shown with no form number.  In no instance, when using these forms, should there be any reference made to rating.

Some *examples* where VA may not, under any circumstance, dispose of a case using a memorandum for the record include:

1. A Veteran filed a claim expressly for one of the new presumptive diseases

2. A Veteran filed a claim for a disease that may be reasonably construed as a covered herbicide disease

3. A Veteran filed a claim that did not directly address a covered herbicide disease but that did raise an issue potentially intertwined with a covered disease, such as hypertensive heart disease, but VA failed to fully develop that claim in order to rule out or confirm the diagnosis of hypertensive heart disease, or any other potential covered disease

4. Any case where VA reviews a claims folder and discovers evidence *in the file* of a covered herbicide-related disease

5. Any case wherein VA initiates development.  (See Development section)

**NOTE:** Verified in-country Vietnam service is conceded in the foregoing examples.

Examples of Memorandums for the Record:

**Example 1:**

In 1993, the individual filed a claim for service connection for HCL.  The medical evidence did not show a diagnosis of HCL.  The individual served from 1969 to 1974 (one consecutive period of service) and received a bad conduct discharge.  The claim was denied in 1994 based on no diagnosis.  Based on these facts, the individual is not a *Nehmer* class member, as he did not have "Veteran" status.  A memorandum for the record is in order.

**Example 2:**

In 1987, the Veteran filed a claim for service connection for lupus.  The medical evidence of record shows a diagnosis of lupus.  The individual served from 1969 to 1978. The claim was denied in 1989.  The rating disposed of the SC claim for lupus, and the incorrect rating disability code (8004-currently used for PD) was used.  The notification letter and rating decision only addressed lupus and did not reference PD.  Based on these facts, the individual is not a *Nehmer* class member, as he did not have a prior claim for service connection for a new presumptive disease.  A no prior claim memorandum for the record is in order.

**Example 3:**

In 1995, the Veteran filed a claim for heart disease.  The medical evidence submitted with the claim confirmed the diagnosis.  The evidence shows the Veteran served in the Air Force from 1965 to 1975 and has verified in-country Vietnam service from 1970-1972.  A VA examination was not ordered and no additional development for any medical records was undertaken.  The claim for service connection was denied in 1997.  The review raised doubt as to whether or not the heart disease could be considered a claim for the new presumptive disease.  Based on these facts, it is reasonable to construe the 1995 claim as a claim for the new presumptive disease and a readjudication of the claim is required.

**Example 4:**

The Veteran filed a claim for hypertension and the medical evidence of record indicated treatment for a heart condition with medication.  The claim was denied for hypertension only.  In this situation, there is an indication that the Veteran had a heart condition.  Based on these facts, the Veteran would be considered a *Nehmer* class member and readjudication of the claim is required.

A slightly different variation to the above scenario would change the outcome.  The Veteran claimed hypertension, and the evidence showed a diagnosis of

hypertension.  Service connection for hypertension was denied.  Based on these facts, we do not have a claim for a new presumptive disease.  In this situation, a no prior claim memorandum for the record is in order.

---

## WARNING

**If there is any doubt about whether or not an individual is a *Nehmer* class member, readjudicate the claim.  Do not prepare a Memorandum for the Record.**

---

**NOTE:**  It is anticipated that Memorandums for the Record will not be frequently used and the least likely used will be "no prior claim," because of the liberal interpretation of a claim.

**Confirmed and Continued Rating**

If classified as a *Nehmer* class member and eligibility requirements for *Nehmer* claims are met, but there is no change to the decision in the previous claim, you should issue a confirmed and continued rating.

If a prior claim for compensation or DIC for disability or death due to IHD, PD, or HCL was denied for some reason other than a lack of service connection, and there is no basis for awarding an earlier effective date under *Nehmer,* contact C&P Service.  Please refer to Appendix 6 for contact information.

Examples
- If the prior claim was denied because there was no evidence that the Veteran had IHD, PD, or HCL, and VA confirms no diagnosis during readjudication, retroactive benefits would not be in order. VA would issue a rating decision denying benefits under *Nehmer*
- If the prior claim was abandoned or withdrawn, there would not be a basis for retroactive payments under *Nehmer*

**Coded Ratings**

If classified as a *Nehmer* class member and eligibility requirements for *Nehmer* claims are met, and the claim is ready-to-rate, the following sections pertain to rating claims for service connection, service-connected death benefits, and claims involving service connection combined with service-connected death benefits.

Total Disability Based on Individual Unemployability (TDIU)
The RVSR is strongly encouraged to consider entitlement to TDIU when pension was previously awarded.

1. Ensure that when considering TDIU, the presumptive condition is the primary reason for the Veteran being unemployable.
2. If the RVSR has further questions, please e-mail VAVBAWAS/CO/NEHMER.

**Example**

The Veteran was granted entitlement to pension at 60 percent for IHD under disability code 7005.  Under *Nehmer* review, VA determined that the Veteran is service-connected for IHD.  Because IHD is the primary condition causing the Veteran to be unable to obtain or maintain gainful employment, award TDIU.  <u>Do not send VA Form 21-8940 because the evidence that VA would obtain from this form is already of record due to the pension claim.</u>

**NOTE:** Prior to September 21, 1992, RVSRs were required to code all claims and noted claims (See Footnote 1 in Appendix 15).

**NOTE**: If a *Nehmer* claim involves multiple issues, only one rating decision is produced.

**Claims for Service Connection**

Claims for service connection may arise from:
- Informal claims
- Inferred claims
- Claims reasonably raised by VA
- For purposes of *Nehmer* review, a live pension claim  is a claim for compensation

<u>Issue(s)</u>
Clearly state all issues of entitlement identified by the claimant or inferred based on the facts or circumstances of the claim.  List the disability/disabilities and the current assigned evaluation(s).  Also, specify any complications or other recognized herbicide-related conditions and the current assigned evaluation(s).  *See* M21-1MR, Part III, iv.6.B.2.

<u>Evidence and Evidentiary Basis</u>
The Evidence section must be a clear and concise inventory of all evidence considered in arriving at the decision.

The evidence will include but is not limited to:

- Applicable dates, such as dates covered by service treatment records (STRs), identifying at least the month and year
- Private treatment reports
- Private hospitalization reports

- Information sources, such as the names of Department of Veterans Affairs (VA) and private medical facilities, private physicians, and other information sources,
- DD Form 214
- VA Form 21-526
- VA Form 21-534
- VA Form 21-530
- VA Form 21-601
- VA Form 21-4182, *Application for Dependency and Indemnity Compensation or Death Pension,* a supplemental attachment to Social Security application forms
- VA Examinations
- Social Security Administration Records
- Prior rating decision that denied service connection for the presumptive disability, unless this is an open claim
- Death Certificate/Autopsy Report
- All other information pertinent and related to the presumptive condition(s)

Decision
Clearly and concisely state the decision made on each issue or inferred issue. *See* M21-1MR, Part III, iv.6.C.9

Reasons for Decision
The rating decision must concisely cite and evaluate all evidence that is relevant and necessary to the determination.  Clearly explain why the evidence is found to be persuasive or unpersuasive, and address all pertinent evidence relating to the presumptive condition(s).

**NOTE:**  *Nehme*r decisions will be stand-alone documents as they will be reviewed without the claims folder by others as well as class counsel.  Class counsel will **not** have the claims folder during their review, therefore, it is crucial all evidence pertinent to the presumptive condition(s) is listed and properly discussed in the decision.

Coding and Assigning a Percentage
The Cardiovascular System in the Rating Schedule was revised effective January 12, 1998.  A grant of IHD prior to January 12, 1998, will require application of the Rating Schedule that was applicable on January 12, 1998.  These evaluations are protected if there is no change in the condition AND the new regulation would result in a lower evaluation.  However, if the new criteria provides for a higher evaluation, grant the entitlement effective the change in regulation.  38 U.S.C. § 1155; 38 C.F.R. § 3.114(a).

Special Monthly Compensation
Special monthly compensation entitlement must be considered as appropriate. Many times (S)1 (schedular housebound - single 100 percent and additional

service connected conditions which combine to 60 percent), is in order when we grant an additional 100 percent under *Nehmer* (38 U.S.C. 1114(s) and 38 C.F.R. 3.350(i)).

Effective Date
The effective date of claims for service connection is the later of the date VA received the claim on which the prior denial was based or the date the disability arose.

For purposes of *Nehmer* IHD, PD, or HCL claims, the date a disability arose is the date VA had sufficient evidence or information to identify the existence of such a disease or, the evidence or information available was sufficient to "code" IHD, PD, or HCL as a disability pursuant to guidance regarding coding contained in the Veterans Benefits Adjudication Manual M21-1MR, and/or prior versions of such manual.

**NOTE**:  38 U.S.C. § 5110(g) and 38 C.F.R. § 3.114 **do not apply** to *Nehmer* claims.

**Claims for Service-Connected Death**

VA Form 21-534 must be considered for DIC if:

- Only death pension (NSC) was claimed **or**
- No distinction was made between death pension and DIC

VA Form 21-530, *Application for Burial Benefits*, must be considered for DIC if:

- SC was indicated on VA Form 21-530 and VA Form 21-534 was received within one year[1]
- VA's failure to provide VA Form 21-534 after receipt of VA Form 21-530 with SC indicated[2]
- In each instance, the effective date for the DIC benefits is the date the VA Form 21-530 was received[3]
- Receipt of attachment to Social Security Application, VA Form 21-4182, *Application for Dependency and Indemnity Compensation or Death Pension*, may establish the date of claim

38 C.F.R. § 3.150(b), Forms to be Furnished, receipt of notice of death must be considered if appropriate application form was not forwarded for execution by or on behalf of any dependent who has apparent entitlement to pension, compensation or DIC.

---

[1]  38 C.F.R. § 3.152 (b)(1); Mitscher v. West, 13 Vet. App. 123, 128 (1999)
[2] 38 C.F.R. § 3.155(a).
[3]  38 C.F.R. § 3.152 (b)(1); Mitscher v. West, 13 Vet. App. 123, 128 (1999)

Evidence

For purposes of a *Nehmer* review, the standards for the evidence section of a rating decision for service-connected death do not differ from those of a rating decision for service connection.  The evidence must show all the evidence pertaining to the claim identified for *Nehmer* review.  Refer to the Evidence subsection of the Claims for Service Connection section for details on the requirements for Evidence.

Issue(s), Decision(s), and Reasons for Decision

For purposes of a *Nehmer* review, the standards for these elements (Issue, Decision, and Reasons for Decision) of a rating decision for service-connected death do not differ from those of a rating decision for service connection.  Please refer to the subsection in the Claims for Service Connection section for guidance.

**NOTE:**  A grant of DIC is appropriate when the presumptive condition is:

- Primary cause of death
- Secondary cause of death
- Contributory cause of death

Effective Date

The effective date for DIC claims must be one of the following dates:

- The date VA received the claim, or
- The first of the month of the Veteran's death, if filed within one year from the date of the Veteran's death.

Dependents Educational Assistance (DEA) - Chapter 35

A new period of DEA eligibility may accrue when the Veteran dies.  As such, the issue of DEA eligibility may be considered twice in a single rating, once on the basis of retroactive entitlement when the Veteran was alive, and a second time for death benefits purposes.

See Appendix 7 for Rating Templates for DIC.

**Claims for Service Connection and Service-Connected Death**

Note that *Nehmer* claims may contain multiple issues, but that these issues are addressed in a single rating decision.  All *Nehmer* claims involving claims for service connection and service-connected death must be addressed in one rating decision.

Coding Considerations

In order to generate live coding for a death case, you MUST use the "accrued" indicator in RBA2000.  It is on the "Profile" screen (the screen on which you enter the jurisdiction and date of claim) on the left side, about halfway down.  It will be

accessible only for a death case.  If you don't use the "accrued" indicator, the Master Record will allow you to enter all the historical live coding data, but will print only the death data.

<u>Issue(s), Decision(s), and Reasons for Decision</u>
For purposes of a *Nehmer* review, the standards for these elements (Issue, Decision, and Reasons for Decision) of a rating decision for service-connected death do not differ from those of a rating decision for service connection.  Please refer to the subsection in the Claims for Service Connection section for guidance.

**NOTE:**  After completion of the Rating, the Database should be updated to track all actions associated with a class member's claim.


## AUTHORIZATION

The VSR and SVSR are responsible for assuring that the rating decision, award action(s), and notice of decision with appeal rights are accurate and properly prepared for all benefits.  This includes live compensation claims, DIC claims, burial claims, and other retroactive benefits.

This section involves award processing for the following types of claims:

      1)     Live Veterans Claims
      2)     DIC Claims
      3)     Burial Claims

Prior to award input, the *Nehmer* database must be utilized to ensure previous actions associated with a class member's claim were completed.  This will include **re-verifying in-country RVN service and the initial document used to support the effective date shown in the rating decision**.  If any discrepancy is found, it will be brought to the attention of the RVSR that rated the claim for possible corrective action or concurrence.

A notification letter is **not** required if a memorandum for the record is prepared by the RVSR.  Clear the pending EP.  Update the *Nehmer* Database.

**Live Veterans Claims**

Prepare the award under the appropriate EP as instructed by the *Nehmer* Project Manager (Southern Area Office).

In situations where payment is not necessary, clear the EP and do not prepare an award.  Examples of such instances include confirmed and continued rating decisions.

The following sections provide additional information on dependents, previous cost of living adjustments (COLAs), and withholding for military pay.

Dependents

If the Veteran's new combined evaluation for compensation is 30 percent or above, additional compensation is payable based on qualified dependents (to include Helpless Child).

If development for dependency was not completed prior to the rating decision, request the required evidence after processing the rating decision.  Clear the EP in these situations.

Kicker / Public Law 101-508

Veterans that were in receipt of compensation benefits on December 1, 1990, did not receive a COLA until January 1, 1991.  Public Law 101-508 reinstated the December 1, 1990, COLA.  This was payable on March 1, 1992.  This one-time payment was known as the "kicker."  VETSNET must be manually adjusted to account for the kicker.

Liesegang, et al v. Secretary of Veterans Affairs

On December 10, 2002, the US Court of Appeals for the Federal Circuit issued a decision in the case of *Liesegang, et al v. Secretary of Veteran Affairs*.  The Court held that the correct effective date for our regulation adding Type 2 diabetes to the list of presumptive disabilities related to herbicide exposure is May 08, 2001, instead of July 9, 2001.

As a result of that decision, VA issued an automatic one-time adjustment to 9,340 Veterans granting an earlier payment date of June 1, 2001.  The one time payment was made on August 4, 2003.  In each adjusted case a notice was issued to the Veteran, POA, and RO.   An additional 4,680 cases were manually reviewed.  When reviewing the current *Nehmer* cases that may have previously involved Type 2 diabetes you must assure that this adjustment was actually made.  This may require a thorough review of the claims folder.  It is important that the Veteran gets paid correctly when entering the information into the prior payment field in VETSNET for retroactive awards.

Withholding for Military Pay

In claims that involve military retired pay, the authorization activity must ensure that all proper adjustments are made correctly.  Verify the Veteran waived his or her military pay in lieu of compensation.  This can be found on VA Form 21-526 or VA Form 21-651, *Election of Comp in Lieu of Retired Pay or Waiver of Retired Pay to Secure Comp from VA.*

**NOTE:**  Prior to 1978, a signature block was not included on VA Form 21-526.  A copy of Form 21-651 must be of record.

In some instances, the Veteran may have received separation, severance pay, or drill pay that must be adjusted.  In these instances the authorization activity must assure that all adjustments are made properly.

**NOTE**:  In some circumstances Veterans may receive full military retirement pay and VA compensation benefit payments.

**NOTE:**  Retired pay rates will be obtained from DFAS database.

### DIC Claims

The authorization activity must check all dependency information prior to awarding benefits.  Only the proper claimant(s) can be paid.

Prepare the award under an appropriate EP as instructed by the *Nehmer* Project Manager (Southern Area Office).  Be sure the payee number for the EP is appropriate for the claimant.  For more information on payee codes, see M21-1 Part I, Appendix C.

Additional Allowances
When preparing the award, be sure to include any additional allowances that the surviving spouse may be entitled.  For example, an additional allowance for:
- Dependents
- Total disability rating for a continuous period of eight years or more preceding death and the spouse married to the Veteran during the same time period

Death Prior to December 31, 1992
If the Veteran died prior to January 1, 1993, DIC is paid to a surviving spouse based on whichever of the following provisions provides the greater benefit:

- 38 U.S.C. § 1311a(3), which is based on the Veteran's pay grade, or
- 38 U.S.C. § 1311a(1) and 38 U.S.C. § 1311a(2), which is based on the basic rate of DIC and any additional allowance payable because the Veteran was rated as totally disabled for at least eight continuous years and married to the surviving spouse for the same period of time

The pay grade for all Veterans who died prior to December 31, 1992, must be verified.  Pay grade may be found on the DD Form 214 or other service documents.

A verified pay grade code is not required on:

- Awards of DIC to children or parents, or
- Awards based on a Veteran's death after December 31, 1992

Withholding for SBP Payments
In claims that involve SBP, the authorization activity must assure that all proper adjustments are made correctly.  Under a recent Federal Circuit decision, DFAS cannot deduct DIC payments from monthly SBP annuities, if the annuitant is entitled to both DIC and SBP benefits, and has remarried after age 57.

**NOTE**: SBP payments may be obtained from DFAS database.

Remarriage of the Surviving Spouse
The Surviving Spouse may have remarried after the death of the Veteran. Please review M21-1MR, IV.III.3.F.23, General Information on the Effect of a Surviving Spouse's Remarriage, for additional guidance.

Month of Death Payment
Before awarding the month of death payment, verify that the surviving spouse has not received this payment by using the Payment History Inquiry Screen in Corporate and a review of the claims folder.

Consideration of VA Form 21-4182, *Application for Dependency and Indemnity Compensation or Death Pension*, must be recognized as a claim for VA death benefits (See M21-1MR IV.iii.3.A.4 and 38 C.F.R. § 3.153).

VA Form 21-4182 constitutes an initial claim for any or all of the death benefits:

- DIC
- Death pension, and/or
- Accrued benefits.

Additional information may be found M21-1MR III.ii.2.C.14.b.

**Burial Claims**

Before awarding monetary burial benefits the authorization activity must verify all evidence is of record.

Prepare the award under an appropriate EP as instructed by the *Nehmer* Project Manager (Southern Area Office).

The following sections provide additional information on dependents, previous cost of living adjustments, and withholding for military pay.

Burial Claims Prior to the Current December 1, 2001, Rate
Please be aware that service connected burial payments were less than $2000 prior to December 1, 2001.  See the table below for a list of prior rates and their effective dates.

| Burial Amounts | | | |
|---|---|---|---|
| Date | SC Amount | NSC Burial Amount | NSC Plot Amount |
| 06-18-73 | $800 | $250 | $150 |
| 10-01-78 | 1100 | 300 | 150 |
| 04-01-88 | 1500 | 300 | 150 |
| 09-11-01* | 2000 | 300 | 300 |
| 12-01-01 | *2000 | 300 | 300 |

\* The SC burial amount was increased on December 1, 2001, and is effective for deaths that occurred on or after September 11, 2001.

Prior Payments of NSC Burial
Check the claims folder for any prior payments of NSC burial.  This amount must be deducted from the total amount for service connected benefits payable.

**Retroactive Benefits**

Prepare the award under an appropriate EP as instructed by the *Nehmer* Project Manager (Southern Area Office).  Ensure that the correct rates and total retroactive amounts have been calculated correctly.  If multiple payees exist, prepare awards using different payee codes, dividing the total amount equally.

**Award Annotation**

The VSR must annotate the award with "*Nehmer* Retroactive payment based on [the name of new presumptive condition]" in the remarks section of the award printout.

**Notification Letter**

Use PCGL to generate the notification letters.  Be sure to suppress the BDN-generated letters as only locally generated letters may be issued.  Examples of the notification letters for live cases and death cases can be found in Appendix 10.

For burial claims, use the standard burial letter found in PCGL to generate the notification letters.  This letter should be merged with the death letter, when there was a claim for DIC.

Verify the letter contains a calculation of the retroactive amount and be sure to include all ancillary benefits that the Veteran or his/her dependents may be entitled.  Award and denial letters must include:

- The decision made
- The monthly VA rates
- The applicable effective dates
- Any benefits being withheld and the reason for withholding benefits
- Estimated retroactive benefit
- Appellate rights of the claimant
- Information about any additional benefits or entitlements the claimant may be due

After award authorization, the letters must be scanned into Virtual VA.  For more information on using Virtual VA, see the Virtual VA User Guide.

## SME Quality Reviews

VA will use a two-tier review process for ratings, and a two-tier review process for authorization.  Prior to processing a rating decision, all *Nehmer*-related ratings must undergo a review by a *Nehmer* rating SME.  This review will include providing a second signature on the rating decision and completing the rating portion of the SME review checklist (Appendix 17).

Upon completion of the rating review, the award action and notice of decision (award letter) will be reviewed and authorized by a designated authorizing SME. In addition to authorizing the case, the authorizing SME will also complete the authorization portion of the SME review checklist.  The SME reviewers must conduct a review of their respective areas of responsibility.  The checklist **must** be incorporated into the claims file.  This includes a checklist that annotates errors that are subsequently corrected.

The SMEs should not conduct quality reviews in cases wherein they were any of the following:

- o  Veterans Service Representative that prepared development or award action; or
- o  Rating Veterans Service Representative that prepared the rating decision.

## Sending Documents to OGC
In accordance with the court order, a copy of the Payment History Inquiry Screen in Corporate must be submitted when requested by OGC.  Please refer to Appendix 6 for contact information.

# APPENDICES

**Appendix 1 – List of Presumptive Conditions in 38 C.F.R. § 3.816**

The following is a list of conditions presumptively associated with herbicide exposure and the dates the regulations governing the presumptions became effective, as found in 38 C.F.R. § 3.816 (b)(2):

| | |
|---|---|
| Soft-tissue Sarcoma | October 15, 1991 |
| Hodgkin's disease | February 3, 1994 |
| Non-Hodgkin's lymphoma | May 19, 1993 |
| Porphyria cutanea tarda | February 3, 1994 |
| Lung cancer | June 9, 1994 |
| Bronchus cancer | June 9, 1994 |
| Larynx cancer | June 9, 1994 |
| Trachea cancer | June 9, 1994 |
| Multiple myeloma | June 9, 1994 |
| Acute and Subacute peripheral neuropathy | November 7, 1996 |
| Prostate cancer | November 7, 1996 |
| Type 2 Diabetes | May 8, 2001 |
| Chronic lymphocytic leukemia (CLL) | October 16, 2003 |
| AL Amyloidosis (ALA) | May 7, 2009 |
| Ischemic heart disease | August 31, 2010 |
| Parkinson's disease | August 31, 2010 |
| B-cell leukemia | August 31, 2010 |

## Appendix 2 – Information on Vietnam Naval Operations

C&P Service has initiated a program to collect data on Vietnam naval operations for the purpose of providing regional offices with information to assist with development in *Haas* related disability claims based on herbicide exposure from Navy Veterans.  To date, we have received verification from various sources showing that a number of offshore "blue water" naval vessels conducted operations on the inland "brown water" rivers and delta areas of Vietnam.  We have also identified certain vessel types that operated primarily or exclusively on the inland waterways.  The ships and dates of inland waterway service are listed below.  If a Veteran's service aboard one of these ships can be confirmed through military records during the time frames specified, then exposure to herbicide agents can be presumed without further development.

All vessels of Inshore Fire Support [IFS] Division 93 during their entire Vietnam tour
- USS Carronade (IFS 1)
- USS Clarion River (LSMR 409) [Landing Ship, Medium, Rocket]
- USS Francis River (LSMR 525)
- USS White River (LSMR 536)

All vessels with the designation LST [Landing Ship, Tank] during their entire tour [WWII ships converted to transport supplies on rivers and serve as barracks for brown water Mobile Riverine Forces]

All vessels with the designation LCVP [Landing Craft, Vehicle, Personnel] during their entire tour

All vessels with the designation PCF [Patrol Craft, Fast] during their entire tour [Also called Swift Boats, operating for enemy interdiction on close coastal waters]

All vessels with the designation PBR [Patrol Boat, River] during their entire tour [Also called River Patrol Boats as part of the Mobile Riverine Forces operating on inland waterways and featured in the Vietnam film "Apocalypse Now"]

| Vessel | Description |
|--------|-------------|
| USS Mansfield (DD-728) | [Destroyer] Operated on Saigon River August 8-19, 1967, and December 21-24, 1968 |
| USS Richard E. Kraus (DD-849) | [Destroyer] Operated on coastal inlet north of Da Nang, June 2-5, 1966, protecting Marines holding a bridge |
| USS Basilone (DD-824) | [Destroyer] [1966]Operated on Saigon River, May 24-25 |
| USS Hamner (DD-718) | [Destroyer] Operated on Song Lon Tao and Long Song Tao Rivers, August 15-September 1, 1966 |

| Vessel | Description |
|--------|-------------|
| USS Conway (DD-507) | [Destroyer] Operated on Saigon River, early August 1966 |
| USS Fiske (DD-842) | [Destroyer] Operated on Mekong River, June 16-21, 1966 |
| USS Black (DD-666) | [Destroyer] Operated on Saigon River, July 13-19, 1966 |
| USS Providence (CLG-6) | [Cruiser, Light, Guided Missile] Operated on Saigon River 3 days during January 1964 |
| USS Mahan (DLG-11) | [Guided Missile Frigate] Operated on Saigon River October 24-28, 1964 |
| USS Okanogan (APA-220) | [Attack Transport] Operated on Saigon River July 22-23, 29-30, 1968, and August 5-6, 1968 |
| USS Niagara Falls (AFS-3) | Combat Stores Ship] Unloaded supplies on Saigon River and Cam Rahn Bay, April 22-25, 1968 |

Exposure Aboard the USS Ingersoll

The National Archives and Records Administration (NARA) has confirmed that the Navy destroyer USS Ingersoll (DD 652) traveled into the inland waterways of RVN on October 24 and 25, 1965. Concede exposure to herbicides for crewmembers that served aboard the USS Ingersoll on these dates.

If a Veteran alleges herbicide exposure based on duty aboard the USS Ingersoll, request Navy personnel records via DPRIS (request code O19).

If personnel records are unavailable, or do not confirm a specific shipboard assignment during this timeframe, send a request for a review of NARA records to C&P Service via e-mail at VAVBAWAS/CO/211/AGENTORANGE. This request should include the Veteran's:

- Name
- Date of birth
- VA claim number
- Social Security number (SSN), and
- Service number, if different than SSN

Claims Based on Service Aboard Ships Offshore the RVN

When a Veteran claims exposure to herbicides during service aboard a Navy or Coast Guard ship that operated on the offshore waters of the RVN, establish exposure on a presumptive basis if:

- Evidence shows the ship

- o Docked on the shores of the RVN, or
- o Operated temporarily on the RVN inland waterways
- Evidence places the Veteran onboard the ship at the time the ship docked on the shore or operated in inland waterways, and
- If the Veteran claims the ship docked on the shore, the Veteran has stated that he/she went ashore after the ship docked

<u>Vessels that operated primarily or exclusively on the inland waterways</u>

| Vessel |
| --- |
| All U.S. Coast Guard Cutters with hull designation WPB [patrol boat] and WHEC [high endurance cutters] |
| USS Asheville (PG-84) [patrol gunboat] |
| USS Gallop (PG-85) |
| USS Antelope (PG-86) |
| USS Ready (PG-87) |
| USS Crockett (PG-88) |
| USS Marathon (PG-89) |
| USS Canon (PG-90) |
| USS Patapsco (AOG-1) [gasoline tanker] |
| USS Elkhorn (AOG-7) |
| USS Genesee (AOG-8) |
| USS Kishwaukee (AOG-9) |
| USS Tombigbee (AOG-11) |
| USS Noxubee (AOG-56) |
| USS Mark (AKL-12) [light cargo ship] |
| USS Brule (AKL-28) |
| USS Montrose (APA-212) [attack transport] |
| USS Okanogan (APA-210) |
| USS Bexar (APA-237) |
| USS Benewah (APB-35) [self-propelled barracks ship] |
| USS Krishna (ARL-38) |
| Barracks Barge (APL-26) [sleeping quarters] |
| Barracks Barge (APL-30) |
| USS Belle Grove (LSD-2) [landing ship dock] |
| USS Comstock (LSD-19) |
| USS Tortuga (LSD-26) |
| Winnemucca (YTB-785) [harbor tug] |
| Floating Base Platform (YRBM-17) [repair, berthing, and messing barge] |
| Floating Base Platform (YRBM-18) |
| Floating Base Platform (YRBM-20) |
| USS Mercer (APB-39) |
| USS Nueces (APB-40) |
| USS Benewah (APB-35) |
| USS Tutuila (ARG-4) [repair ship] |

| USS Satyr (ARL-23) [repair ship] |
| USS Sphinx (ARL-24) |
| USS Askari (ARL-30) |
| USS Indra (ARL-37) |
| USS Colleton (APB-36) |

<u>Vessels that operated temporarily on Vietnam's inland waterways or docked to the shore</u>

| Vessel | Description |
| --- | --- |
| USS Card (ACV-11) | [Escort carrier] Mined, sunk, and salvaged in Saigon River Harbor during May 1964 |
| USS Maury (AGS-16) | [Mapping survey ship] Conducted surveys of Mekong Delta and other coastal areas and rivers beginning November 1965 through 1969 |
| USS Henrico (APA-45) through March 1967 | [Amphibious attack transport] Operated on Hue River during March 1965 and conducted numerous troop landing |
| USS Montrose (APA-212) | Operated on Song Hue River during December 1965, operated on Long Tau River during March 1967, and operated on Cua Viet River and at Dong Ha during May 1967 |
| USS Talladega (APA-208) | Operated on Saigon River during October 1967 |
| USS Bolster (ARS-38) | [Salvage ship] Crew operated on land to extract USS Clark County (LST-601) from beach after grounding at Duc Pho from November 18 to December 1, 1967 |
| USS Canberra (CAG-2) | [Guided missile cruiser] Operated on Saigon River from March 31 through April 1, 1966, on Cua Viet River during December 15, 1966, and on Mekong Delta Ham Luong River during January 15, 1967 |
| USS Sproston (DD-577) | [Destroyer] Operated on Mekong Delta and Ganh Rai Bay during January 1966 |
| USS Picking (DD-685) | Operated on Saigon River during November 16, 1965 |
| USS Epperson (DD-719) | Docked to Da Nang Pier on October 4, 1970 |
| USS Southerland (DD-743) | Operated on Song Nga Bay and Saigon River during July 1966 |
| USS John W. Thomason (DD-760) | Operated on Nga Be River during 1969 |
| USS Buck (DD-761) | Operated on Mekong River Delta and Saigon River during October 1966 |

| USS Preston (DD-795) | Operated on Mekong River Delta, Ganh Rai Bay, and Saigon River during September 28 – 29 and December 27 – 29, 1965 |
| --- | --- |
| USS Warrington (DD-843) | Operated on Mekong River Delta Rung Sat Special Zone, North of Vung Gahn Rai Bay during March 1967 |
| USS Dyess (DD-880) | Operated on Saigon River and Rung Sat Special Zone from June 19–July 1, 1966 |
| USS Perkins (DD-877) | Operated on Saigon River during June 1969 |
| USS Orleck (DD-886) | Operated on Mekong River Delta during July 1969 |
| USS Joseph Strauss (DDG-16) | [Guided missile destroyer] Operated on Mekong River Delta and Ganh Rai Bay during November 7 and December 7, 1968 |
| USS Waddell (DDG-24) | Operated on Cua Viet River during March 1967 |
| USS Newell (DER-322) | [Radar destroyer escort] Docked at port of Nha Trang during December 22-24, 1965 |
| USS Duluth (LPD-6) | [Amphibious transport dock] Docked to pier at Da Nang during March and October 1971 |
| USS Cleveland (LPD-7) | Operated on Cua Viet River and at Dong Ha, as well as Hue River, from November 1967 through 1968 and Saigon River during September 1969 |
| USS Dubuque (LPD-8) | Docked at Da Nang on March 15, 1970 |
| USS Boxer (LPH-4) | [Amphibious assault ship] Docked to pier at Cam Rahn Bay on September 9, 1965 |
| USS Carter Hall (LSD-3) | [Landing ship dock] Operated on Cua Viet River and at Dong Ha during December 1967 |

**IMPORTANT**: In all cases where a Veteran claims exposure to herbicides during service aboard a ship in offshore waters, regional offices should place a copy of the U.S. Army and Joint Services Records Research Center's (JSRRC's) memorandum shown in Appendix 3 in the Veteran's claim folder. This document will:

- Substitute for individual inquiries to the Compensation and Pension Service's Agent Orange mailbox and to the JSRRC, and
- Establish that the JSRRC has no evidence to support a claim of herbicide exposure during shipboard service

**NOTE:**

- Service aboard a ship that *anchored* in an open deep-water harbor, such as Da Nang, Vung Tau, or Cam Ranh Bay, along the RVN coast does not constitute inland waterway service or qualify as docking to the shore and is not sufficient to establish presumptive exposure to herbicides. Evidence of shore docking is required in order to concede the possibility that the Veteran's service involved duty or visitation in the RVN

- Veterans who served aboard large ocean-going ships that operated on the offshore waters of the RVN are often referred to as "blue water" Veterans because of the blue color of the deep offshore waters. They are distinguished from "brown water" Veterans who served aboard smaller river patrol and swift boats that operated on the brown-colored rivers, canals, estuaries, and delta areas making up the inland waterways of the RVN

- Brown water Navy and Coast Guard Veterans receive the same presumption of herbicide exposure as Veterans who served on the ground in the RVN

**Appendix 3 – Naval and Coast Guard Development**

The current development and due process requirements for Navy and Coast Guard claims include sending a request for research to both the C&P Service Agent Orange Mailbox and JSRRC for verification exposure.  In order to expedite the resolution of these claims, JSRRC provided a document for inclusion in the Veteran's file.

This document substitutes as a response from the C&P Service Agent Orange Mailbox as well JSRRC and explains that there is no available evidence to support a claim of herbicide exposure aboard a Navy or Coast Guard ship during Vietnam. It will serve as a final JSRRC response in claims where the Veteran alleges exposure based on: (1) loading herbicide agents aboard a naval ship for transportation to Vietnam, (2) serving aboard a ship that transported, stored, used, or tested herbicide agents, and (3) working on shipboard aircraft that flew over Vietnam or equipment that was used in Vietnam.

JSRRC Memorandum

**DEPARTMENT OF THE ARMY**
**U.S. ARMY & JOINT SERVICES RECORDS RESEARCH CENTER**
**7701 TELEGRAPH ROAD**
**KINGMAN BUILDING, ROOM 2C08**
**ALEXANDRIA, VA 22315-3828**

AAHS-RDC 01 May 09

MEMORANDUM FOR RECORD

SUBJECT: Joint Services Records Research Center Statement on Research Findings Regarding Navy and Coast Guard Ships During the Vietnam Era

1. In the course of its research efforts, the JSRRC has reviewed numerous official military documents, ships histories, deck logs, and other sources of information related to Navy and Coast Guard ships and the use of tactical herbicide agents, such as Agent Orange, during the Vietnam Era.

2. To date, the JSRRC has found no evidence that indicates Navy or Coast Guard ships transported tactical herbicides from the United States to the Republic of Vietnam or that ships operating off the coast of Vietnam used, stored, tested, or transported tactical herbicides. Additionally, the JSRRC cannot document or verify that a shipboard veteran was exposed to tactical herbicides based on contact with aircraft that flew over Vietnam or equipment that was used

in Vietnam.

3. Therefore, the JSRRC can provide no evidence to support a veteran's claim of exposure to tactical herbicide agents while serving aboard a Navy or Coast Guard ship during the Vietnam Era.

/s/
Domenic A. Baldini
Director

**Appendix 4 – List of APOs for Verification of RVN Service**

For a complete list of the FPO-APO addresses, visit:

http://vbaw.vba.va.gov/bl/21/rating/stressor/general/GENERAL%201942-2002%20APO-FPO%20Files.pdf

or do the following:

- From the C&P Service Intranet Home Page, click on "Stressor Verification Site" which is located under the Rating Job Aids section
- On the "Stressor Verification - General Information" page, click on "General 1942-2002 APO-FPO Files"
- After clicking on the link, the PDF will load all of the FPO-APO files. The listing of APO's begins on page 4998

The following APO's have been verified by the Military Postal Service Agency (MPSA) as having been used for delivery to Vietnam.

96201 — AF
Tan Son Nhut Afld., Saigon, Viet
Nam                                    11-15-66
CO                                      3-13-73

96202
Replaced APO 2
Chongong-ni, Korea                      1-1-65
CO                                      7-20-71

96203 — AF
Monkey  Mountain,  Quang  Nam,  Viet
Nam                                    11-10-66
CO                                      3-6-73

96204 — AF; Army (1-21-69)
Dalat, Viet Nam                        11-10-66
CO                                     10-1-72

96204
Yongsan, Korea                          8-22-80
CO                                     10-15-82

96205 — AF
Nha Trang Afld., Viet Nam              12-1-66
CO                                      3-28-73

96206
Replaced APO 6
Camp Kaiser, Korea                      1-1-65
Co                                      3-4-71

96206
Yongsan, Korea                          8-22-80
CO                                     10-15-82

96207
Replaced APO 7
Tongduchon-ni, Korea                    1-1-65
CO                                      3-4-71

96208
Replaced APO 8
Chunchon, Korea                         1-1-65

96209 — AF
Replaced APO 9
RAAF Laverton, Victoria, Australia  1-1-65
Avalon                                 10-21-65
Canberra                               12-16-65
RAAF Richmond, NSW             before 7-  -70
Sydney                                  3-1-72

96210 — AF
Misawa  Security  Complex,  Misawa  AB,
Japan                                   8-1-67

96211 — AF
Suwon AB, Korea                         1-30-68
CO                                      ?

96212
Replaced APO 612
Taegu, Korea                            1-1-65

96213 — AF
Taegu Aux. AS, Korea                    2-28-68

96214 — AF
Nha Be, Viet Nam                       11-1-66
CO                                      5-11-68

96214
Puunene, Maui, Hawaii                   6-20-72
CO                                      ?

96214
Kimhae, Korea                           1-1-83

96215 — AF; Army (4-6-66)
Replaced APO 15
Can Tho, Viet Nam                       1-1-65
CO                                      9-  -73

96216
Tay Ninh, Viet Nam                      4-11-67
CO                                      2-28-71

96217
Duc Phu, Viet Nam                      12-28-67
CO                                     12-28-71

96218
Replaced APO 18
Taegu, Korea                            1-1-65

96219
Chu Lai, Viet Nam                      10-17-67
CO                                      4-7-71

96220
Replaced APO 20
Pupyong, Korea                          1-1-65
Chejo-do                                9-4-73

96221
Phuoc Vinh, Viet Nam                   12-31-67
Phan Thiet                              5-10-71
CO                                     10-1-72

96221 — AF
Yokota AB, Japan                       10-22-75
CO                                      9-12-80

96222 — AF; Army (3-16-69)
Cholon, Saigon, Viet Nam               11-1-66
Tan Son Nhut AB                         2-13-68
CO                                      3-28-73

96223
Phu Bai, Viet Nam                       1-26-68
Long Binh                              10-21-68
CO                                     11-19-69

96224
Replaced APO 24
Munsan-ni, Korea                        1-1-65
Tongduchon-ni                           3-  -71

96225
Replaced APO 25
Schofield Barracks, Oahu, Hawaii        1-1-65
Cu Chi, Viet Nam                        3-  -66
CO                                      4-20-71

96225
Schofield Barracks, Oahu, Hawaii        7-16-73
CO                                      9-3-77

96226
Phu Tai Valley, Bin Dinh, Viet Nam  10-1-68
CO                                      4-25-72

96227 — AF
Replaced APO 27
Bien Hoa AB, Viet Nam                   1-1-65
CO                                      3-14-73

96228
Bear Cat, Viet Nam                      2-15-68
Chu Lai                                 2-17-68
Phu Bai                                 3-11-68
Bien Hoa                                9-25-68
Tan Son Nhut AB                        10-28-68
CO                                     12-10-69

96229
Kanchanaburi, Thailand                  1-19-68
Co                                      3-2-70

96230 — AF
Da Nang AB (west), Viet Nam            11-1-71
CO                                     11-30-71

96230 — AF
Kadena AB, Okinawa, Ryukyus             5-5-72

96231
Replaced APO 31
Taejon, Korea                           1-1-65

96232
Replaced APO 32
Camp Charn Sinthope, Thailand           1-1-65
Sattahip                                3-1-66
CO                                      2-14-76

96233
Replaced APO 33

| | | |
|---|---|---|
| Korat, Thailand | 1-1-65 | |
| CO | 6-30-74 | |

**96234 — AF**
| | |
|---|---|
| Bien Hoa AB, Viet Nam | 12-10-71 |
| Tan Son Nhut AB | 3-1-72 |
| CO | 5-2-75 |

**96235 — AF**
| | |
|---|---|
| Replaced APO 235 | |
| Naha AB, Okinawa, Ryukyu | 1-1-65 |

**96236 — AF**
| | |
|---|---|
| Duong Dong, Viet Nam | 7-13-67 |
| CO | 1-6-69 |

**96236**
| | |
|---|---|
| Tainan, Taiwan | 11-1-71 |
| CO | 10-20-76 |

**96237 — Army; AF (11-15-66)**
| | |
|---|---|
| Replaced APO 37 | |
| Udorn Afld., Thailand | 1-1-65 |
| CO | 1-26-76 |

**96238**
| | |
|---|---|
| Replaced APO 38 | |
| Qui Nhon, Viet Nam | 1-1-65 |
| CO | 4-25-72 |

**96239 — AF**
| | |
|---|---|
| Replaced APO 239 | |
| Kadena AB, Okinawa, Ryukyus | 1-1-65 |

**96240 — AF; Army (3-28-66)**
| | |
|---|---|
| Replaced APO 40 | |
| Nha Trang, Viet Nam | 1-1-65 |
| CO | 9- -73 |

**96241 — AF**
| | |
|---|---|
| Udon RTAFB, Thailand | after 7- -70 |
| CO | 6-25-75 |

**96242 — AF**
| | |
|---|---|
| Udorn RTAFB, Thailand | 3-1-74 |
| CO | 1-26-76 |

**96243 — AF; Army (3-13-69)**
| | |
|---|---|
| Replaced APO 143 | |
| Saigon, Viet Nam | 1-1-65 |
| Tan Son Nhut AB | 9-4-73 |
| CO | 5-2-75 |

| | |
|---|---|
| Box DAC   Dacca, Pakistan | |
| Box ND    New Delhi, India | |
| Box CAM   Phnom Penh, Cambodia | |
| Box L     Vientiane, Laos | |
| Box C     Calcutta, India | |

**96244 — AF**
| | |
|---|---|
| Khao Khieo RTAFS, Thailand | 9-8-68 |
| CO | 3-31-71 |

**96244 — AF**
| | |
|---|---|
| Tachikawa AB, Japan | 10-25-74 |
| Yokota AB | -80 |

**96245 — AF**
| | |
|---|---|
| Ko Kha AS, Thailand | 5-10-71 |
| CO | 5-12-76 |

**96248**
| | |
|---|---|
| Replaced APO 48 | |
| Machinato, Okinawa, Ryukyus | 1-1-65 |
| Makiminato | ? |

**96249**
| | |
|---|---|
| Replaced APO 49 | |
| Sukiran, Okinawa, Ryukyus | 1-1-65 |
| CO | 8-31-71 |

**96250**
| | |
|---|---|
| Replaced APO 50 | |
| Sukiran, Okinawa, Ryukyus | 1-1-65 |
| Bien Hoa, Viet Nam | 5-5-65 |
| An Khe | 10-18-67 |
| Bong Son | 10-8-69 |
| CO | 8-17-71 |

**96251**
| | |
|---|---|
| Replaced APO 51 | |
| McDonald Barracks, Korea | 1-1-65 |
| Yong-Tae-ri | 5-  -71 |

**96253 — AF**
| | |
|---|---|
| Udorn RTAFB, Thailand | 1-27-76 |
| CO | 2-20-76 |

**96256**
| | |
|---|---|
| Tay Ninh, Viet Nam | 8-1-66 |
| Chu Lai | 4-16-67 |
| Moc Bai, Quang Tin Prov. (LZ Baldy) | 5-1-69 |
| Da Nang | 6-7-71 |
| CO | 6-22-72 |

**96257**
| | |
|---|---|
| Xuan Loc (Long Giow), Viet Nam | 7-8-66 |
| Bien Hoa | 9-26-69 |
| Di An | 4-5-70 |
| Long Binh | 5-  -71 |
| Pho Loi | 12-7-71 |
| CO | 12-28-72 |

**96258 — AF; Army (4-6-66)**
| | |
|---|---|
| Replaced APO 158 | |
| Hue, Viet Nam | 1-1-65 |
| CO | 2-10-73 |

**96259**
| | |
|---|---|
| Replaced APO 59 | |
| Pusan, Korea | 1-1-65 |

**96260 — AF; Army (4-8-66)**
| | |
|---|---|
| Replaced APO 60 | |
| Quang Ngai, Viet Nam | 1-1-65 |
| CO | 2-10-73 |

**96261**
| | |
|---|---|
| Lopburi, Thailand | 10-1-66 |
| CO | 3-31-74 |

**96262**
| | |
|---|---|
| Saigon, Viet Nam | ? |
| Pleiku | 8-6-66 |
| Camp Redcliff, An Khe | 3-1-70 |
| CO | 12-15-70 |

**96263 — AF**
| | |
|---|---|
| Replaced APO 63 | |
| Taipei, Taiwan | 1-1-65 |
| CO | 4-20-79 |

**96264 — AF**
| | |
|---|---|
| Replaced APO 64 | |
| Kunsan AB, Korea | 1-1-65 |

**96265**
| | |
|---|---|
| Tuy Hoa, Viet Nam | 9-10-66 |
| Pleiku | 4-10-67 |
| CO | 12-15-70 |

**96266**
| | |
|---|---|
| Long Binh, Viet Nam | 6-1-66 |
| CO | 3-28-73 |

**96267**
| | |
|---|---|
| Replaced APO 67 | |
| Asaka, Japan | 1-1-65 |
| CO | 5-2-75 |

**96268**
| | |
|---|---|
| Ban Me Thuot, Viet Nam | ? |
| Bear Cat | 10-10-66 |
| Dau Tieng | 7-14-67 |
| CO | 10-1-72 |

**96269**
| | |
|---|---|
| Dong Ha, Viet Nam | 11-5-66 |
| CO | 4-16-72 |

**96270 — AF**
| | |
|---|---|
| Replaced APO 70 | |
| Wakkanai AS, Hokkaido, Japan | 1-1-65 |
| CO | 6-9-72 |

**96270 — AF**
| | |
|---|---|
| Yokota AB, Japan | ? |

**96271**
| | |
|---|---|
| Replaced APO 71 | |
| Pyongtaek, Korea | 1-1-65 |

96272 — AF
Replaced APO 72
Chieng Mai Aprt., Thailand — 1-1-65
CO — 7-8-76

96273 — AF
Replaced APO 73
Takhli AB, Thailand — 1-1-65
CO — 1-31-72

96274 — AF
Replaced APO 74
Clark AB, Luzon, Philippines — 1-1-65

96275 — AF
Replaced APO 75
Kahului, Maui, Hawaii — 1-1-65
CO — 7-31-71

96276 — AF
Replaced APO 76
Kimpo AB, Korea — 1-1-65

96277 — AF
Replaced APO 77
Wallace AS, San Fernando La Union, Philippines — 1-1-65

96278
Pleiku, Viet Nam — 7-16-66
CO — 12-15-70

96279
Long Binh, Viet Nam — 12-1-66
CO — 2-15-71

96280 — AF
Taipei AS, Taiwan — 2-7-66
CO — 3-1-76

96281 Army; AF (2-24-71)
Replaced APO 181
Chitose AB, Hokkaido, Japan — 1-1-65
CO — 6-18-75

96282 — AF
Khon Kaen City, Thailand — 3-10-66
CO — 11-15-66

96282 — AF
Nam Phong Khon Kaen City, Thailand — 5-16-67
CO — 4-27-70

96282 — AF
Taipei, Taiwan — 7-1-74
CO — 4-20-79

96283 — AF
Kadena AB, Okinawa, Ryukyus — 3-10-66
CO — 3-25-66

96284 — AF
Nandi Airport, Fiji — 8-20-66
CO — 12-11-71

96285 — AF
Miyako-Jima, Ryukyus — 10-1-66
CO — 8-15-67

96285 — AF
Kashiwa, Japan — 9-5-73
CO — 3-25-76

96286 — AF
Kume-Jima, Ryukyus — 10-1-66
CO — 8-15-67

96286 — AF
Clark AB, Philippines — after 7- -70

96287 — AF
Okino-erabu Shima, Japan — 10-1-66
CO — 8-15-67

96287 — AF
Woomera, Australia — 8-24-70

96288 — AF
Korat AB, Thailand — 8-1-66
CO — 2-26-76

96289
Saigon (Di An), Viet Nam — 3-4-66
CO — 4-15-72

96290 — AF
Replaced APO 90
Kaohsiung, Taiwan — 1-1-65
CO — 4-20-79

96291 — AF; Army (4-6-66)
Replaced APO 91
Vung Tau, Viet Nam — 1-1-65
CO — 3-25-73

96292 — AF
Replaced APO 92
Onna Point, Okinawa, Ryukyus — 1-1-65
CO — 5-19-71

96292 — AF
Yokota AB, Japan — ?

96293 — AF
Replaced APO 93
Taichung, Taiwan — 1-1-65
CO — 6-30-75

96294
An Khe, Viet Nam — 3-4-66
Cheo Reo — 7-25-72
CO — 10-1-72

96295 — AF
Replaced APO 95
Pleiku Aprt., Viet Nam — 1-1-65
CO — 4-18-72

96296 — AF; Army (4-6-66)
Soc Trang, Viet Nam — 1-1-65
CO — 10-1-72

96297 — AF; Army (3-30-66)
Replaced APO 97
Ban Me Thuot, Viet Nam — 1-1-65
CO — 3-15-73

96298 — AF
Replaced APO 98
John Hay AB, Baguio, Philippines — 1-1-65

96299 — AF
Replaced APO 99
Grant Heights, Tokyo, Japan — 1-1-65
CO — 9-21-73

96301
Replaced APO 301
Yongsan, Korea — 1-1-65

96302
Replaced APO 102
Yongsan, Korea — 1-1-65

96303 — AF
Replaced APO 103
Don Muang AB, Bangkok, Thailand — 1-1-65
CO — 5-21-76

96304 — AF
Replaced APO 104
Ubon RTAFB, Thailand — 1-1-65
CO — 11-1-74

96305 — AF
Replaced APO 105
Johnston Island — 1-1-65

96306 — AF; Army (10-17-68)
Replaced APO 306
Rangoon, Burma — 1-1-65
CO — 6-30-71

96307 — AF
Replaced APO 307
Tan Son Nhut AB, Viet Nam — 1-1-65
CO — 3-13-73

96308 — AF; Army (4-6-66)
Phu Bai Airport, Viet Nam — 3-25-65
CO — 2-10-73

96309 — AF; Army (3-16-69)
Cholon, Viet Nam                          5-1-65
Tan Son Nhut                              2-  -68
CO                                       3-28-73

96310 — AF
Replaced APO 310
Nakhon Phanom, Thailand                   1-1-65
CO                                       10-26-75

96311
Mactan Island Air Field, Cebu,
Philippines                               5-1-65
CO                                       11-30-69

96311 — AF
Clark AB, Philippines                    10-18-73

96312 — AF; Army (3-20-66)
Cam Ranh Bay, Viet Nam                    5-1-65
CO                                       6-21-72

96313 — AF
RNZAF Station, Woodbourne, Blenheim,
   New Zealand                            3-5-65
CO                                       5-10-73

96314 — AF
Replaced APO 314
Tan Son Nhut Air Field, Viet Nam    1-1-65
(Opened to serve advisory teams and simi-
lar units in remote areas without postal
facilities.)
CO                                       4-20-72

96315 — AF
Replaced APO 315
USCG LORAN Station, Marcus
   Island                                 1-1-65
CO                                       11-30-68

96315 — AF
Don Muang Airport, Bangkok,
   Thailand                               6-1-72
CO                                       6-21-80

96316 — AF; Army (11-1-70)
Tuy Hoa AB, Viet Nam                      5-1-65
CO                                       2-22-72

96317 — AF; Army (4-1-67)
Phan Thiet, Viet Nam                      5-1-65
Da Nang                                  12-27-70
CO                                       4-27-72

96318 — AF; Army (3-25-66)
Camp Holloway, Pleiku, Viet Nam    5-1-65
Camp Schmidt, Pleiku                      6-7-71
CO                                       3-28-73

96319 — AF
Kung Kuan AB, Taiwan                     6-11-65
Chin Chuan Kang AB                 after 7-  -70

CO                                       4-15-79

96320 — AF; Army (12-15-71)
Binh Thuy AB, Viet Nam                    8-9-65
CO                                       4-16-72

96321 — AF
Phan Rang AB, Viet Nam                   8-20-65
CO                                       3-25-72

96322 — AF
Tan Son Nhut Afld., Viet Nam             10-1-65
CO                                       6-15-69

96322 — AF
Don Muang Airport, Bangkok,
   Thailand                               7-1-72
CO                                        7-8-76

96323 — AF
Replaced APO 323
Tachikawa AB, Japan                       1-1-65
CO                                       8-30-77

96324 — AF
Replaced APO 100
Tachikawa AB, Japan                       1-1-65
CO                                       4-30-65

96324 — AF
Kwanju Aux. Air Station, Korea            3-1-68

96325 — AF; Army (7-20-67)
Chu Lai, Viet Nam                        10-1-65
CO                                       12-28-71

96326 — AF
Cam Ranh Bay AB, Viet Nam               10-29-65
CO                                       5-17-72

96327 — AF
Phu Quoc I., Viet Nam                    11-5-65
CO                                        3-1-67

96327 — AF
Bikini Atoll, Marshall Is.               3-20-69
CO                                       10-14-69

96327 — AF
Andersen AFB, Guam, Marshall Is.             ?

96328 — AF
Replaced APO 328
Yokota AB, Japan                          1-1-65

96330 — AF
Sattahip AB, Thailand                     9-9-65
U-Tapao Afld.                      before 7-  -70
CO                                        7-8-76

96331
Replaced APO 331

Sukiran, Okinawa, Ryukyus                 1-1-65
Makiminato                               9-  -75

96332 — AF; Army (10-10-68)
Camp Davies, Saigon, Viet Nam           10-15-67
Long Binh                               10-10-68
CO                                      10-25-72

96333 — AF
Eniwetok, Marshall Is.                    2-16-65

96334 — AF
Replaced APO 334
Andersen AFB, Guam, Mariana Is.    1-1-65

96335
Replaced APO 135
Inchon, Korea                             1-1-65
Camp Coiner, Yongsan                     2-11-74

96336 — AF
Replaced APO 136
Tokyo, Japan                              1-1-65

96337 — AF
Replaced APO 137
Da Nang Aprt., Viet Nam                   1-1-65
CO                                        3-9-73

96338
Kobe, Japan                              2-15-65
CO                                       2-15-75

96339
Bang Pla, Thailand                       6-10-68
CO                                        1-7-72

96340 — AF
Replaced APO 140
Tainan AB, Taiwan                         1-1-65
CO                                       4-15-79

96341
Kilauea Mil. Camp Hawaii Nat. Park,
   Hawaii                                 2-7-69
CO                                        9-3-77

96342 — AF
Replaced APO 142
Chai-yi, Taiwan                           1-1-65
CO                                        6-1-70

96343
Replaced APO 343
Zama, Japan                               1-1-65

96344
Camp Oji, Tokyo, Japan                   10-12-66
CO                                       1-20-70

**96344**
Makiminato, Okinawa, Ryukyus 10-15-74
Sukiran -79

**96345**
Qui Nhon, Viet Nam 7-1-65
Bien Hoa 7-27-65
Saigon 11-12-65
CO 4-2-70

**96346 — AF**
Replaced APO 146
Bangkok, Thailand 1-1-65

**96347**
Bien Hoa or Cam Ranh Bay, V.N. 7-8-65
An Khe 8-1-65
Phan Rang 11-14-65
Bien Hoa 6- -68
Long Binh 9-15-68
CO 3-28-73

**96348 — AF**
Replaced APO 148
Komaki AB, Japan 1-1-65
CO 3-31-65

**96348 — AF; Army (3-1-72)**
Tan Son Nhut AB, Viet Nam 9-20-67
Long Binh 3-1-72
CO 2-20-73

**96349**
Sukiran, Okinawa, Ryukyus 2-11-66
Da Nang, Viet Nam 5-1-68
CO 3-28-73

**96350**
Nha Trang, Viet Nam 10-25-66
CO 4-5-72

**96351 — AF**
Replaced APO 151
Pingtung, Taiwan 1-1-65
CO 3-27-69

**96351 — AF**
Andersen AFB, Guam, Marianas ?

**96352 — AF**
Replaced APO 152
Bangkok, Thailand 1-1-65
Udorn 6-28-73
CO 7-10-75

**96353**
Cu Chi, Viet Nam 1-15-66
CO 12-13-70

**96354**
Replaced APO 354
Tokorozawa, Japan 1-1-65
1-15-71

**96355**
Pleiku, Viet Nam 1-1-66
Duc Pho 8-1-67
LZ Baldy 1-28-68
LZ English, Bong Son 3-2-68
Pleiku 3-30-68
CO 12-15-70

**96356 — AF**
Replaced APO 156
Djakarta, Indonesia 1-1-65

**96357 — AF; Army (4-6-66)**
Replaced APO 157
Vinh Long, Viet Nam 1-1-65
CO 10-1-72

**96358**
Replaced APO 358
Uijong-bu, Korea 1-1-65

**96359**
My Tho, Viet Nam 1-5-66
CO 10-1-72

**96360 — AF**
Replaced APO 160
Shu Lin Kou AS, Taiwan 1-1-65
CO 3-25-77

**96361 — AF**
Tan Son Nhut AB, Viet Nam 10-25-67
CO 10-29-70

**96361 — AF**
Tachikawa AB, Japan 7-1-74
Yokota AB ?

**96362 — AF**
Dong Ha, Viet Nam 2-15-66
CO 10-31-69

**96363 — AF; Army (8-20-66)**
Ca Mau, Viet Nam 4-1-66
CO 10-1-72

**96364 — AF**
Camp Kinser, Okinawa, Ryukyus 4-10-66
CO 5-31-67

**96364 — AF**
Clark AB, Philippines 6-1-72
CO 7-8-76

**96365 — AF**
Pago Pago, American Samoa 5-10-66
CO 9-5-74

**96366 — AF**
Phitsanulok, Thailand 5-1-66
CO 6-30-70

**96366 — AF**
Osan AB, Korea ?

**96367 — AF**
Mukdahan, Thailand 5-1-66
CO 12-31-69

**96367 — AF**
Kadena AB, Okinawa, Ryukyus 5-15-74

**96368 — AF**
Phu Cat AB, Binh Dinh, Viet Nam 7-11-66
Cam Ranh AB after 7- -70
Tan Son Nhut 3-1-72
CO 3-15-73

**96369 — AF**
Clark AB, Philippines 3-10-66
CO 3-25-66

**96369 — AF**
Alice Springs, Australia 4-10-68

**96370**
Bear Cat, Viet Nam 10-1-66
Dong Tam 7-27-68
Schofield Bks., Oahu, Hawaii 8-19-69
CO 2-9-70

**96370**
Kwang-chon (Reno Hill), Korea 7-16-73
CO 12-29-81

**96371**
Phu My, Viet Nam 12-20-66
Bear Cat 1-15-67
Dong Tam 7-27-68
Tan An 8- -69
CO 10-5-70

**96371**
Kimpo, Korea 7-8-74

**96372**
Phu My, Viet Nam 1-15-67
Bear Cat 4-19-67
Dong Tam 7-27-68
CO 8-18-69

**96373**
Bear Cat, Viet Nam 12-8-66
Dong Tam 7-27-68
Schofield Barracks, Oahu, Hawaii 8-18-69
CO 2-9-70

**96374**
Saigon, Viet Nam 4-15-67
Chu Lai 4-23-67
CO 1-26-72

**96375**
Long Binh, Viet Nam 7-1-67
CO 3-28-73

| | | |
|---|---|---|
| **96376** | | |
| Xuan Loc, Viet Nam | 2-20-67 | |
| CO | 2-15-72 | |
| **96377** | | |
| Cam Ranh Bay, Viet Nam | 12-1-66 | |
| CO | 4-30-72 | |
| **96379** | | |
| Cam Ranh Bay, Viet Nam | 5-23-67 | |
| CO | 4-30-72 | |
| **96381** | | |
| Saigon, Viet Nam | 12-21-66 | |
| Long Binh | 9-26-68 | |
| CO | 3-28-73 | |
| **96383** | | |
| Classified | | |
| Bien Hoa AB (Camp Eagle), V.N. | 12-18-67 | |
| Phu Bai | before 7- -70 | |
| CO | 3-9-72 | |
| **96384** | | |
| Long Binh, Viet Nam | 1-7-67 | |
| Tan Son Nhut AB | 10-21-72 | |
| CO | 3-13-73 | |
| **96385** | | |
| Tay Ninh, Viet Nam | 11-15-67 | |
| CO | 12-31-70 | |
| **96386** | | |
| Ramsoon Station, 7 RRFS, Nong Song, Thailand | 2-15-68 | |
| Ramasun | 10-2-72 | |
| CO | 6-15-76 | |
| **96388** | | |
| Saigon, Viet Nam | 3-25-67 | |
| Tan Son Nhut AB | 10-21-72 | |
| CO | 3-28-73 | |
| **96389** | | |
| Panom, Thailand | 1-31-67 | |
| CO | 3-2-70 | |
| **96390** | | |
| Replaced APO 900 | | |
| Tokyo, Japan | 1-1-65 | |
| CO | 12-31-75 | |
| **96392** | | |
| North Cam Ranh Bay, Viet Nam | -70 | |
| CO | ? | |
| **96393** | | |
| Saigon, Viet Nam | 3-1-73 | |
| CO | 5-2-75 | |

| | | |
|---|---|---|
| **96395** | | |
| Quang Tri, Viet Nam | 8-9-71 | |
| CO | 3-30-72 | |
| **96397** | | |
| Wonju, Kangwon-Do, Korea | 9-1-70 | |
| **96398** | | |
| Di An, Viet Nam | 11-15-70 | |
| Phu Loi | 2-26-71 | |
| CO | 10-31-72 | |
| **96399** | | |
| Saigon, Viet Nam | 10-26-70 | |
| CO | 3-28-73 | |
| **96401 — AF** | | |
| Canton Island | 12-4-70 | |
| (Serving military personnel and activities at Santiago, Chile.) | | |
| CO | 7-11-79 | |
| **96402 — AF; Army (4-6-66)** | | |
| Replaced APO 300 | | |
| Bac Lieu, Viet Nam | 1-1-65 | |
| CO | 10-1-72 | |
| **96403 — AF** | | |
| RAAF Base Amberly, Australia | 3-1-72 | |
| CO | 9-3-74 | |
| **96404 — AF** | | |
| Canberra, Australia | 3-1-72 | |
| **96405 — AF** | | |
| Melbourne, Australia | 3-1-72 | |
| **96409 — AF** | | |
| Bangkok, Thailand | 12-1-72 | |
| CO | 6-27-75 | |
| **96411 — AF** | | |
| Tachikawa AB, Japan | 2-15-72 | |
| Honolulu, Oahu, Hawaii | 7-1-74 | |
| CO | 7-26-75 | |
| **96415 — AF** | | |
| Replaced APO 815 | | |
| Iwo Jima | 1-1-65 | |
| CO | 11-25-68 | |
| **96415** | | |
| Timaru, New Zealand | 9-3-73 | |
| CO | 10-25-75 | |
| **96421 — AF** | | |
| Bangkok, Thailand | 4-25-69 | |
| CO | 2-23-77 | |

| | | |
|---|---|---|
| **96430 — AF** | | |
| Takhli RTAFB, Thailand | 5-5-7 | |
| CO | 8-24-7 | |
| **96431 — AF** | | |
| Clark AB, Philippines | 8-18-7 | |
| **96432 — AF** | | |
| Clark AB, Philippines | 8-15-7 | |
| **96434 — AF** | | |
| Clark AB, Philippines | 5-1-7 | |
| **96435 — AF** | | |
| Sung Shan Airport, Taipei, Taiwan | 7-1-7 | |
| CO | 4-20-7 | |
| **96436 — AF** | | |
| Cheju-Do, Korea | 2-1-7 | |
| CO | 6-28-7 | |
| **96437 — AF** | | |
| Kangnung, Korea | 2-1-7 | |
| CO | 11-15-7 | |
| **96438** | | |
| Replaced APO 438 | | |
| Moanalua, Oahu, Hawaii | 1-1-6 | |
| CO | 9-3-7 | |
| **96442 — AF** | | |
| Bangkok, Thailand | 5-1-7 | |
| CO | 2-1-7 | |
| **96455 — AF** | | |
| Replaced APO 455 | | |
| Paengnyong-Do, Korea | 1-1-6 | |
| Chinchon-ni LSN Annex | 6-28-7 | |
| Osan AB | 4-1-7 | |
| **96460** | | |
| Replaced APO 460 | | |
| Waegwan, Korea | 1-1-6 | |
| **96461** | | |
| Suwon, Korea | 7-15-81 | |
| **96468 — AF** | | |
| Bangkok, Thailand | 2-15-66 | |
| **96477** | | |
| Quang Tri, Viet Nam | 7-15-68 | |
| CO | 8-15-71 | |
| **96483** | | |
| Kimpo AB, Korea | 9-15-71 | |
| Bupyeong | -80 | |

**96485**
| Phu Cat, Viet Nam | 1-1-72 |
| Qui Nhon | 5- -72 |
| CO | 3-20-73 |

**96488**
| Inchon, Korea | 7-15-72 |
| Bupyeong | -81 |

**96489**
| Camp Ruam Chit Chai, Sakon Nakhon, Thailand | 6-3-68 |
| CO | 1-15-71 |

**96490 — 1st Cavalry Div. (Airmobile)**
| An Khe, Viet Nam | 9-30-65 |
| Phu Bai | 2-1-68 |
| Camp Evans, Phuoc Vinh | 10-1-68 |
| Bien Hoea | 7-12-69 |
| CO | 8-16-72 |

**96491**
| Qui Nhon, Viet Nam | 10-1-65 |
| Tan Son Nhut AB | 3-28-66 |
| Long Binh | 5-15-66 |
| CO | 2-23-73 |

**96492**
| Charang Valley, Qui Nhon, V.N. | 10-5-68 |
| CO | 4-25-72 |

**96493**
| Bao Loc, Viet Nam | 11-18-68 |
| CO | 4-15-72 |

**96494**
| Camp Holloway, Pleiku, Viet Nam | 6-18-69 |
| CO | 5-1-72 |

**96495**
| Quang Tri, Viet Nam | 5-1-68 |
| CO | after 7- -70 |

**96496**
| Long Binh, Viet Nam | 3-20-68 |
| CO | 3-25-73 |

**96499 — AF; Army (4-6-66)**
Replaced APO 299
| Kontum, Viet Nam | 1-1-65 |
| CO | 10-1-72 |

**96501 — AF**
Replaced APO 101
| Wake Island | 1-1-65 |

**96502 — AF**
Replaced APO 302
| Hakata Adm. Annex, Kyushu, Japan | 1-1-65 |
| Fukuoka Int. Airport, Fukuoka | 6-9-72 |

| CO | 4-30-74 |

**96503**
Replaced APO 503
| Yokohama, Japan | 1-1-65 |
| Camp Zama | 10-15-74 |

**96504**
Replaced APO 660
| Yokohama, Japan | 1-1-65 |
| CO | 7-1-75 |

**96515 — AF**
Replaced APO 915
| Wheeler AFB, Oahu, Hawaii | 1-1-65 |
| CO | 9-3-77 |

**96519 — AF**
Replaced APO 919
| Misawa AB, Honshu, Japan | 1-1-65 |

**96525 — AF**
Replaced APO 925
| Fuchu AS, Japan | 1-1-65 |
| CO | 3-15-76 |

**96528 — AF**
Replaced APO 928
| Manila, Philippines | 1-1-65 |

**96529 — AF**
Replaced APO 929
| Itazuke AB, Japan | 1-1-65 |
| CO | 5-16-72 |

**96530**
| Bear Cat, Viet Nam | 3-28-68 |
| CO | 12-2-72 |

**96545 — AF**
Replaced APO 145
| Helemano Military Reservation, Oahu, Hawaii | 1-1-65 |
| CO | 9-3-77 |

**96553 — AF**
Replaced APO 953
| Hickam AFB, Oahu, Hawaii | 1-1-65 |
| CO | 9-3-77 |

**96555**
Replaced APO 555
| Kwajalein, Marshall Is. | 1-1-65 |

**96556**
Replaced APO 956
| Pohakuloa, Hawaii | 1-1-65 |

**96557**
Replaced APO 957

| Schofield Barracks, Oahu, Hawaii | 1-1-65 |
| CO | 9-3-77 |

**96558**
Replaced APO 958
| Ft. Shafter, Oahu, Hawaii | 1-1-65 |
| CO | 9-3-77 |

**96570 — AF**
Replaced APO 970
| Osan AB, Korea | 1-1-65 |

**96571**
Replaced APO 971
| Inchon, Korea | 1-1-65 |
| Kimpo AB | 7-27-71 |
| Pyongtaek | 7-1-74 |

**96594 — AF**
Replaced APO 994
| Johnson Family Housing Annex, Honshu, Japan | 1-1-65 |
| CO | 6-23-73 |

**96599**
| Long Binh, Viet Nam | 7-1-66 |
| An Khe | 2-1-68 |
| CO | 7-4-69 |

A hospital or medical treatment report with one of the approved APO codes indicates that the Veteran was seen or treated in an RVN.

## Appendix 5 – Workflow for Processing *Nehmer* Claims



**Appendix 6 – Contact Information for Processing *Nehmer* Claims**

| Compensation and Pension Service | |
|---|---|
| **Method** | **Contact Information** |
| E-mail | VAVBAWAS/CO/NEHMER |
| Mailing Address | Department of Veterans Affairs<br>Compensation & Pension Service (211A)<br>Attn:  *Nehmer* Working Group<br>810 Vermont Ave NW<br>Washington, DC 20420 |

| Southern Area Office | |
|---|---|
| **Method** | **Contact Information** |
| E-mail | VAVBANAS/SAREA/NEHMER |
| Telephone | 615-695-4070 |
| Mailing Address | Department of Veterans Affairs<br>Southern Area Office<br>3322 West End, Suite 408<br>Nashville, TN  37203 |

| Defense Finance and Accounting Service – SBP ONLY | |
|---|---|
| **Method** | **Contact Information** |
| Telephone - **SBP ONLY** | 216-522-6393 |
| **Separation, severance and retired pay contact information will be provided at a later date.** | |

**Appendix 7 – Example Rating Decisions**

The following pages provide example *Nehmer* rating decisions for your reference.

**Example Rating Decision for Live Compensation with No Prior Grant**

<u>INTRODUCTION</u>

Mr./Ms. [enter full name], your records reflect that you are a Veteran who served in the [enter military branch] from [enter date] to [enter date]. The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA records indicate that you previously filed a claim for [insert name of new presumptive condition] and were subsequently denied. A special review of your claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*. Based on our review of the evidence listed below, we have made the following decision(s) in your case.

<u>DECISION</u>

1. Service connection for [insert new presumptive condition here] associated with herbicide exposure is granted with a [percentage] percent evaluation, effective [insert date of receipt of the Veteran's initial claim for service connection for this condition].

<u>EVIDENCE</u>

- DD Form 214
- VA Form 21-526, Veteran's Application for Compensation or Pension, received on [insert date]
- Other information that creates a claim (informal, inferred, footnote 1)
- VA examination dated [insert date of exam]
- Other Medical Evidence (private, SSA, treatment reports)
- Service Treatment Records
- Rating decision dated [insert date of rating here], denying service connection for [insert new presumptive condition here]
- Include all information pertinent and related to the presumptive condition(s).

<u>REASONS FOR DECISION</u>

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure. As such, VA has determined that a statistically significant association exists between exposure to

herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea, Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

1.  Service connection is granted for [insert presumptive diagnosis], for purposes of entitlement to retroactive benefits.

VA has confirmed that you had in-country service in the Republic of Vietnam based on [insert evidence here].

Medical evidence from [hospital, doctor, laboratory results] in the record indicates a diagnosis of [diagnosis] on [date]. [Reason for effective date].

You claimed service connection for [diagnosis] on [insert date of claim].  Service connection for [diagnosis] was denied by a rating decision dated, [insert date of decision] because [diagnosis] was not incurred or aggravated during military service, nor was it present to a degree of 10 percent within one year of your discharge from active duty.

Subsequently, [diagnosis] was added recently to the list of disabilities recognized as being related to herbicide exposure.  As such, service connection for [diagnosis] is now granted because it is presumptively related to your military service.  The effective date of service connection for [diagnosis] is [insert date of receipt of claim], the date your original claim for service connection for [diagnosis] was received.

[Insert paragraph for rating of the new presumptive condition and include an explanation of the percentage assigned for the condition, as well as the requirements for achieving the next higher percentage level.]
[Include a thorough discussion of relevant medical evidence used to assign the rating, including any secondary conditions.]

**Example Rating Decision for Live Compensation with Prior Grant**

## INTRODUCTION

Mr./Ms. [enter full name], your records reflect that you are a Veteran who served in the [enter military branch] from [enter date] to [enter date]. The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA records indicate that service connection was previously granted for [insert issue/diagnosis] and [insert type of benefits] benefits were paid.

VA records indicate that you previously filed a claim for [insert name of new presumptive condition(s)] and were subsequently denied.  A special review of your claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*.  Based on our review of the evidence listed below, we have made the following decision(s) in your case.

## DECISION

1.  Service connection for [insert presumptive disability] associated with herbicide exposure is granted with a [percentage] percent evaluation, effective [insert date].

## EVIDENCE

- DD Form 214
- VA Form 21-526, Veteran's Application for Compensation or Pension, received on [date]
- VA Form XX-XXXX
- Other information that creates a claim (informal, inferred, footnote 1)
- VA examination dated [insert date of exam]
- Other Medical Evidence (private, SSA, treatment reports)
- Service Treatment Records
- Rating decision dated [insert date of rating here], denied service connection for [insert new presumptive condition here]
- Include all information pertinent and related to the presumptive disability(s)

## REASONS FOR DECISION

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have

a statistically significant association with such exposure.  As such, VA has determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea, Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in Republic of Vietnam.

1.  Service connection for [insert presumptive disability], for purposes of entitlement to retroactive benefits.

VA has confirmed that you had in-country service in the Republic of Vietnam based on [insert evidence here].

Medical evidence from [hospital, doctor, laboratory results] in the record indicates a diagnosis of [insert presumptive disability] on [date].

You claimed service connection for [insert disability] on [insert date of claim].  Service connection for [disability] was established by a rating decision dated, [insert date of decision] because [insert basis for grant].

Subsequently, [insert presumptive disability] was added recently to the list of disabilities recognized as being related to herbicide exposure.  As such, service connection is now granted because it is presumptively related to your military service.  The effective date of service connection for [insert presumptive disability] is [insert date of receipt of claim], the date your original claim for service connection for [insert presumptive disability] was received.

[Insert paragraph for rating of the new presumptive condition and include an explanation of the percentage assigned for the condition, as well as the requirements for achieving the next higher percentage level.]

**Example Rating Decision for Live Compensation Denial**

## INTRODUCTION

Mr./Ms. [full name], your records reflect that you are a Veteran who served in the [military branch] from [date] to [date].  The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA records indicate that you previously filed a claim for [insert name of new presumptive condition] and were subsequently denied.  A special review of your claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*.  Based on our review of the evidence listed below, we have made the following decision(s) in your case.

## DECISION

1.  Service connection for [insert presumptive disability], for purposes of entitlement to retroactive benefits is not granted.

## EVIDENCE

- DD Form 214
- VA Form 21-526, Veteran's Application for Compensation or Pension, received on [insert date received]
- Other information that creates a claim (informal, inferred, footnote 1)
- VA examination dated [insert date of exam]
- Other Medical Evidence (private, SSA, treatment reports)
- Service Treatment Records
- Rating decision dated [insert date of rating here], denying service connection for [insert new presumptive condition here]

## REASONS FOR DECISION

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure.  As such, VA has determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea,

Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

1.  Service connection for [insert presumptive disability], for purposes of entitlement to retroactive benefits.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

Medical evidence from [hospital, doctor, laboratory results] in the record indicates a diagnosis of [insert presumptive disability] on [date].  You claimed service connection for [insert presumptive disability] on [insert date of claim].  Service connection for [enter presumptive disability] was denied by a rating decision dated, [insert date of decision] because [insert reason(s) for denial].

The denial of your claim for service connection for [insert presumptive disability] is confirmed, because [insert reason(s) for confirming denial.

[Include an explanation for the denial here]

**Example Rating Decision for Service-Connected Death Grant with No Prior Grant**

## INTRODUCTION

VA's records reflect that [full name] was a Veteran who served in the [military branch] from [date] to [date].  The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA's records indicate that you previously filed a claim for your [DIC claimant's relationship]'s death as a result of [insert presumptive disability] and were subsequently denied.  A special review of the Veteran's claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*.  Based on our review of the evidence listed below, we have made the following decision(s) in this case.

## DECISION

1. Service connection for the cause of death is granted.
2. Basic eligibility to Dependents' Educational Assistance is established effective [insert date].

## EVIDENCE

- DD Form 214
- VA Form 21-534, *Application for Dependency and Indemnity Compensation*, received on [date]
- Death certificate
- Medical Evidence [Medical Evidence may include, but is not limited to 1) diagnosis; 2) date of diagnosis; 3) date of death; 4) cause of death; and autopsy report.]

**\*Note to RVSR**:  Always verify that the Veteran filed no claim during his/her lifetime.  Also verify whether a 21-530, Application for Burial Benefits has been submitted.

## REASONS FOR DECISION

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure.  As such, VA has

determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea, Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

1.  Service connection for the cause of the Veteran's death, for purposes of entitlement to retroactive benefits.

VA has confirmed that the Veteran had in-country service in the Republic of Vietnam based on [insert evidence here].

During the lifetime of the Veteran, [he/she] did not submit a claim for benefits based on [insert presumptive disability].

On [date] a claim for service connected death benefits as a result of the Veteran's death was received.  On [date], this claim was denied because, at that time, [insert presumptive disability] was not found to have been incurred or aggravated during military service, nor was it present to a degree of 10 percent within one year of the Veteran's discharge from active duty.

On [date] the Veteran died and the cause of death was recorded as [cause of death, including contributory causes, if relevant].

Subsequently, [insert presumptive disability] was added recently to the list of disabilities recognized as being related to Agent Orange exposure.  As such, service connection for the cause of the Veteran's death is now granted, effective from [date]. [Reason for effective date]

**NOTE**:  [Insert only if a VAF 21-530 is not in file-Please send VA Form 21-530, Application for Burial Benefits to surviving spouse.]

2. Eligibility for Dependents' Educational Assistance under 38 U.S.C. Chapter 35.

Eligibility to Dependents' Educational Assistance is derived from a Veteran who has a permanent and total service-connected disability; or a permanent and total disability was in existence at the time of death; or the Veteran died as a result of a service-connected disability.  Also, eligibility exists for a serviceperson who died in service.  Basic eligibility to Dependents' Education Assistance is granted

and is effective from [insert date], because the Veteran's death is presumptively related to military service.

[Insert the reasons for the effective date here]

**Example Rating Decision for Service-Connected Death Grant with Prior Grant (claim received within one year of Veteran's death)**

INTRODUCTION

VA's records reflect that [full name] was a Veteran who served in the [military branch] from [date] to [date].  The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA's records indicate that you previously filed a claim for your [DIC claimant's relationship]'s death as a result of [insert name of new presumptive condition].  A special review of the Veteran's claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*.  Based on our review of the evidence listed below, we have made the following decision(s) in this case.

DECISION

1. An earlier effective date is granted for the service-connected cause of death.
2. An earlier effective date for eligibility to Dependents' Educational Assistance is established.

EVIDENCE

- DD Form 214
- VA Form 21-530, Application for Burial Benefits, received on [insert date 530 received]
- VA Form 21-534, Application for Dependency and Indemnity Compensation (DIC), received on [insert date 534 received]
- Death certificate
- Medical Evidence [Medical Evidence may include, but is not limited to 1) diagnosis; 2) date of diagnosis; 3) date of death; 4) cause of death; and autopsy report.]
- Rating decision dated [insert date of rating for 530 claim] granting burial benefits, effective [insert effective date]
- Decision dated [insert date of decision for 534] for service connection for the cause of death, effective [insert effective date]

REASONS FOR DECISION

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to

herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure.  As such, VA has determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea, Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

1.  An earlier effective date is granted for the service-connected cause of death.

VA has confirmed that the Veteran had in-country service in the Republic of Vietnam based on [insert evidence here].

On [insert date of diagnosis], medical evidence in the record indicates your [insert claimant's relationship] was diagnosed with [insert presumptive disability].  On [date] your [insert claimant's relationship] died and the cause of death was recorded as [cause of death, including contributory causes, if relevant].

On [date of award and notice letter], we granted benefits for your DIC claim, with an effective date of [insert effective date for 534], the date your DIC claim was received.

Subsequently, [insert presumptive diagnosis] was added to the list of disabilities recognized as being related to Agent Orange exposure.  As such, an earlier effective date for DIC benefits as a result of your [insert claimant's relationship]'s death is now granted.  The effective date is [insert earlier effective date] [Reason for earlier effective date].

2. An earlier effective date for Dependents' Educational Assistance under 38 U.S.C. Chapter 35.

Eligibility to Dependents' Educational Assistance is derived from a Veteran who has a permanent and total service-connected disability; or a permanent and total disability was in existence at the time of death; or the Veteran died as a result of a service-connected disability.  Also, eligibility exists for a serviceperson who died in service.  Basic eligibility to Dependents' Education Assistance is granted and is effective from [date].

**Example Rating Decision for Service-Connected Death Grant with Prior Pension Grant**

<u>INTRODUCTION</u>

VA's records reflect that [full name] was a Veteran who served in the [military branch] from [date] to [date].  The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA's records indicate that there was a claim previously filed for your [DIC claimant's relationship]'s death as a result of [insert name of new presumptive condition].  A special review of the Veteran's claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*.  Based on our review of the evidence listed below, we have made the following decision(s) in this case.

<u>DECISION</u>

1. Service connection for the cause of death is granted.
2. Basic eligibility to Dependents' Educational Assistance is established.

<u>EVIDENCE</u>

- DD Form 214
- VA Form 21-534, Application for Dependency and Indemnity Compensation (DIC), received on [insert date 534 received]
- Death certificate
- Medical Evidence [Medical Evidence may include, but is not limited to 1) diagnosis; 2) date of diagnosis; 3) date of death; 4) cause of death; and autopsy report.]

<u>REASONS FOR DECISION</u>

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure.  As such, VA has determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea,

Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

1.  Service connection for the cause of the Veteran's death, for purposes of entitlement to retroactive benefits.

VA has confirmed that the Veteran had in-country service in the Republic of Vietnam based on [insert evidence here].

On [insert date VA Form 21-534 received] you filed a claim for non service-connected pension benefits.  Medical evidence in the record indicates a diagnosis of [insert presumptive disability] on [insert date of diagnosis].  On [date] the Veteran died and the cause of death was recorded as [cause of death, including contributory causes, if relevant].

On [date], we granted non service-connected pension benefits, effective [insert effective date].

Subsequently, [insert presumptive disability] was added recently to the list of disabilities recognized as being related to Agent Orange exposure.  As such, service connection for cause of death is now granted.  The effective date is [date VA Form 21-534 claim was received], the date your claim for non service-connected benefits was submitted.

2. Eligibility for Dependents' Educational Assistance under 38 U.S.C. Chapter 35.

Eligibility to Dependents' Educational Assistance is derived from a Veteran who has a permanent and total service-connected disability; or a permanent and total disability was in existence at the time of death; or the Veteran died as a result of a service-connected disability.  Also, eligibility exists for a serviceperson who died in service.  Basic eligibility to Dependents' Education Assistance is granted and is effective from [date].

**Example Rating Decision for Service-Connected Death Confirmed and Continued**

## INTRODUCTION

VA's records reflect that [full name] was a Veteran who served in the [military branch] from [date] to [date].  The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA's records indicate that you previously filed a claim for your [DIC claimant's relationship]'s death as a result of [insert name of new presumptive condition] and were subsequently denied.  A special review of the Veteran's claims file was mandated by federal court order in *Nehmer v. Department of Veterans Affairs*. Based on our review of the evidence listed below, we have made the following decision(s) in this case.

## DECISION

1.  The prior decision regarding service connection for cause of death is confirmed and no change is warranted for that prior denial under the provisions of the court's orders in *Nehmer*.

## EVIDENCE

- DD Form 214
- VA Form 21-534, Application for Dependency and Indemnity Compensation, received on [date]
- VA Form 21-530, Application for Burial Benefits was received on [insert date]
- Death certificate
- Medical Evidence [Medical Evidence may include, but is not limited to 1) diagnosis; 2) date of diagnosis; 3) date of death; 4) cause of death; and autopsy report.]
- Decision dated [insert date of decision] denied service connection for cause of death

## REASONS FOR DECISION

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure.  As such, VA has

determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea, Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

<u>1.  Service connection for the cause of the Veteran's death, for purposes of entitlement to retroactive benefits.</u>

VA has confirmed that the Veteran had in-country service in the Republic of Vietnam based on [insert evidence here].

During the lifetime of your [DIC claimant's relationship-husband, son, spouse, father, etc], [he/she] did not submit a claim for benefits based on [insert disability shown as cause of death].

On [date] a claim for service connected death benefits as a result of his/her death was received.  The date of death is [insert date] and the cause of death was recorded as [cause of death, including contributory causes, if relevant].  A rating dated [insert date], denied your DIC claim.

The denial of your claim for service-connected death is confirmed and no change is warranted under the provisions of the court's orders in *Nehmer*.

**Example Rating Decision for Service-Connected Death Grant and Retroactive Compensation**

## INTRODUCTION

VA's records reflect that [insert full name of Veteran] was a Veteran who served in the [insert name of military branch in which Veteran served] from [insert date service began] to [insert date of discharge].  The Secretary of the Department of Veterans Affairs (VA) has established that Ischemic Heart Disease, Parkinson's Disease, Hairy Cell Leukemia and other Chronic B-cell Leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.

VA's records indicate that your [insert DIC claimant's relationship, i.e.- husband, father, etc] previously filed a claim for [insert name of new presumptive disability] and was subsequently denied.  A special review of your [survivor's relationship]'s claims file was mandated by federal court order in *Nehmer v. Department of Veterans Administration*.  Based on our review of the evidence listed below, we have made the following decision(s) in this case.

## DECISION

1. Service connection for [insert presumptive disability] associated with herbicide exposure is granted with a [insert percentage] percent evaluation, effective [insert date of receipt of the Veteran's initial claim for service connection for this condition].
2. Service connection for the cause of death is granted.
3. Basic eligibility to Dependents' Educational Assistance is established.

## EVIDENCE

- DD Form 214
- VA Form 21-526, Veteran's Application for Compensation or Pension, received on [insert date of receipt of the Veteran's original claim for service connection for this condition].
- Other information that creates a claim (informal, inferred, implied or a potential claim)
- VA examination dated [insert date of exam]
- Other Medical Evidence (private, SSA, treatment reports)
- Service Treatment Records
- Decision dated [insert date of decision], denied service connection for [insert presumptive disability]
- VA Form 21-534, Application for Dependency and Indemnity Compensation, received on [insert date claim received]
- Death certificate

- VA Form 21-530, Application for Burial Benefits received on [insert date claim received]
- Decision dated [insert date of rating], denied service connected death for [insert presumptive disability]

REASONS FOR DECISION

Pursuant to the authority granted by the Agent Orange Act of 1991, VA may determine that a presumption of service connection based on exposure to herbicides used in Vietnam is warranted for conditions that VA has found to have a statistically significant association with such exposure.  As such, VA has determined that a statistically significant association exists between exposure to herbicides and subsequent development of the following conditions:  chloracne, non-Hodgkin's lymphoma, soft tissue sarcoma, Hodgkin's disease, porphyria cutanea tarda (PCT), multiple myeloma, acute and subacute peripheral neuropathy, prostate cancer, cancers of the lung, bronchus, larynx, trachea, Type II (adult-onset) diabetes mellitus, chronic lymphocytic leukemia, AL amyloidosis, Parkinson's disease, ischemic heart disease, and B-cell leukemias, such as hairy cell leukemia.

For purposes of this review, Vietnam Veterans had in-country service in the Republic of Vietnam.

1.  Service connection for [insert presumptive disability], for purposes of entitlement to retroactive benefits.

VA has confirmed that the Veteran had in-country service in the Republic of Vietnam based on [insert evidence here].

Medical evidence in the record indicates a diagnosis of [insert presumptive disability] on [date].  The Veteran claimed service connection for [insert presumptive disability] on [insert date of claim].  Service connection for [insert presumptive disability] was denied by a rating decision dated, [insert date of decision] because [insert presumptive disability] was not incurred or aggravated during military service, nor was it present to a degree of 10 percent within one year of the Veteran's discharge from active duty.

Subsequently, [insert presumptive disability] was added recently to the list of disabilities recognized as being related to herbicide exposure.  As such, service connection for [insert presumptive disability] is now granted because it is presumptively related to the Veteran's military service.  The effective date of service connection for [insert presumptive disability] is [insert date of receipt of claim], the date the Veteran's original claim for service connection for [insert presumptive disability] was received.

[Insert paragraph for rating of the new presumptive condition and include an explanation of the percentage assigned for the condition, as well as the requirements for achieving the next higher percentage level.]

2.  Service connection for the cause of the Veteran's death, for purposes of entitlement to retroactive benefits.

On [date] the Veteran died and the cause of death was recorded as [cause of death, including contributory causes, if relevant].  On [date] a claim for service connected death benefits as a result of the Veteran's death was filed.  On [date], this claim was denied because, as was found in the previous denial of the Veteran's claim, [insert presumptive disability] was not found to have been incurred or aggravated during military service, nor was it present to a degree of 10 percent within one year of the Veteran's discharge from active duty.

Subsequently, [insert presumptive disability] was added recently to the list of disabilities recognized as being related to herbicide exposure.  As such, service connection for the cause of the Veteran's death is now granted, because it is presumptively related to the Veteran's military service.  The effective date of service connection for the Veteran's death is [insert date of receipt of DIC claim], the date your original claim for service connection for your [survivor's relationship] death was received.

3.  Eligibility for Dependents' Educational Assistance under 38 U.S.C. Chapter 35.

Eligibility to Dependents' Educational Assistance is derived from a Veteran who has a permanent and total service-connected disability; or a permanent and total disability was in existence at the time of death; or the Veteran died as a result of a service-connected disability.  Also, eligibility exists for a serviceperson who died in service.  Basic eligibility to Dependents' Education Assistance is granted and is effective from [date].

**Example Memorandum for the Record for No Vietnam Service**

| *NEHMER*<br>MEMORANDUM FOR THE RECORD | | | |
|---|---|---|---|
| **Department of Veterans Affairs** | **POA** | **Date of Memorandum** | |
| **Veteran's Name** | **Resource Center** | **VA Employee Name** | **VA File Number** |

ISSUE: No Vietnam Service

A systematic review of the Veteran's claims folder has been conducted in accordance with *Nehmer v. U.S. Department of Veterans Affairs*, which requires the payment of retroactive benefits to certain *Nehmer* class members. This case was identified as a potential *Nehmer*-class case based on the addition of Ischemic Heart Disease, Parkinson's Disease, and B-cell/Hairy cell leukemias to the list of diseases presumptively associated with exposure to certain herbicide agents.  Entitlement to potential retroactive benefits applies to all cases wherein VA received a claim for benefits, or wherein VA denied benefits, on or after September 25, 1985, and before the date VA publishes the final regulation adding the new disabilities to the list of diseases presumptively associated with herbicide exposure in Vietnam.

VA has confirmed that the Veteran did not have service in the Republic of Vietnam as defined by law.  In the absence of any conclusive evidence that the Veteran served in the Republic of Vietnam, or was otherwise exposed to herbicides used in the Republic of Vietnam during military service, further review under *Nehmer* is not required.  If VA receives any documentation that confirms that the Veteran did perform duty in the Republic of Vietnam, then entitlement to benefits under the *Nehmer* court order will be reconsidered.

[**User Input** - A detailed explanation regarding why the individual is not a class member is required.  The explanation must be sufficient in detail for the reviewer to undertake a clear analysis as to why the case does not qualify for *Nehmer* readjudication.]

Name (Rating Specialist/DRO)

Name (Rating Specialist/DRO)

**Example Memorandum for the Record for No Claim**

| *NEHMER*<br>MEMORANDUM FOR THE RECORD | | | |
|---|---|---|---|
| **Department of Veterans Affairs** | **POA** | **Date of Memorandum** | |
| **Veteran's Name** | **Resource Center** | **VA Employee Name** | **VA File Number** |

ISSUE:  No Prior Claim

A systematic review of the Veteran's claims folder has been conducted in accordance with *Nehmer v. U.S. Department of Veterans Affairs*, which requires the payment of retroactive benefits to certain *Nehmer* class members. This case was identified as a potential *Nehmer*-class case based on the addition of Ischemic Heart Disease, Parkinson's Disease, and B-cell/Hairy cell leukemias to the list of diseases presumptively associated with exposure to certain herbicide agents.  Entitlement to potential retroactive benefits applies to all cases wherein VA received a claim for benefits, or wherein VA denied benefits, on or after September 25, 1985, and before the date VA publishes the final regulation adding the new disabilities to the list of diseases presumptively associated with herbicide exposure in Vietnam.

VA has confirmed that the Veteran/Widow did not file a claim for benefits nor was denied a claim for benefits, as defined under *Nehmer* between September 25, 1985, and the date VA published the final regulation adding the new disabilities to the list of diseases presumptively associated with herbicide exposure in Vietnam.  In the absence of such evidence, further review under *Nehmer* is not required.

[**User Input** - A detailed explanation regarding why the individual is not a class member is required.  The explanation must be sufficient in detail for the reviewer to undertake a clear analysis as to why the case does not qualify for *Nehmer* readjudication.]

Name (Rating Specialist/DRO)

Name (Rating Specialist/DRO)

**Appendix 8 – Disability Benefit Questionnaires**

The following pages provide approved Disability Benefit Questionnaires (DBQs) for your use.

## Ischemic Heart Disease Disability Benefit Questionnaire

OMB Approved No. 2900-0749
Respondent Burden: 15 minutes

| **VA** Department of Veterans Affairs | **ISCHEMIC HEART DISEASE (IHD) DISABILITY BENEFITS QUESTIONNAIRE** |
|---|---|

**IMPORTANT - PLEASE READ THE PRIVACY ACT AND RESPONDENT BURDEN INFORMATION ON REVERSE BEFORE COMPLETING FORM.**

| NAME OF PATIENT/VETERAN | PATIENT/VETERAN'S SOCIAL SECURITY NUMBER |
|---|---|

**NOTE TO PHYSICIAN** - The veteran has applied to the Department of Veterans Affairs (VA) for disability benefits. Please complete this questionnaire, which VA needs for review of the veteran's application.

**SECTION I - DIAGNOSIS**

**Note:** IHD includes, but is not limited to, acute, sub-acute and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable and Prinzmetal's angina. IHD does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke, or any other condition that does not qualify within the generally accepted medical definition of ischemic heart disease.

1A. DOES THE VETERAN HAVE ISCHEMIC HEART DISEASE *(IHD)*?

☐ YES   ☐ NO

**Note: Provide only diagnoses that pertain to IHD**

| 1B. DIAGNOSIS # 1 - | ICD CODE - | DATE OF DIAGNOSIS - |
|---|---|---|
| 1C. DIAGNOSIS # 2 - | ICD CODE - | DATE OF DIAGNOSIS - |
| 1D. DIAGNOSIS # 3 - | ICD CODE - | DATE OF DIAGNOSIS - |

1E. IF ADDITIONAL DIAGNOSES THAT PERTAIN TO IHD, LIST USING ABOVE FORMAT

**SECTION II - MEDICAL HISTORY**

2A. DOES THE VETERAN'S TREATMENT PLAN INCLUDE TAKING CONTINUOUS MEDICATION FOR THE DIAGNOSED CONDITION?

☐ YES   ☐ NO

2B. LIST MEDICATIONS PRESCRIBED FOR IHD-RELATED CONDITIONS:

**2C. IS THERE A HISTORY OF:** *(Check all that apply and provide treatment facility and treatment date)*

| CONDITION | YES (Check) | NO (Check) | TREATMENT FACILITY | DATE OF TREATMENT |
|---|---|---|---|---|
| PERCUTANEOUS CORONARY INTERVENTION (PCI) | | | | |
| MYOCARDIAL INFARCTION | | | | |
| CORONARY BYPASS SURGERY | | | | |
| HEART TRANSPLANT (If "Yes," is it as likely as not that the veteran's heart transplant is due to IHD? ☐ YES ☐ NO) | | | | |
| IMPLANTED CARDIAC PACEMAKER (If "Yes," is it as likely as not that the veteran's pacemaker is due to IHD? ☐ YES ☐ NO) | | | | |
| IMPLANTED AUTOMATIC IMPLANTABLE CARDIOVERTER DEFIBRILLATOR (AICD) (If "Yes," is it as likely as not that the veteran's AICD is due to IHD? ☐ YES ☐ NO) | | | | |

**SECTION III - CONGESTIVE HEART FAILURE (CHF)**

3A. DOES THE VETERAN HAVE CHF?   ☐ YES   ☐ NO

3B. IS THE VETERAN'S CHF CHRONIC? ☐ YES   ☐ NO

3C. IF THE VETERAN'S CHF IS NOT CHRONIC, HAS THE VETERAN HAD MORE THAN ONE EPISODE OF ACUTE CHF IN THE PAST YEAR? ☐ YES   ☐ NO

*If "Yes," provide name of treatment facility:* _____

*Date of most recent episode of CHF:* _____

**SECTION IV - CARDIAC FUNCTIONAL ASSESSMENT**

4A. HAS A DIAGNOSTIC EXERCISE TEST BEEN CONDUCTED? ☐ YES   ☐ NO

*If "Yes," provide level of METS the veteran can perform as shown by diagnostic exercise testing:* _____

*Date of most recent test:* _____

VA FORM
MAY 2010   **21-0960A**

4B. IF EXERCISE METs TESTING WAS NOT COMPLETED BECAUSE IT IS NOT REQUIRED AS PART OF THE VETERAN'S TREATMENT PLAN, COMPLETE THE FOLLOWING METs TEST BASED ON THE VETERAN'S RESPONSES:

Lowest level of activity at which veteran reports symptoms *(Check all symptoms that apply)*

☐ DYSPNEA  ☐ FATIGUE  ☐ ANGINA  ☐ DIZZINESS  ☐ SYNCOPE

This METs Level has been found to be consistent with activities such as:

☐ **1-3 METs** (This METs level has been found to be consistent with activities such as eating, dressing, taking a shower, slow walking (2 mph) for 1-2 blocks)

☐ **>3-5 METs** (This METs level has been found to be consistent with activities such as light yard work (weeding), mowing lawn (power mower), brisk walking (4 mph)

☐ **>5-7 METs** (This METs level has been found to be consistent with activities such as golfing (without cart), mowing lawn (push mower), heavy yard work (digging)

☐ **>7-10 METs** (This METs level has been found to be consistent with activities such climbing stairs quickly, moderate bicycling, sawing wood, jogging (6 mph)

☐ Veteran denies experiencing above symptoms with any level of physical activity

## SECTION V - DIAGNOSTIC TESTING

**NOTE:** Determination of cardiac hypertrophy/dilatation is required; the suggested order of testing for cardiac hypertrophy/dilatation is EKG, then chest x-ray (PA and lateral), then echocardiogram. Echocardiogram is only necessary if the other two tests are negative. A limited echocardiogram, if available, is appropriate to determine if cardiac hypertrophy/dilatation is present by measuring only left ventricular dimension, wall thickness and ejection fraction.

5A. IS THERE EVIDENCE OF CARDIAC HYPERTROPHY OR DILATATION?
☐ YES  ☐ NO

5B. DIAGNOSTIC TEST AND DATE GIVEN *(Provide most recent test only)*

☐ EKG - Date of EKG: _____
☐ CHEST X-RAY - Date of chest x-ray: _____
☐ ECHOCARDIOGRAM - Date of echocardiogram: _____
☐ OTHER STUDY (Specify): _____  (Date): _____

5C. LEFT VENTRICULAR EJECTION FRACTION (LVEF), IF KNOWN: _____ %  DATE OF TEST: _____
(If LVEF testing is not of record, but available medical information reflects the severity of the veteran's cardiovascular condition, LVEF testing is not required)

## SECTION VI - FUNCTIONAL IMPACT AND REMARKS

6. DOES THE VETERAN'S IHD IMPACT THE VETERAN'S ABILITY TO WORK?
☐ YES  ☐ NO  *(If "Yes," describe impact, providing one or more examples)*

7. REMARKS *(If any)*

## SECTION VII - PHYSICIAN'S CERTIFICATION AND SIGNATURE

**CERTIFICATION** - To the best of my knowledge, the information contained herein is accurate, complete and current.

| 8A. PHYSICIAN'S SIGNATURE | 8B. PHYSICIAN'S PRINTED NAME | 8C. DATE SIGNED |
|---|---|---|
| 8D. PHYSICIAN'S PHONE NUMBER | 8E. PHYSICIAN'S MEDICAL LICENSE NUMBER | 8F. PHYSICIAN'S ADDRESS |

**NOTE** - VA may obtain additional medical information, including an examination, if necessary to complete VA's review of the veteran's application.

**IMPORTANT** - Physician please fax the completed form to _____
*(VA Regional Office FAX No.)*

**PRIVACY ACT NOTICE:** VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58/VA21/22/28, Compensation, Pension, Education and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. Your obligation to respond is required to obtain or retain benefits. VA uses your SSN to identify your claim file. Providing your SSN will help ensure that your records are properly associated with your claim file. Giving us your SSN account information is voluntary. Refusal to provide your SSN by itself will not result in the denial of benefits. VA will not deny an individual benefits for refusing to provide his or her SSN unless the disclosure of the SSN is required by a Federal Statute of law in effect prior to January 1, 1975, and still in effect. The requested information is considered relevant and necessary to determine maximum benefits under the law. The responses you submit are considered confidential (38 U.S.C. 5701). Information submitted is subject to verification through computer matching programs with other agencies.

**RESPONDENT BURDEN:** We need this information to determine entitlement to benefits (38 U.S.C. 501). Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 15 minutes to review the instructions, find the information, and complete the form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at www.reginfo.gov/public/do/PRAMain. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

VA FORM MAY 2010, 21-0960A

## Parkinson's Disease Disability Benefit Questionnaire

OMB Approved No. 2900-0749
Respondent Burden: 15 minutes

**Department of Veterans Affairs** | **PARKINSON'S DISEASE DISABILITY BENEFITS QUESTIONNAIRE**

IMPORTANT - PLEASE READ THE PRIVACY ACT AND RESPONDENT BURDEN ON REVERSE BEFORE COMPLETING FORM.

| NAME OF PATIENT/VETERAN | PATIENT/VETERAN'S SOCIAL SECURITY NUMBER |
|---|---|

NOTE TO PHYSICIAN – The veteran has applied to the Department of Veterans Affairs (VA) for disability benefits. Please complete this questionnaire, which VA needs for review of the veteran's application.

### SECTION I - DIAGNOSIS

| 1A. DOES THE VETERAN NOW HAVE OR HAS HE/SHE EVER BEEN DIAGNOSED WITH PARKINSON'S DISEASE? <br> ☐ YES   ☐ NO | 1B. ICD CODES(S) | 1C. DATE OF DIAGNOSIS |
|---|---|---|

2. DOMINANT HAND
☐ RIGHT   ☐ LEFT   ☐ AMBIDEXTROUS

### SECTION II - MOTOR MANIFESTATIONS

3. MOTOR MANIFESTATIONS DUE TO PARKINSON'S OR ITS TREATMENT *(Check all that apply)*

| MOTOR MANIFESTATIONS | NONE | MILD | MODERATE | SEVERE |
|---|---|---|---|---|
| A. STOOPED POSTURE | | | | |
| B. BALANCE IMPAIRMENT | | | | |
| C. BRADYKINESIA OR SLOWED MOTION *(Difficulty initiating movement, "freezing," short shuffling steps)* | | | | |
| D. LOSS OF AUTOMATIC MOVEMENTS *(Such as blinking, leading to fixed gaze, typical Parkinson's facies)* | | | | |
| E. SPEECH CHANGES *(Monotone, slurring words, soft or rapid speech)* | | | | |

F. TREMOR (Characteristic hand shaking, "pill-rolling")  ☐ YES  ☐ NO
  EXTREMITIES AFFECTED:
  ☐ RIGHT UPPER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE
  ☐ LEFT UPPER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE
  ☐ RIGHT LOWER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE
  ☐ LEFT LOWER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE

G. MUSCLE RIGIDITY AND STIFFNESS ☐ YES ☐ NO
  EXTREMITIES AFFECTED:
  ☐ RIGHT UPPER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE
  ☐ LEFT UPPER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE
  ☐ RIGHT LOWER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE
  ☐ LEFT LOWER
    ☐ NOT AFFECTED ☐ MILD ☐ MODERATE ☐ SEVERE

### SECTION III - MENTAL MANIFESTATIONS

4. MENTAL MANIFESTATIONS DUE TO PARKINSON'S OR ITS TREATMENT *(Check all that apply)*

| MENTAL MANIFESTATIONS | NONE | MILD | MODERATE | SEVERE |
|---|---|---|---|---|
| A. DEPRESSION | | | | |
| B. COGNITIVE IMPAIRMENT OR DEMENTIA | | | | |

VA FORM
MAY 2010   **21-0960C**

**SECTION IV - ADDITIONAL MANIFESTATIONS/COMPLICATIONS**

5.  ADDITIONAL MANIFESTATIONS/COMPLICATIONS DUE TO PARKINSON'S OR ITS TREATMENT *(Check all that apply)*

| ADDITIONAL MANIFESTATIONS/COMPLICATIONS | NONE | MILD | MODERATE | SEVERE |
|---|---|---|---|---|
| A. LOSS OF SENSE OF SMELL<br>☐ PARTIAL   ☐ COMPLETE | | | | |
| B. SLEEP DISTURBANCE *(Insomnia or daytime "sleep attacks")* | | | | |
| C. DIFFICULTY CHEWING/SWALLOWING | | | | |
| D. URINARY PROBLEMS *(Incontinence or urinary retention) - (Indicate "None" or, if absorbent material required due to incontinence, specify pads/day):*    OR, IF APPLICABLE, USE OF AN<br>☐ 0  ☐ 1  ☐ 2-4  ☐ >4   ☐ APPLIANCE | | | | |
| E. CONSTIPATION *(DUE TO SLOWING OF GI TRACT OR SECONDARY TO PARKINSON'S MEDICATIONS)* | | | | |
| F. SEXUAL DYSFUNCTION | | | | *(Proctudes interioscenta, including erectile dysfunction)* |
| G. OTHER MANIFESTATIONS/COMPLICATIONS *(Specify):* | | | | |
| H. OTHER MANIFESTATIONS/COMPLICATIONS *(Specify):* | | | | |

6. FINANCIAL RESPONSIBILITY - In your judgment, is the veteran able to manage his/her benefit payments in his/her own best interest, or able to direct someone else to do so?

☐ YES   ☐ NO

**SECTION V - FUNCTIONAL IMPACT AND REMARKS**

7. DOES THE VETERAN'S PARKINSON'S IMPACT THE VETERAN'S ABILITY TO WORK?

☐ YES   ☐ NO   *(If "Yes," describe impact and provide one or more examples)*

8. REMARKS *(If any)*

**SECTION VI - PHYSICIAN'S CERTIFICATION AND SIGNATURE**

**CERTIFICATION** - To the best of my knowledge, the information contained herein is accurate, complete and current.

| 9A. PHYSICIAN'S SIGNATURE | 9B. PHYSICIAN'S PRINTED NAME | 9C. DATE SIGNED |
|---|---|---|
| 9D. PHYSICIAN'S PHONE NUMBER | 9E. PHYSICIAN'S MEDICAL LICENSE NUMBER | 9F. PHYSICIAN'S ADDRESS |

**NOTE** - VA may obtain additional medical information, including an examination, if necessary to complete VA's review of the veteran's application.

**IMPORTANT** - Physician please fax the completed form to _____

*(VA Regional Office FAX No.)*

PRIVACY ACT NOTICE: VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58VA21/22/28, Compensation, Pension, Education and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. Your obligation to respond is required to obtain or retain benefits. VA uses your SSN to identify your claim file. Providing your SSN will help ensure that your records are properly associated with your claim file. Giving us your SSN account information is voluntary. Refusal to provide your SSN by itself will not result in the denial of benefits. VA will not deny an individual benefits for refusing to provide his or her SSN unless the disclosure of the SSN is required by a Federal Statute of law in effect prior to January 1, 1975, and still in effect. The requested information is considered relevant and necessary to determine maximum benefits under the law. The responses you submit are considered confidential (38 U.S.C. 5701). Information submitted is subject to verification through computer matching programs with other agencies.

RESPONDENT BURDEN: We need this information to determine entitlement to benefits (38 U.S.C. 501), Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 15 minutes to review the instructions, find the information, and complete the form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at www.reginfo.gov/public/do/PRAMain. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

VA FORM MAY 2010, 21-0960C

## B-cell Leukemia Disability Benefit Questionnaire

OMB Approved No. 2900-0749
Respondent Burden: 15 minutes

**Department of Veterans Affairs**

### HAIRY CELL AND OTHER B-CELL LEUKEMIAS DISABILITY BENEFITS QUESTIONNAIRE

**IMPORTANT - PLEASE READ THE PRIVACY ACT AND RESPONDENT BURDEN INFORMATION ON REVERSE BEFORE COMPLETING FORM.**

| NAME OF PATIENT/VETERAN | PATIENT/VETERAN'S SOCIAL SECURITY NUMBER |
|---|---|

**NOTE TO PHYSICIAN** - The veteran has applied to the Department of Veterans Affairs (VA) for disability benefits. Please complete this questionnaire, which VA needs for review of the veteran's application.

### SECTION I - DIAGNOSIS

1A. DOES THE VETERAN NOW HAVE OR HAS HE/SHE EVER BEEN DIAGNOSED WITH HAIRY CELL LEUKEMIA OR ANY OTHER B-CELL LEUKEMIA?
☐ YES   ☐ NO   *(If "No," skip to Item 6, "Remarks")*

**NOTE: Provide only diagnoses that pertain to hairy cell or any other B-cell leukemias**

| 1B. DIAGNOSIS # 1 - | ICD CODE - | DATE OF DIAGNOSIS - |
|---|---|---|
| 1C. DIAGNOSIS # 2 - | ICD CODE - | DATE OF DIAGNOSIS - |
| 1D. DIAGNOSIS # 3 - | ICD CODE - | DATE OF DIAGNOSIS - |

1E. IF ADDITIONAL DIAGNOSES THAT PERTAIN TO HAIRY CELL AND OTHER B-CELL LEUKEMIAS, LIST USING ABOVE FORMAT

### SECTION II - STATUS OF DISEASE

2. STATUS OF DISEASE
☐ ACTIVE   ☐ REMISSION

### SECTION III - TREATMENT

3. TREATMENT *(Check one)*
☐ VETERAN IS CURRENTLY UNDERGOING TREATMENT FOR THIS LEUKEMIA WITH SURGICAL, RADIATION, IMMUNOTHERAPY, ANTINEOPLASTIC CHEMOTHERAPY AND/OR OTHER THERAPEUTIC PROCEDURES
☐ VETERAN HAS COMPLETED TREATMENT FOR THIS LEUKEMIA - Date of discontinuance of treatment:

### SECTION IV - COMPLICATIONS OR RESIDUALS OF TREATMENT

4A. DOES THE VETERAN CURRENTLY HAVE ANY COMPLICATIONS OR RESIDUALS OF TREATMENT? ☐ YES ☐ NO *(Check all that apply)*

4B. ARE THERE ANY COMPLICATIONS OR RESIDUALS REQUIRING TRANSFUSION OF PLATELETS OR RED CELLS?
☐ YES ☐ NO   *(If "Yes," indicate frequency)*
   ☐ AT LEAST ONCE PER YEAR BUT LESS THAN ONCE EVERY 3 MONTHS
   ☐ AT LEAST ONCE EVERY 3 MONTHS
   ☐ AT LEAST ONCE EVERY 6 WEEKS

4C. ARE THERE ANY COMPLICATIONS OR RESIDUALS CAUSING RECURRING INFECTIONS?
☐ YES ☐ NO   *(If "Yes," indicate frequency)*
   ☐ AT LEAST ONCE PER YEAR BUT LESS THAN ONCE EVERY 3 MONTHS
   ☐ AT LEAST ONCE EVERY 3 MONTHS
   ☐ AT LEAST ONCE EVERY 6 WEEKS

4D. ARE THERE ANY COMPLICATIONS OR RESIDUALS RELATED TO ANEMIA?
☐ YES ☐ NO   *(If "Yes," check all that apply)*
   ☐ ASYMPTOMATIC ANEMIA
   ☐ REQUIRES CONTINUOUS MEDICATION
   ☐ REQUIRES BONE MARROW TRANSPLANT - Date:
   ☐ SYMPTOMATIC ANEMIA *(Check signs and symptoms that apply)*

| ☐ WEAKNESS | ☐ EASY FATIGABILITY | ☐ DYSPNEA ON MILD EXERTION |
|---|---|---|
| ☐ LIGHT-HEADEDNESS | ☐ SHORTNESS OF BREATH | ☐ SYNCOPE |
| ☐ CARDIOMEGALY | ☐ TACHYCARDIA | ☐ DYSPNEA AT REST |
| ☐ HIGH OUTPUT CONGESTIVE HEART FAILURE | ☐ HEADACHES | ☐ OTHER SYMPTOM(S) *(Specify)* _____ |

   IF AVAILABLE, PROVIDE MOST RECENT HEMOGLOBIN LEVEL (gm/100ml): _____ Date _____

   IF AVAILABLE, PROVIDE MOST RECENT PLATELET COUNT: _____ Date _____

4E. IF ANY OTHER RESIDUAL COMPLICATIONS ARE PRESENT PLEASE SPECIFY:

VA FORM
MAY 2010   **21-0960B**

**SECTION V - FUNCTIONAL IMPACT AND REMARKS**

5. DOES THE VETERAN'S B-CELL LEUKEMIA IMPACT THE VETERAN'S ABILITY TO WORK?

☐ YES   ☐ NO   *(If "Yes," describe impact, providing one or more examples)*

6. REMARKS *(If any)*

**SECTION VI - PHYSICIAN'S CERTIFICATION AND SIGNATURE**

**CERTIFICATION** - To the best of my knowledge, the information contained herein is accurate, complete and current.

| 7A. PHYSICIAN'S SIGNATURE | 7B. PHYSICIAN'S PRINTED NAME | 7C. DATE SIGNED |
|---|---|---|
| 7D. PHYSICIAN'S PHONE NUMBER | 7E. PHYSICIAN'S MEDICAL LICENSE NUMBER | 7F. PHYSICIAN'S ADDRESS |

**NOTE** - VA may obtain additional medical information, including an examination, if necessary to complete VA's review of the veteran's application.

**IMPORTANT** - Physician please fax the completed form to _____

*(VA Regional Office FAX No.)*

**PRIVACY ACT NOTICE:** VA will not disclose information collected on this form to any source other than what has been authorized under the Privacy Act of 1974 or Title 38, Code of Federal Regulations 1.576 for routine uses (i.e., civil or criminal law enforcement, congressional communications, epidemiological or research studies, the collection of money owed to the United States, litigation in which the United States is a party or has an interest, the administration of VA programs and delivery of VA benefits, verification of identity and status, and personnel administration) as identified in the VA system of records, 58VA21/22/28, Compensation, Pension, Education and Vocational Rehabilitation and Employment Records - VA, published in the Federal Register. Your obligation to respond is required to obtain or retain benefits. VA uses your SSN to identify your claim file. Providing your SSN will help ensure that your records are properly associated with your claim file. Giving us your SSN account information is voluntary. Refusal to provide your SSN by itself will not result in the denial of benefits. VA will not deny an individual benefits for refusing to provide his or her SSN unless the disclosure of the SSN is required by a Federal Statute of law in effect prior to January 1, 1975, and still in effect. The requested information is considered relevant and necessary to determine maximum benefits under the law. The responses you submit are considered confidential (38 U.S.C. 5701). Information submitted is subject to verification through computer matching programs with other agencies.

**RESPONDENT BURDEN:** We need this information to determine entitlement to benefits (38 U.S.C. 501). Title 38, United States Code, allows us to ask for this information. We estimate that you will need an average of 15 minutes to review the instructions, find the information, and complete the form. VA cannot conduct or sponsor a collection of information unless a valid OMB control number is displayed. You are not required to respond to a collection of information if this number is not displayed. Valid OMB control numbers can be located on the OMB Internet Page at www.reginfo.gov/public/do/PRAMain. If desired, you can call 1-800-827-1000 to get information on where to send comments or suggestions about this form.

VA FORM MAY 2010, 21-0960B

**Appendix 9 – Rating Schedule**

For a complete discussion of the cardiovascular evaluation criteria in effect prior to January 12, 1998, as well as a discussion of the old and new side-by-side comparison go directly to:

http://vbaw.vba.va.gov/bl/21/Publicat/Regs/Part4/TUTORIAL/Cv_indx.htm.

**Appendix 10 – Example Notification Letters**

The following pages provide example *Nehmer* notification letters for your reference.

**Example Letter for Live Veteran Service-Connected Grant**

---

XXXX XXXX XXXXX                          In Reply Refer To: XXXXXXXX
XXXX XXXXXXX XX                          CSS XXX XX XXXX
XXXXXX, XX XXXXX                         XXXXX, Xxxx Xxxx

Dear XXXXXXX:

The Secretary of the Department of Veterans Affairs (VA) recently established that ischemic heart disease, Parkinson's disease, and hairy cell and other chronic B-cell leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.  Our records indicate that you previously filed a claim for *[insert name of new presumptive condition]*.

We have conducted a special review of your claims file mandated by the United States District Court's orders in *Nehmer v. U.S. Department of Veterans Affairs*.

This letter tells you about your award amount and payment start date and what we decided.  It includes a copy of our rating decision that gives the evidence used and reasons for our decision.  We have also included information about additional benefits, what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## Your Estimated Retroactive Amount
The estimated amount of retroactive benefits is $*[amount]*.  These retroactive benefits are a result of the United States District Court's order in *Nehmer v. U.S. Department of Veterans Affairs*.  Please see *Your Award Amount and Payment Start Date.*

## Your Award Amount and Payment Start Date
*[Use standard PCGL paragraphs and tables.  Be sure to include dependency information.  Insert all dependent's names.]*

## You Can Expect Payment
*[Use standard PCGL paragraphs]*

## We Have Withheld Benefits
*[Use standard PCGL paragraphs, if applicable]*

## What We Decided

We granted service connection for *[insert name of new presumptive here]* for the purposes of entitlement to retroactive benefits, effective *[date]*.
*[Use standard PCGL paragraphs, if applicable]*

## Do You Have Dependents?

*[Use standard PCGL paragraphs – include VA Form 21-686c and 21-674 for students in attachments]*

## How Do You Start Direct Deposit?

[*Use appropriate PCGL paragraph*]

## Are You Entitled to Additional Benefits?

*[Use standard Additional Benefits PCGL paragraphs, if applicable.  Additional benefit paragraphs include insurance, medical care, vocational rehabilitation and employment benefits, commissary, etc.]*

## What You Should Do If You Disagree With Our Decision

*[Use standard PCGL paragraph]*

## If You Have Questions or Need Assistance

*[Use standard PCGL paragraphs]*

*[POA - Use standard PCGL paragraphs]*

Sincerely yours,

XXXXX
XXXXX
*[Title]*

Enclosure(s): Rating Decision
*[Include all Enclosures necessary]*
VA Form 4107

**Example Letter for Live Veteran Service-Connected Denial**

XXXX XXXX XXXXX
XXXX XXXXXXX XX
XXXXXX, XX XXXXX

In Reply Refer To: XXXXXXXX
CSS XXX XX XXXX
XXXXX, Xxxx Xxxx

Dear XXXXXXX:

The Secretary of the Department of Veterans Affairs (VA) recently established that ischemic heart disease, Parkinson's disease, and hairy cell and other chronic B-cell leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions. Our records indicate that you previously filed a claim for *[insert name of new presumptive condition]*.

We have conducted a special review of your claims file mandated by the United States District Court's orders in *Nehmer v. U.S. Department of Veterans Affairs*.

This letter tells you what we decided. It includes a copy of our rating decision that gives the evidence used and reasons for our decision. We have also included information about what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## What We Decided
*[Use standard PCGL paragraphs]*

## What You Should Do If You Disagree With Our Decision
*[Use standard PCGL paragraphs]*

**If You Have Questions or Need Assistance**

*[Use standard PCGL paragraphs]*

*[POA - Use standard PCGL paragraphs]*

Sincerely yours,

**XXXXX**
XXXXX
*[Title]*

Enclosure(s): Rating Decision
*[Appropriate attachments]*

**Example Letter for DIC Grant**

XXXX XXXX XXXXX
XXXX XXXXXXX XX
XXXXXX, XX XXXXX

In Reply Refer To: XXXXXXXX
XSS XXX XX XXXX
XXXXX, Xxxx Xxxx

Dear XXXXXXX:

The Secretary of the Department of Veterans Affairs (VA) recently established that ischemic heart disease, Parkinson's disease, and hairy cell and other chronic B-cell leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions. Our records indicate that [Name of Veteran] previously filed a claim for *[insert name of new presumptive condition]*.

We have conducted a special review of your *[DIC claimant's relationship]*'s claims file mandated by the United States District Court's orders in *Nehmer v. U.S. Department of Veterans Affairs*.

This letter tells you about your award amount and payment start date and what we decided. It includes a copy of our rating decision that gives the evidence used and reasons for our decision. We have also included information about additional benefits, what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## Your Estimated Retroactive Amount

The estimated amount of retroactive benefits based on *[Veteran's name]*'s claim for service connected compensation is $*[amount]*. The estimated amount of DIC retroactive benefits is $*[amount]*. *[Make necessary adjustments to the paragraph to address the benefit payment].*

These retroactive benefits are a result of the United States District Court's order in *Nehmer v. Nehmer v. U.S. Department of Veterans Affairs*. Please see *Your Award Amount and Payment Start Date.*

## Your Award Amount and Payment Start Date

*[Use standard PCGL paragraphs and tables. Insert name(s) for additional dependents. Be sure to include dependency information.]*

**You Can Expect Payment**
*[Use standard PCGL paragraphs]*

**We Have Withheld Benefits**
*[Use standard PCGL paragraphs]*

**What We Decided**
We granted service connection for [insert name of new presumptive here] for the purposes of entitlement to retroactive benefits, effective [date] until [date of death].

 *[Use all other necessary standard PCGL paragraphs]*

**How Do You Start Direct Deposit?**
*[Use standard PCGL paragraphs]*

**What Additional Information or Evidence Do We Still Need From You?**
*[Use standard PCGL paragraphs]*

**When and Where to Send the Information or Evidence**
*[Use standard PCGL paragraphs]*

**Are You Entitled to Additional Benefits?**
*[Use standard PCGL paragraphs]*

**What You Should Do If You Disagree With Our Decision**
*[Use standard PCGL paragraphs]*

**If You Have Questions or Need Assistance**
*[Use standard PCGL paragraphs]*

*[POA - Use standard PCGL paragraphs]*

Sincerely yours,

**XXXXX**
XXXXX
[Title]

Enclosure(s): Rating Decision
          *[All Necessary Enclosures]*

**Example Letter for DIC Denial**

XXXX XXXX XXXXX
XXXX XXXXXXX XX
XXXXXX, XX XXXXX

In Reply Refer To: XXXXXXXX
XSS XXX XX XXXX
XXXXX, Xxxx Xxxx

Dear XXXXXXX:

The Secretary of the Department of Veterans Affairs (VA) recently established that ischemic heart disease, Parkinson's disease, and hairy cell and other chronic B-cell leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.  *[If the Veteran filed a claim insert:]*  Our records indicate that *[Name of Veteran]* previously filed a claim for *[insert name of new presumptive condition]*.

Our records indicate that you applied for dependency and indemnity compensation (DIC) benefits on *[date]*.

We have conducted a special review of your *[DIC claimant's relationship]*'s claims file mandated by the United States District Court's orders in *Nehmer v. U.S. Department of Veterans Affairs*.

Every effort was made in considering your claim.  This notification tells you what we decided, how we made our decision and what evidence we used to make our decision.  We have also included information on what to do if you disagree with our decision and who to contact if you have questions or need assistance.

## What We Decided
*[Use standard PCGL paragraphs]*

## What You Should Do If You Disagree With Our Decision
*[Use standard PCGL paragraphs]*

**If You Have Questions or Need Assistance**

*[Use standard PCGL paragraphs]*

*[POA - Use standard PCGL paragraphs]*

Sincerely yours,

**XXXXX**
XXXXX
[Title]

Enclosure(s):  Rating Decision
                        VA Form 4107

**Example Letter for Estate Grant**

XXXX XXXX XXXXX
XXXX XXXXXXX XX
XXXXXX, XX XXXXX

In Reply Refer To: XXXXXXXX
XSS XXX XX XXXX
XXXXX, Xxxx Xxxx

Dear XXXXXXX:

The Secretary of the Department of Veteran Affairs (VA) has recently established that ischemic heart disease, Parkinson's disease, and hairy cell and other chronic B-cell leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions. Our records indicate that *[Name of Veteran]* previously filed a claim for *[insert name of new presumptive condition]* during his lifetime.

We have conducted a special review of the Veteran's claim file as mandated by the United States District Court's orders in *Nehmer v. U.S. Department of Veterans Affairs*. We have determined that the Veteran's Estate is entitled to retroactive compensation based on being a recognized class member as outlined in the above court order.

This letter tells you about the award amount and payment start date and what we decided. It includes a copy of our rating decision that gives the evidence used and reasons for our decision. We have also included information of what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## Your Estimated Retroactive Amount

The estimated amount of retroactive benefits is $*[amount]*. This estimated payment was calculated using the new monthly entitlement amount minus any prior payments that were made along with any prior withholdings (if applicable) from the effective date(s) shown in the table below. These retroactive benefits are a result of the United States District Court's order in *Nehmer v. U.S. Department of Veterans Affairs*. Please see the *Award Amount and Payment Start Date*.

## Award Amount and Payment Start Date

*[Use standard PCGL paragraphs and tables.]*

This retroactive payment is being made to the Estate of the Veteran based on being a recognized class member.

## You Can Expect Payment

*[Use standard PCGL paragraphs]*

## What You Should Do If You Disagree With Our Decision

*[Use standard PCGL paragraphs]*

## If You Have Questions or Need Assistance

*[Use standard PCGL paragraphs]*

*[POA - Use standard PCGL paragraphs]*

Sincerely yours,

## XXXXX
XXXXX
[Title]

Enclosure(s): Rating Decision
*[Enclosures vary]*
VA Form 4107

**Example Letter for Child or Parent Grant**

XXXX XXXX XXXXX
XXXX XXXXXXX XX
XXXXXX, XX XXXXX

In Reply Refer To: XXXXXXXX
XSS XXX XX XXXX
XXXXX, Xxxx Xxxx

Dear XXXXXXX:

The Secretary of the Department of Veteran Affairs has recently established that ischemic heart disease, Parkinson's disease, and hairy cell and other chronic B-cell leukemias warrant presumptive service connection based on the association between exposure to herbicides used in the Republic of Vietnam and the subsequent development of these conditions.  Our records indicate *[Name of Veteran]* previously filed a claim for *[insert name of new presumptive condition]* during his lifetime.

We have conducted a special review of the Veteran's claim file as mandated by the United States District Court's orders in *Nehmer v. U.S. Department of Veterans Affairs*. We have determined that you are entitled to retroactive compensation based on being a recognized class member as outlined in the above court order.

This letter tells you about your award amount and payment start date and what we decided.  It includes a copy of our rating decision that gives the evidence used and reasons for our decision.  We have also included information of what to do if you disagree with our decision, and who to contact if you have questions or need assistance.

## Your Estimated Retroactive Amount

The estimated amount of your retroactive benefits is $[amount].  This estimated payment was calculated using the new monthly entitlement amount minus any prior payments that were made along with any prior withholdings (if applicable) from the effective date(s) shown in the table below.  These retroactive benefits are a result of the United States District Court's order in *Nehmer v. U.S. Department of Veterans Affairs.*  Please see *Your Award Amount and Payment Start Date.*

## Your Award Amount and Payment Start Date

*[Use standard PCGL paragraphs and tables]  [Modify for one time only payment]*

We're paying you as a recognized class member of the above named Veteran.

## You Can Expect Payment
[Use standard PCGL paragraphs]

## What You Should Do If You Disagree With Our Decision
[Use standard PCGL paragraphs]

## If You Have Questions or Need Assistance
[Use standard PCGL paragraphs]

[POA - Use standard PCGL paragraphs]

Sincerely yours,

## XXXXX
XXXXX
[Title]

Enclosure(s): Rating Decision
*[Enclosures vary]*
VA Form 4107

**Appendix 11 – The Cardiovascular System in 38 C.F.R § 4.100 (Prior to January 12, 1998)**

Sec. 4.100  Necessity for complete diagnosis.

The common types of disease of the heart are those of rheumatic, syphilitic, arteriosclerotic, hypertensive, or hyperthyroid etiology.  Determinations of relationship to service and evaluation, in the case of disability due to disease of the heart, require accurate identification of the disease, as an active or residual condition, with the complete required classification of etiology, structural lesions, manifestations, and capacity for work.  Many common diagnoses following the first World War do not represent disease entities. ``Chronic myocarditis,'' for example, except as a continuing inflammation following an identified acute myocarditis due to rheumatic fever or other infectious agent, is not a satisfactory diagnosis; there should be further identification of the etiological agent and structural lesions, prior to rating action.  The very common diagnosis ``mitral insufficiency'' is likewise unsatisfactory as reflecting organic valvular disease in the absence of associated mitral stenosis, definite cardiac enlargement without other causes, or history of rheumatic manifestations.  An acceptable diagnosis cannot be based upon the presence of systolic murmurs alone.  Tachycardia and bradycardia, the various arrythmias, and cardiac hypertrophy or dilatation, do not represent generally acceptable diagnoses, and elevation or depression of the systolic or diastolic pressure is usually a manifestation of disease, rather than a clinical entity.

Sec. 4.101  Rheumatic heart disease.

Rheumatic fever is an acute infectious disease, affecting the structures about the joints (though without permanent bone damage) and, frequently, the endocardium.  Children are as a rule affected, usually before the age of 20 years.  Seldom is the initial attack after 25 years.  The disease tends to recur, and serious heart trouble may follow the first or a subsequent attack.  With acute rheumatic fever in service, perhaps without manifest damage to the heart, a subsequent recurrence of the infection, should be accepted as service connected.  With even a few days service, service connection may be given for an acute rheumatic fever and any cardiac residuals.  On the other hand, a mitral insufficiency without a history of rheumatic fever, chorea, or tonsillitis, or definite complication in service, must be considered as functional.  Aortic insufficiency with a history of rheumatic fever and manifestation within approximately 15 years from the date of syphilitic infection, if any, should generally be considered rheumatic and always so when there is associated mitral or aortic stenosis.  With a history of rheumatic fever in service, an aortic insufficiency manifest some years later without other cause shown may be service connected.  The subsequent progress of rheumatic heart disease, and the effect of superimposed arteriosclerotic or hypertensive changes cannot usually be satisfactorily disassociated or separated so as to permit differential service connection. It is for

this reason, in part, that great insistence is placed upon ascertainment of the service-connected disease as a true pathological entity.  A subsequent change of diagnosis from one of an organic condition to one reflecting the effect of psychic or nervous factors casts doubt on the original diagnosis, but unless the correction is promptly made continuance of the service
connection and of the evaluation under the new diagnosis is required.  Such a change does not reflect an improvement of the physical condition.

Sec. 4.102  Varicose veins and phlebitis.

With severe varicose veins, tests to determine impairment of deep return circulation are essential, as the superficial varicosities may be caused by the impairment of deep return circulation, or there may be phlebitis as a complication of varicose ulcers. With phlebitis, or impairment of deep return circulation, the appropriate higher rating should be applied.

Sec. 4.103  [Reserved]

Sec. 4.104  Schedule of ratings--cardiovascular system.

Diseases of the Heart                                                    Rating
7000  Rheumatic heart disease:
  As active disease and, with ascertainable cardiac
  manifestation, for a period of 6 months...................………………………..100
  Inactive:
    Definite enlargement of the heart confirmed by roentgenogram
    and clinically; dyspnea on slight exertion; rales,
    pretibial pitting at end of day or other definite signs of
    beginning congestive failure; more than sedentary
    employment is precluded......................................…………………………..100
    The heart definitely enlarged; severe dyspnea on exertion,
    elevation of systolic blood pressure, or such arrhythmias
    as paroxysmal auricular fibrillation or flutter or
    paroxysmal tachycardia; more than light manual labor is
    precluded...........................................……………………………………..60
  From the termination of an established service episode of
    rheumatic fever, or its subsequent recurrence, with cardiac
    manifestations, during the episode or recurrence, for 3
    years, or diastolic murmur with characteristic EKG
    manifestations or definitely enlarged heart...........…………………………30
  With identifiable valvular lesion, slight, if any dyspnea,
    the heart not enlarged; following established active
    rheumatic heart disease...................................……………………………..10
7001  Endocarditis, bacterial, subacute.
7002  Pericarditis, bacterial or rheumatic, acute.

Rate as rheumatic heart disease.

7003  Adhesions, pericardial:

  Extensive, obliterating the sac, with congestive heart failure      100

  Rate lesser conditions as rheumatic heart disease, inactive.

7004  Syphilitic heart disease:

  Rate as rheumatic heart disease, inactive.

7005  Arteriosclerotic heart disease:

  During and for 6 months following acute illness from coronary

    occlusion or thrombosis, with circulatory shock, etc.....………………….100

  After 6 months, with chronic residual findings of congestive

    heart failure or angina on moderate exertion or more than

    sedentary employment precluded...................………………….......100

  Following typical history of acute coronary occlusion or

    thrombosis as above, or with history of substantiated

    repeated anginal attacks, more than light manual labor not

    feasible...................………………………………………….60

  Following typical coronary occlusion or thrombosis, or with

    history of substantiated anginal attack, ordinary manual

    labor feasible...................………………………………….30

7006  Myocardium, infarction of, due to thrombosis or embolism.

  Rate as arteriosclerotic heart disease.

7007  Hypertensive heart disease:

  With definite signs of congestive failure, more than sedentary

    employment precluded...................………………….......100

  With marked enlargement of the heart, confirmed by

    roentgenogram, or the apex beat beyond midclavicular line,

    sustained diastolic hypertension, diastolic 120 or more,

    which may later have been reduced, dyspnea on exertion, more

    than light manual labor is precluded...................………………….......60

  With definite enlargement of the heart, sustained diastolic

    hypertension of 100 or more, moderate dyspnea on exertion...…………..30

7008  Hyperthyroid heart disease:

  With signs of congestive failure...................………………….......100

  With permanent or paroxysmal auricular fibrillation..........………………….60

  Note: The ratings under Code 7008 are not to be combined with

  ratings for hyperthyroidism. Rate lesser conditions as

  hyperthyroidism.

  Cardiac neurosis.

  Refer to psychiatric schedule.

  Note: The following Codes 7010 through 7015 reflecting

  arrhythmias and conduction abnormalities are occasionally

  encountered. Standing alone they represent incomplete

  diagnoses. Ratings are not to be combined with those for

  other heart or psychiatric conditions.

7010  Auricular flutter, paroxysmal.

  Rate as paroxysmal tachycardia.

7011  Auricular fibrillation, paroxysmal.
  Rate as paroxysmal tachycardia.
7012  Auricular fibrillation, permanent.......................…………………………...10
7013  Tachycardia, paroxysmal:
  Severe, frequent attacks.....................…………………………30
  Infrequent attacks.....................………………………………10
7014  Sinus tachycardia:
  Persistently 100 or more in recumbent position..........……………………10
7015  Auriculoventricular block:
  Complete; with attacks of syncope necessitating the insertion
    of a permanent internal pacemaker, and for 1 year, after
    which period the rating will be on residuals as below....…………………100
  Complete: with Stokes-Adams attacks several times a year
    despite the use of medication or management of the heart
    block by pacemaker.......................………………………………60
  Complete; without syncope or minimum rating when pacemaker has
    been inserted.....................……………………………………30
  Incomplete; without syncope but occasionally symptomatic..……………..10
  Incomplete; asymptomatic, without syncope or need for
    medicinal control after more than 1 year.................………………………..0
  Note 1: Atrioventricular block, partial or complete, may be
    present associated with and related to the supraventricular
    tachycardias or pathological bradycardia. Cases with Mobitz
    Type II block may be encountered, as well as Wenckebach's
    phenomenon, Mobitz Type I block, and varying degrees of A-V
    block associated with tachyarrhythmias or other severe
    disturbances in rate or rhythm. Such unusual cases should be
    submitted to the Director, Compensation and Pension Service.
    On the other hand, simple delayed P-R conduction time, in the
    absence of other evidence of cardiac disease, is not a
    disability.
  Note 2: The 100 percent rating for 1 year following
    implantation of permanent pacemaker will commence after
    initial grant of the 1 month total rating assigned under Sec.
    4.30 following hospital discharge.
7016  Heart valve replacement (prosthesis):
  For 1 year following implantation of prosthetic valve....…………100
  Thereafter; rate as rheumatic heart disease; minimum rating.……30
  Note: The 100 percent rating for 1 year following implantation
    of prosthetic valve will commence after initial grant of the
    1 month total rating assigned under Sec.  4.30 following
    hospital discharge.
7017  Coronary artery bypass:
  For 1 year following bypass surgery..............……...………………100
  Thereafter, rate as arteriosclerotic heart disease.
    Minimum rating.......................………………………………30

Note: Authentic myocardial insufficiency with arteriosclerosis
may be substituted for occlusion.
Note: The 100 pct rating for 1 year following bypass surgery
will commence after the initial grant of the 1-month total
rating assigned under Sec. 4.30 following hospital
discharge.
--------------------------------------------------------------------


Diseases of the Arteries and Veins
--------------------------------------------------------------------
Rating
--------------------------------------------------------------------
7100  Arteriosclerosis, general:
  With slight weakening of bodily vigor.......................……………….20
  Without symptoms or renal, cardiac, or cerebral complications.    0
  Note: Rate the arteriosclerotic complications, such as renal,
  cardiac, or cerebral, under the appropriate schedule.
7101  Hypertensive vascular disease (essential arterial
  hypertension):
  Diastolic pressure predominantly 130 or more and severe
    symptoms.......................................…………………………60
  Diastolic pressure predominantly 120 or more and moderately
    severe symptoms...............................…………………………40
  Diastolic pressure predominantly 110 or more with definite
    symptoms.......................................…………………………20
  Diastolic pressure predominantly 100 or more............…………..10
  Note 1: For the 40 percent and 60 percent ratings under code
  7101, there should be carefull attention to diagnosis and
  repeated blood pressure readings.
  Note 2: When continuous medication is shown necessary for
  control of hypertension with a history of diastolic blood
  pressure predominantly 100 or more, a minimum rating of 10
  percent will be assigned.
7110  Aneurysm, aortic, fusiform, sacular, dissection and/or
  with stenosis:
  After establishment of diagnosis with markedly disabling
    symptoms; and for 1 year after surgical correction (with any
    type graft).......................................…………………………100
  If exertion and exercise is precluded..............................…….60
  Thereafter, rate residual of graft insertion according to
   findings and symptoms under most appropriate analogy.
  Minimum rating.......................................…………………….20
  Note: The 100 percent rating for 1 year following surgical
   correction will commence after initial grant of the 1-month
   total rating under Sec. 4.30 assigned following hospital

discharge.

7111  Artery, any large artery, aneurysm of:
  In lower extremities, symptomatic....................................……………………60
  In upper extremities, symptomatic..............................……………..…40
  Note: Rate post-operative residuals with graft insertion under
   most appropriate analogy, e.g., 7116, etc., minimum rating 20
   percent.

7112  Artery, small, aneurysmal dilatation of...................……………..10

7113  Arteriovenous aneurysm, traumatic:
  With cardiac involvement, minimum rating.......................……………60
  Without cardiac involvement with marked vascular symptoms.
  Lower extremity.............................................………………………50
  Upper extremity.........................................………………………40
  With definite vascular symptoms.
  Lower extremity.............................................………………………30
  Upper extremity.........................................………………………20

7114  Arteriosclerosis obliterans.

7115  Thromboangiitis obliterans (Buerger's disease).

7116  Claudication, intermittent:
  Severe form with marked circulatory changes such as to produce
   total incapacity or to require house or bed confinement.…………100
  Persistent coldness of extremity with claudication on minimal
   walking......................................………………………………60
  Well-established cases, with intermittent claudication or
   recurrent episodes of superficial phlebitis.....................……………40
  Minimal circulatory impairment, with paresthesias, temperature
   changes or occasional claudication...............................………………20
  Note: The 100 percent rating will not be applied under a
   diagnosis of intermittent claudication.

7117  Raynaud's disease:
  Severe form with marked circulatory changes such as to produce
   total incapacity or to require house or bed confinement.…………100
  Multiple painful, ulcerated areas..................................………………60
  Frequent vasomotor disturbances characterized by blanching,
   rubor and cyanosis...............................................………………………40
  Occasional attacks of blanching or flushing...............……………..…20

  Note: The schedular evaluations in excess of 20 percent under
   Diagnostic Codes 7114, 7115, 7116, and 7117 are for
   application to unilateral involvements. With bilateral
   involvements, separately meeting the requirements for
   evaluation in excess of 20 percent, 10 percent will be added
   to the evaluation for the more severely affected extremity
   only, except where the disease has resulted in an amputation.
   The resultant amputation rating will be combined with the
   schedular rating for the other extremity, including the

bilateral factor, if applicable. The 20 percent evaluations
are for application to unilateral or bilateral involvement of
both upper and lower extremities.

7118  Angioneurotic edema:

Severe; frequent attacks with severe manifestations and
prolonged duration...............................................…40

Moderate; frequent attacks of moderate extent and duration........20

Mild; infrequent attacks of slight extent and duration...…............10

7119  Erythromelalgia:

Severe.....................................................…...........40

Moderate....................................................…...........20

Mild....................................................…..............10

7120  Varicose veins.

Pronounced; unilateral or bilateral, the findings of the
severe condition with secondary involvement of the deep
circulation, as demonstrated by Trendelenburg's and Perthe's
tests, with ulceration and pigmentation:

Bilateral..............................................…...............60

Unilateral.............................................…..............50

Severe; involving superficial veins above and below the knee,
with involvement of the long saphenous, ranging over 2 cm. in
diameter, marked distortion and sacculation, with edema and
episodes of ulceration; no involvement of the deep
circulation:

Bilateral..............................................…...............50

Unilateral.............................................…..............40

Moderately severe; involving superficial veins above and below
the knee, with varicosities of the long saphenous, ranging in
size from 1 to 2 cm. in diameter, with symptoms of pain or
cramping on exertion; no involvement of the deep circulation:

Bilateral..............................................…...............30

Unilateral.............................................…..............20

Moderate; varicosities of superficial veins below the knees,
with symptoms of pain or cramping on exertion:

Bilateral or unilateral.................................…...............10

Mild; or with no symptoms...............................…...............0

Note: Severe varicosities below the knee, with ulceration,
scarring, or discoloration and painful symptoms will be rated
as moderately severe.

7121  Phlebitis or thrombophlebitis, unilateral, with
obliteration of deep return circulation, including traumatic
conditions:

Massive board-like swelling, with severe and constant pain at
rest......................................................…...........100

Persistent swelling, subsiding only very slightly and
incompletely with recumbency elevation with pigmentation

cyanosis, eczema or ulceration..................................…………………60
Persistent swelling of leg or thigh, increased on standing or
walking 1 or 2 hours, readily relieved by recumbency;
moderate discoloration, pigmentation and cyanosis or
persistent swelling of arm or forearm, increased in the
dependent position; moderate discoloration, pigmentation or
cyanosis..................................……………………………..30
Persistent moderate swelling of leg not markedly increased on
standing or walking or persistent swelling of arm or forearm
not increased in the dependent position............................……………10
Note: When phlebitis is present in both lower extremities or
both upper extremities, apply bilateral factor.

7122  Frozen feet, residuals of (immersion foot).
With loss of toes, or parts, and persistent severe symptoms:
Bilateral..................................……………………………..50
Unilateral..................................…………………………...30
With persistent moderate swelling, tenderness, redness, etc:
Bilateral..................................……………………………..30
Unilateral..................................…………………………...20
With mild symptoms, chilblains:
Bilateral..................................……………………………..10
Unilateral..................................……………………………10
Note: With extensive losses higher ratings may be found
warranted by reference to amputation ratings for toes and
combination of toes; in the most severe cases, ratings for
amputation or loss of use of one or both feet should be
considered. There is no requirement of loss of toes or parts
for the persistent moderate or mild under this diagnostic
code.

7123 Soft-tissue sarcoma (of vascular origin)..............…………..100
Note: The 100 percent rating will be continued for 6 months
following the cessation of surgical, X-ray, antineoplastic
chemotherapy or other therapeutic procedure. At this point, if
there has been no local recurrence or metastases, the rating
will be made on residuals.

[29 FR 6718, May 22, 1964, as amended at 40 FR 42539, Sept. 15, 1975; 41
FR 11300, Mar. 18, 1976; 43 FR 45361, Oct. 2, 1978; 56 FR 51653, Oct.
15, 1991]

**Appendix 12 – MAP-D Notification/Development Paragraphs for *Nehmer***

**Introductory Paragraph –  Development Letter Issued Prior To Final Regulation**

We are conducting a special review of [Veteran's name/your] claims folder in accordance with *Nehmer v. U.S. Department of Veterans Affairs* (VA), which requires the payment of retroactive benefits to certain *Nehmer* class members. Your case was identified as a potential *Nehmer* class-member case based on the addition of Ischemic Heart Disease, Parkinson's Disease, and B-cell/Hairy cell leukemias to the list of diseases presumptively associated with exposure to certain herbicide agents used in Vietnam.  Entitlement to <u>potential</u> retroactive benefits applies to all cases wherein VA received a claim, or a claim for benefits was pending, or wherein VA denied benefits, on or after September 25, 1985, and before the date VA publishes the final regulation adding the new disabilities to the list of diseases presumptively associated with herbicide exposure in Vietnam.

Your case qualifies for this special review based on a prior VA benefits claim for [insert the newly added presumptive disease].  However, this disease has not yet been added to VA regulations governing disabilities presumptively associated with herbicide exposure.  In order to add this disease, we must follow a series of legal requirements, including publishing a notice in the Federal Register.  We have begun this process, but in the meantime we are requesting evidence necessary for this review so that we may expedite your decision once the regulation becomes final.

<u>**IMPORTANT NOTE TO VSRs: If no additional development is required, edit the last sentence in the second paragraph, "We have begun this process …" before sending the notification letter to the class member.**</u>

**Introductory Paragraph –  Development Letter Issued After Final Regulation**

We are conducting a special review of [Veteran's name/your] claims folder in accordance with *Nehmer v. U.S. Department of Veterans Affairs* (VA), which requires the payment of retroactive benefits to certain *Nehmer* class members. Your case was identified as a potential *Nehmer* class-member case based on the addition of Ischemic Heart Disease, Parkinson's Disease, and B-cell/Hairy Cell Leukemia to the list of diseases presumptively associated with exposure to certain herbicide agents used in Vietnam.  [Entitlement to <u>potential</u> retroactive benefits applies to all cases wherein VA received a claim, or a claim for benefits was pending, or wherein VA denied benefits, on or after September 25, 1985, and before the date VA publishes the final regulation adding the new disabilities to the list of diseases presumptively associated with herbicide exposure in

Vietnam.**]**  Your case qualifies for this special review based on a prior VA benefits claim for [insert the newly added presumptive disease].

**VAE Paragraph**

You may be able to help us expedite your case if you can have your VA or private physician complete the enclosed VA Examination Worksheet.  Submitting this worksheet may eliminate the need for VA to schedule a Compensation and Pension examination to obtain current rating criteria on your case.  This may help us make a decision faster.  Have the physician complete all portions of the worksheet and ensure that he or she signs and dates the worksheet.  In order to fully assist VA in expediting your case, please submit the examination worksheet within 30 days. If you cannot provide this information, your physician refuses to assist, or we otherwise have not received it within 30 days, we may proceed with scheduling an examination for you.

**Soliciting Other Evidence Paragraph**

If you have any additional information that you may consider helpful in the review of your claim, please provide us a copy of such information as soon as possible. Examples of additional information include, but are not limited to marriage certificates, birth certificates, Social Security numbers, and medical reports. Historical medical reports are especially important if your claim(s) was denied long ago and you have subsequent medical treatment records from the time the claim was filed to the present, including any period in between.

**Appendix 13 – *Nehmer* Readjudication (EP 687) Review Worksheet 1**

## DRAFT – SUBJECT TO CHANGE

**Static Fields:**

CLAIM#:                          NAME of VETERAN                          ROJ:
VHA FACILITY#                                        RC (Rating D1BC):
REVIEWER: [User Enter Name]                 DATE RECEIVED IN RC:

Claims file received:  [User will select from drop box containing: 319 – Columbia; 317 – St. Petersburg; 314 – Roanoke; 315 – Huntington; 402 – Togus; 310 – Philadelphia; 334 – Lincoln; 331; St. Louis; 351 – Muskogee; 349 – Waco; 345 – Phoenix; 377 – San Diego; 346 – Seattle; Other - free text up to 25 characters]

**NEHMER READJUDICATION**

### Eligibility Requirements

1. Does the claims file contain verified evidence of in-country Vietnam service? [User will select Y/N  [If User selects Y, proceed to 1A]

1A. Please state where the verified evidence was found in the claims file. [User free text up to 50 characters]

2. Identify the oldest prior claim filed or denied between 9/25/85 and 8/31/10 that serves as the basis of readjudication for Ischemic heart disease (IHD), Parkinson's, HCL and B-cell leukemias, and other Herbicide-Related Disabilities [User will select]:

- ➢ SC claim
- ➢ SC and pension claim
- ➢ Live pension claim
- ➢ Informal claim
- ➢ Inferred claim for SC, or a claim reasonably raised by VA, or an instance where VA failed to address a claim, or VA failed to provide a decision notice letter to the class member
- ➢ N/A (Not a Nehmer class member) [If N/A, skip to item 7]

2A. What are the disability(ies) claimed or inferred? [User selects-multiple selections apply]

1) Ischemic heart disease
2) Parkinson's disease
3) B-cell chronic lymphocytic leukemia/small lymphocytic

4) Acute lymphoblastic leukemia-mature B-cell type
5) B-cell prolymphocytic leukemia
6) Precursor B lymphoblastic leukemia
7) Hairy cell leukemia
8) Other
9) N/A

2B. What is the date of receipt of each of the prior claim(s) from item 2? [Auto list of claims from item 2] [User will enter date of receipt of each claim]

3. What is the type of medical evidence used to verify the disability for:  [Auto list of diseases from 2A] [User selects-multiple selections apply for type medical evidence (VHA; Private Treatment or Other (SSA, etc) used for each disability identified]

Example:

| Disability | VHA | Private Treatment | Other (SSA, etc) |
|---|---|---|---|
| Parkinson's | Y | N | N |
| Ischemic Heart | N | Y | Y |

4. What is the rating date that disposed of the claim from items 2B? [User will enter date of rating that disposed of the claim(s) identified in item 2-Auto list of claims will be generated] [N/A choice]

5. What was the disposition of the claim(s) from item 4? [Auto list of the claims identified in item 2 and drop-down choices are grant (enter effective date benefits granted), denial or outstanding] [If grant is checked, proceed to item 6]

6. Is there a subsequent grant of the previous denial or deferral of benefits, and if so, insert the effective date for benefits that were previously granted based on the oldest prior claim from item 2. [User will enter the effective date benefits were previously granted] [Do not allow for entry into item 7. Skip to item 8]

7. Does the Veteran meet Nehmer all three eligibility requirements?  [User will select Y/N]
[If "YES" go to item 8]
[If "NO", identify why the individual is not a Nehmer class member (multiple selections permitted and a selection is required) and go to item 7A] [If No in-country VN service is selected, proceed to 7A]

➢ No in-country VN service
➢ No prior claim filed or denied between 9/25/85 and 8/31/10
➢ No diagnosis of claimed disabilities

7A.  Is development required? [User will select Y/N] [If YES proceed to 8; If NO skip to 19]

8. Does a prior rating decision correctly deny SC for [Auto list of disabilities identified in item 2A]?  [User required entry]

| Disability | Rating |
|------------|--------|
|            |        |

### Other Herbicide-Related Disabilities

9. Was a SC claim filed for any other AO disability? [User will select Y/N]
[If "YES", User must select disability(ies) from the drop box and proceed to items 10-12]
[If "NO" is checked, Auto skip of this area and proceed to the area entitled "Death Claims"]

[User selects-multiple selections permitted]

  - Type 2 diabetes also known as type II diabetes mellitus or adult-onset diabetes
  - Hodgkin's disease
  - Multiple myeloma
  - Non-Hodgkin's lymphoma
  - Acute and Subacute peripheral neuropathy
  - Porphyria cutanea tarda
  - Prostate cancer
  - Lung cancer
  - Bronchus cancer
  - Larynx cancer
  - Trachea cancer
  - Chronic lymphocytic Leukemia (CLL)
  - AL Amyloidosis (ALA)
  - Soft tissue sarcoma

10. What is the type medical evidence used to verify the diagnosis(es) [Auto list of all disabilities identified in item 9]? [User entry required]

[Multiple selections are allowed for the type medical evidence used for each disability identified]

Example:

| Disability | VHA | Private Treatment | Other (SSA, lay statements, etc) |
|------------|-----|-------------------|-----------------------------------|
| Type 2 diabetes | Y | N | N |
| Hodgkin's disease | N | Y | Y |

| Multiple myeloma | N | Y | Y |
|---|---|---|---|

11. Does a rating decision grant SC for [Auto list named disabilities in item 9]? [Y/N-User entry required]

12. Does a rating decision assign the correct effective date for [Auto list named disabilities identified in item 9]?  [Y/N-User entry required]

**Death Claim**
Is the Veteran still living [Y/N-User entry required]
[If the Veteran is living-skip this entire area go to items under "Initial Screening Summary"]

13. Was there a claim for death benefits-to include burial filed or denied between 9/25/85 and 8/31/10 [Y/N-User entry]
[If Yes, proceed to Q14]
[If No, Allow only Q15 and skip to Q19]

14. What is the date of receipt of death claims? [User will enter date-required entry]

15. What is the date of death? [User will enter date-required entry]

16. What is the Veteran's primary, secondary or contributory cause of death caused by [Auto list of disabilities identified in items 2A and 9-Allow for multiple selections of disabilities and for each disability, allow for the following drop-down choices: primary, secondary, contributory, N/A. Allow for one choice only].

| Disability | Primary | Secondary | Contributory | N/A |
|---|---|---|---|---|
| Parkinson's | Check mark | Grayed-out | Grayed-out | Grayed-out |
| Ischemic Heart | Grayed-out | Check mark | Grayed-out | Grayed-out |

17. What is the date that disposes of the death claim? [User will enter data field – Optional]

18. What was the disposition of the claim from item 13? [User will select from drop-down choices]

  ➢ granted [User will enter date of rating]
  ➢ denied[User will enter date of rating]
  ➢ deferred [User will enter date of rating]
  ➢ pending

[Stop and Save]

**Initial Screening Summary**

19. Is the Nehmer claim ready for rating activity?  [Y/N-User entry]
[If "YES", drop-down choices. User entry required]
  a.  Grant with medical development [If a grant with medical development is indicated proceed to 21]
  b.  Full grant with no additional medical development [If a full grant is indicated skip to item 31]
  c.  Denial [If Denial is indicated, skip to item 34
  d.  Memorandum for the record [If selected, skip to item 32]
  e.  Confirmed and continued (C&C) [If a C&C is indicated skip to item 34]
[If "NO", proceed to item 20 and do not allow an entry in the below drop box]

20. Is development action(s) required before a rating can be prepared?  [Y/N-User entry]
[If 'YES', proceed to Rating Development Action(s) Required and do not allow an entry in items identified under Ready-to-Rate section (Q32-34)]
[If "NO", proceed to Rating Development Action(s) Required and allow for entry in the Ready-to-Rate section (Q32-34)]

[Stop and Save]

## Rating Development Action(s)

21. Specify the medical development action(s) required to rate claim:  [User will select from drop box-multiple choices allowed]

  ➢  Service Treatment Records
  ➢  Uniformed Services Hospital records
  ➢  VAE
  ➢  VAMC Treatment Records
  ➢  A statement/letter from most recent treating physician
  ➢  Private treatment records
  ➢  SSA Records
  ➢  Autopsy/summary medical report
  ➢  Death certificate
  ➢  Other

## Non-Medical Development Action(s)

22. Are additional development actions required?  [Y/N-User entry] [Add drop box and allow multiple selections and a write-in if "Other" is checked] [If NO, skip to the Q28]

22A. If so, what type of evidence? [User entry, select from list]

  ➢  birth certificate(s)

- marriage certificate
- divorce decree
- service verification/PIES/DPRIS
- other (free text – 5 sub-choices, up to 50 characters)

[STOP and SAVE]

23. Is development required for a valid address? [Y/N-User entry]

24. Is development required to identify payee(s)? [Y/N-User entry]

25. Is development required for paid-in-full receipts? [Y/N-User entry]

[If "YES', User will select from list]
[If "NO", go to Q26]

- funeral home/mortuary
- cemetery
- individual receipts

26. Is development required for [User will select from list]

- retired pay
- SBP
- separation pay
- N/A

27. What avenue of communication is being used to request required evidence identified in items 22-26, except PIES or JSRRC?
[User enters input date field and then check-boxes]

- telephone
- electronic mail
- written communication

[Stop and Save]

## Receipt of Requested Evidence

28. Was all requested evidence received? [Y/N-User entry]
[If "YES", go to Q28A]
[If "NO", go to Q29]

28A. Enter the date the requested evidence was received [User will insert date-required entry] and proceed to "RVSR Decision" section.

29 Was the (request for evidence) mail returned undeliverable?  [Y/N-User entry]
[If "YES" an entry is required in item 29A]
[If "NO", go to Q30]

29A. If the (request for evidence) mail was returned undeliverable, is the requested evidence required in order to rate the claim? [Y/N-User entry]
[If "NO" proceed to item 32]
[If "YES" is selected go to "Decision Notice Area"]

30. Is additional evidence needed in order to rate? [Y/N-User entry]
[If "NO" go to "Ready-to-Rate section"]
[If "YES", repeat Q21 – Q29. Label as Q30A – Q30J]

31. Is additional evidence needed to prepare award action(s)?
[If "NO" go to "Ready-to-Rate" section]
If "YES", repeat Q22 – Q27. Label as Q31A – 31F]

[Stop and Save]

## RVSR Decision

32. Does retroactive payment under Nehmer apply to this claim? [Y/N-User entry]
[If "YES" skip item 33 and proceed to 34]
[If "NO" User entry is required in item 33]

33. Is C.F.R. § 3.114a applicable? [Y/N-User entry]

34. What is the disposition of the claim(s)?  [User insert date--Required Entry and allow multiple entries]

- ➢ SC
  - ○ Grant (includes any additional medical development)
  - ○ Denial (includes C&C and memorandum
- ➢ DIC
  - ○ Grant (includes any additional medical development)
  - ○ Denial (includes C&C and memorandum

Burial
  - ○ Grant (includes any additional medical development)
  - ○ Denial (includes C&C and memorandum

34A.  Name of RVSR that prepared decision?  [User enters name]

[Stop and Save]

## Award Action [an entry is required in all items]

35. Did you prepare award action(s) for all claimed benefits?  [Y/N-User entry]
[If Yes, go to Q36.]
[If No, go to Q40.]

36. Are there multiple payees? [Y/N-User entry]

37. Are retroactive benefits payable?  [Y/N-User entry]
[If "NO", go to Q39]
[If "YES', go to 37A]

37A. Is the SC retroactive benefit payable based on: select [User entry-drop-down choices]

> New AO Presumptives [User entry-amount required]
> Other AO disabilities only [User entry-amount required]
> New AO Presumptives and other AO disabilities [User entry-amount required]
> No SC Retro

37B. Is the DIC retroactive benefit payable based on select: select [User entry-select from drop-down choices]

> New AO Presumptives [User entry-amount required]
> Other AO disabilities only [User entry-amount required]
> New AO Presumptives and other Herbicide-Related disabilities [User entry-amount required]
> No DIC Retro

37C. Is the retroactive SC burial benefit payable based on, select [User entry-select from drop-down choices]

> New AO Presumptives [User entry-amount required]
> Other AO disabilities only [User entry-amount required]
> New AO Presumptives and other Herbicide-Related disabilities [User entry-amount required]
> No Burial Retro

38. Did you appropriately withhold for retired pay, SBP, etc? [Y/N/N/A]


39. Did you award SC burial? [Y/N]

**Decision Notice letter**

40. Did you prepare a decision notice letter(s)? [Y/N-User entry]
[If "YES", go to 40A.]

[If "NO", go to go to Q41].

40A. Check all attachments that apply [User entry-check boxes of appropriate attachments and paragraph-education benefits]

> appeal rights-VAF 4107
> rating decision, VAF 21-8760
> VAF 22-5490
> VA Pamphlet 22-73-3
> VAF 28-8890
> VAF 28-1900
> CH31
> CHAMPVA
> Commissary and Exchange privileges
> Life Insurance
> POA paragraph
> other appropriate paragraphs or attachments (free text)

41.  Select the type of decision prepared by the RVSR and enter the date the decision is sent for initial review by the authorization activity.  What is the significance of putting this into the database, why not insert these specific instructions into the SOP.   We are getting too much into the weeds.

> Rating decision to include C&C rating and decision notice letter [User enters the date decision was sent to SVSR]
> Memorandum for the record [User enters the date the memorandum for the record is sent to SVSR and selects the reason(s) why a memorandum is prepared-If an entry is not shown in items "a" or "b" do not allow an entry in item "c"]
>  a.  No In-country Vietnam Service
>  b.  No Prior Claim filed or denied between 9/25/85 and [automatic insert date-date pending of final regulation-unknown at this time]
>  c.  No Diagnosis of claimed disability(ies) [Entry in this field is only allowed if in conjunction with item a or b]

[Stop and Save]

### Quality Review

42. Did authorization activity approve the Memorandum for Record or decision notice letter and rating decision?
[If "Yes", User must input date and go to Q42A. Do not allow date entered in 42 to be earlier than date shown in Q41]
[If "No", User must select type of correction from drop box list]
   a.  Rating deficiency
   b.  Letter deficiency

   c.  Effective date correction (Date of claim not accurately identified or
      described)
   d.  Dependency
   e.  Issues not addressed (SC burial, etc)
   f.  DFAS – Retired pay/SBP
   g.  Other development actions
   h.  Finance – large check amount
   i.  Footnote 1 applicable (VA placed at issue/VA failed to address)
   j.  Other corrections
   k.  N/A

42a. Select the final disposition of the claim approved by the initial reviewer. ?
[User selects appropriate disposition and inserts date of approval-Required Entry
and multiple entries allowed]

   ➢ SC Grant without medical development

   ➢ SC Grant with additional medical development

   ➢ Denial of Live Claim (includes C&C)

   ➢ DIC Grant without medical development

   ➢ DIC Grant with additional medical development (i.e., A/A)

   ➢ Burial Grant

   ➢ Denial of Death Claim (includes C&C)

   ➢ Memorandum for the record [If 41c is the only selection-do not allow an
      entry in this field]

42b.  Name of individual who approved final action. [User must enter name of
individual]

[Stop and Save]

42c. Did SME review the Nehmer claim for quality? [Y/N-User entry]
[If Y, User must input date of review.  Do not allow date entered in Q42c to be
earlier than date shown in Q42.  Continue to Q42d]
[If N, Skip to Q43]

42d.  Did SME identify any deficiencies? [Y/N-User entry]
[If "No", go to Q42e]
[If "Yes", User must select type of deficiency from drop box list and continue to
Q42e]

- ➢ Rating deficiency
- ➢ Letter deficiency
- ➢ Effective date correction
- ➢ Dependency
- ➢ Issues not addresses (SC burial, etc)
- ➢ DFAS – Retired pay/SBP
- ➢ Other development actions
- ➢ Finance – large check amount
- ➢ Footnote 1 applicable (VA placed at issue/VA failed to address)
- ➢ Other corrections
- ➢ N/A

42e.  Name of SME [User must enter name of SME]

[Stop and Save]

43.  Enter the date the decision notice letter and rating decision was released to
class member(s) or the date the Memorandum for the Record was approved:
[User-input date field-optional]

Miscellaneous Issues
44. Are there any outstanding deferred issues, unrelated to Nehmer, that require
action by the ROJ?  [Y/N-User entry-optional]

45. Was decision notice letter returned undeliverable?  [Y/N-User entry-optional]

46. Enter date claims file was returned to RO of jurisdiction: [User entry date
field-optional]

46A. Select the appropriate ROJ [User entry drop down list]:


| 301 | Boston         | 318 | Winston-Salem |
|-----|----------------|-----|---------------|
| 304 | Providence     | 319 | Columbia      |
| 306 | New York       | 320 | Nashville     |
| 307 | Buffalo        | 321 | New Orleans   |
| 308 | Hartford       | 322 | Montgomery    |
| 309 | Newark         | 323 | Jackson       |
| 310 | Philadelphia   | 325 | Cleveland     |
| 311 | Pittsburgh     | 326 | Indianapolis  |
| 313 | Baltimore      | 327 | Louisville    |
| 314 | Roanoke        | 328 | Chicago       |
| 315 | Huntington     | 329 | Detroit       |
| 316 | Atlanta        | 330 | Milwaukee     |
| 317 | St. Petersburg | 331 | St. Louis     |

| | | | |
|---|---|---|---|
| 333 | Des Moines | 355 | San Juan |
| 334 | Lincoln | 358 | Manila |
| 335 | St. Paul | 362 | Houston |
| 339 | Denver | 372 | Washington |
| 340 | Albuquerque | 373 | Manchester |
| 341 | Salt Lake City | 377 | San Diego |
| 343 | Oakland | 402 | Togus |
| 344 | Los Angeles | 405 | White River Jct. |
| 345 | Phoenix | 436 | Ft. Harrison |
| 346 | Seattle | 437 | Fargo |
| 347 | Boise | 438 | Sioux Falls |
| 348 | Portland | 442 | Cheyenne |
| 349 | Waco | 452 | Wichita |
| 350 | Little Rock | 459 | Honolulu |
| 351 | Muskogee | 460 | Wilmington |
| 354 | Reno | 463 | Anchorage |

For Information Purpose Only (Static Fields):

LIST of ALL PRESUMPTIVE HERBICIDE CONDITIONS UNDER THE NEHMER COURT ORDER:

| | |
|---|---|
| Soft-tissue Sarcoma | October 15, 1991 |
| Hodgkin's disease | February 3, 1994 |
| Non-Hodgkin's lymphoma | May 19, 1993 |
| Porphyria cutanea tarda | February 3, 1994 |
| Lung cancer | June 9, 1994 |
| Bronchus cancer | June 9, 1994 |
| Larynx cancer | June 9, 1994 |
| Trachea cancer | June 9, 1994 |
| Multiple myeloma | June 9, 1994 |
| Acute and Subacute peripheral neuropathy | November 7, 1996 |
| Prostate cancer | November 7, 1996 |
| Type 2 Diabetes | May 8, 2001 |
| Chronic lymphocytic Leukemia (CLL) | October 16, 2003 |
| AL Amyloidosis (ALA) | May 7, 2009 |
| Ischemic heart disease | [Pending Regulation] |
| Parkinson's disease | [Pending Regulation] |
| B-cell chronic lymphocytic leukemia/small lymphocytic | [Pending Regulation] |
| Acute lymphoblastic leukemia-mature B-cell type | [Pending Regulation] |
| B-cell prolymphocytic leukemia | [Pending Regulation] |
| Precursor B lymphoblastic leukemia | [Pending Regulation] |
| Hairy cell leukemia | [Pending Regulation] |

**Appendix 14 – *Nehmer* Readjudication Data Collection for EP 687**

**NOTE:**

**Request comprehensive reports showing total numbers, RC#, and other specific data as shown below.**

**Pull all detailed reports by RC#, ROJ, claim #, name of Veteran, and other specific data as shown below.**

1. Date, name of reviewer, and RC# received the claims file:  [Date, reviewer, and RC# will be captured from static fields] [Output-cumulative total and detailed listing per date, name of reviewer and RC#]

2. Identify the disability:  [Data will be captured from Q2A, Q9]
   a. Ischemic heart disease [Q-2A(1)]
   b. Parkinson's disease [Q-2A(2)]
   c. HCL and other B-cell Leukemias [Q-2A(3-8)]
   d. Other Herbicide-related diseases [Q-9]
   e. Other [Q-2A(9)]

3. Identify those selected as <u>Not</u> a *Nehmer* class member [Q41a or Q41b] [Output should give total number by RC# and provide a detailed listing by claim number and specify the why the individual is not a *Nehmer* class member]

   ➢ No in-country VN service
   ➢ No prior claim filed or denied between 9/25/85 and 8/31/10

4. Identify type of medical evidence used to rate: [Data will be captured from Q10-show cumulative totals and detailed listings with totals]
   a. VHA records to include examinations
   b. Private treatment records
   c. Other (SSA, lay statements, etc)

5. Identify survivor claims. [Capture data from Q14- if a date is shown; provide cumulative totals per RC and detailed listing].

6. Type of additional evidence is needed:  [Data will be captured from Q21, Q22, Q22A Q23, Q24, Q25, and Q26 if "Yes" is selected-show cumulative totals by type evidence needed and detailed listing]

   ➢ Rating development to include specific evidence Q21
   ➢ Non-medical evidence Q22A
   ➢ Valid Address Q23
   ➢ Payee Q24

> ➢ Burial receipts Q25
> ➢ DFAS Q26-do not collect N/A selection

7. Date requested evidence is received and claim is ready to rate:  [Data will be captured from Q28A]

8. Development Mail returned undeliverable:  [Data will be captured from Q29 if "Yes" selected]

9. Date of initial *Nehmer* rating decision:  [Data will be captured from Q34]

10. Disposition of claims readjudicated under *Nehmer* and name of RVSR: [Data will be captured from Q34 and Q34A]

➢ SC
  o Grant (includes any additional medical development)
  o Denial (includes C&C)
➢ DIC
  o Grant (includes any additional medical development)
  o Denial (includes C&C)
➢ Burial
  o Grant (includes any additional medical development)
  o Denial (includes C&C)

11. Retroactive benefit amount:  [SC Data will be captured from; Q37A, Q37B, and Q37C as shown below]
    a. SC-Q37A
➢ New AO Presumptives [User entry-amount required]
➢ Other AO disabilities only [User entry-amount required]
➢ New AO Presumptives and other AO disabilities [User entry-amount required]
➢ No SC Retro

    b. DIC –Q37B
➢ New AO Presumptives [User entry-amount required]
➢ Other AO disabilities only [User entry-amount required]
➢ New AO Presumptives and other Herbicide-Related disabilities [User entry-amount required]
➢ No DIC Retro

    c. SC Burial-Q37C
➢ New AO Presumptives [User entry-amount required]
➢ Other AO disabilities only [User entry-amount required]
➢ New AO Presumptives and other Herbicide-Related disabilities [User entry-amount required]
➢ No Burial Retro

12.  Type of correction(s) identified.  [Data will be captured from Q42(a-j)-if "No" selected]

13.  Date decision letter and rating approved for release and name of individual who approved final action:  [Data will be captured from Q42-if "Yes" selected and Q42b]

14.  Type of deficiencies based on SME review:  [Data will be captured from Q42d-if "Yes" selected-specify the type error]

15. Date decision letter and rating approved for release; or the date memo was approved:  [Data will be captured from Q43]

**Appendix 15 – *Nehmer* Adjudication (EP 681) Review Worksheet 2**

## DRAFT – SUBJECT TO CHANGE

<u>Static Fields</u>:

CLAIM#:                              NAME of VETERAN                    RO:
INITIAL REVIEWER: [User Enter Name]


Pending Claim Information


1. Does the claims file contain verified evidence of in-country Vietnam service? [User will select Y/N]

2. Identify the pending claim filed, that serves as the basis for adjudication, between 09/25/85 and 08/31/10 for Ischemic heart disease (IHD), Parkinson's, and HCL and B-cell leukemias  [User will select-one option]:

    a. SC claim
    b. SC and pension claim
    c. Pension claim
    d. Informal claim
    e. Inferred claim for SC or a claim reasonably raised by VA or an instance where VA failed to address a prior claim or VA failed to provide a decision notice letter to the class member

2A. What are the disability(ies) claimed or inferred? [User selects-multiple selections apply]

    1. Ischemic heart disease
    2. Parkinson's disease
    3. B-cell chronic lymphocytic leukemia/small lymphocytic
    4. Acute lymphoblastic leukemia-mature B-cell type
    5. B-cell prolymphocytic leukemia
    6. Precursor B lymphoblastic leukemia
    7. Hairy cell leukemia
    8. Other

2B. What is the date of receipt of the claim from item 2? [Auto list of claim from item 2] [User will enter date of receipt of the claim]

**Other AO Disabilities**

3. Was a SC claim (live or death) filed for any other herbicide-related disabilities prior to the current pending claim? **[**User will select Y/N**]**
**[**If "YES", User must select disabilities from the drop box and proceed to item 4**]**
**[**If "NO" is checked, Auto skip of this area and proceed to the area entitled "Death Claims"**]**

**[**User selects-multiple selections permitted**]**

  a. Type 2 diabetes also known as type II diabetes mellitus or adult-onset diabetes
  b. Hodgkin's disease
  c. Multiple myeloma
  d. Non-Hodgkin's lymphoma
  e. Acute and Subacute peripheral neuropathy
  f. Porphyria cutanea tarda
  g. Prostate cancer
  h. Lung cancer
  i. Bronchus cancer
  j. Larynx cancer
  k. Trachea cancer
  l. Chronic lymphocytic Leukemia (CLL)
  m. AL Amyloidosis (ALA)
  n. Soft tissue sarcoma

4. What is the type medical evidence used to verify the diagnosis(es) for **[**Auto list of all disabilities identified in items 2A and 3**]**? **[**User selects multiple selections that apply for the type medical evidence (VHA; Private Treatment or Other (SSA lay statements, etc.) used for each disability identified**]**

Example:

| Disability | VHA | Private Treatment | Other (SSA, lay statements, etc) |
|---|---|---|---|
| IHD | Y | N | N |
| Hodgkin's disease | N | Y | Y |
| Multiple myeloma | N | Y | Y |

5. Does a rating decision grant/deny SC (live or death) for **[**Auto list named disabilities in items 2A and 3**]**?  **[**Y/N-User entry required**] [**For all disabilities in the auto list, a required dropdown containing "Grant," "Deny," and "N/A" After user selects from dropdown, they will be prompted for a required date**]**

6. Does a rating decision assign the correct effective date for **[**Auto list named disabilities identified in items 2A and 3**]**?  **[**Y/N-User entry required**]**

Death Claim

### **Is the Veteran still living [Y/N-User entry required]**
### **[If the Veteran is living-skip this entire area go to items under "Initial Screening Summary"]**

7. Was there a claim for death benefits-to include burial filed between 9/25/85 to 8/31/10?      **[**Y/N-User entry**]**
**[**If Yes, proceed to Q8**]**
**[**If No, skip to Q8 and allow entry in Q9 and skip to Q11**]**

8. What is the date of receipt of death claim? **[**User will enter date-required entry**]**

9. What is the date of death? **[**User will enter date-required entry**]**

10. What is the Veteran's primary, secondary or contributory cause of death? **[**Auto list of disabilities identified in items 2A and 3-Allow for multiple selections of disabilities and for each disability, allow for the following drop-down choices: primary, secondary, contributory, N/A. Allow for one choice only**]**

| Disability | Primary | Secondary | Contributory | N/A |
|---|---|---|---|---|
| Parkinson's | <u>Check mark</u> | Grayed-out | Grayed-out | Grayed-out |
| Ischemic Heart | Grayed-out | <u>Check mark</u> | Grayed-out | Grayed-out |

[Stop and Save]

### **Initial Screening Summary**

11. Is the *Nehmer* claim ready for rating activity? [Y/N-User entry]
[If "YES", drop-down choices.  User entry required]
    a.  Grant with medical development [If a grant with medical development is indicated proceed to 13]
    b.  Full grant with no additional medical development [If full grant is indicated skip to item 14]
    c.  Denial [If Denial is indicated, skip to 28]
    d.  Confirmed and continued (C&C) [If a C&C is indicated skip to item 28]
[If  "NO", proceed to item 12]

12. Is development action(s) required before a rating can be prepared?   [Y/N-User entry]

[If "YES", proceed to Rating Development Action(s) Required and do not allow an entry in items identified under "RVSR Decision" (Q26-Q29)]
[If "NO", proceed to Rating Development Action(s) Required and allow for entry in the "RVSR Decision" section (Q26-Q29)]

## Rating/Development Action(s)

13. Specify the medical development action(s) required to rate claim:  **[**User will select from drop box-multiple choices allowed**]**

    a.  Service Treatment Records
    b.  Uniformed Services Hospital records
    c.  VAE
    d.  VAMC Treatment Records
    e.  A statement/letter from most recent treating physician
    f.  Private treatment records
    g.  SSA Records
    h.  Autopsy/summary medical report
    i.  Death certificate
    j.  Other

## Non-Medical Development Action(s)

14. Are additional development actions required?  **[**Y/N-User entry**] [**Add drop box and allow multiple selections and a write-in if "Other" is checked**] [**If NO, skip to the Q20**]

14A. If so, what type of evidence? **[**User entry, select from list**]**

    a.  birth certificate(s)
    b.  marriage certificate
    c.  divorce decree
    d.  service verification/PIES/DPRIS
    e.  other (free text – 5 sub-choices, up to 50 characters)

15. Is development required for a valid address? **[**Y/N-User entry**]**

16. Is development required to identify payee(s)? **[**Y/N-User entry**]**

17. Is development required for paid-in-full receipts? **[**Y/N-User entry**]**
**[**If "YES', User will select from list**]**
[If "NO", go to Q18]

    a.  funeral home/mortuary
    b.  cemetery
    c.  individual receipts

18. Is development required for [User will select from list]

    a.  retired pay
    b.  SBP
    c.  separation pay
    d.  N/A

19. What date was the VCAA/development letter sent?
[User enters input date field]

19A. What avenue of communication is being used to request required evidence identified in items 13-18, except PIES or JSRRC? [User enters input date field and then check-boxes]
    ➢  telephone
    ➢  electronic mail
    ➢  written communication


[Stop and Save]

## Receipt of Requested Evidence

20. Was all requested evidence received? [Y/N-User entry]
[If "YES", go to Q21]
[If "NO", go to Q22]

21. Enter the date the requested evidence was received [User will insert date-required entry] and proceed to "RVSR Decision" section.

22. Was the (request for evidence) mail returned undeliverable?  [Y/N-User entry]
[If "YES" an entry is required in item 23]
[If "NO", go to Q24]

23. If the (request for evidence) mail was returned undeliverable, is the requested evidence required in order to rate the claim? [Y/N-User entry]
[If "NO" proceed to item 26]
[If "YES" is selected go to "RVSR Decision"]

24. Is additional evidence needed in order to rate? [Y/N-User entry]
[If "NO" go to "RVSR Decision" section]
[If "YES", repeat Q13]

25. Is additional evidence needed to prepare award action(s)?
[If "NO" go to "RVSR Decision" section]

If "YES", repeat Q14-Q19]

[Stop and Save]

### RVSR Decision

26. Does retroactive payment under *Nehmer* apply? **[**Y/N-User entry**]**
**[**If "NO" User entry is required in item 27**]**
[If "YES" skip item 27 and proceed to 28]

27. Is CFR 3.114a applicable? **[**Y/N-User entry**]**

28. What is the disposition of the claim(s)?  [User insert date--Required Entry and allow multiple entries]

- ➢ SC
    - ○ Grant (includes any additional medical development)
    - ○ Denial (includes C&C)
- ➢ DIC
    - ○ Grant (includes any additional medical development)
    - ○ Denial (includes C&C)
- ➢ Burial
    - ○ Grant (includes any additional medical development)
    - ○ Denial (includes C&C)

28A.  Name of RVSR that prepared decision?  **[**User enters name**]**

[Stop and Save]

### Award Action [an entry is required in all items]

29. Did you prepare award action(s) for all claimed benefits?  **[**Y/N-User entry**]**
[If Yes, go to Q30]
[If No, go to Q34]

30. Are there multiple class members? **[**Y/N-User entry**]**

31. Are retroactive benefits payable?  **[**Y/N-User entry**]**
[If "YES', go to 31A]
[If "NO", go to Q33]

31A. Is the SC retroactive benefit payable based on: select **[**User entry-drop-down choices**]**

   a.  New AO Presumptives **[**User entry-amount required**]**

    b.  Other AO disabilities only **[**User entry-amount required**]**
    c.  New AO Presumptives and other AO disabilities **[**User entry-amount required**]**
    d.  No SC Retro

31B. Is the DIC retroactive benefit payable based on select: select **[**User entry-select from drop-down choices**]**

    a.  New AO Presumptives **[**User entry-amount required**]**
    b.  Other AO disabilities only **[**User entry-amount required**]**
    c.  New AO Presumptives and other AO disabilities **[**User entry-amount required**]**
    d.  No DIC Retro

31C. Is the retroactive SC burial benefit payable based on, select **[**User entry-select from drop-down choices**]**

    a.  New AO Presumptives **[**User entry-amount required**]**
    b.  Other AO disabilities only **[**User entry-amount required**]**
    c.  New AO Presumptives and other AO disabilities **[**User entry-amount required**]**
    d.  No Burial Retro

32. Did you appropriately withhold for retired pay, SBP, etc? [Y/N]

33. Did you award SC burial? [Y/N]

**Decision Notice letter**

34. Did you prepare a decision notice letter(s)? [Y/N-User entry]
[If "YES", go to Q34A.]
[If "NO", go to go to Q36A.]

34A. Check all attachments that apply **[**User entry-check boxes of appropriate attachments and paragraph-education benefits**]**

    a.  appeal rights-VAF 4107
    b.  rating decision, VAF 21-8760
    c.  VAF 22-5490
    d.  VA Pamphlet 22-73-3
    e.  VAF 28-8890
    f.  VAF 28-1900
    g.  CH31
    h.  CHAMPVA
    i.  Commissary and Exchange privileges
    j.  Life Insurance

    k.  POA paragraph
    l.  other appropriate paragraphs or attachments (free text)

35.  Select the type of decision prepared by the RVSR and enter the date the decision was sent to SVSR for authorization
    a.  Rating decision and decision notice letter [user entry – date field]
    b.  Confirmed and continued rating and decision notice letter [User entry-date field]

[Stop and Save]

## Quality Review

36. Did authorization activity approve the decision notice letter and rating/C&C decision?
[If "Yes", User must input date and go to Q36A. Do not allow date entered in 36 to be earlier than date shown in Q35]
[If "No", User must select type of correction from drop box list]
    a.  Rating deficiency
    b.  Letter deficiency
    c.  Effective date correction
    d.  Dependency
    e.  Issues not addresses (SC burial, etc)
    f.  DFAS – Retired pay/SBP
    g.  Other development actions
    h.  Finance – large check amount
    i.  Footnote 1 applicable (VA placed at issue/VA failed to address)
    j.  Other corrections

36A. Select the final disposition of the claim approved by the initial reviewer.
[User selects appropriate disposition and inserts date of approval-Required Entry and multiple entries allowed]

➢  SC Grant without medical development

➢  SC Grant with additional medical development

➢  Denial of Live Claim (includes C&C)

➢  DIC Grant without medical development

➢  DIC Grant with additional medical development (i.e., A/A)

➢  Burial Grant

➢  Denial of Death Claim (includes C&C)

36B.  Name of individual who approved final action **[**User must enter name of individual who approved final action and date-required entry**]**

[Stop and Save]

36C. Did SME review the Nehmer claim for quality? **[**Y/N-User entry**]**
**[**If Y, User must input date of review.  Do not allow date entered in 36C to be earlier than date shown in Q36B.  Continue to Q36D**]**
[If N, Skip to Q37]

36D.  Did SME identify any deficiencies? **[**Y/N-User entry**]**
*[If "No", go to Q36E]*
[If "Yes", User must select type of deficiency from drop box list and continue to 36E]
   1.  Rating deficiency
   2.  Letter deficiency
   3.  Effective date correction
   4.  Dependency
   5.  Issues not addresses (SC burial, etc)
   6.  DFAS – Retired pay/SBP
   7.  Other development actions
   8.  Finance – large check amount
   9.  Footnote 1 applicable (VA placed at issue/VA failed to address)
  10. Other corrections

36E.  Name of SME **[**User must enter name of SME**]**

[Stop and Save]

37. Enter the date the decision notice letter and rating decision to include C&Cs was released and sent to OGC: **[**User-input date field-optional**]**

### Miscellaneous Issues
38. Are there any outstanding deferred issues, unrelated to Nehmer, that require action?  **[**Y/N-User entry-optional**]**

39. Was decision notice letter returned undeliverable?  **[**Y/N-User entry-optional**]**

For Information Purpose Only (Static Fields):

LIST of ALL PRESUMPTIVE HERBICIDE CONDITIONS UNDER THE NEHMER COURT ORDER:

| | |
|---|---|
| Soft-tissue Sarcoma | October 15, 1991 |
| Hodgkin's disease | February 3, 1994 |
| Non-Hodgkin's lymphoma | May 19, 1993 |
| Porphyria cutanea tarda | February 3, 1994 |
| Lung cancer | June 9, 1994 |
| Bronchus cancer | June 9, 1994 |
| Larynx cancer | June 9, 1994 |
| Trachea cancer | June 9, 1994 |
| Multiple myeloma | June 9, 1994 |
| Acute and Subacute peripheral neuropathy | November 7, 1996 |
| Prostate cancer | November 7, 1996 |
| Type 2 Diabetes | May 8, 2001 |
| Chronic lymphocytic Leukemia (CLL) | October 16, 2003 |
| AL Amyloidosis (ALA) | May 7, 2009 |
| Ischemic heart disease | August 31, 2010 |
| Parkinson's disease | August 31, 2010 |
| B-cell chronic lymphocytic leukemia/small lymphocytic | August 31, 2010 |
| Acute lymphoblastic leukemia-mature B-cell type | August 31, 2010 |
| B-cell prolymphocytic leukemia | August 31, 2010 |
| Precursor B lymphoblastic leukemia | August 31, 2010 |
| Hairy cell leukemia | August 31, 2010 |

**Appendix 16 –** *Nehmer* **Adjudication (EP 681) Data Collection for EP 687**

**NOTE:**

**Request comprehensive reports showing total numbers, RC#, and other specific data as shown below.**

**Pull all detailed reports by RC#, ROJ, claim #, name of Veteran, and other specific data as shown below.**

1. Date, name of reviewer, and RC# received the claims file:  [Date, reviewer, and RC# will be captured from static fields] [Output-cumulative total and detailed listing per date, name of reviewer and RC#]

2. Identify the disability:  [Data will be captured from Q2A, Q3]
   a. Ischemic heart disease [Q-2A(1)]
   b. Parkinson's disease [Q-2A(2)]
   c. HCL and other B-cell Leukemias [Q-2A(3-8)]
   d. Other Herbicide-related diseases [Q3(a-n)]

3. Identify type of medical evidence used to rate: [Data will be captured from Q4-show cumulative totals and detailed listings with totals]
   e. VHA records to include examinations
   f. Private treatment records
   g. Other (SSA, lay statements, etc)

4. Identify survivor claims. [Capture data from Q8- if a date is shown; provide cumulative totals per RC and detailed listing].

5. Type of additional evidence is needed:  [Data will be captured from Q13, Q14A, Q15, Q16, Q17, and Q18 if "Yes" is selected-show cumulative totals by type evidence needed and detailed listing]

   ➢ Rating development to include specific evidence Q13
   ➢ Non-medical evidence Q14A
   ➢ Valid Address Q15
   ➢ Payee Q16
   ➢ Pain-in-full receipts Q17
   ➢ DFAS Q18-do not collect N/A selection

6. Date requested evidence is received and claim is ready to rate:  [Data will be captured from Q20]

7. Development Mail returned undeliverable:  [Data will be captured from Q21 if "Yes" selected]

8.  Date of initial *Nehmer* rating decision:  [Data will be captured from Q28]

9.   Disposition of claims readjudicated under *Nehmer* and name of RVSR: [Data will be captured from Q28 and Q28A]

➢ SC
    o  Grant (includes any additional medical development)
    o  Denial (includes C&C)
➢ DIC
    o  Grant (includes any additional medical development)
    o  Denial (includes C&C)
➢ Burial
    o  Grant (includes any additional medical development)
    o  Denial (includes C&C)

10.   Retroactive benefit amount:  [SC Data will be captured from; Q31A, Q31B, and Q31C as shown below]
        h.  SC-Q31A
➢ New AO Presumptives [User entry-amount required]
➢ Other AO disabilities only [User entry-amount required]
➢ New AO Presumptives and other AO disabilities [User entry-amount required]
➢ No SC Retro

        i.  DIC –Q31B
➢ New AO Presumptives [User entry-amount required]
➢ Other AO disabilities only [User entry-amount required]
➢ New AO Presumptives and other Herbicide-Related disabilities [User entry-amount required]
➢ No DIC Retro

        j.  SC Burial-Q31C
➢ New AO Presumptives [User entry-amount required]
➢ Other AO disabilities only [User entry-amount required]
➢ New AO Presumptives and other Herbicide-Related disabilities [User entry-amount required]
➢ No Burial Retro

11.   Type of correction(s) identified.  [Data will be captured from Q36(a-j)-if "No" selected]

12.  Date decision letter and rating approved for release and name of individual who approved final action:  [Data will be captured from Q36A-if "Yes" selected and Q36B]

13.  Type of deficiencies based on SME review:  [Data will be captured from Q36D-if "Yes" selected-specify the type error]

14. Date decision letter and rating approved for release; or the date memo was approved:  [Data will be captured from Q37]

**Appendix 17 –** *Nehmer* **SME Checklist and Instructions**

## *Nehmer* SME Checklist Instructions

### Manual Completion:

- The SMEs will input the following:
    - Claim number
    - Veteran's name
    - RO [Claims controlled under end products 681 will require input of the RO]
    - RC and ROJ [Claims controlled under end products 687 will require input of the RC and ROJ]
- The SMEs will legibly print their full name in the appropriate block
- The SMEs will sign their name and input the date in the appropriate blocks
- The SMEs will answer all questions
- The SMEs will provide explanations for all "No" answers marked with an asterisk [•] on the "*Nehmer* Rating or Authorization SME Checklist Explanations" sheets
- The Rating SME will sign as second signature on the rating decision
- The SMEs will file copies of the signed checklists in the claims file
- The SMEs will save copies of the checklists in Virtual VA


### Automated Completion:

- The following fields will be automated in the database:
    - Claim number
    - Veteran's name
    - RO [Claims controlled under end products 681 will require input of the RO]
    - RC and ROJ [Claims controlled under end products 687 will require input of the RC and ROJ]
- The SMEs will type their full name in the appropriate block
- The SMEs will answer all questions
- The SMEs will provide an explanation in a text field for all "No" answers
- The Rating SME will sign as second signature on the rating decision
- The SMEs will:
    - Print the checklist
    - Sign their name and input the date in the appropriate blocks
- The SMEs will file a copy of the signed checklist in the claims file


**NOTE:** All questions require a response.
**NOTE:** All questions on the automated checklist must be answered in sequential order.

## *NEHMER* RATING SME CHECKLIST

| Claim Number: | | Veteran's Name: | | |
|---|---|---|---|---|
| RO: | RC: | | ROJ: | |
| Print Name of SME Reviewer: | | | | |
| SME Reviewer Signature: | | | Date of Review: | |

| | | Yes | No | N/A |
|---|---|---|---|---|
| 1. | Is there evidence of in-country service in Vietnam? | | | |
| 2. | Is IHD, PD or HCL/BCL **claimed OR denied** between 9/25/85 and 8/31/10? | | | |
| 3. | Is there a confirmed diagnosis of the claimed presumptive(s)? | | | |
| 4. | Is a diagnosis ruled out for the claimed presumptive(s)? | | | |
| 5. | Did VA request and obtain additional evidence identified by the class member? * | | | |
| 6. | Is the denial for SC correct? * | | | |
| 7. | If SC for IHD, PD or HCL/BCL is in order, does the decision award the earliest justifiable effective date? * | | | |
| 8. | Is the evidence adequate for rating purposes? * | | | |
| 9. | Does the evidence of record show the current level of disability? * | | | |
| 10. | Is the evaluation assigned appropriate based on the current level of disability? * | | | |
| 11. | Is there evidence of a secondary condition(s) due to IHD, PD or HCL/BCL? | | | |
| 12. | Does the medical evidence on file show current level of disability for the secondary condition(s)? * | | | |
| 13. | Is the correct effective date(s) for the secondary condition(s) assigned? * | | | |
| 14. | Is the correct evaluation for the secondary condition(s) assigned? * | | | |
| 15. | Are other AO presumptive disability(s) noted in the record? | | | |
| 16. | If the AO presumptive disability(s) is affected by *Nehmer,* was the issue correctly addressed? * | | | |
| 17. | If deceased, did AO related disability(s) cause, contribute to, or hasten death? | | | |
| 18. | Is SC death established? * | | | |
| 19. | If SC death was denied, was denial correct? * | | | |
| 20. | Was the evidence cited adequate for the Memorandum for the Record? * | | | |
| 21. | Was all pertinent evidence discussed in the rating decision? * | | | |
| 22. | Was the basis of each decision identified and explained in the rating decision? * | | | |
| 23. | If the minimum evaluation was assigned, was additional development initiated? * | | | |
| 24. | If applicable, were IU and SMC(s) correctly considered and applied? * | | | |
| 31. | Are other issue(s), Nehmer and/or any other, properly addressed? * | | | |

* An explanation is required for "no" answers to these entries.

| *NEHMER* RATING SME CHECKLIST EXPLANATIONS |
|---|
| 5. Did VA request and obtain additional evidence identified by the class member? |
| |
| 6. Is the denial for SC correct? |
| |
| 7. If SC for IHD, PD or HCL/BCL is in order, does the decision award the earliest justifiable effective date? |
| |
| 8. Is the evidence adequate for rating purposes? |
| |
| 9. Does the evidence of record show the current level of disability? |
| |
| 10. Is the evaluation assigned appropriate based on the current level of disability? |
| |
| 12. Does the medical evidence on file show current level of disability for the secondary condition(s)? |
| |
| 13. Is the correct effective date(s) for the secondary condition(s) assigned? |
| |
| 14. Is the correct evaluation for the secondary condition(s) assigned? |
| |
| 16. If the AO presumptive disability(s) is affected by *Nehmer,* was the issue correctly addressed? |
| |
| 18. Is SC death established? |
| |
| 19. If SC death was denied, was denial correct? |
| |
| 20. Was the evidence cited adequate for the Memorandum for the Record? |
| |
| 21. Was all pertinent evidence discussed in the rating decision? |
| |
| 22. Was the basis of each decision identified and explained in the rating decision? |
| |
| 23. If the minimum evaluation was assigned, was additional development initiated? |
| |
| 24. If applicable, were IU and SMC(s) correctly considered and applied? |
| |
| 25. Are other issue(s), Nehmer and/or any other, properly addressed? |
| |

| ***NEHMER* AUTHORIZATION SME CHECKLIST** | | | |
|---|---|---|---|
| Claim Number: | | Veteran's Name: | |
| RO: | RC: | ROJ: | |
| Print Name of SME Reviewer: | | | |
| SME Reviewer Signature: | | Date of Review: | |

|  | Yes | No | N/A |
|---|---|---|---|
| 1.      Was DIC paid? * | | | |
| 2.      Was SC burial paid? * | | | |
| 3.      Were transportation charges paid correctly? * | | | |
| 4.      Were retroactive benefits paid (live and/or death) to the survivor(s)? * | | | |
| 5.      Were all dependents correctly added and/or removed from the award? * | | | |
| 6.      Were offsets, i.e. MRP, SBP, separation, severance and 1151, correctly applied? * | | | |
| 7.      Was the proper class member/payee paid? * | | | |
| 8.      Was the class member(s) notified? * | | | |
| 9.      Is the notification letter adequate? * | | | |
| 10.    Did the notification include appeal rights? | | | |
| 11.    Was the POA included in the notification letter (if applicable)? | | | |
| 12.    Are other issue(s), Nehmer and/or any other, properly addressed? * | | | |

* An explanation is required for "no" answers to these entries.

| ***NEHMER* AUTHORIZATION SME CHECKLIST EXPLANATIONS** |
|---|
| 1. Was DIC paid? |
| |
| 2. Was SC burial paid? |
| |
| 3. Were transportation charges paid correctly? |
| |
| 4. Were retroactive benefits paid (live and/or death) to the survivor(s)? |
| |
| 5. Were all dependents correctly added and/or removed from the award? |
| |
| 6. Were offsets, i.e. MRP, SBP, separation, severance and 1151, correctly applied? |
| |
| 7. Was the proper class member/payee paid? |
| |
| 8. Was the class member(s) notified? |
| |
| 9. Is the notification letter adequate? |
| |
| 12. Are other issue(s), Nehmer and/or any other, properly addressed? |
| |

**Appendix 18 – Footnote 1: Need for Amendment to 38 C.F.R. § 3.816 Regarding *Nehmer* Claims**

The case of *Nehmer v. United States Veterans' Administration* originated in 1986 as a class-action lawsuit against VA by Vietnam veterans and their survivors who alleged that VA had improperly denied their claims for service connection for disability or death allegedly caused by exposure to the herbicide Agent Orange in service.

In a May 3, 1989, decision, the United States District Court for the Northern District of California ruled in the *Nehmer* case that a VA regulation, issued in 1985, which implemented legislation directing the establishment of standards and criteria for adjudication of claims by Vietnam veterans allegedly suffering from herbicide-related disabilities, was invalid because the "cause and effect" standard used in the regulation was inconsistent with the intent of Congress. The court concluded that Congress intended VA to apply a more lenient standard requiring only a "significant statistical association" between herbicide exposure and the occurrence of a disease in exposed persons. The court invalidated VA's regulation and voided all benefit denials under that regulation.

In May 1991, the *Nehmer* parties entered into a "Final Stipulation and Order" (Final Stipulation) outlining the actions to be taken in response to the court's decision. Among other things, the Final Stipulation provided, in general: (1) that VA would issue new regulations in accordance with the Agent Orange Act of 1991; (2) that, after issuing such regulations, VA would readjudicate those claims where a prior denial had been voided by the court's 1989 order and would initially adjudicate all similar claims filed subsequent to the court's order; and (3) that, if benefits were awarded upon such readjudication or adjudication, the effective date of the award would be the date the claim was filed.

In a February 11, 1999, decision, the district court explained and clarified the scope of its 1989 decision. The court stated that its 1989 decision had voided all VA decisions that were rendered while the invalid regulation was in effect and which denied service connection for a Vietnam veteran's disease that was later found to be associated with herbicide exposure under the regulations issued under the Agent Orange Act of 1991. The court explained that it was irrelevant whether the claimant or VA had referenced herbicide exposure or the invalid regulation in connection with the prior claim. Pursuant to that decision, the effective date of service connection granted under the 1994 regulations establishing presumptions of service connection for certain diseases may relate back to the date of an earlier claim for service connection of the same disease, regardless of whether the earlier claim was expressly based on herbicide exposure.

Last year. VA promulgated 38 C.F.R. § 3.816, which codified the procedures for adjudicating claims under the Final Stipulation. On January 21, 2004, class

counsel asserted in a letter to the Department of Justice (DOJ) that footnote 1 in paragraph 5 of the Final Stipulation establishes a substantive rule that VA failed to address in section 3.816. Paragraph 5 states, in relevant part, as follows:

> For any of the [presumptive diseases], as to any denials of claims which were voided as a result of the Court's May 3, 1969 Order, the effective date for disability compensation or dependency and indemnity compensation ... , if the claim is allowed upon readjudication ... , will be the date the claim giving rise to the voided decision was filed ..., <u>assuming the basis upon which compensation is granted after readjudication is the same basis upon which the original claim was filed,</u>[1] or the date the claimant became disabled or death occurred, whichever is later. In the event the basis upon which a claim for compensation benefits is granted after readjudication is different than the basis for the original claim giving rise to the voided decision,[2] the effective date ... will be the date on which the claim asserting the basis upon which the claim is granted was filed, or the date the claimant became disabled or death occurred, whichever is later.

(emphasis added). Footnote 1 provides: "The basis upon which the original claim was filed refers to the disease[s] or condition[s] which Chapter 46 of VA Manual M21-1, paragraph 46.02 <u>required to be coded</u> in the ratings decision contained in the claimant's claim file, which ratings decision was voided by the Court's May 3, 1989 Order." (emphasis added).

At the time that the parties entered the Final Stipulation, paragraph 46.02 of VA Adjudication Procedure Manual M21-1 (1965) provided:

> a. Compensation Ratings. All disabilities claimed will be given consideration as to service connection and be coded as a disability rating on VA Form 21-6796. Any additional disabilities noted will be coded, except:
> (1) Acute transitory conditions that leave no residuals.
> (2) Noncompensable residuals of venereal disease.
> (3) Disabilities noted only on the induction examination, or conditions recorded by history only.
> (4) Disabilities found by authorization to have not been incurred "in line of duty".
>
> b. Pension Ratings. Code all claimed or noted disabilities on VA Form 21-6796 and show the

> percent of disablement for each unless the disabilities
> have been held to be due to the claimant's own willful
> misconduct by Administrative Decision.

(cross references omitted). The Final Stipulation defined "the basis upon which the original claim was filed" with reference to paragraph 46.02 of the manual, which established the requirement that additional noted disabilities be "coded," unless a listed exception applied. Among other things, the manual provision excepted from the coding requirement "conditions recorded by history only." Thus, noted disabilities that have been diagnosed were required to be coded in a rating decision even though the claimant may not have raised any issue concerning those disabilities in the claim being adjudicated. The provision is clear that the term "code" refers to rating codes, not diagnostic codes. Accordingly, a condition that the paragraph 46.02 language "required to be coded," is one that the provision required to be rated in a decision.

Class counsel asserts that the paragraph 46.02 language, which footnote 1 incorporated in the Final Stipulation, established "objective criteria ... for determining whether a rating decision denied compensation for a particular disease." Class counsel further contends that a claim falls within the effective-date provisions of paragraph 5 of the Final Stipulation "if paragraph 46.02 of M21-1 required the covered Agent Orange-related disease to be 'coded' in the rating decision on the claim." In our view, this is a reasonable interpretation of the Final Stipulation because it is consistent with the court's and the parties' intent to provide a remedy for the *Nehmer* class. In other words, in the context of this litigation, it is reasonable to assume that, in 1991, the court and the parties intended to provide a remedy for persons with diagnosed herbicide-related conditions who either received a rating decision denying an express claim for service connection for that condition; received a rating decision that addressed (coded as non-service-connected) an unclaimed herbicide-related condition; or received a rating decision that failed to address a noted condition (failed to code the condition). Each of these types of "decisions" could be viewed as being voided by the court's May 1989 order. However, section 3.816 currently covers only the first type of decision.

A second reasonable but less pro-veteran interpretation of the footnote is that it merely prescribes how to determine the correct effective date for adjudications conducted under paragraph 3 and 4 of the Final Stipulation. Paragraph 3 provides that as soon as VA issues a final rule service-connecting any disease under the Agent Orange Act of 1991, it "shall promptly thereafter readjudicate all claims for any such disease which were voided by the Court's Order of May 3, 1989." Paragraph 4 provides that VA shall rely upon its Special Issue Rating System (SIRS) or notice from an individual claimant to identify claimants who received qualifying denials. Identified claimants may then be awarded an earlier effective date using the paragraph 5 criteria. Class counsel essentially argues that paragraph 5, rather than paragraphs 3 and 4, identifies the claim denials that

the district court voided in its May 1989 decision. That argument is arguably incorrect because it reads paragraph 5 out of context and ignores the paragraph 4 provision that requires VA to use SIRS to identify eligible claimants. SIRS does not contain information concerning unclaimed disabilities that paragraph 46.02 of Manual M21-1 required to be coded.

Class counsel intends to bring this matter to the district court's attention if we refuse to amend section 3.816. As stated above, the Final Stipulation is subject to two reasonable interpretations, only one of which could be viewed as expanding the remedy available to the *Nehmer* classmembers. Clearly, the district court has every reason to select the interpretation proposed by class counsel, as it is a reasonable, pro-veteran interpretation that is consistent with the purpose of the Final Stipulation. In addition, the court could conclude that application of the alternative interpretation would lead to an absurd result. For example, a veteran who, in 1986, filed a claim for service connection for respiratory cancer and received a rating decision denying that claim would be entitled to retroactive benefits under *Nehmer.* However, another veteran, who was also diagnosed with a respiratory cancer and who deliberately limited his 1986 claim to a back condition, knowing that VA could not service-connect his cancer in the absence of a presumption. would not be entitled to retroactive benefits under *Nehmer.*

The pro-veteran interpretation would require a minor amendment to section 3.816(c)(1), which governs effective dates for decisions voided by the district court's May 3, 1989, order. Footnote 1 does not apply where the decision on a claim was made after May 3, 1989.

Amendment of 3.816(c)(1) would affect very few claims. Less than one percent of all claims identified for further adjudication by the *Nehmer* plaintiffs' review of claims files in discovery involved unclaimed conditions that were required to be coded under paragraph 46.02 of Manual M21-1. Further, plaintiffs' file review has covered all herbicide-related presumptive conditions, except type 2 diabetes. which VA service. connected effective July 9, 2001 {the U.S. Court of Appeals for the Federal Circuit later changed the effective date of the regulation service-connecting type 2 diabetes to May 8, 2001, in *Liesegang v. Secretary of Veterans Affairs,* 312 F.3d 1368 (Fed. Cir. 2002)).

With respect to type 2 diabetes, amendment of section 3.816 might require readjudication of some claims. However, VA has already agreed to readjudicate all identifiable type 2 diabetes claims. As stated above, paragraph 4 of the Final Stipulation requires VA to use its SIRS database to identify claimants entitled to readjudication under *Nehmer.* Although SIRS no longer exists, VA searched its VITALS database for type 2 diabetes claimants that filed claims prior to 1999. That search identified 2,777 claimants with potential eligibility under *Nehmer.* VA issued a *Nehmer* readjudication notice (required by paragraph 4 of the Final Stipulation) to 1,756 of those claimants and, in Fast letter 02-33, instructed the

regional offices to readjudicate their c\aims. VA has not provided a readjudication notice to the remaining claimants and has not initiated readjudication of their claims. On December 7, 2000, VA issued Fast Letter 00-91, instructing the regional offices to establish "685 diary" with a July 1, 2001, suspense date for any claim seeking service connection for type 2 diabetes based upon herbicide exposure in Vietnam. On June 14, 2001, VA issued Fast Letter 01-51, which instructed the regional offices to use July 9, 2001, as the effective date for benefits awarded for type 2 diabetes. Because VA believed that *Nehmer* might require readjudication of those claims, the regional offices were instructed to use the "685 diary" for tracking decisions. On October 19, 2001, VA issued Fast letter 01-94, which instructed the regional offices to begin applying *Nehmer* to type 2 diabetes claims. VA later entered into a stipulation in which it agreed to readjudicate all of the type 2 diabetes claims controlled under the "685 diary" (13,318 claims). Although VA readjudicated those claims, a decision was recently made to conduct a full second review.

As part of its compliance with the Federal Circuit's *Liesegang* decision, VA identified 9,340 claimants that filed claims for type 2 diabetes, had Vietnam service, and received a compensation award effective between May 7, 2001, and August 2, 2001.

The 9,340 *"Liesegang* claimants" are probably also listed among the 13,318 "685 diary claimants." Accordingly, except for the 1,756 claims that have already been readjudicated under Fast letter 02-33, we conclude that it would be prudent for VA's upcoming readjudication of 14,339 type 2 diabetes claims (13,318 controlled by the "685 diary" and the 1,021 claims identified from VITALS that remain unadjudicated) to apply the proposed amendment to all identifiable claims that are outside the scope of the district court's discovery orders.

VA's recent decision to conduct a second review of the 13,318 type 2 diabetes claims was prompted in part by quality concerns. Class counsel has demanded that VA produce its quality review data and has threatened to raise the issue before the district court. DOJ refused that request based upon VA's decision to conduct a second review of all 13,318 claims. Amending section 3.816 would provide another basis for conducting the second review and might tend to neutralize class counsel's argument that he is entitled to the quality review data.

**Appendix 19 – VSR and SVSR Responsibilities**

VSR Responsibilities:

- Inputting the award data into the appropriate awards system.  Most awards should be processed in VETSNET.
- Assuring that all prior payments are put into BDN or VETSNET if already in receipt of benefits. RVSR backfills award. Manual adjustments may be required.
- Generating an award document.
- Preparing a notification letter.
- Annotating the award with the presumptive condition.
- Signing the award

SVSR Responsibilities:

- Reviewing the award and notification letter for accuracy.
- Co-signing the award.
- Assuring that a third level review is performed prior to award authorization, in cases involving retroactive payments greater than $25,000.
- Sending the file for review by the *Nehmer* Subject Matter Expert (SME) when selected for quality review.
- Submitting copies of the memorandum for the record and the Payment History Inquiry Screen upon request by OGC.
- Incorporating a copy of the database into the file

## Appendix 20 – Training Guide Revisions

| | Location | Change |
|---|---|---|
| 1 | Exam Templates | Add new templates |
| 2 | Page 28 - "Some examples..." | Add statement (paraphrased) "In these four scenarios, the Veteran has verified Vietnam service." |
| 3 | Page 24 - "Service" section | Add an example of no Vietnam service |
| 4 | Page 28 - Example 2 | Reference to no diagnosis, but no claim was reason for denial. Remove? |
| 5 | Page 29 - Example 4: "A slightly..." | Second paragraph references no diagnosis. |
| 6 | Page 29 - Note | Remove reference to usage of no diagnosis memo in the note |
| 7 | Page 30 - Examples, bullet 1 | No diagnosis |
| 8 | Page 70 - Memo | Remove no diagnosis memo |
| 9 | Page 47 - Appendix 4 | Remove the table and add new table, add page numbers 84-90 to instructions |
| 10 | Page 42 - Appendix 2 | Added new vessels. Reformatted existing vessel lists |
| 11 | Page 23 - Claims Folder Review | Revised section |
| | **September 28, 2010, Updates** | |
| 12 | Page 24 - "Development" section | Addition of text about development |
| 13 | Page 143 - Appendix 17 | SME Checklist and instructions |
| 14 | Page 83 - Appendix 8 | Addition of the Disability Benefits Questionnaires |
| 15 | Page 114 - Appendix 13 | Revised EP 687 worksheet and report |
| 16 | Page 126 - Appendix 14 | Revised EP 687 report |
| 17 | Page 129 - Appendix 15 | Addition of EP 681 worksheet |
| 18 | Page 139 - Appendix 16 | Addition of EP 681 report |
| 19 | Page 147 - Appendix 18 | Moved Footnote 1: Need for Amendment to 38 C.F.R. § 3.816 Regarding *Nehmer* Claims |
| 20 | Page 152 - Appendix 19 | Moved VSR and SVSR Responsibilities |
| 21 | Page 153 - Appendix 20 | Moved Training Guide Revisions |
| 22 | Page 15 - "Readjudication Requirements" section | Addition of "Adjudication" to title |
| 23 | Page 8 - "Background" section | Rewrote text re: number of claims denied |
| 24 | Page 16 - "Eligibility Requirements" section | Addition of 8/31/10 |

| 25 | Page 17 - "Claims for Benefits" section | Addition of 8/31/10 |
|---|---|---|
| 26 | Page 22 - "Nehmer Database" section | Addition of text discussing the Adjudication database |
| 27 | Page 22 - "End Product Control" section | Addition of text re: EP 681 |
| 28 | Page 40 - New Section | Addition of the "SME Review" section |
| 29 | Page 51 - Appendix 4 | Addition to instructions |
| 30 | Page 42 - Appendix 1 | Added dates to IHD, PD and HCL on the List of Presumptive Conditions in 38 C.F.R. § 3.816 |
| 31 | Page 28 | Added when not to use memos |

# TRAINING CASE SCENARIOS

**VSR Scenario 1**

You receive a file for review.  The DD Form 214 shows the Veteran served in the Navy from June 1, 1962, to August 30, 1973.  The file also includes a DPRIS request response showing the Veteran served in-country in the Republic of Vietnam from August 10, 1970, to November 30, 1972.

The Veteran filed an original claim for service connection for IHD on April 3, 1998.  Medical evidence was submitted showing a diagnosis of IHD.  The Veteran was denied service connection and notified of the decision on August 17, 1998.

On December 23, 1998, the Veteran then filed a claim for Pension benefits.  The Veteran listed IHD under conditions that contributed to his unemployability.  Medical evidence dated December 20, 1998, was submitted with a Pension claim showing chronic congestive heart failure.  Pension was granted effective December 23, 1998, with diagnostic code 7005.

The Veteran passed away on January 27, 1999, with the secondary cause of death listed as Ischemic heart disease (IHD).

September 20, 2007, the surviving spouse of the Veteran filed a claim for DIC and was denied and notified on February 19, 2008, due to lack of evidence showing that IHD was caused by service.

VSR has confirmed that the surviving spouse is living and has not remarried since the death of the Veteran.  Evidence of record shows they were married from 1990 until the date of death.  No children are of record.

**Questions**
1) Is this a *Nehmer* case?
2) Are there any retroactive benefits payable?
3) What effective date(s) should be assigned for retroactive compensation, if applicable?
4) What is the effective date for DIC, if applicable?
5) Is any additional development necessary?  If so, what development is required?  If not, what is the next action?

**VSR Scenario 2**

A case arrives at your desk for review.  The BIRLS VID screen shows that the Veteran is currently alive.

A review of the record shows that the Veteran served in-country in the Republic of Vietnam and has a combined rating of 30 percent without dependents.  The Veteran's current rating code sheet shows that she is rated 10 percent for type II diabetes mellitus (Agent Orange) and 20 percent for a left knee condition.  Both conditions were granted effective May 17, 2002, the date the Veteran claimed these conditions.

The Veteran filed a claim for hairy cell leukemia (HCL) on January 10, 1985.  The Veteran's claim was denied and notified on September 12, 1985, because the condition was not incurred nor aggravated by service and the condition was not caused by herbicide exposure.  Diagnostic code 7700 was used to prepare the rating.  Evidence received on January 10, 1985, shows the Veteran was diagnosed with inactive HCL with original diagnosis on November 12, 1984.

**Questions**
  1) Is this a *Nehmer* case?
  2) Is the Veteran entitled to retroactive compensation?
  3) What effective date(s) should be assigned for retroactive compensation, if applicable?
  4) Is any additional development necessary?  If so, what development is required?  If not, what is the next action?

**VSR Scenario 3**

You receive a file for review.  A DD Form 214 in the file shows the Veteran served in the Navy from February 2, 1960, to May 31, 1981, and that the Veteran received a Vietnam Service Medal.  The dates of service were verified using a DPRIS request; however, in-country service was not verified.

The Veteran filed an original claim for service connection for PD on March 29, 2005.  Medical evidence was submitted showing a diagnosis of PD.  The Veteran was denied service connection on July 10, 2005, under diagnostic code 8002.

A review of the file shows that the Veteran passed away on October 8, 2006, with the contributory cause of death listed as Parkinson's disease (PD).  The Veteran was not in receipt of benefits and did not have a claim pending at time of death.

A claim for burial benefits was submitted on October 15, 2006, from Jane Doe.  The application indicated that she was not filing a claim for service-connected death.  Jane also listed herself as the surviving spouse on the application.  Evidence of record shows that Jane was the surviving spouse since 1979 and has not remarried since the date of death.  No children are of record.  VA did not send VA Form 21-534, Application for DIC, Death Pension & Accrued Benefits by Surviving Spouse or Child.

The claim for burial benefits was denied as the Veteran was not in receipt of compensation or pension benefits.  The death certificate shows the address of the deceased to be the same as that of the surviving spouse.

**Questions**
1) Is this a *Nehmer* case?
2) Are there retroactive benefits?
3) What effective date(s) should be assigned for retroactive compensation, if applicable?
4) Is Jane Doe entitled to service connected burial benefits?
5) What is the effective date for DIC, if applicable?
6) Is any additional development necessary?  If so, what development is required?  If not, what is the next action?

**VSR Scenario 4**

A case arrives at your desk for review.  The BIRLS VID screen shows that the Veteran is currently alive.  A review of the record shows that the Veteran served in-country in the Republic of Vietnam.

The Veteran previously filed a claim for Pension benefits on May 10, 2009.  On the Veteran's VA Form 21-526 the Veteran noted she was applying for Pension benefits only.  The Veteran stated in the remarks section that her ischemic heart disease, which is due to service, is keeping her from working.  A rating decision dated September 19, 2009, granted pension benefits using diagnostic code 7007 as the medical evidence showed the Veteran had a left ventricular dysfunction with an ejection fraction of 20 percent.

**Questions**
1) Is this a *Nehmer* case?
2) Is the Veteran entitled to retroactive compensation?
3) What effective date(s) should be assigned for retroactive compensation, if applicable?
4) Is any additional development necessary?  If so, what development is required?  If not, what is the next action?

**VSR Scenario 5**

A review of the record shows that the Veteran served in-country in the Republic of Vietnam.

The Veteran filed a claim for type II diabetes mellitus and hypertensive vascular disease in April 7, 1994.  The Veteran was denied service connection for both conditions on September 21, 1994, using diagnostic codes 7913 and 7101.  The evidence of record showed that the Veteran had a diagnosis of both conditions.  Evidence showed that the Veteran was hospitalized 2 times for diabetes mellitus in 1993 for hypoglycemia.  The Veteran was also on daily injections of insulin and on a restricted diet.  The records also showed that the Veteran's blood pressure was 210/115 mmHg.

The Veteran filed a claim to reopen his type II diabetes claim and filed a new claim for ischemic heart disease on August 28, 1996.  The claim was again denied on February 15, 1997.  The evidence showed that the Veteran required 2 daily injections of insulin and now required daily dialysis due to chronic renal failure.  Additionally, the evidence showed that a workload of 2 Metabolic Equivalents (METs) resulted in dyspnea, fatigue, and dizziness and the Veteran's diastolic pressure was predominantly measured at 132 mmHg.

A review of the file shows that the Veteran passed away on October 8, 1998, with the primary cause of death listed as end-stage renal disease, with contributing cause of death as diabetes mellitus.  The surviving spouse filed a claim for death pension benefits on December 8, 1998.  The surviving spouse was granted death pension and is still receiving benefits.  The evidence of record shows that the spouse was married continuously to the Veteran from May 8, 1981, until the Veteran's death.  The record also shows that they never had children.  The spouse has not remarried.

**Questions**
1) Is this a *Nehmer* case?
2) Are there retroactive benefits?
3) What effective date(s) should be assigned for retroactive compensation, if applicable?
4) Is surviving spouse entitled to additional death benefits?  If so, what is the benefit and what is the effective date?
5) Is any additional development necessary?  If so, what development is required?  If not, what is the next action?

## RVSR Scenario 1

Rater Joe receives a file that is marked ready for decision.  The DD Form 214 shows the Veteran served in the Navy from June 1, 1962, to August 30, 1973.  The file also includes a DPRIS request response showing dates of service in the Republic of Vietnam from August 10, 1970, to November 30, 1972.

The Veteran filed an original claim for service connection for IHD on April 3, 1998.  Medical evidence was submitted showing a diagnosis of IHD.  Evidence shows that, at the time of the claim, continuous medication was required and a workload of 8 Metabolic Equivalents (METs) resulted in dyspnea, fatigue, and dizziness.  The Veteran was denied service connection and notified of the decision on August 17, 1998.

On December 23, 1998, the Veteran then filed a claim for Pension benefits.  The Veteran listed IHD under conditions that contributed to his unemployability.  Medical evidence dated December 20, 1998, was submitted with a Pension claim showing chronic congestive heart failure.  Pension was granted effective December 23, 1998, with diagnostic code 7005.

The Veteran passed away on January 27, 1999, with the secondary cause of death listed as ischemic heart disease (IHD).

On, September 20, 2007, the surviving spouse of the Veteran filed a claim for Dependency and Indemnity Compensation (DIC) and was denied and notified on February 19, 2008, due to lack of evidence showing that IHD was caused by service.

VSR has confirmed that the surviving spouse is living and has not remarried since the death of the Veteran.  Evidence of record shows they were married from 1990 until the date of death.  No children are of record.

### Questions
1) Is this a *Nehmer* case?
2) Are there any retroactive benefits payable?
3) What percentage(s) and effective date(s) should be assigned for retroactive compensation, if applicable?
4) What is the effective date for DIC, if applicable?
5) What is the next action?

**RVSR Scenario 2**

A case arrives at your desk for a rating decision.  The BIRLS VID screen shows that the Veteran is currently alive.

A review of the record shows that the Veteran served in-country in the Republic of Vietnam and has a combined rating of 30 percent without dependents.  The Veteran's current rating code sheet shows that she is rated 10 percent for type II diabetes mellitus (Agent Orange) and 20 percent for a left knee condition.  Both conditions were granted effective May 17, 2002, the date the Veteran claimed these conditions.

The Veteran filed a claim for hairy cell leukemia (HCL) on January 10, 1985.  The Veteran's claim was denied and notified on September 12, 1985, because the condition was not incurred nor aggravated by service and the condition was not caused by herbicide exposure.  Diagnostic code 7700 was used to prepare the rating.  Evidence received on January 10, 1985, shows the Veteran was diagnosed with inactive HCL with original diagnosis on November 12, 1984.

**Questions**
1) Is this a *Nehmer* case?
2) Is the Veteran entitled to retroactive compensation?
3) What percentage(s) and effective date(s) should be assigned for retroactive compensation, if applicable?
4) What is the next action?

**RVSR Scenario 3**

You receive a file identified as ready to rate.  A DD Form 214 in the file shows the Veteran served in the Navy from February 2, 1960, to May 31, 1981, and that the Veteran received a Vietnam Service Medal.  The dates of service were verified using a DPRIS request; however, in-country service was not verified.

The Veteran filed an original claim for service connection for PD on March 29, 2005.  Medical evidence was submitted showing a diagnosis of PD.  The Veteran was denied service connection on July 10, 2005, using diagnostic code 8002.

A review of the file shows that the Veteran passed away on October 8, 2006, with the contributory cause of death listed as Parkinson's disease (PD).  The Veteran was not in receipt of benefits and did not have a claim pending at time of death.

A claim for burial benefits was submitted on October 15, 2006, from Jane Doe.  The form indicated that she was not filing a claim for service-connected death.  Jane also listed herself as the surviving spouse on the application.  Evidence of record shows that Jane was the surviving spouse since 1979 and has not remarried since the date of death.  No children are of record.

The claim for burial benefits was denied on February 20, 2006, as the Veteran was not in receipt of compensation or pension benefits and the location of death was noted as the decedent's residence.  VA sent Jane VA Form 21-534 and the form was not returned.

**Questions**
1) Is this a *Nehmer* case?
2) Are there retroactive benefits?
3) What percentage(s) and effective date(s) should be assigned for retroactive compensation, if applicable?
4) Is Jane Doe entitled to burial benefits?
5) What is the effective date for DIC, if applicable?
6) What is the next action?

**RVSR Scenario 4**

A case arrives at your desk for a rating decision.  The BIRLS VID screen shows that the Veteran is currently alive.  A review of the record shows that the Veteran served in-country in the Republic of Vietnam.

The Veteran previously filed a claim for Pension benefits on May 10, 2009.  On the Veteran's VA Form 21-526 the Veteran noted she was applying for Pension benefits only.  The Veteran stated in the remarks section that her ischemic heart disease, which is due to service, is keeping her from working.  A rating decision dated September 19, 2009, granted pension benefits using diagnostic code 7007 as the medical evidence showed the Veteran had a left ventricular dysfunction with an ejection fraction of 20 percent.

**Questions**
1) Is this a *Nehmer* case?
2) Is the Veteran entitled to retroactive compensation?  Yes, a claim for pension is a claim for compensation.  .
3) What percentage(s) and effective date(s) should be assigned for retroactive compensation, if applicable?
4) What is the next action?

**RVSR Scenario 5**

You receive a file for a rating decision.  A review of the record shows that the Veteran served in-country in the Republic of Vietnam.

The Veteran filed a claim for type II diabetes mellitus and hypertensive vascular disease in April 7, 1994.  The Veteran was denied service connection for both conditions on September 21, 1994, using diagnostic codes 7913 and 7101.  The evidence of record showed that the Veteran had a diagnosis of both conditions. Evidence showed that the Veteran was hospitalized 2 times for diabetes mellitus in 1993 for hypoglycemia.  The Veteran was also on daily injections of insulin and on a restricted diet.  The records also showed that the Veteran's blood pressure was 210/115 mmHg.

The Veteran filed a claim to reopen his type II diabetes claim and filed a new claim showing a diagnosis of ischemic heart disease on August 28, 1996.  The claim was again denied on February 15, 1997.  The evidence showed that the Veteran required 2 daily injections of insulin and now required daily dialysis due to chronic renal failure.   Additionally, the evidence showed that a workload of 2 Metabolic Equivalents (METs) resulted in dyspnea, fatigue, and dizziness and the Veteran's diastolic pressure was predominantly measured at 132 mmHg.

A review of the file shows that the Veteran passed away on October 8, 1998, with the primary cause of death listed as end-stage renal disease, with contributing cause of death as diabetes mellitus.  The surviving spouse filed a claim for death pension benefits on December 8, 1998.  The surviving spouse was granted death pension and is still receiving benefits.  The evidence of record shows that the spouse was married continuously to the Veteran from May 8, 1981, until the Veteran's death.  The record also shows that they never had children.  The spouse has not remarried.

**Questions**
1) Is this a *Nehmer* case?
2) Are there retroactive benefits?  .
3) What percentage(s) and effective date(s) should be assigned for retroactive compensation, if applicable?
4) Is surviving spouse entitled to additional death benefits?  If so, what is the benefit?
5) What is the next action?  Prepare rating and send to Authorization for award.

# EXHIBIT 3

## VA Fast Letter 10-41

"*Processing of Claims for Ischemic Heart Disease (IHD), Parkinsons Disease (PD), Hairy-Cell Leukemia and Other Chronic B-cell Leukemias (HCL/BCL), and Other Diseases Under Nehmer.*"

Amended Complaint Exhibit   *U.S. ex.rel.  Vatan  V.QTC  Medical Services, Inc, et.al.  CV14-8961-PA (SSx)*

First Amended Complaint
Exhibit 3
Page  # 000247



**DEPARTMENT OF VETERANS AFFAIRS**
**Veterans Benefits Administration**
**Washington, DC 20420**

Date: September 28, 2010

Director (00/21)                                    In Reply Refer To: 211A
All VA Regional Offices and Resource Centers       Fast Letter 10-41

SUBJ:  Processing of Claims for Ischemic Heart Disease (IHD), Parkinson's Disease
(PD), Hairy Cell Leukemia and Other Chronic B-cell Leukemias (HCL/BCL), and Other
Diseases Under *Nehmer*

## Background Information

On October 13th, 2009, Secretary Shinseki announced his intent to establish a
presumption of service connection for IHD, PD, or HCL/BCL for Veterans who served in
the Republic of Vietnam.  This decision was based on the Institute of Medicine's
seventh biennial update, *"Veterans and Agent Orange:  Committee to Review the
Health Effects in Vietnam Veterans and Exposure to Herbicides."*  Under the court order
of the U.S. District Court for the Northern District of California (the "Court") in *Nehmer v.
U.S. Department of Veterans Affairs*, 712 F. Supp. 1404, 1409 (N.D. Cal. 1989), VA
must re-adjudicate previously denied claims for IHD, PD, or HCL/BCL filed by *Nehmer*
class members (Vietnam Veterans and certain survivors) and provide retroactive
benefits to the date of the prior claim to such individuals pursuant to 38 C.F.R § 3.816.
This requirement involves claims filed or denied from September 25, 1985, to August
31, 2010, the date VA published the final regulation establishing a presumption of
service connection for the foregoing diseases.

The Veterans Benefits Administration (VBA) has decided to partially centralize the
processing of Nehmer cases.  Resource centers (RCs) will handle *Nehmer* re-
adjudication cases and regional offices of jurisdiction (ROJs) will handle pending claims
received prior to the final regulation.

Policies and procedures outlined in this letter apply to all *Nehmer* cases, which include
end products (EPs) 681 and 687.  Due to the complexity of *Nehmer* cases, further
instructions and clarification on processing have been issued by VBA.

## Regulatory Guidance

Following the publication of a proposed regulation that would amend 38 C.F.R. §
3.309(e) by adding IHD, PD, and HCL/BCL to the list of diseases presumptively

associated with exposure to herbicides in Vietnam, VBA began preparation for adjudication and readjudication of claims affected by the addition of these new presumptive conditions.  VBA will issue these decisions on or after October 30, 2010.  The processing of these decisions must be consistent with the *Nehmer* court orders, 38 C.F.R. § 3.816, the *Nehmer* Training Letter (TL) 10-04 and Training Guide, and *Nehmer* training video.

VA's final regulation was issued on August 31, 2010.  *See* 75 Fed. Reg. 53202.  The final rule is a major rule, and implementation of this rule is subject to the provisions of the Congressional Review Act (CRA).  The CRA provides for a 60-day waiting period to allow Congress the opportunity to review the regulation.  **Accordingly, no final decisions may be issued in cases involving one or more of the three new presumptive conditions before October 30, 2010**.

## End Product Guidance

For the purposes of tracking, separate EPs have been assigned to the *Nehmer* claims: EP 687 for readjudication of previously denied claims and EP 681 for new claims received between the Secretary's original announcement and August 31, 2010.  For additional information on EP control of *Nehmer* claims, please see Fast Letter 10-38.

## Accountability

ROJs and RCs must strictly comply with the instructions set forth in this letter and the Training Guide.  It is critical that *Nehmer* claims be expeditiously handled in accordance with the law.  Processing errors have resulted in court-imposed discovery, repeated processing of thousands of cases, and adverse judicial precedents.

The processing of *Nehmer* claims often requires VA to operate under court-imposed deadlines.  Failure to comply with instructions could result in court-ordered sanctions against VA and/or VA officials.  *Nehmer* decisions are subject to scrutiny within VA, by plaintiffs' counsel, and by the Federal Court that oversees the *Nehmer* litigation.

## Actions That Can Be Taken in Anticipation of the October 30, 2010 Implementation Date

Send the claimant a notification letter, if not already complete, using appropriate *Nehmer* development paragraphs, to include instructions outlined in Fast Letter 09-50.  There are no specific *Nehmer* paragraphs for EP 681s other than standard VCAA.  Begin development for service treatment/personnel records or private medical records that may be necessary to establish the claim as ready-to-rate.  Extensive development may not be required in claims where sufficient evidence to rate the claim is already of record.  Examinations should be ordered to ascertain the current degree of disability *if* the record, to include a review of any available VHA records, does not provide evidence adequate for rating purposes.  When examinations are necessary, they should be ordered as early in claims process as possible.

Following any necessary development, the claim should be held until the CRA waiting period has expired, which is October 30, 2010. At that time, VA can issue rating decisions and notices of the decision to the claimant. If entitlement to benefits can be established on a direct basis, a rating decision should be released without delay.

Please see the Standard Operating Procedure (SOP) for the necessary guidance.

## Training Guide

Training Letter 10-04 and its attached Training Guide contain instruction on claims processing and effective-date determinations, which are more complex than normal benefit awards.

A joint Field Operations and Compensation & Pension (C&P) Service *Nehmer* Working Group developed the comprehensive Training Guide. Each RC involved in the processing of *Nehmer* claims selected individuals to participate in its development. Each RC selected individuals (and may select others as needed) to serve as *Nehmer* subject matter experts (SMEs) for its RC and as points of contact (POCs) for the *Nehmer Working Group.* ROJs must also select SMEs.

## Required Training

In late June and early July, the C&P Service Policy Staff conducted videotaped classroom training on the *Nehmer* claims process in Columbia, SC. The training is available on the VA Learning Management System (LMS) under the following LMS numbers: 1328781, 1328780, 1328782, and 1328783. This LMS training is required for personnel working at all RCs and ROJs involved in the *Nehmer* project. 16 hours of training will be allotted to personnel who complete the LMS training.

Additional training for ROJs will be conducted via LiveMeeting, or similar format, in October 2010. ROJs will receive communication regarding this training in the near future.

## Databases for *Nehmer* Processing

Two *Nehmer* claims processing databases have been created for this project: *Nehmer* Readjudication (EP 687) Worksheet 1; and, *Nehmer* Adjudication (EP 681) Worksheet 2 which can be found at WebLogon. As of September 22, 2010, *Nehmer* Adjudication (EP 681) Worksheet 2 is currently under construction at the Philadelphia ITC and should be completed before October 30, 2010. The *Nehmer* databases contain a step-by-step review checklist requiring user input during the review of each claims file. A complete list of questions for each database can be found in TL 10-04.

*Nehmer* Readjudication (EP 687) Worksheet 1 was established for use at the RCs for processing of EP 687 claims. *Nehmer* Adjudication (EP 681) Worksheet 2 must be

used at the ROJs for processing of EP 681 claims. ROJs will receive instructions on the database in conjunction with the planned training in October 2010.

The information obtained from the databases will be used for a variety of data-collection and reporting purposes and will also serve as the mechanism for status reporting to VBA leadership, the Secretary, Office of General Counsel, Department of Justice, and the Court. Inaccurate reporting of work completed and failure to adequately track and document work have resulted in the Court issuing "Show Cause" orders regarding why VA and VBA supervisors should not be held in contempt of court. Therefore, VA personnel must exercise extreme care when inputting information into each database.

## Project Management

Michael Dusenbery, Director of the Nashville VARO, has been assigned as the *Nehmer* Project Manager (PM). Questions for the PM can be directed to VAVBANAS/SAREA/NEHMER.

## Payment Effective Dates

Under *Nehmer*, you must award the earliest possible effective date in accordance with 38 CFR § 3.816. The Training Guide and videos have detailed information about effective dates. Questions about the interpretation of the effective-date provisions pertaining to *Nehmer* may be referred to the C&P Policy Staff, Attention: Kerry Baker. at VAVBAWAS/CO/NEHMER.

## Jurisdiction of Claims Files

Pending *Nehmer* cases with 681 EPs that involve the death of the claimant subsequent to VA receiving the claim will be forwarded to and adjudicated by the appropriate RC: Philadelphia, Seattle, or Waco. Further instruction will be provided in the final SOP. Please refer to the SOP for additional information on jurisdiction, priority processing, transfer, and shipment of claims files associated with *Nehmer*.

## Quality Reviews

VA will use a two-tier review process for ratings, and a two-tier review process for authorization. Prior to processing a rating decision, all *Nehmer*-related ratings must undergo a review by a *Nehmer* rating SME. This review will include providing a second signature on the rating decision and completing the rating portion of the SME review checklist (Enclosure 1).

Upon completion of the rating review, the award action and notice of decision (award letter) will be reviewed and authorized by a designated authorizing SME (Senior or GS-11 VSR). In addition to authorizing the case, the authorizing SME will also complete the authorization portion of the SME review checklist. The SME reviewers must

conduct a review of their respective areas of responsibility.  The *Nehmer* SME Checklist (Enclosure 1) will be used to ensure quality in the processing of *Nehmer* claims.  <u>The checklist must be incorporated into the claims file, and additional instructions are included with Enclosure 1.  This includes a checklist that annotates errors that are subsequently corrected.</u>

The Philadelphia ITC is currently in the process of automating the checklist, which will be located at <u>WebLogon</u>.  Until such action is complete, utilize the SME checklist enclosed with this fast letter.  In anticipation of the imminent implementation of automated checklists, field stations will not be required to backfill previously completed checklists into <u>WebLogon</u> once programming is complete.  However, claims files for cases ready-to-rate as of the release of this fast letter must contain a completed checklist.

The SMEs should not conduct quality reviews in cases wherein they were any of the following:

- o  Veterans Service Representative that prepared development or award action; or
- o  Rating Veterans Service Representative that prepared the rating decision.

C&P Service will conduct quality reviews on a statistically valid number of cases.  Further, Systematic Technical Accuracy Review (STAR) will select and review additional cases based on standard STAR requirements.  Due to the priority, complexity, and large volume of claims files requiring *Nehmer* processing, C&P Service intends to communicate strengths and weaknesses to assist the ROJs and RCs in this process.  SMEs may liberally contact their assigned Working Group POCs for information, additional training, or other assistance necessary to avoid processing errors.

## *Nehmer* Policy Issues

When possible, questions concerning *Nehmer* policy issues should be addressed with the designated SME.  If the SME is unable to answer the question or needs additional guidance, the question should be forwarded to the Q&A mailbox at VAVBANAS/SAREA/NEHMER.

## Attorney Fees

If a claimant had an appeal pending seeking service connection for one of the new presumptive conditions and VA awards service connection subsequent to the Secretary's announcement, then fees would be payable under 38 U.S.C. § 5904 if the requirements of that provision are otherwise satisfied and the *fees are reasonable*.

## Rating and Notification Requirements

The following guidance is in direct contrast to M21-1MR Part III.iv.6.A.1.b, which states that ratings may not contain only denied and deferred issues (Improper Use of a Partial Rating). **The guidance below is only for the *Nehmer* claims process and is not to be used in any other circumstance**.

- o If a *Nehmer* claim is not ready to rate, but the claim contains other non-*Nehmer* issues that are ready to rate, and that must be denied, the RC/ROJ should defer the *Nehmer* claim and deny the other issues. The production EP should be cleared and the *Nehmer* claim forwarded for continued processing. The rating must address the denied issues and defer the *Nehmer*-related presumptive condition. The notification letter must document the denial and include the deferral of the *Nehmer* presumptive condition.

- o If the *Nehmer* claim must be denied, a rating must be done. If there are pending issues, not associated with the *Nehmer* claim, those issues should be deferred on the rating decision unless they are ready to rate. The notification letter must document the denial of the *Nehmer* claim and include the deferral of the other pending issues. The RC/ROJ should clear the *Nehmer* EP, and continue to process the remaining issues, if any.

- o During the development of a *Nehmer*-related condition, if VA discovers that development of a non-*Nehmer* related issue(s) has not been initiated, such as sending the initial notice letter, then combine the notice required under *Nehmer* and the notice normally required under 38 C.F.R. § 3.159 (Duty to Assist). There is no need to provide separate notices.

## Whom to Contact for Help

If you have questions or need additional information, e-mail your inquiry to the Q&A mailbox at VAVBANAS/SAREA/NEHMER.

## Rescission

This letter rescinds Fast Letter 09-09, Readjudication of Claims for AL Amyloidosis (ALA) and Other Diseases Under *Nehmer*.

/S/
Thomas J. Murphy
Director
Compensation and Pension Service

Enclosure

First Amended Complaint
Exhibit 3
Page # 000253

6

**Enclosure 1**

## *Nehmer* SME Checklist Instructions

### Manual Completion:

- The SMEs will input the following:
  - Claim number
  - Veteran's name
  - RO [Claims controlled under end products 681 will require input of the RO]
  - RC and ROJ [Claims controlled under end products 687 will require input of the RC and ROJ]
- The SMEs will legibly print their full name in the appropriate block
- The SMEs will sign their name and input the date in the appropriate blocks
- The SMEs will answer all questions
- The SMEs will provide explanations for all "No" answers marked with an asterisk [•] on the "*Nehmer* Rating or Authorization SME Checklist Explanations" sheets
- The Rating SME will sign as second signature on the rating decision
- The SMEs will file copies of the signed checklists in the claims file
- The SMEs will save copies of the checklists in Virtual VA

### Automated Completion:

- The following fields will be automated in the database:
  - Claim number
  - Veteran's name
  - RO [Claims controlled under end products 681 will require input of the RO]
  - RC and ROJ [Claims controlled under end products 687 will require input of the RC and ROJ]
- The SMEs will type their full name in the appropriate block
- The SMEs will answer all questions
- The SMEs will provide an explanation in a text field for all "No" answers
- The Rating SME will sign as second signature on the rating decision
- The SMEs will:
  - Print the checklist
  - Sign their name and input the date in the appropriate blocks
- The SMEs will file a copy of the signed checklist in the claims file

**NOTE:** All questions require a response.
**NOTE:** All questions on the automated checklist must be answered in sequential order.

## *NEHMER* RATING SME CHECKLIST

| Claim Number: | | Veteran's Name: | |
|---|---|---|---|
| RO: | RC: | | ROJ: |
| Print Name of SME Reviewer: | | | |
| SME Reviewer Signature: | | Date of Review: | |

| | | Yes | No | N/A |
|---|---|---|---|---|
| 1. | Is there evidence of in-country service in Vietnam? | | | |
| 2. | Is IHD, PD or HCL/BCL **claimed OR denied** between 9/25/85 and 8/31/10? | | | |
| 3. | Is there a confirmed diagnosis of the claimed presumptive(s)? | | | |
| 4. | Is a diagnosis ruled out for the claimed presumptive(s)? | | | |
| 5. | Did VA request and obtain additional evidence identified by the class member? * | | | |
| 6. | Is the denial for SC correct? * | | | |
| 7. | If SC for IHD, PD or HCL/BCL is in order, does the decision award the earliest justifiable effective date? * | | | |
| 8. | Is the evidence adequate for rating purposes? * | | | |
| 9. | Does the evidence of record show the current level of disability? * | | | |
| 10. | Is the evaluation assigned appropriate based on the current level of disability? * | | | |
| 11. | Is there evidence of a secondary condition(s) due to IHD, PD or HCL/BCL? | | | |
| 12. | Does the medical evidence on file show current level of disability for the secondary condition(s)? * | | | |
| 13. | Is the correct effective date(s) for the secondary condition(s) assigned? * | | | |
| 14. | Is the correct evaluation for the secondary condition(s) assigned? * | | | |
| 15. | Are other AO presumptive disability(s) noted in the record? | | | |
| 16. | If the AO presumptive disability(s) is affected by *Nehmer,* was the issue correctly addressed? * | | | |
| 17. | If deceased, did AO related disability(s) cause, contribute to, or hasten death? | | | |
| 18. | Is SC death established? * | | | |
| 19. | If SC death was denied, was denial correct? * | | | |
| 20. | Was the evidence cited adequate for the Memorandum for the Record? * | | | |
| 21. | Was all pertinent evidence discussed in the rating decision? * | | | |
| 22. | Was the basis of each decision identified and explained in the rating decision? * | | | |
| 23. | If the minimum evaluation was assigned, was additional development initiated? * | | | |
| 24. | If applicable, were IU and SMC(s) correctly considered and applied? * | | | |
| 25. | Are other issue(s), Nehmer and/or any other, properly addressed? * | | | |

* An explanation is required for "no" answers to these entries.

| *NEHMER* RATING SME CHECKLIST EXPLANATIONS |
|---|
| 5. Did VA request and obtain additional evidence identified by the class member? |
| |
| 6. Is the denial for SC correct? |
| |
| 7. If SC for IHD, PD or HCL/BCL is in order, does the decision award the earliest justifiable effective date? |
| |
| 8. Is the evidence adequate for rating purposes? |
| |
| 9. Does the evidence of record show the current level of disability? |
| |
| 10. Is the evaluation assigned appropriate based on the current level of disability? |
| |
| 12. Does the medical evidence on file show current level of disability for the secondary condition(s)? |
| |
| 13. Is the correct effective date(s) for the secondary condition(s) assigned? |
| |
| 14. Is the correct evaluation for the secondary condition(s) assigned? |
| |
| 16. If the AO presumptive disability(s) is affected by *Nehmer,* was the issue correctly addressed? |
| |
| 18. Is SC death established? |
| |
| 19. If SC death was denied, was denial correct? |
| |
| 20. Was the evidence cited adequate for the Memorandum for the Record? |
| |
| 21. Was all pertinent evidence discussed in the rating decision? |
| |
| 22. Was the basis of each decision identified and explained in the rating decision? |
| |
| 23. If the minimum evaluation was assigned, was additional development initiated? |
| |
| 24. If applicable, were IU and SMC(s) correctly considered and applied? |
| |
| 25. Are other issue(s), Nehmer and/or any other, properly addressed? |
| |

| NEHMER AUTHORIZATION SME CHECKLIST | | | |
|---|---|---|---|
| Claim Number: | | Veteran's Name: | |
| RO: | RC: | | ROJ: |
| Print Name of SME Reviewer: | | | |
| SME Reviewer Signature: | | Date of Review: | |

|  |  | Yes | No | N/A |
|---|---|---|---|---|
| 1. | Was DIC paid? * | | | |
| 2. | Was SC burial paid? * | | | |
| 3. | Were transportation charges paid correctly? * | | | |
| 4. | Were retroactive benefits paid (live and/or death) to the survivor(s)? * | | | |
| 5. | Were all dependents correctly added and/or removed from the award? * | | | |
| 6. | Were offsets, i.e. MRP, SBP, separation, severance and 1151, correctly applied? * | | | |
| 7. | Was the proper class member/payee paid? * | | | |
| 8. | Was the class member(s) notified? * | | | |
| 9. | Is the notification letter adequate? * | | | |
| 10. | Did the notification include appeal rights? | | | |
| 11. | Was the POA included in the notification letter (if applicable)? | | | |
| 12. | Are other issue(s), Nehmer and/or any other, properly addressed? * | | | |

* An explanation is required for "no" answers to these entries.

| NEHMER AUTHORIZATION SME CHECKLIST EXPLANATIONS |
| --- |
| 1. Was DIC paid? |
| |
| 2. Was SC burial paid? |
| |
| 3. Were transportation charges paid correctly? |
| |
| 4. Were retroactive benefits paid (live and/or death) to the survivor(s)? |
| |
| 5. Were all dependents correctly added and/or removed from the award? |
| |
| 6. Were offsets, i.e. MRP, SBP, separation, severance and 1151, correctly applied? |
| |
| 7. Was the proper class member/payee paid? |
| |
| 8. Was the class member(s) notified? |
| |
| 9. Is the notification letter adequate? |
| |
| 12. Are other issue(s), Nehmer and/or any other, properly addressed? |
| |

# EXHIBIT  4

## Department of Veterans Affairs, Veterans Benefits Administration (VBA), Nehmer Training Guide for QTC

# DEPARTMENT OF VETERANS AFFAIRS

## Veterans Benefits Administration (VBA)



# *Nehmer* Training Guide
# for QTC

**June 2012**

## TRAINING GUIDE FOR SCREENING OF NEHMER CLAIMS

### Purpose

The purpose of this training guide is to provide information necessary to review and identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease (IHD), Parkinson's Disease (PD), and Hairy Cell/B-Cell Leukemia (HCL/BCL).  This guide will supplement the Screening Checklist and will provide valuable background information for reviewers.

### Background

On October 13th, 2009, Secretary Shinseki announced his intent to establish presumptive service connection for IHD, PD, and HCL/BCL for Veterans who served in the Republic of Vietnam.  This decision was based on the Institute of Medicine's seventh biennial update, *"Veterans and Agent Orange:  Committee to Review the Health Effects in Vietnam Veterans and Exposure to Herbicides."*  Under the court order of the U.S. District Court for the Northern District of California (the "Court") in *Nehmer v. U.S. Department of Veterans Affairs*, 712 F. Supp. 1404, 1409 (N.D. Cal. 1989), VA has been readjudicating previously denied claims for IHD, PD, or HCL/BCL filed by *Nehmer* class members (Vietnam Veterans and their survivors) and providing retroactive benefits pursuant to 38 C.F.R § 3.816.  This requirement involves claims filed or denied from September 25, 1985, to August 31, 2010, the date VA published the final regulation at 38 C.F.R. § 3.309(e) establishing a presumption of service connection for the foregoing diseases.

Since 2010, the Veterans Benefits Administration (VBA) has been readjudicating previously denied claims under the final *Nehmer* Stipulation and Order for the three newest herbicide-related (AO) presumptive conditions.  Additional claims have since been discovered by Class Counsel, in coordination with VBA, where the Veteran was already awarded service connection for one of the new AO disabilities on a basis other than the presumptive provisions.

For example, VBA may have previously awarded service connection to a Veteran for IHD secondary to Diabetes Mellitus Type II (DMII) prior to the effective date of the new regulation for IHD, PD and HCL/BCL.  Since service connection was already established and had never been denied, the case may not have been included in the original *Nehmer* data batch.  It is possible that these Veterans could be due an earlier effective date in accordance with the *Nehmer* stipulation and order.

Class counsel asserts, in correspondence dated April 5, 2012, that the Department of Veterans Affairs (VA) did not identify all Veterans, living and deceased, who were **awarded** compensation on another basis, other than
2

Amended in October 2012

presumptive, for IHD, PD, and/or HCL/BCL, between September 25, 1985 and October 13, 2009.  Based on this assertion, VA conducted a data run of cases that were granted service connection for IHD, PD, and/or HCL/BCL during September 25, 1985 and October 13, 2009.  This data run generated **69,350** cases that are now subject to a review for possible earlier effective date of entitlement under the Nehmer stipulation.

**Scope**

In cooperation with Class Counsel, VBA agreed to review Vietnam Veterans' claims where VBA has already awarded service-connection for purposes of consideration of eligibility for an earlier effective date in accordance with *Nehmer*. There are three general scenarios when this might occur.

- The veteran was awarded benefits based on IHD, PD, HCL/BCL secondary to a service connected condition and the effective-date provisions applicable to *Nehmer* cases were not considered.[1]
- If an existing service-connected disability aggravated the previously non-service connected IHD, PD or HCL/BCL and VA granted service connection for IHD, PD or HCL/BCL without applying the effective date provisions applicable to *Nehmer*.[2]  This could result in an earlier effective date and an increased evaluation.
- If an existing service-connected disability was previously granted on a direct basis for IHD, PD or HCL/BCL and the effective-date provisions applicable to *Nehmer* cases were not considered.[3]  For example, a Veteran was awarded service connection for IHD on a direct basis in 1991 and was previously denied service connection for IHD in 1987.

VBA has taken reasonable steps to identify persons in the above-mentioned categories who may qualify for retroactive benefits.  A recent data run by VBA identified **69,350** cases that are now subject to a review for possible earlier effective date of entitlement under the Nehmer stipulation.  A targeted review will be conducted to determine if an earlier effective date is allowable under the final stipulation.

**Checklist Components**

Listed below are the checklist components and accompanying details that will assist reviewers when completing the Agent Orange Screening Checklist.

**Question 1:**  To determine whether service connection was granted for IHD, PD, or BCL/HCL or a similar condition between September 25, 1985 and October 13, 2009, a careful review of all Rating Decisions (blue document) during this period

---

[1] 38 Code of Federal Regulation (C.F.R.) § 3.310 (a)
[2] 38 C.F.R. § 3.310 (b)
[3] 38 C.F.R. § 3.303

Amended in October 2012

must be undertaken.  Review the *Decision* section and *Code Sheet* of each Rating Decision to determine the decision outcome for each claimed issue.  See Example 1 for a sample of the *Decision* section of the Rating Decision.  See Example 2 below for a sample *Code Sheet*.

In making the above-determination, refer to the definitions listed below.  In addition, if a related condition (not described in the definitions) is present on a Rating Decision during the applicable period, the reviewer should check YES on #1b of the checklist.

If Yes is checked in either of the boxes under question #1, then the reviewer should carefully answer the subsequent checklist questions to determine if there is potential entitlement to additional benefits.

## Example 1

## DECISION

1. Service connection for Mantle cell lymphoma is granted with a 30 percent evaluation, effective October 5, 1987.
2. Service connection for coronary artery disease secondary to diabetes mellitus is granted with a 50 percent evaluation, effective November 4, 1987
3. Service connection is denied for low back condition.

**Definitions of the Three New Presumptive Conditions**

Ischemic Heart Disease

According to Harrison's Principles of Internal Medicine (Harrison's Online, Chapter 237, Ischemic Heart Disease, 2008), ischemic heart disease is a condition in which there is an inadequate supply of blood and oxygen to a portion of the myocardium; it typically occurs when there is an imbalance between myocardial oxygen supply and demand.  Therefore, for purposes of this regulation, the term "ischemic heart disease" includes, but is not limited to, acute, subacute, and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm and including "non-ischemic CAD" or "ischemic CAD" as both will be considered further in adjudication) and coronary bypass surgery; and stable, unstable, and Prinzmetal's angina.  Since the term refers only to heart disease, it does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke.

Chronic B-Cell Leukemia

B-cell leukemia describes several different types of lymphoid leukemias and
4

Amended in October 2012

includes the following types:

- B-cell chronic lymphocytic leukemia/small lymphocytic lymphoma
- Acute lymphoblastic leukemia, mature B-cell type
- B-cell prolymphocytic leukemia
- Precursor B lymphoblastic leukemia
- Hairy cell leukemia

There are fourteen kinds of lymphomas involving B-cells.

- Diffuse large B-cell lymphoma
- Follicular lymphoma
- Mucosa-associated lymphatic tissue lymphoma (MALT)
- Small cell lymphocytic lymphoma (overlaps with the chronic lymphocytic leukemia)
- Mantle cell lymphoma (MCL)
- Burkitt lymphoma
- Mediastinal large B-cell lymphoma
- Waldenström macroglobulinemia
- Nodal marginal zone B-cell lymphoma (NMZL)
- Splenic marginal zone lymphoma (SMZL)
- Extranodal marginal zone B-cell lymphoma
- Intravascular large B-cell lymphoma
- Primary effusion lymphoma
- Lymphomatoid granulomatosis

Parkinson's Disease

Parkinson's disease (PD) belongs to a group of conditions called motor system disorders, which are the result of the loss of dopamine-producing brain cells. The four primary symptoms of PD are tremor, or trembling in hands, arms, legs, jaw, and face; rigidity, or stiffness of the limbs and trunk; bradykinesia, or slowness of movement; and postural instability, or impaired balance and coordination. As these symptoms become more pronounced, patients may have difficulty walking, talking, or completing other simple tasks. PD usually affects people over the age of 50.  Early symptoms of PD are subtle and occur gradually.  In some people the disease progresses more quickly than in others.  As the disease progresses, the shaking, or tremor, which affects the majority of PD patients may begin to interfere with daily activities.  Other symptoms may include depression and other emotional changes; difficulty in swallowing, chewing, and speaking; urinary problems or constipation; skin problems; and sleep disruptions.  There are currently no blood or laboratory tests that have been proven to help in diagnosing sporadic PD.  Therefore the diagnosis is based on medical history and a neurological examination.  The disease can be difficult to diagnose accurately.  Doctors may sometimes request brain scans or laboratory tests in order to rule
5

Amended in October 2012

out other diseases.

**Question 2:**  A review of the Rating Decision document will assist the reviewer in determining the following from the checklist:

Condition – Will be documented under the *Decision* section of the Rating Decision.  See example 1 above.

Date of Rating Decision – Date will be displayed on the Rating Decision document.

Basis – To determine the basis for which service connection was granted, the reviewer should refer to the *Decision* section (example 1 above) and the *code sheet* of the Rating Decision.  See example 2 below for a display of the coded conclusion.  The basis for the decision will be listed after or under the condition.

Effective Date of Entitlement - To determine the effective date of entitlement, the reviewer should refer to the *Decision* and *Coded Conclusion* sections of the Rating Decision document.

<u>**Example 2**</u>

<u>Coded Conclusion</u>

SUBJECT TO COMPENSATION (1. SC)

| 7799-7703 | Mantle cell lymphoma |
| | Service Connected, Vietnam Era, Incurred |
| | 30 percent from 10/05/1987 |

| 7005 | Coronary Artery Disease secondary to diabetes mellitus |
| | Service Connected, Vietnam Era, Secondary |
| | 50 percent from 11/04/1987 |

NOT SERVICE CONNECTED/NOT SUBJECT TO COMPENSATION (8. NSC)

| 5295 | Low back condition. |
| | (Not Service Connected, Not Incurred/Caused by Service) |

Note: All disabilities subject to compensation will be coded under code 1. Disabilities along with evaluations will be listed in descending order.  A diagnostic code will precede the diagnosis.

**Question 3:** The reviewer should review all Rating Decision documents between September 25, 1985 and the earliest grant of service connection for IHD, PD, and/or BCL/HCL to determine whether such conditions were denied service

6

Amended in October 2012

connection.  List the denied condition along with the date of the Rating Decision document.

**Question 4**: The reviewer should review all Rating Decision documents between September 25, 1985 and the earliest grant of service connection for IHD, PD, and/or BCL/HCL to determine whether a claim for condition(s) other than IHD, PD, and BCL/HCL were adjudicated by VA.

**Question 5**:  In addressing this question, the reviewer shall carefully review all medical evidence received and associated with the claim(s) noted under question 4 of the checklist.  If these medical records contain documented diagnoses of IHD, PD, or BCL, or similar condition(s), then Yes must be checked in question 7 of the checklist.

It is imperative that all medical evidence received in support of the claim(s) be thoroughly reviewed.  The "Evidence" section of the applicable Rating Decisions will list all pertinent evidence considered for each decision.

**Question 6**:  The entire Claims Folder should be reviewed to ensure the documents in the file are in chronological order, and then the volumes with evidence or correspondence dated September 25, 1985 to the present must be thoroughly reviewed to determine if there is a potential basis for entitlement to additional benefits based on the presumption of service connection for IHD, PD, and HCL/BCL.  Service Treatment Record envelopes would not need to be opened and reviewed by QTC staff, as they are not relevant to this review.

**Question 7**:  In determining whether there is potential eligibility for presumptive consideration, the reviewer should rely primarily on the "note" annotations under questions 2, 3 and 5 (in red font).  If "Yes" is checked for either question 3 or 5, or if the facts described in the "note" to question 2 are present, then "Yes" must be checked under #7 and the case must be referred to a VA Regional Office for further review.

There may be other special considerations noted during the review that relate to whether the individual in question qualifies for an earlier effective date.  If, after considering these factors, there exist doubt as to whether the Veteran may qualify for additional benefits, then such doubt should be resolved in favor of the Veteran and the Yes box for question 7 should be checked.  A full explanation should be included in the comments section.

7

Amended in October 2012

# EXHIBIT  5

## "Agent Orange Screening Checklist"

## (IHD/PD/BCL File Review Checklist)

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

**Name:**

**File #:**                              **Branch of Service:**

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☐YES ☐ NO

(b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: _____

Date of Rating Decision: _____

Basis (direct, secondary, aggravation, aggravated by service connected condition):

_____

Effective Date of Entitlement:

_____

**Note**:  If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☐ NO ☐ NA

If Yes, record the following information:

    Disability Denied: _____

    Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☐YES ☐ NO ☐ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☐YES ☐ NO

**Note**: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed? ☐YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☐ YES ☐ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Reviewers:**

_____            _____
Print Name                                        Print Name


_____            _____
Signature                                          Signature (Physician)


_____            _____
Date                                                 Date

# EXHIBIT  6

## QTC- Produced  "*Nehmer* Reference Manual" For Its Claim File Analysts

Amended Complaint Exhibit   *U.S. ex.rel.  Vatan  V.QTC  Medical Services, Inc, et.al.  CV14-8961-PA (SSx)*

First Amended Complaint
Exhibit 6
Page  # 000270

# Nehmer Reference Manual



**By: Wei Xiong**

**7/16/2013**

First Amended Complaint
Exhibit 6
Page # 000271

# Table of Contents

Background ................................................................................................... 3

Agent Orange Overview ................................................................................ 5

Checklist Quality Assurance ......................................................................... 6

Checklist Guide ............................................................................................. 7

E-Process Flow ............................................................................................. 10

C-file Tracking Steps .................................................................................... 17

Frequently Seen Referral Decisions ............................................................. 19

Checklist Templates ...................................................................................... 20

Quiz ............................................................................................................... 37

Glossary ........................................................................................................ 39

Index ............................................................................................................. 42

# Background

The name "Agent Orange" came from the orange identifying stripe used on the 55-gallon drums in which it was stored.

**Agent Orange** is a blend of tactical herbicides the U.S. military sprayed from 1962 to 1971 during Operation Ranch Hand in the **Vietnam War** to remove trees and dense tropical foliage that provided enemy cover.

The two active ingredients in the Agent Orange herbicide combination were equal amounts of 2,4-dichlorophenoxyacetic acid (2,4-D) and 2,4,5-trichlorophenoxyacetic acid (2,4,5-T), which contained traces of 2,3,7,8-tetrachlorodibenzo-p-dioxin (TCDD).

The dioxin TCDD was an unwanted byproduct of herbicide production. **Dioxins** are pollutants that are released into the environment by burning waste, diesel exhaust, chemical manufacturing, and other processes. The herbicides left unintended consequences on the human body.

Vietnam Veterans claimed that the diseases that they developed after service were related to the herbicide exposure. The VA however consistently took the position that only one disease, chloracne, was associated to Agent Orange and routinely denied other claimed conditions.

On **September 25th, 1985**, the Dioxin and Radiation Exposure Compensation Standards Act went into effect in the Code of Federal Regulations amidst veterans' concerns over long term effects. The Act was to ensure that benefits were afforded for all disabilities arising out of service in Vietnam. The Act authorized VA to rule on which conditions should be deemed service connected based on herbicide exposure. The Act also created an assumption that any veteran who served "in country" meaning, actually set foot in Vietnam, was automatically presumed to have been exposed to herbicides. However, this act reaffirmed VA's position that only chloracne was sufficiently linked to herbicides.

**Nehmer class action** law suit filed resulted in court action in 1989 that voided all benefit decisions made under this regulation as if the decision had never been made.

All such disabilities found to be linked to Agent Orange required all previous denials to be re-adjudicated or re-rated.

Any condition deemed presumptive to herbicide exposure and previously denied will be rated with special rules regarding date benefits are effective. The effective date will be essentially the date the VA received the claim or the date the disability actually arose, whichever is later.

On **October 13, 2009**, the VA announced Secretary Shinseki's decision to establish presumptive service connection for three additional illnesses associated with exposure to herbicides used in Vietnam based on an independent study conducted by the Institute of Medicine. The illnesses affected by the recent decision are **B-Cell Leukemias (such as hairy cell leukemia), Parkinson's disease**, and **Ischemic Heart Disease**.

**August 31, 2010** marks the date the regulations governing the presumptive conditions became effective.

As of September 20, 2010, approximately 145,000 Vietnam Veterans and survivors were previously denied service-connection or filed new claims. All of these claims must be adjudicated/re-adjudicated in order to comply with the Final Nehmer Stipulation.

| List of conditions presumptively associated with herbicide exposure | Dates regulations governing the presumptions became effective |
| --- | --- |
| Soft-tissue Sarcoma | 15-Oct-91 |
| Hodgkin's disease | 3-Feb-94 |
| Non-Hodgkin's lymphoma | 19-May-93 |
| Porphyria cutanea tarda | 3-Feb-94 |
| Lung cancer | 9-Jun-94 |
| Bronchus cancer | 9-Jun-94 |
| Larynx cancer | 9-Jun-94 |
| Trachea cancer | 9-Jun-94 |
| Multiple myeloma | 9-Jun-94 |
| Acute and Subacute peripheral neuropathy | 7-Nov-96 |
| Prostate cancer | 7-Nov-96 |
| Type 2 Diabetes | 8-May-01 |
| Chronic lymphocytic leukemia (CLL) | 16-Oct-03 |
| AL Amyloidosis (ALA) | 7-May-09 |
| Ischemic heart disease | 31-Aug-10 |
| Parkinson's disease | 31-Aug-10 |
| B-cell leukemia | 31-Aug-10 |

# <u>Agent Orange Overview</u>

- **Medical Records Case Assignment Sheet:**
  - o Top Cover of C-file
    - **Name**
    - **QTC#**
    - **Tracking Barcode**
    - **Number of Volume**
- **Claims Folders:**
  - o Most recent volume on top, chronologically down to earliest claims folder.
  - o Volume # marked on covers for those with multiple volumes
  - o **VA Identification #** on cover/spine of folders
- **DD214**
  - o *Certificate of Release or Discharge from Active Duty*
  - o Right flap of most recent claims folder (Sometimes in center)
  - o Focus on **Branch** and **Service**
- **21-526**
  - o Veteran's Application for Compensation and/or Pension: **Date of Original Claim**
  - o Usually at bottom of earliest volume
- **Rating Decisions**
  - o Printed on blue papers
  - o All must be read thoroughly with emphasis on cited medical evidence
  - o Components
    - **Introduction**
      - Overview of service
      - Overview of Current Claim
    - **Decision**
      - For most recent Claim
    - **Evidence**
      - Medical evidence in support of the decision
    - **Reasons for Decision**
      - Detailed explanation of basis of the decision
    - **Compensation Decision**
- Overview of all outstanding compensation decisions

# Checklist Quality Assurance

1. **Checklist Format:** NEEDS TO BE CONSISTENT BECAUSE **EVERY** ALTERATION ON CHECKLIST WILL BE SIGNED OFF BY PROVIDER

2. **Last Name, First:** Verify with official documents in c-file

3. **Footer:**  Name, QTC# *important for search within E-process

4. **Name/Date/Sig:** Provider Signature date must match E-process appointment

5. **Signed/Narrative report:** Must be identical in content other than the fact Narrative does not require signature. Type CFA/provider name in Narrative Report

# Checklist Guide

- **Name**:
    - o **MR CAS** - *Check that the name match with the name in c-file

- **VA Identitication #**:
    - o Located on the front and spine of c-file. It could be the **SSN** or random 7-8 digit number
    - o Not to be confused with **QTC Contract #**

- **Branch of Service**:
    - o DD 214: It could indicate medals consistent with in-country Vietnam Service
        - ▪ Confirm Vietnam in-country service. If not Vietnam Veteran, indicate on Checklist and notify Quality Team for confirmation and further guidance.

- **Q1**: *(a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009?  (b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL?*
    - o Review most recent RD for overview of SC conditions
    - o chronologically review every RD and look for the first grant for all 3 Nehmer Conditions
    - o If **YES** move onto **Q2**. If answer is **NO** for both, Skip to **Q3,Q4, Q5, Q6 and Q7**

- **Q2**: *If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the earliest grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009.*
    - o **Condition**
        - ▪ **First** Rating Decision that granted Service Connection for Nehmer Conditions (PD, IHD, BCL/HCL)
    - o **Date of Rating Decision (RD)**
        - ▪ Located at top Right Corner of RD (Look in heading on older ratings)
    - o **Basis of granting SC**

- Automatic referral if basis is **Aggravation**
  - o **Effective date**
    - Date of earliest grant of compensation

- **Q3:** _**Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?**_
  - o Does not mean ANY DENIAL
    - If SC for one of the three conditions was denied, but a subsequent rating decision granted SC effective prior to the date of the denial, this is NOT an actual denial
    - A grant of pension for one of the three conditions is considered a denial for SC and the answer to question 7 must be "Yes"
    - Do not confuse with **Deferral** meaning the claim is paused pending additional evidence
- **Q4:** _**Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?**_
  - o **ORIGINAL Claim**
    - If the veteran filed a claim for any of the Nehmer conditions as an original claim, i.e. the first time the veteran files a VA Disability Compensation Claim, mark **N/A**
  - o For Nehmer purposes: Medical evidence can result in an award without a formal claim being filed. They do not constitute a claim **by themselves**, but if we have such medical records at the time we receive a separate SC claim, then the condition shown by the medical records is **part of that claim.** Accordingly, for effective-date purposes, they should be considered part of whatever claim was the subject of the rating decision."
  - o *Psychiatric evaluation DSM IV Axis III diagnoses

- **Q5:** _**If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?**_
  - o must be evidence irrefutably not addressed in RD
  - o unless evidence explicitly states in RD, assume it was not used

- **Q6:** _**Was the entire claims folder reviewed?**_
  - o Through the process of elimination, the entire c-file is reviewed

- o Service Treatment Records **(STR)** in c-files are not required to be reviewed but they can be used to substantiate a diagnosis.

- **Q7**: *POTENTIAL Eligibility for Presumptive Consideration*
  - o Yes
    - Examples
      - Additional evidence located that were not considered to grant service connection for any of the Nehmer conditions claimed
      - Nehmer Denial
      - Aggravation
  - o No
    - Examples
      - All evidence considered
      - Pre-Nehmer decision dates
      - Not Vietnam Service Vet

# E-Process Flow



**Triage** – Referrals are **triaged** for consistency with requirements of Nehmer

**Assign** – Currently all cases are automatically **assigned** to 318A until mini-teams are created

**Schedule** – Appointments are **scheduled** with the provider who signed the checklist

**Review Rpt** – **Narrative Report/Signed Report/201 Service Bill** are created prior to **PDCK**

**Transfer to Bill** – Cases are electronically delivered back to the VA **(DOT)**

**Search** – **Searches** through stored cases in e-process. Most often used after reports are rejected due to report inconsistencies

**Case History** – Case History searches E-process for outstanding cases using **QTC Claimant ID, VA Claim #, Name,** or **Social Security number.**

**Exam File Manager** – **Signed reports** are scanned and uploaded into e-process until e-signature is implemented

**MR Flow** – **C-file tracking tool**

- **Schedule Tab**
  - ○ Case History



  - ○
  - ○ Case Details



  - ○
  - ○ **Create New Appointment** (Blank Narrative Report generates automatically in **Review Report Tab** after appointment is created)

  - ○



- Appointment date must match **Date of Provider Signature**
  - Schedule in 10 minute increments
- Schedule with in-house provider in **Diamond Bar**
  - See Index for **Provider #**
- Enter **CPT Code** according to c-file size to create 201 Service Bill
  - **0033AA**: C-file **EQUAL** or **LESS** than 3 inches
  - **0033AB**: C-file **GREATER** than 3 inches

- Enter C-file measurement under **MED REC** and **Notes**
  - Round to 1 decimal point to assist with billing (i.e. 3.1 inches)

Nehmer Reference Manual
E-Process Flow 13



- **Review report**



- ○ Blank **Narrative Report** * Currently not user friendly because no Checkable boxes.
  - ■ <u>**Until Checkable boxes are inserted by IT, continue filling out the checklist in Microsoft Word and Copy/Paste to Narrative Report.**</u>

- ○
- ○ **Signed report**

- Make sure checklist is signed by both **CFA** and **Provider** before scanning.
- Checklist scanned by MRE then uploaded to Exam File Manager



- o **NOTES**
  - **C-file Size**
    - OPSBILLING
  - **AOQ7ANSR (Agent Orange Question 7 Answer)**
    - **Yes/No** referral with brief explanation



- o **BEFORE PDCK PLEASE VERIFY THE FOLLOWING ARE COMPLETED**
  - **Narrative Report**
  - **Signed Report**
  - **201**
  - **Notes**
  - **C-file Measurement**
- o <u>PDCK</u>
- • **Transfer to Bill**



 CPT Code 0003 needs to be entered since there are 1-2 Worksheets associated with this appointment. Click OK to enter in Notes. Click Cancel to correct CPT Codes.

Click OK (Not Applicable to Nehmer)    [ OK ]    [ Cancel ]

Nehmer Reference Manual
E-Process Flow 15





- DOT Process
  - Click **DOT**
  - Enter Billing Notes
  - Pending Scanned
    - **DOTSCAN**
    - Last Verifications of **Narrative/Signed Reports**
  - **Rejections**



    - **Pink** – **Billing Rejection**
      - CPT Code does not match size of c-file
      - Missing notes
    - **Green** – **IT rejection**
      - Report inconsistencies
      - If Reports need to be appended or replaces use the following naming convention
        - **Narrative – 1234567_1_1_R**
        - **Signed Report – 1234567_1_1_R**

Nehmer Reference Manual
E-Process Flow 16

- **Completed C-file**
  - o   Signed report inside top folder
  - o   CAS on Cover to help MR facilitate the return of c-files
  - o   **FINAL** Stamp

# C-file Tracking Steps



- **NH – MR to NH**
    - o **Received from Medical Records**
        - ▪ Track upon reception of C-file from Medical Records



- **NH - Review**
    - o **Check Out – For Review**
        - ▪ Track when starting Review process
        - ▪ Can be tracked at same time as **Received from Medical Records**
    - o **Check In – Review In Process**
        - ▪ Track if WIP at the end of work day
    - o **Check In – Ready For Provider**
        - ▪ Track when CFA Review is completed and c-file is ready for **Provider Review**



- **NH – Provider** (Provider Tracking)
    - o **Check Out – For Provider Review**
    - o **Check In – Review Complete**



- **NH - Delivery**
    - o **Check Out – For PDCK**

- Track after Signed Report is obtained from Provider and case is ready for PDCK
  - o **Check In – Nehmer Complete**
    - Track after DOT and checklist placed in C-file



- **NH-NH to MR**
  - o **Returned to Medical Records**
    - Track when all is complete and c-file ready to be shipped back to VA
    - MR cannot ship until this tracking step is complete

# **Frequently Seen Referral Decisions**

## NO Referral

- No Evidence of **IHD/PD/BCL** in possession of VA prior to initial service connection for Nehmer Conditions
- **Pre/Post-Nehmer** Service Connection
  - o **The scope of the review is for any claim or construed claim that was pending on or after 09/25/85 and before 10/13/09.   Anything post/prior to these dates is not Nehmer.**
  - o Scenario:  The veteran filed a claim on August 1, 1985.  But the VA did not make a decision until February 10, 1986. Even though the claim was filed *before* September 25, 1985, it was still pending *after* 9/25/85.
  - o In this scenario, the CFA should use the <u>date of the rating decision</u> to determine if it meets the scope of the review and NOT the date of entitlement.
- Service Connection for Nehmer conditions granted on **Original Claim**
  - o Service connection is granted with an assigned **Effective Date** based on the date the Original Claim was received
- **Non-Vietnam Era Veteran**
  - o Service locations can be found on **DD214, Rating Decision**, etc.
  - o Please refer to **Quality Team** if suspected

## YES Referral

- Medical evidence for **IHD/PD/BCL**
  - o Evidence for IHD/PD/BCL must be received prior to the date of claim establishing entitlement
- Basis of service connection: **Aggravation/Aggravated**
- Pension Grant
  - o Indicated in Rating Decision as **PT**
  - o Pension grant considered a denial because condition is not connected to military service (Complete **Q.3** as **Yes**)
- Nehmer **Denial**
  - o **Scenario:**  The veteran filed a claim for CAD secondary to DM2 on August 16, 2005 and was denied due to the absence of CAD diagnosis.  The rating decision on April 7, 2007 granted CAD and assigned an effective date of April 7, 2007.
  - o In this scenario, we would **Refer** because there is potential retroactive benefits.
- Nehmer condition granted service connection upon **Death**
- **DIC** (Dependency and Indemnity Compensation) DENIED

# Checklist Templates

| Scenarios | Standard Phrasing |
|---|---|
| *Ex. 1: Pre-Nehmer* | Pre-Nehmer Case:  Service Connection for **[INSERT NEHMER CONDITION]** granted service connection on **[DATE]** Rating Decision with entitlement date of **[DATE]**. |
| *Ex. 2: Original Claim* | Service connection for **[INSERT NEHMER CONDITION]** granted with an assigned effective date based on the date the Original Claim was received. |
| *Ex. 3: No Additional Evidence* | No medical evidence received showing **[INSERT NEHMER CONDITION]** prior to the date of claim establishing entitlement. No evidence of **[INSERT OTHER 2 PRESUMPTIVE NEHMER CONDITIONS]** found during this review. |
| *Ex. 4: Multiple Nehmer Conditions* | **Input information for Nehmer Condition to be referred on Question 2. If none to be referred, choose any condition.** |
| *Ex. 5: Evidence Received/Found* | **Diagnosis of [INSERT NEHMER CONDITION OR SIMILAR DIAGNOSIS] received with 1/2/1235 rating decision. (Please see Red tab in Volume 1)** |
| *Ex. 6: Nehmer Denial* | **[INSERT NEHMER CONDITION] denied service connection on [DATE] rating decision.** |
| *Ex. 7: Aggravation* | **Referring as a result of Aggravation as basis for [INSERT NEHMER CONDITION] service connection.** |
| *Ex. 8: Pension Grant* | **Pension Claim Granted for [INSERT NEHMER CONDITION] on [DATE] Rating Decision.** |

Nehmer Reference Manual
Checklist Templates 21

*Ex. 1: Pre-Nehmer*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

**Name: Doe, John**

**File #: 123456789**                     **Branch of Service: Army**

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☐YES ☒ **NO**

(b) If No is checked above:  Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☒ **NO**

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: _____

Date of Rating Decision: _____

**Basis (direct, secondary, aggravation, aggravated by service connected condition):**

_____

Effective Date of Entitlement: _____

**Note**:  If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☐ NO ☒ **NA**

If Yes, record the following information:

    Disability Denied: _____

    Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☐ **YES** ☐ **NO** ☒ **NA**

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☐ **YES** ☐ **NO**

**Note**: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?   ☒ **YES** ☐ **NO**

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☐ **YES**  ☒ **NO**

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Pre-Nehmer Case: Service Connection for Ischemic Heart Disease granted service connection on 1/2/1234 Rating Decision.**

**Reviewers:**

**CFA NAME** _____
Print Name

**PROVIDER NAME** _____
Print Name

_____
Signature

_____
Signature (Physician)

**REVIEW DATE**
Date

**SIGNATURE DATE**
Date

*Ex. 2: Original Claim*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

| |
|---|
| **Name: Doe, John** |
| **File #: 123456789                    Branch of Service: Army** |

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)
Condition: **Ischemic Heart Disease**

Date of Rating Decision: **1/2/1990**

   **Basis (direct, secondary, aggravation, aggravated by service connected**

   **condition):** Direct

Effective Date of Entitlement: **1/2/1989**

**Note**: If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☐ NO ☒ NA

If Yes, record the following information:

   Disability Denied: _____

   Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between

September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☐YES ☐ NO ☒ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☐YES ☐ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?  ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☐ YES  ☒ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Service connection for Ischemic Heart Disease granted with an assigned effective date based on the date the Original Claim was received.**

---

**Reviewers:**
**CFA NAME**_____        **PROVIDER NAME**_____
Print Name                                          Print Name


_____        _____
Signature                                           Signature (Physician)

**REVIEW DATE**                                **SIGNATURE DATE**
Date                                                    Date

*Ex. 3: No Additional Evidence*

## Agent Orange Screening Checklist

| |
|---|
| **Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia** |
| **Name: Doe, John** |
| **File #: 123456789**          **Branch of Service: Army** |

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: **Ischemic Heart Disease**

Date of Rating Decision: **1/2/1990**

**Basis (direct, secondary, aggravation, aggravated by service connected condition):** Direct

Effective Date of Entitlement: **1/2/1989**

**Note**:  If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☒ NO ☐ NA

If Yes, record the following information:

Disability Denied: _____

Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☒YES ☐ NO ☐ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☐YES ☒ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?  ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☐ YES ☒ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**No medical evidence received showing IHD prior to the date of claim establishing entitlement. No evidence of Parkinson's Disease, or B-Cell Leukemia found.**

**Reviewers:**

<u>**CFA NAME**</u>
Print Name

_____
Signature

<u>**REVIEW DATE**</u>
Date

<u>**PROVIDER NAME**</u>
Print Name

_____
Signature (Physician)

<u>**SIGNATURE DATE**</u>
Date

*Ex. 4: Multiple Nehmer Conditions*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

**Name: Doe, John**

**File #: 123456789**                  **Branch of Service: Army**

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: **Chronic Lymphocytic Leukemia**

Date of Rating Decision: **1/2/1995**

**Basis (direct, secondary, aggravation, aggravated by service connected condition):** Presumptive

Effective Date of Entitlement: **1/2/1994**

**Note**: If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☒ NO ☐ NA

If Yes, record the following information:

Disability Denied: _____

Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between

September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☒YES ☐ NO ☐ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☒YES ☐ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?  ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☒ YES ☐ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Diagnosis of Chronic Lymphocytic Leukemia received with 1990 rating decision. (See Red Tab in Volume 1)**

**Ischemic Heart Disease granted Direct service connection on on 1/2/1990 rating decision with entitlement date of 1/2/1989. No medical evidence received showing IHD prior to the date of claim establishing entitlement. No evidence of Parkinson's Disease found.**

**Reviewers:**
**CFA NAME** _____
Print Name

_____
Signature

**REVIEW DATE**
Date

**PROVIDER NAME** _____
Print Name

_____
Signature (Physician)

**SIGNATURE DATE**
Date

*Ex. 5: Evidence Received/Found*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

**Name: Doe, John**

**File #: 123456789**                    **Branch of Service: Army**

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: **Ischemic Heart Disease**

Date of Rating Decision: **1/2/2000**

> **Basis (direct, secondary, aggravation, aggravated by service connected condition): Direct**

Effective Date of Entitlement: **1/2/1999**

**Note**: If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☒ NO ☐ NA

If Yes, record the following information:

Disability Denied: _____

Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☒YES ☐ NO ☐ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☒YES ☐ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?  ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☒ YES ☐ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Diagnosis of IHD received with 1990 rating decision. (Please see Red tab in Volume 1)**

**Reviewers:**

<u>**CFA NAME**</u>_____
Print Name

<u>**PROVIDER NAME**</u>_____
Print Name

_____
Signature

_____
Signature (Physician)

<u>**REVIEW DATE**</u>
Date

<u>**SIGNATURE DATE**</u>
Date

Nehmer Reference Manual
Checklist Templates 31

*Ex. 6: Nehmer Denial*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

### Name: Doe, John

### File #: 123456789                                 Branch of Service: Army

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above: Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: **Ischemic Heart Disease**

Date of Rating Decision: **1/2/2000**

**Basis (direct, secondary, aggravation, aggravated by service connected condition):** Direct

Effective Date of Entitlement: **1/2/1999**

**Note**: If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☒YES ☐ NO ☐ NA

If Yes, record the following information:

   Disability Denied: **Myocardial Infarction**

   Date of Rating Decision (containing the denial): **1/2/1989**

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☒YES ☐ NO ☐ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☐YES ☒ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed? ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☒ YES ☐ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Myocardial Infarction denied service connection on 1/2/1989 rating decision.**

---

**Reviewers:**

<u>**CFA NAME**</u> _____
Print Name

<u>**PROVIDER NAME**</u> _____
Print Name

_____
Signature

_____
Signature (Physician)

<u>**REVIEW DATE**</u>
Date

<u>**SIGNATURE DATE**</u>
Date

*Ex. 7: Aggravation*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

**Name: Doe, John**

**File #: 123456789**                    **Branch of Service: Army**

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above:  Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: **Ischemic Heart Disease**

Date of Rating Decision: **1/2/2000**

> **Basis (direct, secondary, aggravation, aggravated by service connected condition):** Aggravated

Effective Date of Entitlement: **1/2/1999**

**Note**:  If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☐YES ☐ NO ☒ NA

If Yes, record the following information:

> Disability Denied: _____

> Date of Rating Decision (containing the denial): _____

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☐YES ☐ NO ☒ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☐YES ☐ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?  ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____

_____

7) Potential Eligibility for Presumptive Consideration: ☒ YES ☐ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Referring as a result of Aggravation as basis for IHD service connection.**

**Reviewers:**

<u>**CFA NAME**</u> _____
Print Name

_____
Signature

<u>**REVIEW DATE**</u> _____
Date

<u>**PROVIDER NAME**</u> _____
Print Name

_____
Signature (Physician)

<u>**SIGNATURE DATE**</u>
Date

### *Ex. 8: Pension Grant*

## Agent Orange Screening Checklist

**Purpose: To identify cases in which there is a potential basis for entitlement to additional benefits based on the presumption of service connection for Ischemic Heart Disease, Parkinson's Disease, and B-Cell/Hairy Cell Leukemia**

**Name: Doe, John**

**File #: 1234567890**          **Branch of Service: Army**

1) (a) Was service connection granted for Ischemic Heart Disease(IHD), Parkinson's Disease(PD), or B-Cell/Hairy Cell Leukemia (BCL) between September 25, 1985 and October 13, 2009? ☒YES ☐ NO

(b) If No is checked above:  Was service connection granted for a condition that is similar to IHD, PD, and/or BCL? ☐YES ☐ NO

2) If YES to either question in #1 above: Identify the specific condition, date of Rating Decision, basis, and effective date of entitlement for the *earliest* grant of service connection for IHD, PD, or BCL, or similar condition, between September 25, 1985 and October 13, 2009. (Note: If more than one condition was granted during this period, then list other noted conditions separately in the Comments Section along with the following elements.)

Condition: **Coronary Artery Disease**

Date of Rating Decision: **3/6/2006**

> **Basis (direct, secondary, aggravation, aggravated by service connected condition): Secondary**

Effective Date of Entitlement: **4/14/2005**

**Note**:  If a condition is service connected based on aggravation by an existing service connected condition, then you must check Yes to #7 below.

3) Was service connection denied for IHD, PD, or BCL between September 25, 1985 and the earliest grant of service connection for the condition(s) noted in #2 above?

☒YES ☐ NO ☐ NA

If Yes, record the following information:

>    Disability Denied: **Arteriosclerotic Heart Disease S/P Stent Placement**

>    Date of Rating Decision (containing the denial): **4/7/2001**

**Note**: If Yes is checked for #3, then you must check Yes to #7 below.

4) Was a claim(s) for any condition (other than IHD, PD, or BCL) filed between September 25, 1985 and the earliest grant of IHD, PD, or BCL noted in #2 above?

☒YES ☐ NO ☐ NA

5) If Yes was checked for #4 above, did reviewer identify medical records associated with the claim(s) that documents a diagnosis of IHD, PD, or BCL, or similar condition(s)?

☒YES ☐ NO

<u>Note</u>: If Yes is checked for #5, then you must check Yes to #7 below.

6) Was the entire claims folder reviewed?  ☒YES ☐ NO

If NO, list reason and what portion of the claims folder was reviewed? (i.e., date range of review): _____
_____

7) Potential Eligibility for Presumptive Consideration: ☒ YES ☐ NO

Comments:  You should use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a *Nehmer* class member based on the manifestation of Ischemic Heart Disease, Parkinson's Disease, and/or B-Cell/Hairy Cell Leukemia.

**Pension Claim Granted for Arteriosclerotic Heart Disease on 4/7/2001 Rating Decision.**

**Reviewers:**

**CFA NAME** _____
Print Name

**PROVIDER NAME** _____
Print Name

_____
Signature

_____
Signature (Physician)

**REVIEW DATE**
Date

**SIGNATURE DATE**
Date

# <u>Quiz</u>

*Assume that the veteran filed an ORIGINAL CLAIM on October 1, 1985 for question 1-4*

1. Veteran filed a claim on July 1, 2008 for CAD secondary to DM2 and submitted medical evidence dated May 1, 2007 showing a diagnosis of CAD. The rating decision granted service connection (SC) for CAD secondary to DM2 on November 30, 2008 and assigned an effective entitlement date of July 1, 2008 (the date the VA received the claim).
Should you refer the case or not?  Please give your reason(s).
**NO – The evidence dated May 1, 2007 was already considered by the VA and was received on July 1, 2008.**

2. The same dates and condition as above except there was a previous claim: the veteran was denied a claim for service connection for a heart condition on March 1, 1995. The rating decision denied the claim because there was no diagnosis of any heart condition. A review of the C-file failed to show any evidence of any heart condition.
Should you refer the case or not?  Please give your reason(s).
**NO – the veteran was already granted entitlement for the CAD effective July 1, 2008. There are NO MR showing a dx of CAD prior to the date the claim was received on July 1, 2008 (Hint:  Even though the MR on May 1, 2007 showed CAD, this was already considered to grant CAD on 7/1/08).**

3. The same dates and condition as #1 except for the following:  the veteran filed a claim for a shell fragment wound, left knee on February 1, 1988. When the VA obtained the veteran's treatment records from VAMC West LA, treatment and diagnosis of CAD from January 1987 to July 1987 was included. The rating decision on December 10, 1988 granted SC for the left knee scar.
Should you refer the case or not?  Please give your reason(s).
**YES – There is evidence of CAD prior to July 1, 2008 that was submitted with another claim. (Hint:  Even though the claim was not for CAD, the evidence showing CAD prior to 7/1/08 requires the VA to re-adjudicate the claim under *Nehmer*)**

4. The same scenario as #1 except that an ER report received by the VA in 1993 reveals that vet treated for cardiac arrest with findings of ventricular arrhythmia.
Should you refer the case or not?  Please give your reason(s).
**YES – this warrants re-adjudication by the VA because we want to err in favor of the veteran. There are several reasons for cardiac arrest/arrhythmias such as trauma or drug OD so this must be weighed for reasonable doubt and possibly a medical opinion may be needed.**

5. Veteran gives a history of being diagnosed with left ventricular enlargement as a child as well as PVC's.  Those medical reports were submitted to VA in 1988.  In

2002 the VA grants CAD due to service connected diabetes.  Does Nehmer require that this case be referred or not?  Please give your reason(s).
**NO – these records were pre-military service. (Hint: If there was aggravation of the heart condition shown in service, then refer.)**

6. Parkinson's Disease was granted on a direct basis in 2002.   There is a medical record showing an assessment of paralysis agitans in file since 1991.  Should you refer the case or not?  Please give your reason(s).
**CARLOS: YES – If the medical records were associated with a submitted claim. (Hint:  Paralysis agitans is the same as Parkinson's disease.)**

7. Vet served in Vietnam from 1967 to 1968.  In 2004, VA granted Parkinsonian syndrome secondary to head trauma in Germany while in the military.  Veteran separated from active duty in 1994.  In claims file since 1995 is an OPTR with an assessment of possible Parkinson's disease due to tremor in right side extremities.  Should the case be referred or not?  Please give reasons(s).
**YES and NO - possible PD is not a definitive diagnosis.  Parkinsonian syndrome secondary to head trauma is not subject to *Nehmer* review as this is not PD.  However, when in doubt, please refer.  Probably no eligibility but if there is any gray area, let VA rater make the determination.**

8. Veteran was denied ASHD in 1983 by rating decision.  VA granted ASHD as a secondary condition in 2005 based on medical records submitted with that claim.  No evidence of a heart condition was submitted between 1983 denial and claim in 2005.  Should you refer the case or not?  Please give reason(s)?
**NO – no medical evidence for review to justify an earlier effective date.  Denial was pre-*Nehmer*.**

9. CLL was previously granted under Nehmer prior to regulatory inclusion of b-Cell leukemias, one of which is CLL.  Does this negate a further review?  Please provide your reason(s).
**NO – there may be MR on file that was submitted with another claim showing CLL that can potentially give an earlier entitlement. (Hint: CLL was added to the Agent Orange presumptive list effective October 16, 2003 and under *Nehmer*, VA can potentially grant all the way back to September 25, 1985.)**

10. Vietnam veteran retired from service in 1990.  He filed a claim within a year and was granted direct service connection for CAD from date of military retirement.  Are there any situations where presumptive service connection under Nehmer would be considered?  Please provide reason(s).
**NO – There are no situations to grant presumptive SC under *Nehmer.* (Hint: This is the first time the veteran filed a claim with the VA and liberalizing law does not apply.**

# Glossary

| Service Connection | **Service connection** is the status granted by rating decision for eligibility to benefits based on supporting evidence or regulatory provision which supports a causal relationship to military service by direct (incurred), secondary, aggravation or presumptive basis. |
|---|---|
| **Nehmer Effective Date** | The date the original claim was filed or arose, whichever is later, even if it was before the effective date of applicable regulatory presumption, and without regard to finality of prior denial(s). Effective dates can go back as far as the date of claim that was pending on September 25, 1985. |
| **Nehmer Claim** | *Nehmer* class members are Vietnam Veterans who served in-country and have a covered herbicide disease, or the surviving spouse, child, or parent of a Vietnam Veteran who died from a covered herbicide disease. The claimant need not file a new claim or a claim for earlier effective date when new presumptive condition is added. VA must search its records to find eligible claimants and award benefits, without action on the claimant's part. *Medical records noting the existence of a condition later made presumptively service-connected can in some instances, result in an award without a formal claim ever being filed. |
| **Incurred/Direct** | An **Incurred/Direct** disability may have been directly caused by service (e.g., a combat wound), or it may be the remote result of some incident of service, or it may have simply begun coincident with service. It is not required that the condition be diagnosed |

| | |
|---|---|
| | during service or even be shown in the service records, only that the evidence taken as a whole shows that the condition must have begun during service, or was the result of service or some incident thereof. **For Nehmer purposes, Incurred/Direct service connection can be used interchangeably.** |
| **Secondary** | If a non-service-connected medical condition is caused by another service-connected condition then this medical condition may also be service-connected. It must be shown by medical evidence that it is "at least as likely as not" that the medical condition for which the veteran is seeking service connection was caused by or **Secondary** to an existing service-connected condition. |
| **Aggravation/Aggravated** | **Aggravation** can be a disability incurred pre-service or a disability incurred post-service, either of which could be made worse by a service connected disability. |
| **Presumptive** | **Presumption** of service connection is regulatory in nature and not usually supported by any medical evidence of record that would indicate direct service connection. |
| **Pension Claim** | Income-based benefit for veterans who served honorably during a period of war and who are permanently and totally disabled. |
| **Compensation Claim** | **Compensation** for service-connected disabilities |
| **Original Claim** | An **Original Claim** is the first disability claim application for any condition on a form prescribed by the Secretary of the Department of Veterans Affairs (VA).  For Veterans, the prescribed forms for filing an |

|  | original claim are:<br><br>• *VA Form 21-526, Veteran's Application for Compensation and/or Pension*<br>• *VA Form 21-526c, Pre-Discharge Compensation Claim, and*<br>• *VA Form 21-526EZ, Application for Disability Compensation and Related Compensation Benefits* |
|---|---|
| **Initial Claim** | The initial application of VA disability claim for a condition. For Nehmer purposes, **initial claim** will only refer to claims for IHD/PD/BCL. |
| **Rating Decision** | Legal Decision made by the VA regarding a veteran's Compensation/Pension disability claim. |
| **Date of Entitlement** | **Date of entitlement** refers to the date a veteran becomes entitled to a disability benefit. |

# Index

## Definition

*Nehmer* class members are Vietnam Veterans who served **in-country** and have a covered herbicide disease, or the surviving spouse, child, or parent of a Vietnam Veteran who died from a covered herbicide disease.

## Effective dates

- **9/25/1985**: The date the rules implementing "Veterans' Dioxin and Radiation Exposure Compensation Standards Act
- **10/13/2009**: VA Secretary Eric Shinseki announces intent to establish presumptive service connection for IHD, PD, and HCL for Veterans who served in the Republic of Vietnam.

## Presumptive Conditions

- **Ischemic Heart Disease (IHD):**
  - Acute, subacute, and old myocardial infarction (**MI**)
  - Atherosclerotic cardiovascular disease (**ASHD**)
  - Coronary artery disease (**CAD**)
  - Coronary spasm
  - Coronary bypass surgery (**CABG**)
  - Stable, unstable, and Prinzmetal's angina.
  - Left Ventricular Hypertrophy
  - Cardiomegaly
  - *Does not include hypertension or peripheral manifestations of arteriosclerosis such as peripheral vascular disease or stroke.
- **B-cell leukemia (BCL):**
  - B-cell chronic lymphocytic leukemia
  - Small lymphocytic lymphoma
  - Acute lymphoblastic leukemia, mature B-cell type
  - B-cell prolymphocytic leukemia
  - Precursor B lymphoblastic leukemia
  - Hairy cell leukemia
- **Lymphomas involving B-cells**
  - Diffuse large B-cell lymphoma
  - Follicular lymphoma
  - Mucosa-associated lymphatic tissue lymphoma (**MALT**)
  - Small cell lymphocytic lymphoma (overlaps with the chronic lymphocytic
  - leukemia)
  - Mantle cell lymphoma (**MCL**)
  - Burkitt lymphoma

- o Mediastinal large B-cell lymphoma
- o WaldenstrÖm macroglobulinemia
- o Nodal marginal zone B-cell lymphoma (**NMZL**)
- o Splenic marginal zone lymphoma (**SMZL**)
- o Extranodal marginal zone B-cell lymphoma
- o Intravascular large B-cell lymphoma
- o Primary effusion lymphoma
- o Lymphomatoid granulomatosis
- **Parkinson's Disease (PD):**
  - o **Tremor**, or trembling in hands, arms, legs, jaw, and face
  - o **Rigidity**, or stiffness of the limbs and trunk;
  - o **Bradykinesia**, or slowness of movement;
  - o **Postural Instability**, or impaired balance and coordination.
  - o Other symptoms
    - Depression and other emotional changes
    - Difficulty in swallowing, chewing, and speaking
    - Urinary problems or constipation
    - Skin problems; and sleep disruptions.

- **CPT Codes**

| 0033AA | C-file Less Than 3 Inches |
| 0033AB | C-file Greater Than 3 Inches |

- **Service Connection Codes**

| 1 | Service connection is granted and is subjected to compensation |
| 2 | Pension Grant |
| 8 | Conditions listed are NOT Service Connected and NOT subjected to compensation |
| 9 | Denial of Not Service Connected Pension |
| 37 | Secondary Service Connection |

- **Rating Codes**

| 8004 | Paralysis Agitans (Parkinson's Disease) |
| 7703 | Chronic Lymphocytic Leukemia |
| 7700 | Anemia |
| 7709 | Hodgkin's Disease |
| 7715 | Non-Hodgkin's lymphoma |
| 7005 | Arteriosclerotic heart disease (Coronary artery disease) |
| 7006 | Myocardial infarction |
| 7007 | Hypertensive heart disease |
| 7020 | Cardiomyopathy |
| 7017 | Coronary Bypass Surgery |
| 7101 | Hypertensive vascular disease (hypertension and isolated systolic hypertension)<br><br>*If **ONLY** 7101 is used, NOT CONSIDERED IHD |
| ##99 - #### | If a "99" code is used and hyphenated to a following code, it means that this is an **analogous code** and there is no specific VA diagnostic code for the disease being considered.  Example: 8099-8004 is often used for Parkinson's syndrome or Parkinsonism which is not Parkinson's Disease. |
| #### - #### | When two conditions are related the codes will be hyphenated with the **etiology** in front and **governing condition** in the rear. Example:  7101-7005 CAD is due to hypertension. |

- **Military Branch ID**

| A | Army |
| B | Navy |
| C | USMC |

| D | USCG |
|---|---|
| E | USPHS |
| F | USAF |
| G | WAC |
| H | Air Corps |

- **Provider List**

| Dr. Jamshid Tamiry | #1382 |
|---|---|
| Dr. Chisato Oba | #61285 |
| Dr. Terrance Flanagan | #51966 |
| Dr. Neeraj Gupta | #49750 |
| Dr. Roger Tauran | #59770 |
| Dr. Alfred Quansah | #50320 |
| Dr. Kenneth Johnson | #62025 |
| Dr. Maria Banico | #46466 |
| Dr. Aida Cruz | #47581 |
| Dr. Homayoun Saeid | #1247 |
| Dr. Greg Pizarro | #62678 |
| Dr. Harry Eisenbach | #59881 |
| Dr. Hanna Mary | #62719 |
| Dr. Neil Partain | #63164 |
| Dr. Ernest Prochazka | #60216 |

# EXHIBIT  7

## Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklists (Original and 'Revised')

## Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist

1. File Number: _____

2. Veteran's SSN: _____

3. Veteran's First Name: _____

4. Veteran's Last Name: _____

5. Was a claim for PN, or a claim that could be construed as a claim for PN, previously received from the claimant?  ☐YES   ☐NO

   If YES, please complete bullets **a** through **c**.  If NO, please skip to Question 6.
   a. Date of **earliest** PN Claim: _____
   b. Previous Result:   ☐GRANT   ☐DENIAL
   c. Previous Diagnosis/Symptoms:   ☐ PN **is not** identified.
   ☐ PN that began in service, within one year of last exposure and/or prior to May 8, 1976 **is** identified.
   ☐ PN that is **not** considered Early-Onset is identified (e.g., PN secondary to diabetes mellitus, or PN with other known etiology).

6. PN Evidence in Folder:   ☐YES   ☐NO

   Is there any objective or lay evidence in the Claims Folder that suggests PN manifested itself during military service, within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest)?
   - If YES, then you must answer bullets **a** through **d** below.
   - If NO, then you are certifying that a review of the evidence of record reveals no complaints, symptoms, or diagnoses that may be related to Early-Onset PN.

   a. Date of Symptom Onset or Diagnosis: _____
   b. Diagnosis from Evidence in Folder: _____
   c. Source of Objective Evidence, (e.g., facility name): _____
   d. Other Evidence, (e.g., lay statements): _____

7. **Potential for Eligibility for Presumptive Consideration?**

   **NOTE:** If the answer to #6 is YES for evidence in folder, then you must choose YES below for potential presumptive eligibility.  Also, if PN that began during military service, within one year of last exposure and/or prior to May 8, 1976 is chosen in #5c, then you must choose YES for potential presumptive eligibility.

   ☐ YES    Rationale that PN manifested during military service, within 1 year of last exposure and/or prior to May 8, 1976: _____

   ☐ NO    Rationale that PN did **not** manifest during military service, within 1 year of last exposure and/or prior to May 8, 1976: _____

8. SUMMARY OF CASE REVIEW:  Use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual factors that relate to whether the individual in question qualifies for consideration as a Nehmer class member based on the manifestation of PN during service, within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest).  In addition, this section may include a detailed statement

## Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist

setting forth an explanation for whether this case meets the criteria for further review under Nehmer pursuant to the Nehmer Training Guide Addendum for Early Onset Peripheral Neuropathy (addendum to TL 10-04).

._____

_____

_____

_____

_____

_____

_____

REVIEWER SIGNATURES:


_____          _____
Print Name                                 Print Name


_____          _____
Signature                                  Signature (Physician)


_____          _____
Date                                       Date

## Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist

1. File Number:  Click here to enter text

2. Veteran's SSN:  Click here to enter text._____

3. Veteran's First Name:  Click here to enter text._____

4. Veteran's Last Name:  Click here to enter text._____

5. Was a claim for PN, or a claim that could be construed as a claim for PN, previously received from the claimant?  ☐**YES**   ☐**NO**

   If YES, please complete bullets **a** through **c**.  If NO, please skip to Question 6.
   a. Date of **earliest** PN Claim:  Click here to enter text._____
   b. Previous Result:  ☐**GRANT**   ☐**DENIAL**
   c. Previous Diagnosis/Symptoms:  ☐ PN **is not** identified.
      ☐ PN that began in service, within one year of last exposure and/or prior to May 8, 1976 **is** identified.
      ☐ PN that is **not** considered Early-Onset is identified (e.g., PN secondary to diabetes mellitus, or PN with other known etiology).

6. PN Evidence in Folder:  ☐**YES**   ☐**NO**

   Is there any objective or lay evidence in the Claims Folder that suggests PN manifested itself during military service which, for example, could include PN symptoms or a PN diagnosis within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest)?
   - If YES, then you must answer bullets **a** through **d** below.
   - If NO, then you are certifying that a review of the evidence of record reveals no complaints, symptoms, or diagnoses that may be related to Early-Onset PN.

   a. Date of Symptom Onset or Diagnosis:  Click here to enter text._____
   b. Diagnosis from Evidence in Folder:  Click here to enter text._____
   c. Source of Objective Evidence, (e.g., facility name):  Click here to enter text._____
   d. Other Evidence, (e.g., lay statements):  Click here to enter text._____

7. **Potential for Eligibility for Presumptive Consideration?**

   NOTE: If the answer to #6 is YES for evidence in folder, then you must choose YES below for potential presumptive eligibility.  Also, if PN that began during military service, within one year of last exposure and/or prior to May 8, 1976 is chosen in #5c, then you must choose YES for potential presumptive eligibility.

   ☐ **YES**   Rationale that PN manifested during military service, within 1 year of last exposure and/or prior to May 8, 1976: Click here to enter text._____
   _____

   ☐ **NO**   Rationale that PN did **not** manifest during military service, within 1 year of last exposure and/or prior to May 8, 1976: Click here to enter text._____
   _____

8. SUMMARY OF CASE REVIEW:  Use this section to supplement the information provided above and note any special circumstances present in this case.  This includes any special or unusual

**Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist**

factors that relate to whether the individual in question qualifies for consideration as a Nehmer class member based on the manifestation of PN during service, within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest).  In addition, this section may include a detailed statement setting forth an explanation for whether this case meets the criteria for further review under Nehmer pursuant to the Nehmer Training Guide Addendum for Early Onset Peripheral Neuropathy (addendum to TL 10-04).

Click here to enter text.

REVIEWER SIGNATURES:

Click here to enter text.

Print Name

Signature

Date

Click here to enter text.

Print Name

Signature (Physician)

Date

# EXHIBIT  8

## QTC Advertisement/Solicitation for Physician Reviewers



# USADocJobs
Physician JOB Bank

**Job (this posting is now closed/inactive)**

Company Profile | Save to Job Cart | Return

## General Information

Job title: **Physicians Needed For NEHMER Agent Orange Case File Review - EASY MONEY!!**
Job location: Diamond Bar, CA 91765 United States
Requisition code:
Date posted: 04/12/13
Compensation:
Specialty:
Sub specialty:
Job type:

## Job Description

Job description:

QTC was recently asked by the VBA to assist with a yearlong project. This project is very different then our normal exams that we currently do for the Department of Veteran Affairs.

NEHMER Agent Orange Case File Review

We are looking for providers that can work 4 - 8 hours at a time. We have a need providers to start as soon as possible. You would come to our QTC Bridge Gate building in Diamond Bar, CA and complete these case file reviews in a secured room. All pertinent information has been tabbed by one of our claims file analysts beforehand.

Fees: QTC will pay you per case file reviewed. You can see anywhere between 4 to 6 cases an hour (you will pick up speed). If you are able to work a full 8 hour day QTC will ensure you make a minimum of $600 a day. If you see 5 cases an hour, 8 hrs a day you could make at least $1000.

We are looking for providers that have availability ASAP. Please reply with your availability or give me a call at your earliest convenience. Maggie Dillon @ 909-978-3548 or email your updated CV to mdillon@qtcm.com.

## Job Requirements

Education, training, experience:

Company Profile | Save to Job Cart | Return

# EXHIBIT  9

## Summary of Relators' Complaints to QTC / Lockheed Ethics,

## and

## Email From President of QTC, Mr. Jason Seibel, Concerning Relator's Complaint of False Performance of Chart Reviews

### Summary of David Vatan's Complaint to Lockheed Martin's Ethics

In my complaint about the **"QUALITY"** I reported the following(s) during a telephone conversation with Lockheed Martin's Ethics officer, Ms. Roxane MacGillivray.

\* \* \* \* \* \*

...I referenced the Daily Performance Reports that QTC's Nehmer Department had previously emailed on a daily basis. In elaborating the matter further, I used the following example:

I reported that according to the Daily Performance Reports, certain Claim File Analyst, (CFA) had reviewed & delivered up to 50 Claim Folders (c-files) per day. If we add a maximum of 2 hour daily allowable overtime to the regular 8 hour daily shift, then this would make a total of 10 working hours per day which is equivalent of 600 minutes. (10 hour x 60 min = 600 minutes)

If a certain CFA is reported to have reviewed & delivered 50 c-files in a day, then he/she had spent a total of 12 minutes in order to review & process each c-file. (600 min/50 files =12 minutes) *Excluding all rest breaks!

I explained to Ms. MacGillivray that the eProcess (QTC's Tracking /Database) alone would take between 10-12 minutes for a seasoned CFA to process and finalize one c-file. If this was the case then, when and how the **REVIEW** is conducted?...the math doesn't add up!

In addition, I described Nehmer (IHD/PD/BCL) Checklist, specifically, I referred to Question #6. I mentioned that by virtue of answering **YES** to Question #6 and, signing the checklist, we attest in fact, that the entire c-file is reviewed. This in reality would be a untrue & a false statement cause it would impossible to do so under the circumstances.

I also pointed out that if Question #6 is answered **YES** then the same rule applies to providers, (Licensed Physicians) as well. They are also a party who sign the checklist. I told her that I had closely observed providers work who had spent an average of 3-5 hours to review and sign between 40-70 c-files on a daily basis.

I told Ms. MacGillivray that I believe it was humanly & mathematically impossible to review & deliver so many c-files in a said given time and to **ATTEST** on the Checklist that each c-file is reviewed in its entirety!

Therefore, in my opinion, the entire review process was flawed and had no value, whatsoever!

**David Vatan**
**01/31/2015**

**From:** Vatan, David
**Sent:** Monday, October 6, 2014 9:13 AM
**To:** Ubungen, Frenorgin; kerrie.l.shuster@lmco.com
**Cc:** Seibel, Jason; Brown, Donna
**Subject:** Matter surrounding Dr. Eisenbach

Dear Ms. Ubungen,

Further to our meeting and the email sent on Friday 10/03/2014, I would like to inform you of the followings:

That, a coworker has witnessed Dr. Eisenbach not reviewing the veterans c-file by not opening the STR folders and simply signing the corresponding checklist.

That, during a case discussion, Dr. Eisenbach himself admitted to me that he does not have time to open the STRs.

That, Ms. Ramos keeps a secret stash of small c-files, the so called "Cherry Picked" c-files in her office. The said c-files secretly being distributed among the CFAs including some new hires with work history of less than 3 months.

I firmly believe, under the law, a provider has an affirmative obligation to follow due diligence. Failure to do so, violates the very tenets of medical law/ethics. It is assumed that by virtue of reviewing medical records a provider has entered doctor-patient relationship.

By the same token, QTC has an affirmative contractual obligation to supervise the review process. I would like to warn you that moving the providers to the end of the row is not an acceptable corrective action. It surely is indicative of a cover up.

Similarly, unequal distribution of small file among the CFA, is also unacceptable. It creates an unhealthy work environment, which in my opinion is a targeted act towards me and it constitutes a retaliation.

On the basis of this communication, let the record reflect the above matter is reported to the above recipients. It is further assumed that the recipients has been fully informed about the above matters, accordingly.

Sincerely,
David

**David Vatan**
Claims File Analyst (318)
QTC - A Lockheed Martin Company
T: 800.953.9111  Ext. 3544

dvatan@qtcm.com

**"Do What is Right, Respect Others and Perform with Excellence"**

 Think before you print
Being Green for tomorrow.

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to which they are addressed. If you have received this e-mail in error, please notify the sender. Please note that any views or opinions presented in this e-mail are solely those of the author and do not necessarily present those of the company. Finally, the recipient should check this e-mail and any attachments for the presence of viruses. The company accepts no liability for any damage caused by any virus transmitted by this e-mail.

First Amended Complaint
Exhibit 5
Page # 000325

**From:** Seibel, Jason
**Sent:** Monday, October 06, 2014 9:27 AM
**To:** Vatan, David; Ubungen, Frenorgin; kerrie.l.shuster@lmco.com
**Cc:** Brown, Donna
**Subject:** RE: Matter surrounding Dr. Eisenbach

Mr. Vatan,

Thank you for your feedback regarding the provider review of STR folders. QTC takes the cFile provider review process seriously.

For the record, your continued focus on responsibilities outside your job description is representative of creating a disruptive work environment—including for your peers, functional and clinical staff. Given the volume and focus intensity for others outside your position's scope, I have concerns about your ability to effectively deliver high quality, reliable work on behalf of our customers.

I kindly ask you focus on the job at hand.  Please permit our processes to review the STR concern you have raised.

Jason Seibel

# EXHIBIT  10

# Email From Kerrie Schuster, Ethics Officer for Lockheed Martin Concerning Relator's Complaint of False Performance of Chart Reviews

Amended Complaint Exhibit   *U.S. ex.rel.  Vatan  V.QTC  Medical Services, Inc, et.al.  CV14-8961-PA (SSx)*

First Amended Complaint
Exhibit 10
Page  # 000327

**From:** Shuster, Kerrie L [mailto:kerrie.l.shuster@lmco.com]
**Sent:** Wednesday, October 08, 2014 11:23 AM
**To:** Vatan, David
**Subject:** RE: Matter surrounding Dr. Eisenbach

Mr. Vatan, thank you for letting me know about this. I have verified that appropriate individuals are addressing the matters you describe below.  I will continue to follow this situation and advise leadership and HR as warranted.

Again, thank you for bringing these concerns forward,

Kerrie L. Shuster

Ethics Officer, LM IS&GS *Civil and D&IS*

# EXHIBIT  11

## Email and Letter From Ms. Beronica Ramos, Placing Relator On A Productivity Improvement Plan And Threatening Termination After Relator Made Complaints

 

**A Lockheed Martin Company**            Serving America's Heroes

October 07, 2014

David Vatan,

Ogie and I met with you on September 03, 2014 to conduct your Midpoint Review meeting and we discussed that you have not been meeting productivity expectations for your role as a Claim File Analyst. The expectation is to deliver a minimum of 12 cases per eight hours worked. The CFA productivity should be to deliver on average between 12 and 15 cases per 8 hours worked.   We previously reviewed your productivity from January to June of 2014, and I have also included your July, August and September productivity statistics below:

- In Jan you delivered an average of 11 cases per 8 hours worked

- In Feb you delivered an average of 11.9  per 8 hours worked

- Due to the low number of referrals in Mar and Apr, some CFAs including yourself were asked to index medical records.

- In May you delivered an average of 7.3 cases per 8 hours worked

- In June you delivered an average of 7.6 cases per 8 hours worked

- In July you delivered an average of 7 cases per 8 hours worked

- In August you delivered an average of 7.9 cases per 8 hours worked

- In September you delivered an average of 8.1 cases per 8 hours worked.

During the month of April, 2014 and May, 2014 the CFA's were trained and provided ample time to familiarize themselves with processing PNR cases.  You have the necessary medical knowledge and experience and have been provided the training needed to review PN cases.

After our Midpoint Review meeting I expected to see immediate and significant improvement regarding your productivity. Data above shows some improvement; however, it is still below the level of productivity expectation.  So far for the month of

 

A Lockheed Martin Company          Serving America's Heroes

October, your daily deliveries from 10/1/14 to 10/3/14 are provided below resulting in an average of **9 cases per day (Total DOTs 27/3 days)**.

- On 10/1/14-You delivered 7 cases per 8 hours worked

- On 10/2/14- You delivered 10 cases per 8 hours worked

- On 10/3/14- You delivered 10 cases per 8.25 hours worked

It is important for you to understand that your productivity must improve immediately to meet and sustain the minimum expectation of delivering 12 cases per 8 hours worked. We will review your progress within the next 30 days.

We are committed to seeing you succeed and I will assist and support your efforts towards meeting these expectations, please let me know if I can be of assistance. I encourage you to keep this information close by and reference it as often as you need. If you are unsuccessful in improving your performance to meet and sustain the above mentioned expectations; disciplinary action may result.

If you have any questions or concerns, please feel free to contact me at any time.

**Respectfully,**

**Beronica Ramos**

First Amended Complaint
Exhibit 11
Page # 000331

**From:** Ramos, Beronica
**Sent:** Thursday, October 09, 2014 7:44 AM
**To:** Vatan, David
**Cc:** Ramos, Beronica
**Subject:** Confidential

David,

The purpose of this email is to follow up from our discussion held on Tuesday regarding productivity.  We met on September 03, 2014 to conduct your Mid Point Review meeting and we discussed that you have not been meeting productivity expectations for your role as a Claim File Analyst

\* The CFA productivity should be to deliver on average between 12 and 15 cases per 8 hours worked.

We are committed to seeing you succeed.  Please keep this information close by and reference it as often as you need.  I will assist and support your efforts towards meeting these expectations.  If you are unsuccessful in improving your performance to meet and sustain the above mentioned expectations, disciplinary action may result.

If you have any questions or concerns, please feel free to contact me at any time.

Respectfully,


Beronica Ramos

Operations Manager

Veteran Service Coordinator Operational Lane/NEHMER

QTC- A Lockheed Martin Company

(909) 978.3525 (direct)

(800) 953.9111 x3525

(888) 376-6135 (fax)

bramos@qtcm.com <mailto:bramos@qtcm.com>


Do What is Right, Respect Others and Perform with Excellence


This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to which they are addressed. If you have received this e-mail in error please notify the system manager. Please note that any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of the company. Finally, the recipient should check this email and any attachments for the presence of viruses. The company accepts no responsibility for any damage caused by any virus transmitted by this e-mail.