CROWELL & MORING LLP
Mark R. Troy (CSB No. 120418, mtroy@crowell.com)
Jeffrey H. Rutherford (CSB No. 181695, jrutherford@crowell.com)
Megan A. Weisgerber (CSB No. 285271, mweisgerber@crowell.com)
515 S. Flower St., 40th Floor
Los Angeles, California 90071
Telephone: 213.622.4750
Facsimile: 213.622.2690

Attorneys for Defendants QTC MEDICAL SERVICES, INC.
and LOCKHEED MARTIN CORPORATION

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, ex rel. David Vatan, <br><br> Plaintiff, <br><br> v. <br><br> QTC Medical Services, Inc. et al., <br><br> Defendant. | Case No. CV 14-08961-PA (SSx) <br><br> **DEFENDANTS QTC MEDICAL SERVICES INC. AND LOCKHEED MARTIN CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS RELATOR'S FIRST AMENDED COMPLAINT; DECLARATION OF GRANT KIM AND SUPPORTING EXHIBITS** <br><br> Date: December 7, 2015 <br> Time: 1:30 p.m. <br> Place: Courtroom 15 <br> Los Angeles – Spring Street <br> Judge: Hon. Percy Anderson |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on December 7, 2015 at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 15 of the above-entitled Court located at 312 N. Spring Street, Los Angeles, California 90012, Defendants QTC Medical Services, Inc. ("QTC") and Lockheed Martin Corporation ("Lockheed") (collectively "Defendants") will and hereby do move this Court to dismiss Relator David Vatan's ("Relator" or "Vatan") first through third claims for relief under Federal Rule of Civil Procedure ("Rule") 12(b)(6) because Relator's First Amended Complaint fails to plead sufficient plausible facts to state claims for relief, as required by Rule 8(a), and fails to plead fraud with particularity, as required by the heightened pleading requirements of Rule 9(b).  Defendants do not move to dismiss Relator's fourth claim for relief (retaliatory discharge) at this time.

This motion is made following an in-person conference of counsel pursuant to Local Rule 7-3, which took place on November 3, 2015.  This Motion is based on this Notice of Motion, Memorandum of Points and Authorities, and Declaration of Grant Kim filed herewith, the papers and records on file herein, and such oral and documentary evidence as may be presented at the hearing on the Motion.

Dated:     November 9, 2015                    CROWELL & MORING LLP


                                         _____
                                              */s/ Mark R. Troy*
                                              Mark R. Troy
                                              Jeffrey H. Rutherford
                                              Megan A. Weisgerber
                                              Attorneys for Defendants
                                              QTC MEDICAL SERVICES, INC. and
                                              LOCKHEED MARTIN CORPORATION

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................... 1

II.   STATEMENT OF FACTS .............................................................. 2

    A.    Government Benefits To Veterans Exposed To Agent Orange ............ 2

    B.    VA Contract With QTC ............................................................ 3

        1.    QTC's Nehmer Phase II screening review ................................ 3

        2.    QTC's PN screening review ................................................ 5

        3.    QTC's two-tier review system ............................................ 5

    C.    Summary Of Relator's Allegations ........................................ 6

III.  ARGUMENT ............................................................................... 8

    A.    Vatan's First Amended Complaint Runs Afoul Of Rule 8(a) ............ 9

    B.    Vatan Fails To Allege Plausible And Particular FCA Violations Under 31 U.S.C.§ 3729(a)(1)(A)-(B) (Counts I – II) ...................... 11

        1.    Vatan does not adequately allege false certifications that were prerequisites (material) to government payment ............ 12

        2.    Vatan does not adequately allege scienter ............................. 17

        3.    Vatan's purported examples do not provide any reliable indicia that QTC submitted false claims for payment ............. 20

    C.    Vatan Fails To Adequately Allege A Conspiracy To Violate The FCA Under 31 U.S.C § 3729(a)(1)(C) (Count III) .......................... 24

IV.  CONCLUSION ........................................................................... 25

1

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

3 Cases

4

5 *Ab-Tech Const., Inc. v. United States*,
    31 Fed. Cl. 429 (1994) *aff'd sub nom. Ab-Tech Const. v. United*
6   *States*, 57 F.3d 1084 (Fed. Cir. 1995) ................................................................ 15

7 *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002) ........................................................................ 16, 17
8

9 *Allison Engine Co. v. U.S. ex rel. Sanders*,
    553 U.S. 662 (2008) .............................................................................................. 24
10

11 *Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ 8

12

13 *Branch v. Tunnell*,
    14 F.3d 449 (9th Cir. 1994) .................................................................................... 3

14 *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
    637 F.3d 1047 (9th Cir. 2011) ............................................................................ 8, 9
15

16 *Gonzalez v. Planned Parenthood of Los Angeles*,
    759 F.3d 1112 (9th Cir. 2014) *cert. denied sub nom. Gonzalez v.*
17  *Planned Parenthood of Los Angeles, California*, 135 S. Ct. 2313
    (2015) .................................................................................................................... 11
18

19 *Hearns v. San Bernardino Police Dep't*,
    530 F.3d 1124 (9th Cir. 2008) .............................................................................. 10
20

21 *United States ex rel. Hendow v. Univ. of Phoenix*,
    461 F.3d 1166 (9th Cir. 2006) ................................................................... 11, 14, 17
22

23 *United States ex rel. Hopper v. Anton*,
    91 F.3d 1261 (9th Cir. 1996) .......................................................................*passim*
24

25 *McHenry v. Renne*,
    84 F.3d 1172 (9th Cir. 1996) ................................................................................ 10
26

27 *Nehmer v. U.S. Veterans' Admin.*,
    Case No. CV 86-06160-TEH (N.D. Cal.) ......................................................*passim*

28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Nevijel v. N. Coast Life Ins. Co.*,
    651 F.2d 671 (9th Cir. 1981) ............................................................................. 10

*United States ex rel. Pervez v. Beth Israel Med. Ctr.*,
    736 F. Supp. 2d 804 (S.D.N.Y. 2010) .............................................................. 24

*United States ex rel. Reiber v. Basic Contracting Servs. Inc.*,
    578 F. App'x 693 (9th Cir. 2014) ..................................................................... 18

*Shroyer v. New Cingular Wireless Servs., Inc.*,
    622 F.3d 1035 (9th Cir. 2010) .......................................................................... 18

*United States ex rel. Steury v. Cardinal Health, Inc.*,
    625 F.3d 262 (5th Cir. 2010) ............................................................................ 15

*Ebeid ex rel. United States v. Lungwitz*,
    616 F.3d 993 (9th Cir. 2010) .................................................................*passim*

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) .............................................................................. 3

*Wilkins ex rel. United States v. State of Ohio*,
    885 F. Supp. 1055 (S.D. Ohio 1995) ............................................................... 25

*United States ex rel. Wall v. Circle C Const., L.L.C.*,
    697 F.3d 345 (6th Cir. 2012) ............................................................................ 24

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) ................................................................2, 13, 17

**Statutes**

31 U.S.C.§ 3729(a)(1)(A)-(C) .......................................................... 1, 11, 24

False Claims Act .......................................................................................*passim*

Federal Stark Act ............................................................................................ 14

Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21,
    123 Stat 1617 ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Title IV and the Higher Education Act of 1965 ........................................................ 14

**Other Authorities**

38 C.F.R. § 3.303(a) ..................................................................................................... 2

38 C.F.R. § 3.307(a)(6) & (d) ...................................................................................... 3

38 C.F.R. § 3.309(e) ..................................................................................................... 3

Fed. R. Civ. P. 8(a) .............................................................................................. *passim*

Fed. R. Civ. P. 9(b) .............................................................................................. *passim*

Rule 12(b)(6)................................................................................................................ 8

CROWELL
& MORING LLP
ATTORNEYS AT LAW

-iii-

DEFENDANTS' NOTICE OF MOT. AND MOT.
TO DISMISS; CASE NO. CV 14-08961-PA (SSx)

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.      INTRODUCTION

Relator Vatan brings this *qui tam* complaint under the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A)-(C), alleging that QTC submitted false claims for payment in connection with QTC's contract with the Department of Veterans Affairs.  To state an FCA cause of action, a plaintiff must allege: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 997 (9th Cir. 2010)).  These elements distinguish an FCA case from one that merely takes issue with a defendant's performance under a government contract.

Vatan's complaint falls into the latter category, failing to comply with the pleading requirements of Rules 8(a) and 9(b).  The contract at issue required QTC to screen veterans' claim files to determine whether the veterans were potentially eligible for additional compensation benefits as a result of their exposure to toxic herbicides during their Vietnam War military service.  Vatan, who was one of QTC's screeners, alleges his personal opinion – without reference to any contract requirement – that the screeners were not properly trained and that some unnamed screeners worked so quickly that their screenings must have been inadequate and must have resulted in erroneous determinations.  Vatan then speculates that these unspecified and unquantified errors resulted in the submission of false claims.

Vatan also alleges that inadequate training and screeners working at a faster pace than he worked resulted in QTC falsely certifying compliance with various federal court orders, statutes, and regulations.  But he fails to connect these unidentified certifications to any contract requirements.

As to each of his theories, Vatan fails to provide any particular details needed for QTC to defend the claims against it: he assumes but does not identify or quantify claim files that QTC reviewed in error.  Rather, he is using this lawsuit to

attempt to discover unknown wrongs; that is, what (if any) errors were made.  If he is able to place the burden on QTC of essentially re-examining all of its work – a burden which is unsupported by even the most lenient interpretation of Rule 9(b) – then he will simply presume that any error found was a fraudulent false claim.  That presumption is not found in the FCA.  On the contrary, case law discussed herein clearly distinguishes between what would, at best, be a breach of contract claim and fraud under the FCA.  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 373, 378 (4th Cir. 2008) ("An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision.  To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract.").  Vatan's allegations wholly fail to comply with Rules 8(a) and 9(b), and he fails to state a proper cause of action.

## II.    STATEMENT OF FACTS

### A.    Government Benefits To Veterans Exposed To Agent Orange

The U.S. Department of Veterans Affairs ("VA") provides compensation to military service veterans who (1) have service connected exposure to Agent Orange, an herbicide containing the toxic chemical Dioxin, during their service in the Vietnam War, and (2) have been diagnosed with diseases that are presumptively service connected[1] to Agent Orange exposure as a result of Vietnam military service, including Ischemic Heart Disease ("IHD"), Parkinson's Disease ("PD"),

---

[1]      Service connection means that a particular injury or disease resulting in disability was incurred as a result of a service in the Armed Forces, or if the injury or disease existed prior to such service, then it was aggravated as a result of the service.  38 C.F.R. § 3.303(a).  Service connection can be direct, meaning there is evidence of the disease during military service, or presumed, meaning evidence of the disease developed after military service but the connection is presumed by virtue of a veteran's exposure to an herbicide (or other toxic) agent during certain military service in a specific time period.  38 C.F.R. §§ 3.303(a), 3.307(a)(6) & (d), and 3.309(e).

Hairy Cell/B-Cell Leukemia ("BCL"), and early-onset Peripheral Neuropathy ("PN"),[2] among other diseases.  (Dkt. No. 18, First Am. Compl. ("FAC") ¶¶ 22-23.) Following court orders from a class action lawsuit by Vietnam War veterans and their families, *see Nehmer v. U.S. Veterans' Admin.*, Case No. CV 86-06160-TEH (N.D. Cal.), the federal government enacted various federal statutes and regulations requiring the VA to re-adjudicate certain veteran claim files to determine if those veterans are entitled to additional compensation benefits.  (*See* FAC ¶¶ 24-30.)

### B.    VA Contract With QTC

The VA contracts with QTC for various services under Contract No. VA798-11-D0003 ("VA Contract").  (Declaration of Grant Kim ("Kim Decl.") ¶ 1, Ex. A.[3])

### 1.    QTC's *Nehmer* Phase II screening review

Under the VA Contract Modification P00006, effective August 2012, the VA contracted with QTC to provide pre-screening services of veterans' claim files ("c-files") for three new Agent Orange presumptive conditions: IHD, PD, and BCL ("*Nehmer* Phase II Review").  (FAC ¶¶ 39, 42; Kim Decl., Ex. A at 5.)  The contract required QTC to review c-files to make a preliminary determination of

---

[2]     In September 2013, the applicable VA regulations were modified to include "early-onset" peripheral neuropathy, which means that the disease was manifest to a degree of 10 percent or more within a year after the last date on which the veteran was exposed to an herbicide agent during active military, naval, or air service.  38 C.F.R. §§ 3.307(a)(6)(i)-(ii), 3.309(e).

[3]     The Court can consider the contract documents without converting the instant motion to dismiss into a motion for summary judgment because the documents are alleged throughout Vatan's complaint, and they are the basis of his allegations, but they are not physically attached to the complaint.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").

whether the veteran has the requisite Vietnam service, entitling him to a presumptive service connection; and if so, then the contract required QTC to review the c-files to determine whether the veteran previously filed a disability claim for IHD, PD, or BCL and whether the claim was granted or denied[4] between September 25, 1985 and October 13, 2009.  (Kim Decl., Ex. A at 7-8.)  The contract provided QTC with a **VA-created** Screening Checklist, which included the information necessary for QTC to identify whether a c-file was potentially eligible for re-adjudication.  (*Id*.)  The VA-created checklist asked, among other questions:

- whether the veteran previously filed a disability claim and whether the VA granted that claim, awarding service connection benefits for IHD, PD, BCL, or similar condition between September 25, 1985 and October 13, 2009 (checklist question no. 1);

- whether the veteran was denied a disability claim for service connection benefits for IHD, PD, BCL, or similar condition between September 25, 1985 and the earliest grant of the connection identified in question no. 1 (checklist question no. 3); and

- whether the veteran filed disability claim(s) for any condition other than IHD, PD, and BCL between September 25, 1985 and the earliest grant of service connection for IHD, PD, BCL (checklist question no. 4), and medical records associated with those claim(s) documented a diagnosis of IHD, PD, BCL, or similar condition (checklist question no. 5).

(*Id*.)  The VA-created checklist mandated that if the answers to questions 3 or 5 were "yes," then the answer must also be "yes" to question 7, which asks whether the veteran is potentially eligible for presumptive consideration of IHD, PD, and BCL, and in turn indicated to the VA that the c-file was eligible for re-adjudication.  (*Id*. at 8.)  QTC reviewed approximately 65,000 c-files as part of the *Nehmer* Phase

---

[4]   VA disability "rating decision" sheets – which are part of veterans' c-files – document whether the VA granted or denied prior disability claims.  Rating decisions are printed on colored paper, making them easy to locate in a c-file. (FAC ¶¶ 95-96.)

II Review.  (FAC ¶¶ 39, 65.)

## 2.  QTC's PN screening review

Under the VA Contract Modification P00018, effective April 2014, the VA contracted with QTC to provide additional pre-screening services for early-onset PN ("PN Review") for certain veterans who previously filed disability claims for service-connected PN.  (Kim Decl. Ex. B.)  As with the *Nehmer* Phase II Review, the contract again provided QTC with a **VA-created** Screening Checklist, which asked, among other things:

- whether the veteran previously filed a disability claim for PN and, if so, the earliest date the claim was filed, whether the claim was granted, and the previous diagnosis or symptoms for that claim (checklist question no. 5); and

- whether the c-file contained any evidence suggesting PN manifested itself (symptoms or diagnosis) during Vietnam military service or within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest) (checklist question no. 6).

(Kim Decl. Ex. D at 19-20.[5])  The VA-created checklist mandated that if the answer to question 6 was "yes," then the answer must also be "yes" for question 7, which asked whether the veteran was potentially eligible for presumptive consideration for early-onset PN.  (*Id.*)  As with the *Nehmer* Phase II Review, the contract required QTC to make a preliminary determination for every c-file that the veteran had the requisite Vietnam service.  (*See* FAC ¶ 69(a).)  QTC will review approximately 95,000 c-files as part of the PN review.  (FAC ¶¶ 43, 44.)

---

[5]     VA Contract Modification P00018 added the PN review.  (Kim Decl. Ex. B.) Modifications P00019 and P00020 amended the VA-created checklist in May and June 2014, respectively.  (Kim Decl. Exs. C-D.)  All citations to PN Review checklist refer to the checklist referenced in Modification P00020.

### 3.    QTC's two-tier review system

As part of the *Nehmer* Phase II and PN reviews, QTC implemented a two-tier review system: first, QTC claims file analysts ("CFAs"), such as Vatan, conducted a first-level review of the c-files and completed the VA-mandated checklists; and second, QTC licensed physician providers ("Providers") reviewed and signed off on the CFA-completed checklists for completion and accuracy.  (FAC ¶¶ 39-41.)

Critically, QTC's contractual role was limited to screening the c-files for potential presumptive consideration and referring eligible c-files to the VA for re-adjudication.  (Kim Decl. Exs. A, B.)  QTC did not make recommendations or determinations for VA disability rating decisions or benefits entitlement.  (FAC ¶ 44.)

### C.    Summary Of Relator's Allegations

In March 2013, QTC hired Vatan as a CFA, just as QTC was ramping up the *Nehmer* Phase II Review.  (FAC ¶ 40.)  QTC terminated Vatan's employment on December 10, 2014, long before QTC completed the PN review.  (FAC ¶¶ 15, 43.)

While difficult to parse, the crux of Vatan's complaint appears to speculate about what the VA Contract required and then makes general allegations that QTC did not comply with those requirements.  Without citation to any actual contractual requirement, Vatan claims:

- QTC did not adequately train CFAs (*see, e.g.*, FAC ¶¶ 40, 73, 105-106);

- QTC imposed minimum daily goals for how many c-files CFAs should review per day, and QTC emphasized the speed with which CFAs and Providers reviewed c-files (*see, e.g.*, FAC ¶¶ 75-78, 82, 108-109, 116);

- QTC used the checklists for purposes of expediting and short-cutting the review process (*see, e.g.*, FAC ¶¶ 95-96), ignoring the fact that the VA created the checklists and contractually mandated that QTC use the checklists as part of the review; and

- As a result of QTC's inadequate training, emphasis on speed, and use of the checklists, QTC presumably violated the False Claims Act because

Vatan believes that CFAs and Providers conducted incomplete and inadequate reviews of c-files.  (*See generally* FAC ¶¶ 144-175.)

Vatan does not identify a single instance where QTC failed to refer an eligible c-file to the VA for re-adjudication, and he does not identify a single false representation that QTC made to the government.  Rather, Vatan summarily claims that QTC violated the False Claims Act because its reviews of c-files "failed to comply . . . with the requirements of court orders in the *Nehmer* litigation, the U.S. Code, VA policy or regulation."  (FAC ¶ 147.)  Vatan then offers the speculative conclusion that QTC "presented false and fraudulent claims for payment . . ., expressly and impliedly certif[ying] to the VA that the claim[s] w[ere] performed in compliance with the *Nehmer* stipulations, statutes, regulation, VA policy, and [QTC's] contractual obligations."  (FAC ¶ 149.)  But Vatan identifies no contractual provision that obligated QTC to comply with any order from the *Nehmer* litigation or any federal statute, federal regulation, or VA policy.  Vatan's general allegation that QTC falsely certified compliance with its contract obligations does nothing more than state a basic requirement that applies to any contract; and assuming such certifications exist, they would not automatically convert QTC's invoices to false claims for payment even in any instances in which a contract requirement went unfulfilled.

Vatan also claims that QTC made "false records," *i.e.*, the completed checklists, which falsely certified "that the entire claim file (which by its nature includes medical records in their entirety) had been reviewed," and "the review required by the VA was, in many cases, simply not performed."  (FAC ¶¶ 154-155.)  Again, Vatan does not identify a single instance where QTC did not adequately review a c-file.  For this claim to overcome a motion to dismiss, Vatan would need to allege (1) a specific contract requirement mandating QTC to conduct a specific type of review, (2) a particular c-file was not reviewed correctly or as required by the contract and/or was incorrectly referred to the VA as ineligible for potential re-

1  adjudication, (3) QTC lied to the government by certifying that the c-file was
2  correctly and adequately reviewed, and (4) QTC submitted claims for payment
3  based on that lie.  Vatan alleges none of these specifics, and he provides no basis
4  for QTC to understand the allegations and adequately prepare a defense.

5      As discussed in more detail below, Vatan's purported examples of fraudulent
6  conduct, when distilled, hold no water because they omit information that is critical
7  in determining whether any given c-file was adequately reviewed.  (*See, e.g.*, FAC
8  ¶ 116 (alleging that unnamed Providers reviewed 10-15 unidentified c-files without
9  realizing that the associated c-file "assignment" sheets were mixed up), ¶¶ 118-120
10  (alleging that the VA returned 184 c-files to QTC because the checklists were
11  incomplete), ¶ 132 (alleging examples of c-files associated with unnamed veterans
12  where the CFAs and/or Providers did not note certain medical evidence on the
13  checklists).  Undeterred by the absence of any false certification, false claim for
14  payment, or false statement, Vatan makes the sweeping and conclusory allegation
15  that QTC's purported fraudulent review of every c-file "renders [QTC's] services
16  meaningless and of no value to the government, [and] the entire value of the
17  contract should be disgorged to the government."  (FAC ¶ 144.)

## III.  ARGUMENT

19      Rule 8(a) requires a plaintiff's complaint to contain "a short and plain
20  statement showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A
21  court must dismiss a complaint under Rule 12(b)(6) unless it pleads "enough facts
22  to state a claim to relief that is plausible on its face," which requires the allegations
23  to "be enough to raise a right to relief above the speculative level."  *Bell Atl. Corp.*
24  *v. Twombly*, 550 U.S. 544, 555, 570 (2007).  Additionally, "[t]he heightened
25  pleading standard of Rule 9(b) governs FCA claims."  *United States ex rel. Cafasso*
26  *v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  Rule 9(b)
27  requires a plaintiff to "state with particularity the circumstances constituting fraud
28  or mistake."  *Id*. at 1054-55 (citing Fed. R. Civ. P. 9(b)).  Stated another way, the

complaint must identify "the who, what, when, where, and how of the misconduct charged," as well as "what is false or misleading about [the purportedly fraudulent] statement, and why it is false." *Id.* at 1055 (quoting *Ebeid*, 616 F.3d at 998).

## A. Vatan's First Amended Complaint Runs Afoul Of Rule 8(a)

As an initial matter, the Court should dismiss Vatan's operative complaint because it fails to comply with Rule 8(a)'s requirement for a "short and plain statement" showing the plaintiff is entitled to relief. The first amended complaint is far from short and plain. It runs 78 pages and includes 169 paragraphs. It offers an extensive background on the history of Agent Orange and the Vietnam War, the *Nehmer* litigation, the VA's obligations under *Nehmer* court orders, all the diseases (and their symptoms) that have been deemed service connected to Agent Orange exposure, and associated federal regulations, statutes, and policies. (*See, e.g.*, FAC ¶¶ 22-36, 53-65, 85-86, 104.)

None of that voluminous material has any bearing on the issues in this case, QTC's contract with the VA, or any potential basis for FCA liability. If QTC had to answer the complaint, the answer would consist largely of a response that neither admits nor denies the material because so much of that material does not constitute an allegation. Such a complaint and answer is not an effective or efficient way to set the parameters of the litigation. *Cf. Cafasso*, 637 F.3d at 1054 ("[T]he pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged.") (internal quotation marks and alterations omitted). Vatan's complaint attaches lengthy government-created documents that are not plausibly connected in any way to his allegations against QTC. (*See* FAC Exhibits 1-3.)

In addition, Vatan identifies QTC Holdings, Inc. (the alleged parent corporation of QTC Medical Services, Inc.) as a defendant in the body of the complaint but excludes QTC Holdings, Inc. as a defendant on the caption page. (*Compare* FAC Caption Page *with* FAC ¶¶ 17-18.) Vatan alleges that Lockheed

Martin acquired QTC Holdings and all of its subsidiaries and then summarily claims that there is no corporate distinction between Lockheed Martin and the QTC companies without providing any allegation that the parent and subsidiary corporations lacked independence, or that the principals conducted their affairs with fraudulent intent.  (FAC ¶ 20.)  Finally, despite naming multiple defendants in his complaint – including unnamed co-conspirators – Vatan alleges four claims for relief without specifying which of the named defendants or John Does is liable for which of the wrongs.  (*See* FAC ¶¶ 145-166.)

"[N]arrative ramblings and storytelling . . . [i]s not . . . the traditional pleading style which prescribes a short and plain statement, and it does not provide defendants notice of what legal claims are asserted against which defendants." *McHenry v. Renne*, 84 F.3d 1172, 1176 (9th Cir. 1996) (affirming dismissal of complaint when, despite warning by the district court, the plaintiff filed a 53-page complaint that was "argumentative, prolix, replete with redundancy," consisted "largely of immaterial background information, and wholly failed to link factual allegations to actual legal claims); *see also, e.g.*, *Nevijel v. N. Coast Life Ins. Co.*, 651 F.2d 671, 674 (9th Cir. 1981) (affirming dismissal under Rule 8(a) where plaintiff filed a 48-page complaint that was "verbose, confusing, and almost entirely conclusory).  *But see Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1132 (9th Cir. 2008) (reversing district court's dismissal under Rule 8(a) because – while the complaint was lengthy (81 pages) – the complaint was "logically organized, divided into a description of the parties, a chronological factual background, and a presentation of enumerated legal claims, each of which lists the liable Defendants and legal basis therefor").  The Court should dismiss Vatan's first amended complaint under Rule 8(a) and require that any second amended complaint be more clear and concise to put the Defendants on notice of the allegations against them.

### B.   Vatan Fails To Allege Plausible And Particular FCA Violations Under 31 U.S.C.§ 3729(a)(1)(A)-(B) (Counts I – II)

The FCA provides that a defendant is liable for treble damages and penalties for knowingly presenting or causing to be presented false claims for payment, or for knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(A)-(B).  Where a relator alleges a false certification theory of liability – as Vatan seems to do here – he must allege four elements: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *Ebeid*, 616 F.3d at 997.

"FCA specifically takes aim at knowing falsity, not at negligent misrepresentation.  The statutory phrase 'known to be false' does not mean scientifically untrue; it means a lie.'"  *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014) *cert. denied sub nom. Gonzalez v. Planned Parenthood of Los Angeles, California*, 135 S. Ct. 2313 (2015) (citations omitted).  Thus, to satisfy the falsity and scienter requirements, a plaintiff must prove that the defendant made "a palpably false statement, known to be a lie when it is made."  *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006).  Thus, a review in hindsight for any potential errors would not fill in the missing scienter elements.

The term "certification" has no special significance.  Rather, "the question is merely whether the false certification – or assertion, or statement – was relevant to the government's decision to confer a benefit."  *Ebeid*, 616 F.3d at 997; *see also Hopper*, 91 F.3d at 1267 ("Mere regulatory violations do not give rise to a viable FCA action.").  Express certification is where the defendant "certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted."  *Ebeid*, 616 F.3d at 998.  Implied false certification occurs where the defendant "has previously undertaken to expressly comply with a law,

rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Id.* Under either theory, it is the false certification of compliance – not the underlying violation – that creates liability "when certification is a prerequisite to obtaining a government benefit." *Id.* (citing *Hopper*, 91 F.3d at 1266-67 (explaining that the relevant certification of compliance must be both "a prerequisite to obtaining a government benefit," and a "*sine qua non* of receipt of [government] funding")).

### 1. Vatan does not allege any false certifications that were prerequisites (material) to government payment

Vatan asserts two claims for purported violations of the FCA. In Count 1, Vatan makes the conclusory allegation that Defendants violated the FCA because claims for payment submitted to the VA contained false express and implied certifications that QTC complied with *Nehmer* court orders, federal codes, statutes, regulations, VA policy, and QTC contract obligations. (FAC ¶ 149.) In Count 2, Vatan makes the speculative allegation that Defendants violated the FCA because the checklists contained false statements, *i.e.*, false certifications that the entire c-file was reviewed, and in many cases the review was "simply not performed." (FAC ¶¶ 154-155.) These claims assume out of whole cloth that the VA Contract required QTC to comply with all *Nehmer* court orders and associated statutes and regulations *and* review every page of the c-file, that QTC certified compliance with those unidentified requirements in connection with every claim for payment submitted, and those unidentified certifications were prerequisites to government payment. (FAC ¶¶ 147-150, 154-157.)

These claims are based on allegations that are neither plausible nor particular. Rather, the allegations amount to nothing more than Vatan's utter guesswork of what the VA Contract required and his dissatisfaction with QTC's contract performance, which is insufficient to plausibly allege an FCA violation under Rule

8(a).  Even if these allegations were sufficient to form a basis of an FCA violation –
they are not – Vatan's allegations fail to provide QTC with the particular details
needed for QTC to defend the claims against it: Vatan believes that QTC made
errors in reviewing c-files, but he has no basis to identify or quantify those errors,
and he wants to use litigation discovery to find out what errors (if any) were made
and then infer knowing fraud based on those errors.  This is a classic fishing
expedition that Rule 9(b) prohibits.

        The Ninth Circuit has made clear, "[i]t is not the case that any breach of
contract, or violation of regulations or law, or receipt of money from the
government where one is not entitled to receive the money, automatically gives rise
to a claim under the FCA."  *Hopper*, 91 F.3d at 1265 (affirming summary judgment
in favor of defendant where relator failed to allege that forms submitted for
government funding contained any certifications, and regulatory compliance was
not a prerequisite to payment).  "If every dispute involving contractual performance
were to be transformed into a *qui tam* FCA suit, the prospect of litigation in
government contracting would literally have no end."  *Wilson*, 525 F.3d at 373
(affirming district court judgment against relators where their allegations amounted
merely to a breach of contract action that only the government had standing to
bring).

        In *Hopper*, relator (a teacher) filed an FCA, alleging that the school district
was failing to comply with federal and state laws regarding the handling of students
with special needs.  *Hopper*, 91 F.3d at 1263.  The relator alleged that the district
submitted actionable false claims by submitting annual reports to the California
State Department of Education indicating the number of students with special needs
in the district and receiving government funds based on those numbers.  *Id*. at 1265.
In affirming summary judgment for the district, the Ninth Circuit noted that the
relator "misinterprets the breadth of the [FCA]" because it is not violations of laws,
rules, or regulations that create a cause of action under the FCA, but rather it is "the

false *certification* of compliance which creates liability when certification is a prerequisite to payment." *Id.* at 1266. Because the forms made no certification, the forms could not form the basis of an FCA violation: "The forms do not contain any certification concerning regulatory compliance," and the applicable federal statute "does not require funding recipients to certify their compliance with federal laws and regulations." *Id.* at 1267.

*Ebeid* involved similar defects because the relator generally alleged that the defendants (various health centers) submitted medical claims to the government that violated the common law prohibition on the corporate practice of medicine, the federal Stark Act (prohibiting referrals when the referring physician has a financial interest), and related Medicare regulations. *Ebeid*, 616 F.3d at 998. Affirming the district court's dismissal of the complaint, the Ninth Circuit held that the complaint failed to state with particularity the circumstances constituting fraud:

- the complaint made no reference to any statute, rule, regulation, or contract requirement that conditioned payment on compliance with the state law governing corporate practice of medicine, and the relator baldly asserted the government would not have paid the claims had it known the whole truth; and

- while the Stark Act and applicable Medicare regulations do condition Medicare payments on compliance with the statutes and regulations, the relator's general allegations that physicians had financial relationships with the defendant clinics to which the physicians referred patients lacked any details regarding the "who, what, when, where, and how" of the alleged financial relationships and referrals that resulted in fraud.

*Id.* at 999-1001. *But see Hendow*, 461 F.3d at 1169-70, 1175-76 (reversing the district court's dismissal, and holding that relators adequately alleged false certification FCA liability where the defendant university sought federal funding under Title IV and the Higher Education Act of 1965; federal statutes and regulations and the funding program participation agreement explicitly conditioned the university's eligibility on its compliance with a ban on incentive compensation;

and relators alleged the university knowingly disregarded these requirements by compensating enrollment counselors directly upon enrollment activities); *Ab-Tech Const., Inc. v. United States*, 31 Fed. Cl. 429 (1994) *aff'd sub nom. Ab-Tech Const. v. United States*, 57 F.3d 1084 (Fed. Cir. 1995) (holding that false certification liability attached where defendant falsely certified itself as a small business and the claims for payment "represented an implied certification by [the defendant's] continuing adherence to the requirements for participation," even though individual claims for payment did not require a certification of compliance).

Like the relators in *Hopper* and *Ebeid*, Vatan identifies no certification of compliance with any federal court orders, statutes, regulations, or policies, and he identifies nothing to suggest that any such certifications were prerequisites to government payment. "This prerequisite requirement seeks to maintain a 'crucial distinction' between punitive FCA liability and ordinary breaches of contract. The prerequisite requirement recognizes that unless the Government conditions payment on a certification of compliance, a contractor's mere request for payment does not fairly imply such certification." *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) (citation omitted) (affirming dismissal where relator failed to alleged that the defendant made an implied certification).

Vatan offers no details regarding the who, what, when, where, and how of the alleged wrongdoing. Vatan has not alleged that he has any insight into the contract requirements for reviewing c-files, or communications between QTC and the VA, and he in fact has none. What Vatan does not know – and presumably has no way of knowing – is which c-files QTC did not refer to the VA for re-adjudication despite the fact that the c-file contained evidence making the veteran potentially eligible for additional compensation. Yet that is the linchpin of his complaint. Were Vatan's operative complaint to survive the pleading stage, the nature of his allegations would put the burden on Defendants to audit or re-review QTC's contract performance; figure out whether errors occurred; piece together the

who, what, when, and how of those errors; and make an after-the-fact determination of whether the errors were simply mistakes or knowing fraud.

The fact that Vatan does not have access and was never privy to any of this information does not justify an end-run around Rule 9(b)'s particularity requirement.  The Ninth Circuit has explained: "[t]o jettison the particularity requirement" where the relator cannot state specific allegations of fraud "is hardly grounds for overriding the general rule, especially because the FCA is geared primarily to encourage insiders to disclose information necessary to prevent fraud on the government." *Ebeid*, 616 F.3d at 999 (holding that the relator was required to allege enough detail to put the defendant on notice of the alleged fraudulent conduct so that the defendant "can defend against the charge and not just deny that [it] has done anything wrong").  In an attempt to get around these critical particulars, Vatan simply alleges that all of QTC's services are meaningless (including services provided after Vatan was fired), and that the entire value of the contract should be disgorged to the government.  (FAC ¶¶ 43, 144.)  Such a "global indictment" of QTC's business is not enough to satisfy 9(b).  *Ebeid*, 616 F.3d at 1000; *cf. United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002) (explaining that it is not enough "to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted").

Vatan's claim that QTC made factually false certifications on the checklists – by way of CFA and Provider signatures upon completion of their review – is nothing but Vatan's personal interpretation of an unspecified contract requirement requiring CFAs to review every page of every c-file and Vatan's general allegation that QTC was aware of this requirement and ignored it, instead using the checklists for the "sole purpose of expediting the review process."  (FAC ¶¶ 74, 96-97.)  Even if these allegations were true – they are not – Vatan states, at best, a breach of contract claim based on his guess of what the contract required.  And even as a

breach of contract claim, Vatan's allegations are wholly speculative – he has no idea how many errors, if any, might have been made.  While courts should construe the phrase "false or fraudulent claim" broadly under the FCA, the statute "surely cannot be construed to include a run-of-the-mill breach of contract action that is devoid of any objective falsehood."  *Wilson* 525 F.3d at 378 ("[I]f allowed to go forward, Relators' FCA claim would have to rest primarily on facts learned through the costly process of discovery. This is precisely what Rule 9(b) seeks to prevent.").

The absence of any false certifications or false claims for payment is fatal. *Aflatooni*, 314 F.3d at 997 ("It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim.").  Because Vatan's complaint fails to identify a single false claim, a statement material to a false or fraudulent claim, or the specific circumstances surrounding the alleged wrongdoing, his complaint is not sufficiently plausible and particular to survive this motion to dismiss.

### 2.    Vatan does not adequately allege scienter

Even if Vatan had sufficiently alleged material false certifications or false claims, Vatan offers no plausible allegation that QTC had the requisite scienter, *i.e.*, that QTC made "a palpably false statement, known to be a lie when it is made." *Hendow*, 461 F.3d at 1172.  While unclear (Defendants cannot be sure), Vatan appears to base his scienter argument on QTC's purported inadequate training and emphasis on speed.  These allegations are red herrings.

With respect to training, Vatan complains that during his new-hire onboarding process, he and other CFAs received no training on the completion of the project, how to review the medical records, medical terminologies, and other substantive guidance on the review necessary to comply with federal law and the VA's regulatory requirements.  (FAC ¶¶ 40, 105-106.)  These allegations – Vatan's personal dissatisfaction with his training – do not even state a contract violation, let alone an FCA violation, and they do not preclude the logical explanation that Vatan and other CFAs were trained "on the job," as opposed to during the new-hire

onboarding process.  *See United States ex rel. Reiber v. Basic Contracting Servs. Inc.*, 578 F. App'x 693 (9th Cir. 2014) (affirming district court's dismissal where relator's complaints about improper training, at best, permitted an inference that a breach of contract occurred).  Notably, Vatan does not claim that despite the lack of training, he and others were unprepared to actually perform the reviews.  Vatan also alleges "on information and believe" that other QTC employees (not specifically hired as CFAs) were re-assigned to complete the PN review, but these employees "may have little o[r] no medical background," held "unrelated" administrative positions, and received no training on the "nuances" of the PN review.  (FAC ¶ 73.) While pleading some facts based on "information and belief" is allowed in unusual circumstances, a relator still must state the facts on which the belief is founded.  *See Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1042 (9th Cir. 2010) ("Claims made on information and belief are not usually sufficiently particular, unless they accompany a statement of facts on which the belief is founded.").  Thus, Vatan's allegations about these employees are pointless unless he can state why he believes they had little "medical background" (however Vatan defines that term), what the purported unrelated positions were, and how he knows they were not trained or otherwise qualified to perform the reviews.

As for QTC's emphasis on speed, Vatan cites 2008 Congressional testimony – based on an informal 2006 study – on the VA's expectation of the average time it would take the VA to review claims.  (FAC ¶¶ 75-76.)  From this testimony, Vatan speculates that the VA Contract modifications – issued several years **after** the cited testimony – required QTC to spend an average of 60 to 90 minutes reviewing each c-file, which in turn made it a reasonable expectation for CFAs to review 7-8 c-files per 8-hour work day.  (FAC ¶¶ 76-77.)  These allegations are neither logical nor plausible.  Vatan is merely building inference upon inference of what he believed was a reasonable expectation on the number of c-files reviewed per day, without regard to any contract requirement or expectation that the VA communicated to

1    QTC with respect to its contract performance.

2         Vatan also claims that when he was first hired, his supervisor (Steve Park)

3    told him that CFAs were expected to review 5-7 c-files per 8-hour work day

4    initially, and after three months of working, CFAs were expected to review 7 c-files

5    per 8-hour work day.  (FAC ¶ 78.)  By December 2013, nine months after Vatan

6    was hired, QTC's Operations Manager for the *Nehmer* Phase II and PN reviews

7    (Fleshika Ashley) communicated to CFAs that they had a "minimum individual

8    goal" of reviewing 15 c-files per day.  (FAC ¶ 109.)  Vatan then claims that the

9    "*actual QTC expectation* was that a [CFA] would review up to 20-25 c-files per

10   day, and some CFAs purported to do so."  (FAC ¶ 82.)  But Vatan does not say who

11   stated this expectation or when, how, and to whom the expectation was

12   communicated.  Vatan alleges that in December 2013 and January 2014, an

13   unnamed CFA claimed that he or she reviewed up to 38 c-files per day, and it was

14   not uncommon for unnamed Providers to sign off on 60-80 c-files per day.  (FAC

15   ¶ 108.)  Even assuming this were true, Vatan fails to take into account over-time

16   (allowing CFAs to review more files than in a typical 8-hour work day), or ad-hoc

17   quality assurance protocols to ensure that CFAs were not sacrificing quality for

18   speed.  More importantly, notwithstanding the speed with which these c-files were

19   allegedly reviewed, Vatan fails to allege whether any of these files were reviewed

20   in error.  Vatan assumes there were errors because he believed other CFAs and

21   Providers worked too fast.  But without more, speed provides no "reliable indicia

22   . . . that [false] claims were actually submitted."  *Ebeid*, 616 F.3d at 998-99.  There

23   is nothing inherently wrong with QTC encouraging people to work quickly or

24   trying to make money by running a business efficiently.

25        Finally, Vatan makes the strange allegation that QTC used the checklists

26   "solely for the purpose of expediting the review process," and that the checklist

27   "obviates the need for that review [of the entire c-file] by only creating eligibility

28   for claims filed after the effective date of *Nehmer*, or 1985."  This allegation makes

no sense.  The VA created the checklists and required QTC to use them, and the contract specifically limited QTC's review to claims filed and adjudicated between September 25, 1985 and October 13, 2009.  (Kim Decl. Ex. A at 7-8.)

As the foregoing makes clear, Vatan's allegations regarding QTC's supposed inadequate training and emphasis on speed are insufficient to allege plausible and particular grounds for scienter.

### 3.   Vatan's purported examples do not provide any reliable indicia that QTC submitted false claims for payment

Vatan attempts to comply with Rule 9(b)'s specificity requirement by identifying purported "examples" of the fraudulent conduct.  "[U]se of representative examples is [] one means of meeting the pleading obligation," but a plaintiff may also allege "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Ebeid*, 616 F.3d at 998-99.  Either way, Vatan's examples – although they contain a great deal of verbiage and medical lingo giving the false appearance of an example – do not save his complaint because, when they are studied in detail, there is no reliable indicia that a false claim was actually submitted: the examples fail to identify the specific c-files at issue, who reviewed those filed, who in QTC management was aware of the problem, and details about whether a particular c-file was erroneously not referred to the VA when it was eligible for potential re-adjudication.  In short, the purported "examples" do have any indication that they are examples of errors made by QTC.

First, Vatan describes a November 2014 incident when a QTC Senior Quality Assurance Specialist (Mary Ann Umali-Abitria) notified Vatan and others working on the *Nehmer* Phase II Review that the VA returned 184 c-files to QTC because the corresponding checklists were not completed properly.  (FAC ¶¶ 118-19.)  In an email, Ms. Umali-Abitria reminded CFAs and quality assurance specialists to ensure the checklists were completed properly, explaining that each of the 184 c-

files were incomplete in one of the following ways: checklist question no. 7 (asking whether the veteran is potentially eligible for re-adjudication) was blank; checklist question nos. 5-7 were blank when the veteran did not have the requisite Vietnam service, when nos. 5-7 should have been marked "no"; checklist question no. 5 (asking whether the veteran made a claim for PN) was blank, but the "summary" section said the veteran did file a claim for PN.  (FAC ¶ 119.)  From this email, Vatan declares that these c-files were "not only incompetently completed but were not even reviewed by the physician reviewer."  (FAC ¶ 120.)  This is utter speculation and offers no reliable indication of fraud.  All the email shows is that 184 c-files (out of 160,000 reviewed) were returned because the checklists were not fully completed.  The information necessary to complete the checklists could be found elsewhere on the form, and QTC encouraged employees to make sure that checklists were "consistent and complete."  (FAC ¶ 119.)

Second, Vatan describes a June 2014 incident where unnamed Providers reviewed 10-15 unidentified c-files without realizing that the associated "assignment" sheets, which allowed QTC to keep track of c-files, were mixed up. Also in June 2014, Vatan submitted three c-files totaling over 2,500 pages of medical records for final review, and an unnamed Provider signed off on all three files in less than 10 minutes.  In August 2014, Vatan submitted a c-file totaling over 2,500 pages for final review that took him four hours to review, and the Provider signed off on the file after five minutes.  (FAC ¶ 116.)  There are various reasons why Providers could quickly review large files.  By cross-referencing the completed checklist with any flagged evidence in the c-file, the Provider may be able to verify within moments whether a veteran does or does not qualify for potential re-adjudication.  For example, if the Provider verified that a veteran did not actually serve in Vietnam during the relevant time period, disqualifying the veteran from an Agent Orange service connection presumption, then the Provider could sign off on that c-file quickly.  Without more details about these c-files and

1    contract-related findings by the reviewing CFA and Provider, these examples

2    provide no basis for QTC to deny or defend against any alleged breaches of

3    contract much less fraudulent conduct supporting an FCA violation.

4           Third, Vatan identifies eight examples of c-files where QTC purportedly

5    missed evidence that, according to Vatan, would have entitled the veterans "to

6    further development of their claim under the IHD/PD/BCL review criteria."  (FAC

7    ¶ 132.)  These examples suffer from the same defects as the ones discussed above

8    because they do not provide information that is required to identify whether QTC's

9    review was deficient.  For example:[6]

10          Veteran D.J.B. (FAC ¶ 132(a)): Vatan alleges that this veteran should have

11   been deemed service connected for heart disease secondary to Type II diabetes

12   effective January 2006 because the c-file contained evidence that the veteran

13   previously complained of chest pressure, and a cardiologist confirmed some

14   diagnosis (unclear what diagnosis) in October 2003.  This allegation incorrectly

15   assumes that QTC makes service connection determinations (it does not), and it

16   does not state whether the veteran had the requisite Vietnam service, when the

17   veteran first filed a claim for heart disease, and the basis for the January 2006

18   benefits determination, all of which are critical to QTC's review and are required to

19   complete the VA-created checklist.  (Kim Decl. Ex. A at 7-8.)

20          Veteran D.A.V. (FAC ¶ 132(b)): Vatan alleges that this veteran was service

21   connected for heart disease secondary to Type II diabetes effective August 2002,

22   and the c-file contains medical evidence that he had heart-related workups that were

23   submitted to the VA in January 1993, and so the veteran was potentially eligible for

24   over 10 additional years of compensation.  Vatan then alleges that the reviewing

25

26   [6]      QTC is unable to identify c-files as part of the *Nehmer* Phase II and PN
     Reviews (which involved over 160,000 c-files) by the veterans' initials only.  In
27   any event, QTC challenges the adequacy of these purported examples on their face.

28

CFA and Provider falsely certified that the c-file contained no medical evidence showing heart disease prior to August 2002.  Again, Vatan's allegations fall short. He does not state whether the veteran had the requisite Vietnam service, and he does not provide the basis for the August 2002 grant of diabetes with secondary heart disease, which is required to make the preliminary determination of whether the veteran is potentially eligible for re-adjudication.  Vatan's claim that the CFA and Provider "falsely certified" that the c-file contained no medical evidence of heart disease prior to August 2002 highlights his misunderstanding of the contract requirements.  QTC was not required to find and document any and all evidence of IHD, PD, or BCL symptoms.  Rather, QTC's review was guided by whether a veteran filed a disability claim, when that claim was filed, and whether that claim was granted or denied and why.  (Kim Decl. Exs. A – D.)  Vatan has no plausible basis to allege that CFA and Provider signatures on the checklists certify that a given veteran's c-file showed no medical evidence of IHD, PD, or BCL symptoms, regardless of whether the veteran had the requisite Vietnam service and otherwise qualified for potential re-adjudication.

Did the veteran have the requisite Vietnam service?  When did the veteran first file the claim?  What was the VA's basis for granting or denying that claim? Answers to these critical questions – which are needed to conclude that QTC's review was in error – are largely missing from each of Vatan's "examples."  (FAC ¶ 132(a)- (h).)  Even if Vatan were to allege the necessary missing information, then, at best, Vatan would allege substandard contract performance.  Because contract performance issues do not implicate fraud, Vatan's purported examples provide no reliable indicia that QTC submitted false claims for payment.

### C.  Vatan Fails To Adequately Allege A Conspiracy To Violate The FCA Under 31 U.S.C. § 3729(a)(1)(C) (Count III)

Section 3729(a)(1)(C) of the FCA imposes liability upon a person who "conspires to commit a violation of" the FCA's substantive requirements.  At

minimum, to state a claim for FCA conspiracy, Vatan must allege (1) an agreement to make a false statement or submitting a false claim; (2) an act in furtherance of the object of the agreement; and (3) the specific intent to defraud the government. *Allison Engine Co. v. U.S. ex rel. Sanders*, 553 U.S. 662, 672-73 (2008)[7] ("[I]t must be established that [the conspirators] agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim.").

In Count 3, Vatan alleges a bare-bones conspiracy violation that merely recites the elements of the cause of action. He does not allege any particular facts regarding the most basic elements of a conspiracy, such as the nature of the alleged agreement, how and when the alleged conspiracy arose, and the names of any individuals who allegedly formed the conspiracy agreement. Accordingly, Vatan's conspiracy claim does not comply with Rules 8(a) and 9(b). *See United States ex rel. Pervez v. Beth Israel Med. Ctr.*, 736 F. Supp. 2d 804, 815 (S.D.N.Y. 2010) (dismissing FCA conspiracy count where the relator made only conclusory allegations and failed to plead any facts of a plausible unlawful agreement between the parties); *Wilkins ex rel. United States v. State of Ohio*, 885 F. Supp. 1055, 1063 (S.D. Ohio 1995) (dismissing FCA conspiracy count where the relator "alleges in conclusory terms that the defendants conspired to defraud the United States, but has pleaded no facts showing the existence of an agreement between two or more of the defendants to defraud the government").

Absent any plausible or particular facts of an agreement between two or more defendants to defraud the government, Vatan's fails to state a claim for FCA

---

[7]    *Allison Engine Co.* was overruled by statute on other grounds. *See* Fraud Enforcement and Recovery Act of 2009 (FERA), Pub. L. No. 111-21, 123 Stat 1617, *as recognized in United States ex rel. Wall v. Circle C Const., L.L.C.*, 697 F.3d 345, 355 n.3 (6th Cir. 2012).

1    conspiracy, and Count 3 fails.

2    **IV.    CONCLUSION**

3         Vatan's first amended complaint is not a short and plain statement as

4    required by Rule 8(a), and it fails to state sufficiently plausible and particular

5    allegations that QTC and Lockheed Martin violated or conspired to violate the

6    False Claims Act, as required by Rules 8(a) and 9(b).  Vatan's entire theory is based

7    on his misguided interpretation of what the contract requires, and his personal

8    dissatisfaction with QTC's performance under the contract.  He alleges no actual

9    false certifications, claims, or statements that were material to government payment

10   and no grounds for scienter.  He believes that CFAs and Providers reviewed c-files

11   too quickly, and he assumes that errors were made because of this speed, but he has

12   no basis to identify or quantify these errors or determine whether the errors were a

13   result of fraud or simply innocent mistakes.  His purported examples of fraudulent

14   conduct omit information that is necessary to determine whether QTC complied

15   with its contract obligations and, in any event, do not provide any reliable indicia of

16   fraud.  For these reasons, the Court should grant Defendants' motion and dismiss

17   Counts 1 – 3 in Vatan's first amended complaint.  Because Vatan's operative

18   complaint makes clear that he does not have the facts necessary to state plausible

19   and particular claims as required by federal pleading rules, Defendants respectfully

20   request that the Court dismiss Counts 1 – 3 with prejudice.

21   Dated:    November 9, 2015                    CROWELL & MORING LLP

22

23

24                                    _____
                                         */s/ Mark R. Troy*
25                                        Mark R. Troy
                                     Jeffrey H. Rutherford
26                                   Megan A. Weisgerber
                                   Attorneys for Defendants
27                               QTC MEDICAL SERVICES, INC. and
                                 LOCKHEED MARTIN CORPORATION
28