1  WATERS, KRAUS & PAUL
2  Michael Armitage (SBN 152740)
   armitage@waterskraus.com
3  Louisa Kirakosian (SBN 271983)
4  lkirakosian@waterskraus.com
   222 North Sepulveda Boulevard, Suite 1900
5  El Segundo, California  90245
6  PH: 310-414-8146

7
   EISENBERG, GILCHRIST & CUTT, P.C.
8  Robert D. Sherlock (Utah Bar No. 02942)
9  (Admitted Pro Hac Vice)
   rsherlock@egclegal.com
10 215 South State, Suite 900
   Salt Lake City, Utah 84111
11 PH: 801-366-9100
12 ATTORNEYS FOR PLAINTIFF-RELATOR
13 DAVID VATAN, M.D.

14                **UNITED STATES DISTRICT COURT**
15                **CENTRAL DISTRICT OF CALIFORNIA**

16

17        UNITED STATES OF                )
18        AMERICA, *ex rel*.              )   **Case No. CV14-8961-PA (SSx)**
19        DAVID VATAN, M.D.               )
                     Plaintiff-Relator,   )   **SECOND AMENDED**
20              v.                        )   **COMPLAINT**
21                                        )
22        QTC MEDICAL SERVICES,           )   **Jury Trial Requested**
          INC,  QTC MANAGEMENT,           )
23        INC. ; QTC HOLDINGS, INC.;      )   **False Claims Act,**
          LOCKHEED-MARTIN                 )
24        CORPORATION ; JOHN              )   **31 U.S.C. § 3730 *et seq*.**
25        DOES #1-10, FICTICIOUS          )
          NAMES                           )
26              Defendants.
27

# INTRODUCTION

1. On behalf of the United States of America, pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, Plaintiff - Relator David Vatan, M.D., files this *qui tam* Complaint against Defendants for treble damages and civil penalties arising from Defendants' conduct in violation of the Federal Civil False Claims Act.

2. This action concerns false, improper, and unlawful billing by Defendant QTC to the U.S. Department of Veterans Affairs (hereinafter referred to as the "VA"). Defendant QTC created and implemented schemes to knowingly and intentionally submit false claims to the VA for services purported to be performed under contracts with the VA.

3. The contracts between the VA and Defendant QTC required QTC to perform competent, complete, and substantive reviews of veterans' claims files, including but not limited to past claims for benefits, inferred and / or informal claims and veterans' medical records to determine if the veterans qualified for benefits or for increased benefits.

4. After isolating and setting aside those veterans' medical records that had evidence raising a possibility of entitlement, QTC was required to complete a "checklist" that constituted an independent medical opinion concerning the existence or nonexistence of medical evidence (symptoms, test

results, diagnoses, etc.) or lay evidence (letters, complaints, symptom descriptions, etc.) that may indicate the veterans entitlement to consideration for new or additional benefits under the newly established or newly revised criteria. This "checklist" constituting the independent medical opinion was forwarded, along with the claim file, to the VA.  The same checklist was used to identify those claims files in which no evidence of possible entitlement was found.

5. These reviews were required of the VA, as further detailed below, due to court orders (the "*Nehmer*" cases), agreements between the Department of Veterans Affairs and the *Nehmer* class counsel,  statutes and regulations governing veterans and  harm to them due to exposure to Agent Orange. These were legally mandated requirements to be performed by the Department of Veterans Affairs. The Department of Veterans Affairs had no discretion in the scope of the requirements and no discretion in whether or not to perform the requirements to specifications.

6. The VA delegated this task contractually to QTC.  QTC failed to competently provide the reviews, failed to comply with and perform the material requirements of the contract, and required its claims file analysts to submit false certifications of the existence or nonexistence of material elements of the review. Instead, QTC focused solely upon the speed with which the

purported reviews were to be completed and the number of files each claims

file analyst "completed" in a day in order to fraudulently increase billings to

the U.S. government.

## I. JURISDICTION AND VENUE

7. This Court has federal subject matter jurisdiction over this action

pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

8. This Court has personal jurisdiction over Defendants, and venue is

proper in this district, pursuant to 31 U.S.C. §3732(a) because Defendants can

be found in and transact business in this district.  Additionally, this Court has

personal jurisdiction over Defendants because acts prohibited by 31 U.S.C. §

3729 occurred in this district.

9. Relator's claims are not based upon allegations or transactions which

are the subject of a civil suit or an administrative civil money penalty

proceeding in which the Government is already a party, as enumerated in 31

U.S.C. § 3730(e)(3).

10. To the extent that there has been a public disclosure unknown to the

Relator, Relator is "original source[s]" and meets the requirements under 31

U.S.C. § 3730(e)(4)(B). To the extent there has been a public disclosure of any

facts or other matters relevant to this Complaint, Relator's knowledge is

independent of and materially adds to  publicly disclosed allegations or

transactions (if any) and meets the requirements under 31 U.S.C. § 3730(e)(4)(B).

## II. PARTIES

**A. Relator**

11. **Plaintiff-Relator David Vatan** is a Medical Doctor who worked as a Claims File Analyst for QTC Services in its VA Services department in Diamond Bar, California. He obtained his M.D. from Spartan Health Sciences University, Saint Lucia, West Indies, in 2008. Relator was employed by QTC from March 11, 2013 until December 10, 2014.

12. As a result of his direct involvement in the processes and events described herein, Relator Vatan has direct and independent knowledge of the false statements and claims that comprised the schemes under which Defendants submitted claims, or caused claims to be submitted, to the Federal Government.

**B. Defendants**

13. **Defendant "QTC": QTC Holdings Inc., QTC Management Inc., and QTC Medical Services, Inc.:** Defendant QTC Holdings, Inc. is a Delaware Corporation doing business in the State of California as the parent corporation of, and indistinguishable from, QTC Medical Services, Inc.

14. Defendant QTC Medical Services, Inc. is a California Corporation operating as a wholly-owned subsidiary of QTC Holdings, Inc. QTC Medical Services, Inc. does business and is headquartered at Diamond Bar, California. QTC Medical Services, Inc. provides services as the largest private contract provider of medical disability evaluation and medical record reviews, under contract to government agencies including but not limited to the VA. QTC Management, Inc. is a California Corporation operating as a wholly-owned subsidiary of QTC Holdings, Inc. It is believed and thereon alleged that QTC Management Inc. is the entity through which QTC managed its medical enterprise; the CEO of "QTC" is reported to be employed by QTC Management. QTC Medical Services Inc. is the entity through which the services described herein were contracted to be provided. Defendants QTC Holdings, QTC Management, and QTC Medical are collectively referred to herein as QTC.

15. **Defendant Lockheed Martin Corporation:** Lockheed Martin Corporation is a Maryland corporation, and maintains its principal executive office in Bethesda, Maryland. It also maintains major operations in Los Angeles County, California.

16. In 2011, Defendant Lockheed Martin acquired QTC Holdings and all its subsidiaries. All of the medical record reviews described herein as the

"*Nehmer* Department" or "*Nehmer* project" were performed at Lockheed Martin's facilities in Diamond Bar, California.

17. In addition, Defendant Lockheed Martin's corporate personnel, including but not limited to its ethics department and human resources, participated directly in the events and circumstances described herein with respect to the termination of relator.

18. **John Does #1-10, fictitious names**, are unknown co-conspirators who, together with the Named Defendants, also participated in and/or conspired to perpetuate the schemes described herein.  To the extent that any of the conduct or activities described in this Complaint were not performed by Defendants, but by the individuals described herein as John Does #1-10, fictitious names, the term "Defendants" shall also refer to John Does #1-10.

## III. STATUTORY, REGULATORY AND FACTUAL BACKGROUND

### A. THE FEDERAL FALSE CLAIMS ACT

19. Pursuant to the Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A) *et seq.*, a cause of action arises when any person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

20. As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

disregard of the truth or falsity of the information.  No proof of specific intent to defraud is necessary.

## B. AGENT ORANGE

21. The facts leading to this lawsuit date back to the United States' involvement in the Vietnam War. During Operation Ranch Hand, a U. S. military operation, the United States government conducted herbicidal warfare in order to kill crops or defoliate vast areas of South Vietnam in an attempt to deprive the Viet Cong of food and vegetation cover. One of the principal components of that herbicidal warfare program, which lasted from 1962 to 1971, was the defoliant that came to be known as "Agent Orange." This herbicide also contained the highly toxic ingredient known as Dioxin.

22. Following the Vietnam War, many veterans believed that their exposure to Agent Orange caused them to contract debilitating or deadly diseases. In February 1987, a group of veterans filed a class action suit challenging 38 C.F.R. § 3.311(a)(d)( July 1, 2011) on a variety of grounds. That case is *Nehmer v. U.S. Veterans' Admin.*, 712 F.Supp.1404 (N.D.Cal.1989). The case was resolved by a consent decree in 1991. Under the consent decree, and pursuant to the requirements in the Agent Orange Act (P.L. 102-4, Feb. 6, 1991; 38 U.S. Code § 1116) the Secretary of Veterans Affairs is tasked with publishing regulations establishing "presumptive service

connection" for diseases whenever research evidence, as approved by the National Institutes of Health, shows a disease has a scientific link to Agent Orange dioxin exposure. These requirements also apply when the diagnostic criteria for disease may have changed. Veterans' claim files are to be re-reviewed for the new eligibility, and benefits paid retroactively to the affected veterans.

23. Presumptive service connection applies to any veterans manifesting the listed disease who served in Vietnam or its coastal waterways at any time during the prescribed years. The veteran is not required to demonstrate the link between his military service and the listed disease.

24. The diseases subject to the contracts in this case, for which QTC contractually performed these re-review obligations (further described in this complaint) were as follows:

*(a) Chronic B-cell Leukemias*-- A type of cancer which affects white blood cells (listed August 31, 2010);

*(b) Ischemic Heart Disease* --Characterized by a reduced supply of blood to the heart (listed August 31, 2010);

*(c) Parkinson's Disease* --A progressive disorder of the nervous system (listed August 31, 2010);

*(d) Peripheral Neuropathy, Early-Onset* – Peripheral neuropathy is a nervous system condition that may be characterized by a wide range of symptoms including numbness, tingling or prickling in the toes or fingers in early stages. This may spread to the feet or hands and may cause burning, throbbing, or shooting pain – often worse at night. Other symptoms include pain, muscle weakness, loss of balance or coordination, and extreme sensitivity to touch. In 1996, the VA presumed an association between herbicide exposure during service and "acute and subacute peripheral neuropathy." The 1996 regulation required the neuropathy to appear "within weeks or months" after exposure and "resolve within two years."

25. In 2010 the VA eliminated the requirement that acute and subacute peripheral neuropathy appear "within weeks or months" after exposure and "resolve within two years," i.e. it may never go away. This meant that a wide range of possible claims needed re-screening and re-adjudication

## C. "INFERRED" CLAIMS

26. When a veteran files a claim (including inferred and informal claims), the VA is obligated to not only consider the claims specifically mentioned by the veteran, but also all benefits to which the veteran might be entitled that are supported by evidence of record.

27. The claimant need not file a new claim or a claim for an earlier effective date when a new presumptive condition is added. The VA must search its records to find eligible claimants and award benefits, without action on the claimant's part.

28. Medical records noting the existence of a condition later made presumptively service-connected can, in some instances, result in an award without a formal claim ever being filed. This can include reports of hospitalizations or examinations performed in VA facilities as defined in 38 CFR 3.157 (July 1, 2011):

**§ 3.157 Report of examination or hospitalization as claim for increase or to reopen.**

(a) General. Effective date of pension or compensation benefits, if otherwise in order, will be the date of receipt of a claim or the date when entitlement arose, whichever is the later. A report of examination or hospitalization which meets the requirements of this section will be accepted as an informal claim for benefits under an existing law or for benefits under a liberalizing law or Department of Veterans Affairs issue, if the report relates to a disability which may establish entitlement. . . .

(b) Claim. ... Report of examination or hospitalization by Department of Veterans Affairs or uniformed services. The date of outpatient or hospital examination or date of admission to a VA or uniformed services hospital will be accepted as the date of receipt of a claim. . . .   38 CFR 3.157 (July 1, 2011) - Report of examination or hospitalization as claim for increase or to reopen.

**D. INFORMAL CLAIMS**

29. Informal claims are an opportunity for the claimant to establish or protect an earlier effective date of a disability benefit claim than would otherwise be possible through the routine submission of a formal claim. In determining what constitutes a "claim", the VA recognizes current CFR sections recognize that an "intent to file" letter, or similar communication, can be the first document constituting the effective date of a claim. As stated in 38 CFR 3.155 (July 1, 2011):

**38 CFR 3.155 - Informal claims**. (a) Any communication or action, indicating an intent to apply for one or more benefits under the laws administered by the Department of Veterans Affairs, from a claimant, his or her duly authorized representative, a Member of Congress, or some person acting as next friend of a claimant who is not sui juris may be considered an informal claim. Such informal claim must

identify the benefit sought. Upon receipt of an informal claim, if a formal claim has not been filed, an application form will be forwarded to the claimant for execution. If received within 1 year from the date it was sent to the claimant, it will be considered filed as of the date of receipt of the informal claim. . . .

   (c) When a claim has been filed which meets the requirements of § 3.151 or § 3.152, an informal request for increase or reopening will be accepted as a claim.

**E. INDEPENDENT MEDICAL OPINIONS**

   30. In the contracts awarded by the VA to QTC, QTC was to render an "independent medical opinion, or "IMO." The term "independent medical opinion" is a specific regulatory term identifying a referral by a VA regional office to a medical expert not employed by the VA:

   38 CFR §3.328 (May 3, 1990) Independent medical opinions.

   (a) General. When warranted by the medical complexity or controversy involved in a pending claim, an advisory medical opinion may be obtained from one or more medical experts who are not employees of VA. Opinions shall be obtained from recognized medical schools, universities, clinics or medical institutions with which arrangements

for such opinions have been made, and an appropriate official of the institution shall select the individual expert(s) to render an opinion.

## F. REVIEWS REQUIRED BY REGULATION

31. In April 2012, the National Veterans Legal Service Program (NVLSP),  Nehmer class counsel, complained to the Department of Justice that the VA's process to identify Nehmer class members was flawed because the VA failed to search for veterans who had been granted, rather than denied, service connection for one of the 3 new presumptive conditions prior to October 13, 2009.  In this case, the VA had re- reviewed records of veterans who had been denied service connection for the three new conditions. However, they may have been granted service connection for one of these conditions, but only as secondary to another service-connected condition, not as a primary condition itself. This could have led to eligibility for an earlier effective date and an increased disability rating when the condition is rated as a primary disability itself.

32. In May 2012, in response to NVLSP's complaint, the VA identified approximately 64,000 additional records needing review for these possibilities. The Department of Justice, and Department of Veterans Affairs, in agreement with the Nehmer class counsel, mandated that this review to be undertaken.

33. The peripheral neuropathy review was conducted in compliance with the requirements in the Agent Orange Act. The redefinition of the medical condition meant that approximately 95,000 veterans' records needed to be re-reviewed because the diagnostic criteria had changed.

34. Both of these reviews were mandated by legal requirements and required to be conducted to fulfill the statutory and regulatory obligations of the VA.

## IV. VA CONTRACTS WITH QTC

35.  QTC is one of the largest, if not the largest, single contractor for the VA.  As part of its range of services for the VA, with respect to the reviews at issue herein, QTC Services has also performed the retrospective claim reviews under the *Nehmer* requirements under contract with the VA.

36. Relator is informed and believes, and thereon alleges, that contract is identified by procurement I.D. # VA 79811D003, executed November 1, 2010. These specific reviews performed by QTC that are the subject of this case were identified in four separate modifications to the performance work statement under this contract:

(a) Modification  # P0006, effective 8-2-2012.  This modification to the performance work statement contained a number of items, and specific

added language to include Agent Orange screening "IMO" ( Independent Medical Opinion). (Exhibit 1)

(b) Modification # P00018, effective 4-14-2014. This modification to the performance work statement notes that "the purpose of this modification is to incorporate a requirement for Peripheral Neuropathy Independent Medical Opinions (IMOs)." (Exhibit 2)

(c) Modification # P00019, effective 5-1-14 (two weeks after the previous modification). The sole purpose of this modification is to replace the Agent Orange Peripheral Neuropathy review checklist with a new form, which adds more detail and instruction to the review. (Exhibit 3)

(d) Modification # P00020, effective 6-11-2014. The sole purpose of this modification is again to replace the Agent Orange Peripheral Neuropathy review checklist with a new form, which adds detail and instructions on the entry of data fields into a computer system. (Exhibit 4)

37. Relator is informed and believes, and after investigation and research alleges, that the final amended performance work statement under which these reviews were conducted contains relevant operative language substantially as follows:

**(a) 19. The Agent Orange three presumptive conditions, Ischemic Heart Disease (IHD), Parkinson's Disease (PD) and**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**Hairy Cell/B-Cell Leukemia (HCL/BCL), Screening  IMO (CLIN 0033)**. The contractor shall review the C-File Folder submitted for review and determine whether a disability request for the Agent Orange three presumptive conditions was previously made and can be construed as a disability request from the claimant.  In addition, the contractor will identify if a grant of the Agent Orange three presumptive conditions was awarded, or if a previous disability request for the Agent Orange three presumptive conditions was denied between September 25, 1985, to August 31, 2010.

 a. The contractor shall review the entire claims folder and provide any additional information as to whether the Veteran in question qualifies for consideration as a Nehmer class member, based on the manifestation of the Agent Orange three presumptive conditions since the completion of military service in Vietnam, or actual exposure to herbicides during Vietnam military service.

 b. The contractor shall provide a completed document Titled: The Agent Orange Screening Checklist Review Template (please see Attachment C) which will include all necessary information required for the review.

c. This template is a completely different document than the existing DBQs for the three presumptive conditions, Ischemic Heart Disease (IHD), Parkinson's Disease (PD) and Hairy Cell/B-Cell Leukemia, (HCL/BCL) and the IMO DBQ. At the moment, there is no Agent Orange Worksheet/DBQ that encompasses all three conditions.

d. The contractor shall segregate and bill appropriately between the IMO (CLIN 0022) and the Agent Orange Screening IMO (CLIN 0033) in accordance with the Price Schedule. Both documents are examiner produced written documents required beyond the normal scope of an examination, and both documents are explicitly requested by the VAROs. The Agent Orange three presumptive conditions- IMO is completed after the examiner has reviewed the Veteran's disability requests and medical record and The Agent Orange Screening Checklist Review Template. Once submitted it shall be billed in accordance with the Agent Orange Screening IMO (CLIN 0033).

**(b) 20. Peripheral Neuropathy Screening IMO (CLIN 0034).**

The contractor shall review the Veteran's disability requests and medical evidence folder (C-file hardcopy or electronic) submitted

for review and determine whether a disability request for Peripheral Neuropathy was previously made and can be construed as a disability request from the claimant.  In addition, the contractor will identify if a grant of Peripheral Neuropathy was awarded, or if a previous disability request for Peripheral Neuropathy was denied between September 25, 1985 and the date of the grant.

 a. The contractor shall review the entire disability request folder (C-file) and provide any additional information as to whether the Veteran in question qualifies for consideration as a Nehmer class member based on the manifestation of Peripheral Neuropathy within one (1) year of completion of military service in Vietnam, or actual exposure to herbicides during Vietnam military service.

 b. The contractor shall provide a completed document titled:  Agent Orange (AO) Peripheral Neuropathy (PN) Review Checklist (please see Attachment G) which will include all necessary information required for the review. This document is different from the existing Peripheral

Neuropathy DBQ and the IMO DBQ.  Currently, there is no Peripheral Neuropathy Worksheet/DBQ.

   c. The contractor shall segregate and bill appropriately between the IMO (CLIN 0022) and the Peripheral Neuropathy IMO (CLIN 0034) in accordance with the Price Schedule. Both documents are examiner produced written documents required beyond the normal scope of an examination, and both documents are explicitly requested by the VAROs. The Peripheral Neuropathy IMO is completed after the examiner has reviewed the Veteran's disability requests and medical record and completed the Peripheral Neuropathy Review Template. Once submitted it shall be billed in accordance with the Peripheral Neuropathy IMO (CLIN 0034).

        1. Evidence required to be reviewed includes, but is not limited to, the DD214/separation documents; all Service Treatment Records (STRs); Outpatient and inpatient treatment records, and overall, the full-claims' folder or "C-file". The size and volume of the claims folder is unique to each Veteran's claims

history within the Veterans Benefits Administration (VBA).  Some records may be only a few pages, while others may include multiple pages. . . .

(Exhibit 5)

## V. THE QTC SCHEME TO SUBMIT FALSE CLAIMS

38. Defendant QTC, through its executive management and *Nehmer* team leaders, created and executed a scheme to submit as many claims as rapidly as possible to the Veteran Administration for the required reviews, in reckless disregard and deliberate ignorance of whether or not those reviews complied with the contractual and regulatory requirements of the contracts and the project.

39. This scheme focused solely on the speed with which files were closed and the billing entries created in the QTC computer system, thus submitting claims to the VA for each file completed.

40. This scheme was executed by training the claims file analysts only on the computer entry process such that the data fields were properly filled in, without training the claims file analysts on the substantive medical data or records necessary or substantive aspects of evidence of the diseases under consideration, nor how to recognize them.

41. QTC further trained the analysts only on the process of recognizing rating decisions or formal claims in Veterans claims file folders, without training claims file analysts on recognizing the possibility of an informal or inferred claim, which possibility would give rise to a referral to the VA for further development.

42. QTC failed to monitor any performance of material elements of the contract, including but not limited to the actual review of the medical record and claims file.

43. QTC emphasized, rewarded, and required only the speed of the "closure" of a chart (review completion/closure in the computer system) with no monitoring, evidence checking, quality review,  or auditing of the actual substance of the product (the review) produced.

44. QTC created internal guidance for use by claims file analysts that contradicted and overrode the actual guidance produced by the Veterans Administration for the project.

45. QTC took affirmative action to hide evidence of non-performance by the physician reviewers from observation by other employees and ignored complaints of contractual non-performance.

46. QTC ignored, threatened, and eventually terminated employees for continuing to internally raise issues, through appropriate channels, concerning this contractual non- performance.

47. Relator is informed and believes, and thereon alleges, that QTC was paid by the Veterans Administration on a "per file" basis using billing codes for each type of review. Claims file analyst entered different codes into the QTC computer system for the size of each file reviewed.

48. Relator is informed and believes, and thereon alleges, that QTC was paid differential amounts, i.e. $300 to $350, per file registered as completed in the QTC computer system.

49. Relator, through personal knowledge gained in the workplace, alleges that the completion of the computer entries transferred the file electronically to the QTC billing office or billing function, for transmittal to the VA.

## VI. DESCRIPTION OF THE QTC ACTIONS IN FURTHERANCE OF THE SCHEME

50. In furtherance of execution of the scheme, QTC engaged in the following actions. Each will be separately delineated with evidence of its execution.

**a. Advertising for and hiring physician reviewers based on the promise of "easy money."**

False Claims Act Second Amended Complaint

23

51. At the outset of the project, QTC established an expectation that the reviews would be fast and easily accomplished. On this basis QTC sought and employed contracted physician reviewers.

52. For example, in an advertisement for physician reviewers, placed by QTC on April 13, 2013 (on the USA Doc Jobs website)(Exhibit 6)  QTC emphasized the fast, easy money available to physician reviewers:

> **"Physicians Needed For NEHMER Agent Orange Case File Review – EASY MONEY!!"**
>
> QTC was recently asked by the VBA to assist with a yearlong project. This project is very different then our normal exams that we currently do for the Department of Veteran Affairs.
>
> . . .
>
> Fees: QTC will pay you per case file reviewed. You can see anywhere between 4 to 6 cases an hour (you will pick up speed). If you are able to work a full 8 hour day QTC will ensure you make a minimum of $600 a day. If you see 5 cases an hour, 8 hrs a day you could make at least $1000. . . .
>
> (Exhibit  6)

**b. Hiring first level claims file analysts not qualified by education or training to perform the contractually required tasks.**

53. Based upon Relator's personal knowledge, only two of the claims file analysts hired for the Nehmer project had medical doctor degrees. (The final reviewing physicians all were medical doctors with current licenses.) These first claims file analysts had experience levels ranging from college degrees in biology and nursing degrees to high school graduates with little or no exposure to medical records, diagnostic criteria, symptoms of the diseases under review or how to recognize those, or any other background sufficient to enable a knowledgeable, substantive review of an entire claims file.

**c. Failing to provide any training to CFAs on the diseases and medical conditions under review.**

54. QTC, in disregard on the information provided in VA guidance and operational manuals for the Nehmer Project, knowingly failed to provide any training to its claims file analyst on the complex and subtle manifestations of the diseases as they may appear in the medical records.

55. These reviews require a person capable of recognizing these very subtle distinctions in potentially very old medical records. QTC failed to provide any training to the claims file analysts on the substantive performance of this review.

**d. Failing to provide any resources to CFAs on substantive aspects (medical) of the reviews required by Contract, including guidance specifically provided by VA.**

56. In the course of its contracts with the VA, QTC is believed to have access to a number of elements of guidance specifically created for QTC as well as those specifically referenced in the checklist that constituted the documentation of the work product of each file under the contract. These include, but are not limited to VA training letter 10-04, (Exhibit 7) which transmitted the Nehmer Project guidance, the addenda to TL 10-04 as referenced in the Peripheral Neuropathy Checklist, and the VA-produced "Nehmer Training Guide For QTC."

57. These resources were critical to the substantive performance of the contractual obligations.

58. However, none of these reference resources were provided to, or made available to, the Claims File Analysts or Physician Reviewers, even though the certifications and representations in the checklists specifically refer to situations and conditions contained in, and described in, these references.

**e. Producing guidance to be used by CFAs that contradicted contract requirements and VA-produced guidance.**

59. The VA produced specific guidance for the Nehmer Phase II review performed by QTC. This document, entitled "Department of Veterans Affairs, Veterans Benefits Administration (VBA), Nehmer Training Guide for QTC," (Exhibit 8) specifically described the Phase II review for IHD/PD/BCL, and was provided to QTC to guide their performance of the review. Among the contents of this document were detailed descriptions of the conditions under review, as well as specific, question- by-question guidance for properly completing the review and its accompanying checklist.

60. Claims file analysts were not provided copies or working instructions or the specific guidance provided by the VA to QTC (i.e. Exhibit 8). Rather, claims file analysts were provided a document entitled "*Nehmer Reference Manual*" that was prepared by QTC on July 16, 2013, (Exhibit 9).

61. A simple comparison of a material part of the actual VA guide for QTC against the QTC guidance provided to their own reviewers demonstrates the intentional misrepresentation of the review undertaken by QTC.

62. The VA Nehmer training guide for QTC, in discussing the critical question 6 on the IHD/PD/BCL checklist ("Was the entire claim folder reviewed?") states:

> The entire Claims Folder should be reviewed to ensure the
> documents in the file are in chronological order, and then the

volumes with evidence or correspondence dated September 25, 1985 to the present must be thoroughly reviewed to determine if there is a potential basis for entitlement to additional benefits based on the presumptions of service connection for IHD, PD, and HCL/BCL. Service Treatment Record envelopes would not need to be opened and reviewed by QTC staff, as they are not relevant to this review.

63. However, the QTC guide advises the CFA that the answer to checklist question 6, "was the entire claims folder reviewed" should, _by default_, always be "yes."  Specifically, the QTC-produced guide provides simply:

"Through the process of elimination the entire c-file is reviewed. Service treatment records in c-files are not required to be reviewed, but they can be used to substantiate a diagnosis."

64. The effect of this instruction is to inform the reviewer to always mark Question 6 "yes", regardless of the truth or falsity of the actual review as instructed by the VA-produced guidance.

**f. Establishing a reward and performance monitoring system solely focused upon numbers and speed.**

65. At the core of this scheme was a concerted and knowing process of encouraging, rewarding, and monitoring only the speed with which the reviews were performed and the number of files cleared each day, with willful disregard for regard to the accuracy or completeness of the review as required by its contract. Accuracy and completeness of the reviews were never incentivized, rewarded, reviewed, or monitored.

66. Defendants created, established, fostered, and rewarded a system to submit claims to, and receive payment from, the government for performance that was in complete disregard of the substantive contractual requirements and otherwise false and deceptive.

67. For example, throughout the months of December 2013 and January 2014, some claims file analysts purported to "review" up to 38 charts per day. A review of performance statistics reflects a completion rate for many CFAs and physicians that could not reasonably be achieved if the claims file analyst actually performed the contractually-required medical review of the file as an Independent Medical Opinion.

68. In order to maximize numbers, the project supervisor, Ms. Felishka Ashley, routinely distributed daily and weekly performance statistics for each individual and each team.

69. For example, on the December 12, 2013 compilation of results and quotas, it was noted that each team had an expected goal. On that day, the publication of the goals, achievements, and next day's goals also reflected that there was "a minimum individual goal of 15" and highlighted in yellow "those not met by individual analysts." On that day, one claims file analyst reported to have properly reviewed 31 files in a work day.

70. The same system of direct and indirect incentives for speed of performance unrelated to quality and thoroughness continued into the peripheral neuropathy review project as well.

(a) For example, on August 12, 2014, the vice president of operations for VA services emailed the VA Nehmer service team to note that the group had completed a large number of files in a single day, and states, "Very good, keep it up. Thank you."

(b) In preparation for the Labor Day weekend 2014, the claims file analysts were informed that if they increased production to double their daily numbers they could take a 3 day weekend during the Labor Day holiday. If they could not double their daily numbers, they were required to come in on the Saturday of the Labor Day weekend to continue reviewing files.

False Claims Act Second Amended Complaint

**g. Taking affirmative steps to conceal the fraudulent non-processing of claims and fraudulent activities of their employed physician reviewers in approving reviews**

71. In addition to the previously described actions to conceal the underlying fraudulent activity surrounding the review and documentation of review of claim files, Defendants took affirmative action to conceal such activities from other employees (including Relator) and to threaten, harass, and marginalize employees who point out Defendants' knowing support and endorsement of the fraudulent activity.

72. For example, during September 2014, several claims file analysts' desks were in close proximity to the physician reviewers.

73. During the course of his duties, Relator learned from a coworker, via text message, that the co-worker witnessed a physician reviewer, Dr. Harry Eisenbach, simply signing off checklists without even opening the claims files.

74. Later, on October 2, 2014, the co-worker informed Relator that he had confronted Dr. Eisenbach and reminded him that he (Eisenbach) needed to pay attention to the review process and that the co-worker had personally witnessed Eisenbach skipping steps.

75. The next day, Friday, October 3, 2014, a meeting was held in which the supervisor, Ms. Ramos, indicated that the claim files would no longer be

put on floors and that the physician reviewers would be moved to the end of a the row, a location where CFAs could not observe their activity.

**h. Ignoring, threatening, and eventually terminating employees for continuing to internally raise issues, through appropriate channels, concerning this contractual non- performance.**

76. In apparent retaliation for the conversation Thursday, October 2, between the previously-mentioned co-worker and the physician, the physician (Eisenbach) made a complaint to management about the co-worker. This complaint claimed that the co-worker had referred to Dr. Eisenbach by his first name (Harry) instead of by his title (Dr. Eisenbach).

77. That same afternoon (October 3rd) Ms. Ogie Ubungen, QTC's Vice President of Operations, confronted the co-worker and strongly counseled him about allegedly referring to Eisenbach by his first name.

78. Not coincidentally, the same day the co-worker received a letter threatening disciplinary action because of his productivity performance.

79. The next work day, Monday, October 6, 2014, Relator forwarded to appropriate individuals within QTC his concerns about the review process of the medical records and the failure of the physicians to actually review the files.

80.  The recipients of his concern included Jason Schibel, CEO of QTC Management; Frenorgin Ubungen, Vice President of Operations at QTC Management;  Kerrie Schuster, an Ethics Officer at Lockheed Martin;  and Donna Brown, the human resource director for QTC Management.

81.  Relator received two direct responses to his concern. First, the CEO of QTC, Mr. Jason Seibel, responded within 15 minutes.  His response stated,

> . . . For the record your continued focus on responsibilities outside your job description is representative of creating a disruptive work environment—including for your peer, functional and clinical staff. Given the volume and focus intensity for others outside your position scope, I have concerns about your ability to effectively deliver high quality reliable work on behalf of our customers. I kindly ask you, focus on the job at hand. Please permit our processes to review the STR concern you have raised.

82.  Secondly, Relator received a response from Kerrie Schuster, ethics officer for Lockheed Martin. This cursory and pro forma email stated:

> Mr. Vatan, thank you for letting me know about this. I have verified that appropriate individuals are addressing the matters you described below. I will continue to follow this

situation and advise leadership and HR as warranted. Again,

thank you for bringing these concerns forward.

83. On Thursday, October 9th, Relator received an email and letter from Ms. Ramos, advising him that he was placed on a productivity improvement plan, counseling him that he must meet a minimum expectation of delivering 12 cases for every 8 hours worked. If this did not happen, i.e., if he did not "improve his performance," disciplinary action was threatened.

## VII. EXAMPLES OF SPECIFIC FRAUDULENT RESULTS AND REVIEWS BY DEFENDANTS FOR WHICH CLAIMS WERE SUBMITTED

84.  The result of this scheme described above was the improper and defective performance of the material requirements of the contract. This is inevitably reflected in the results of the reviews. Those "reviews" that resulted in a "No" answer to the referral question were returned by QTC to the VA regional office from which they had been received with a cover sheet certifying that the chart had been screened in compliance with the contract. Those answered "Yes" were forwarded to designated regional offices for centralized re-review.

85. Under the IHD/PD/BCL review, the claim file analysts purportedly performed reviews of the claim files. The CFA first reviewed the file  then made it available to a physician reviewer by scanning an identifier into the

computer system and making the physical file available with the hard-copy routing/cover sheet.

86. It was not uncommon for review physicians to sign off on over 60 files per day.

(a)  For example, under the system established by QTC, a 1 page case assignment sheet, barcoded for tracking, was attached to each claim file. The checklist itself and the case assignment sheet were attached together.

(b)   During June, 2014, Relator learned from a coworker that the coworker accidently mixed up case assignment sheets and attached incorrect/non-matching checklists for 10-15 cases that were given to physician reviewers for final review.

(c) All of those files were signed by various providers.  No provider even noticed the checklist they were signing did not relate to the claim file attached to it.

(d)   During June 2014, Relator submitted 3 cases with accompanying claim files each totaling in excess of 2,500 pages of medical records for final physician review. All of them were signed and returned to the Relator by the physician reviewer in less than 10 minutes.

(e)   In a similar event, on August 8, 2014, Relator reviewed a claim file containing nearly 2,500 pages or 10 inches of paper equivalent. This complex

review took him 4 hours to complete. He then submitted the checklist to the physician reviewer for confirmation. Five minutes later, Dr. Harry Eisenbach, M.D., contacted the Relator to ask him to scan the barcode on the case assignment sheet. (Without scanning the barcode the provider has no access to the electronic case file including the medical records.)  Relator scanned the barcode and returned it to the physician reviewer immediately.

(f) Within five minutes the checklist was signed by the physician and returned to Relator for processing. No actual review of the file or even the reference documents tabbed by relator could have been performed during that time.

87. During the later phases of Relator's employment at QTC, a number of purportedly reviewed files had been returned to regional offices of the Department of Veterans Affairs. Upon cursory examination of the checklist, these regional offices discovered at least 184 charts where the checklists had been signed as completed yet material blocks on the checklist were not even marked or filled out.

88. On November 13, 2014, Relator and others within the Nehmer project received an e-mail from Mary Ann Umali-Abitria, a Senior Quality Assurance ("QA") Specialist for QTC, concerning the VA's discovery of

incomplete Peripheral Neuropathy checklists in files returned to the VA as

completed. The email stated:

> "CFAs and QAs- REMINDER: please make sure the PNR
> checklist is completed properly especially Question #7-
> FYI- VA has sent a list of 184 cases that has [sic] incomplete
> checklist that were delivered since June up to November 6.-
> All of them have Q# 7 blank. …Let us make sure that the
> checklist is consistent and complete.

89. The checklists were not only incompetently completed but were

likely not even reviewed by the physician reviewer. They were returned to the

VA (and claims for payment likely made to the VA) in this defective condition

after passing both reviewers.

90. When the peripheral neuropathy (PN) review commenced, some of

the records that had been previously reviewed under the IHD project were

again reviewed by the QTC because the VA record needed a further re-review

for the PN diagnosis.

91. As a result, in the ordinary course of Relator's work, he received for

PN review some files that had been reviewed by other CFAs at QTC under the

IHD project. These files had not been further processed by the VA because the

earlier review claimed to find no evidence to prompt further development of

the claim. Documentation to that effect remained in the file, as signed by both the CFA and reviewing physician.

92.  In the course of Relator's review of these claim files, and in investigation of the facts that lead to this complaint, Relator (from his perspective as a medical doctor and thus a knowledgeable reviewer) undertook a further review of the file to determine whether the earlier review by QTC for IHD/PD/BCL was accurate.

93. In the course of these re-reviews by Relator, he found that evidence had not been reviewed, developed, recognized, or noted that would have at least warranted a "YES" response to trigger further development of their claim by the VA under the IHD/PD/BCL review criteria. The following are specific examples of these cases; [1]

(a) **Veteran D.J.B**. The checklist was completed based on VA's Rating Decision dated 08/09/2006. The veteran was Service Connected for Coronary Artery Disease *Secondary to Diabetes* with entitlement effective 1/10/2006.  However, the evidence in the claim file shows that he had complained of chest pressure and a Cardiology consult, *performed by the VA itself*,  on 10/09/2003.  The QTC reviewers missed this

---

[1] The precise identity of these Veterans contains potentially protected individually information under 38 U.S.C. § 5701(a), 7332.  In order to protect the privacy of the claimants, they will be referred to by alphabetical identifiers. The identity will be provided pursuant to a Qualified Protective Order.

evidence and did not refer this case to VA for further adjudication as a

now-primary disease and possible inferred or informal claim .

**(b) Veteran D.A.V**. This veteran was Service Connected (SC) for

Atherosclerotic Heart Disease (ASHD) *secondary to Diabetes II (DM)*

with an effective date of 08/21/2002.  The evidence shows heart-related

workups previously *received by the VA* on 01/19/1993. The QTC

reviewers missed this evidence, consisting of over 50 pages in Volume 1

( the earliest volume) of this multi-volume record, and apparently only

reviewed Volume 3—the most recent volume of the c-file. They did not

refer this case to VA for further adjudication of heart disease as a now-

primary disease. The physician review – the IMO -- also falsely

affirmatively stated in Question 7 narrative that "No medical evidence

received showing ASHD prior to the date of the claim establishing

entitlement. No evidence of PD or BCL found during this review. "

**(c)  Veteran J.R.M**. This veteran was Service Connected (SC) for Coronary

Artery Disease S/P stent effective 03/31/2006. The physician reviewer

falsely affirmatively stated in Remarks to Question 7 that there "was no

medical evidence received showing any evidence of Coronary Artery

Disease" prior to this time.  There was evidence showing abnormal

cardiovascular problems and other evidence showing that he had "chest

pain that comes and goes, will last for 30 seconds" since 02/21/1981, or over 20 years earlier.  The evidence was missed by the QTC reviewers and did not get referred to the VA for further adjudication.

**(d) Veteran N.E.P**. This veteran was Service Connected (SC) for Coronary Artery Disease effective 09/14/2012. However, there is evidence (including 10+ pages of medical records) clearly *also* showing symptoms of Parkinson's disease. The Veteran's claim form for Parkinson's disease dates to 12/12/2012, but at that time the VA rating decision denied service connection for Parkinson's disease. The QTC reviewers missed the evidence in the medical records, and then improperly failed to review other relevant parts of the file for further adjudication. The case should have been sent to the VA for further adjudication.

**(e) Veteran E.L.I.** This veteran was Service Connected (SC) for Coronary Artery Disease, secondary to Diabetes with an entitlement effective January 10, 2008. In the HID/PD/BCL review, the claims file analyst marked "no" on question #7, meaning that there was no evidence in the record to support an earlier date based on Coronary Artery Disease/Ischemic heart disease earlier than the existing date as a condition secondary to diabetes. However the medical record (which should have been reviewed as part of the new review) noted that there

was Coronary Artery Disease and a stent placed on 8/30/2007. The claim form for this condition was received by the VA on 9/27/2007. Thus, under a proper review the veteran should have been entitled to, potentially, five or more months of addition backdated compensation. It is evident that the medical record had simply not been carefully reviewed during the earlier review. The case not reviewed by VA due to the checklist completion by QTC.

(f) **Veteran G.A.R.** This veteran was Service Connected (SC) for Coronary Artery Disease with entitlement effective August 2006. On question #7 review stated "NO" – "no medical evidence received showing any Coronary Artery Disease prior to the date of the claim establishing entitlement of 8/0712006 - No evidence of PD /B cell/ Hcl found during this review." However, there is evidence consisting of a 2-way Chest X-Ray on 04/12/1999 with a report showing an overall diagnostic impression of atherosclerotic heart disease, signed by a radiologist MD at a VA hospital in New York. Because of the missed evidence in this case, and the marking of "no" on question #7 of the checklist, the VA made no further adjudication. This veteran potentially had a claim for compensation for an additional five years.

94. In each of these example cases, a thorough review of the medical record would have revealed that the veteran may have been entitled to a longer duration of compensation, may have circumstances creating an entitlement itself, or revealed that there were other conditions clearly material to a need for a re-review or correction. These subsequent failures deprived the veteran of potentially entitled compensation, and resulted in false claims to the VA.

95. By contrast, the VA relied upon the screenings performed by QTC in determining whether to perform further review and adjudication on the initially screened files. The screenings and forms completed by QTC were material to not only the VA payment s to QTC but to the veterans themselves.

96. In the course of Relator's duties, he also encountered a file sent for peripheral neuropathy review that had been identified for further adjudication in the IHD/PD/BCL review (Checklist Question #7 marked "Yes"). As a result the veteran was re-adjudicated for the newly added conditions, and awarded additional compensation:

**Veteran R.L.B.** The checklist was completed based on VA's Rating Decision (RD) dated 10/06/2000. The veteran was Service Connected (SC) for CAD with entitlement effective 05/27/1999. In the QTC review, the remarks on Question #7 reflected as follows: *YES – Evidence found Borderline EKG minimal voltage criteria for LVH (Left Ventricular*

*Hypertrophy) dated 06/29/1993.* Action & Outcome by the VA: Special Determination - A new Rating Decision issued dated 01/13/2014 based on (QTC) Nehmer phase II review and the checklist dated 05/31/2013. The service connection for CAD entitlement date was changed from 05/27/1999 to an earlier entitlement date of 02/01/1993. This resulted in nearly six years of retroactive compensation for the veteran.

## VIII. DEFENDANTS SUBMITTED FALSE CLAIMS

97. Relator is informed and after investigation alleges that, with respect to each of the reviews described in this complaint and at the time each claim was submitted, Defendants had actual knowledge that such claims were false or acted in reckless disregard and deliberate ignorance of the truth or falsity of the actual performance of the contract requirements. The Defendants acted with actual knowledge that such claims were false or acted in reckless disregard and deliberate ignorance of compliance with the specifics requirements for payment of the claim, the express and implied certifications connected therewith, the truth or falsity of the underlying documents and records supporting such claim. All such representations, statements, records, and certifications were material prerequisites to the entitlement to payment from the VA.

False Claims Act Second Amended Complaint

98. Defendants submitted claims for payment, directly or indirectly, to the VA to request money from the United States Government. With respect to each of these requests for payment, Defendants both expressly and impliedly certified that they had complied with the claim file review requirements contained in the contracts concerning the Nehmer reviews. Such certifications were factually false at the time they were made and/or were made in reckless disregard of their truth or falsity.

### IX. DEFENDANTS' RETALIATION AGAINST RELATOR

99. Relator began his employment as a claims file analyst at QTC on or about March 11, 2013. During his work as a claims file analyst, Relator learned of QTC's scheme.

100. As previously described herein, on Monday, October 6, 2014, Relator communicated his concerns regarding the review process to appropriate individuals within QTC, including Jason Schibel, CEO of QTC Management; Frenorgin Ubungen, Vice President of Operations at QTC Management; Kerrie Schuster, Ethics Officer at Lockheed Martin; and Donna Brown, the human resource director for QTC Management.

101. As previously described herein, in response to Relator's communication, the President of QTC informed Relator that he was creating a "disruptive work environment." Three days later, on Thursday, October 9,

2014, Relator was placed on a productivity improvement plan, counseling him to deliver 12 cases for every 8 hours worked. If this expectation was not met, further disciplinary action was threatened.

102. In November 2014, QTC released a report indicating that the VA had returned 184 checklists, which were erroneously or incompletely marked as described earlier in this complaint. Upon learning of the report and believing the report supported his earlier concerns, Relator again communicated his concern regarding the review process to appropriate individuals.

103. In early December 2014, Relator was informed by QTC Human Resources of an investigation against Relator for alleged events occurring months earlier. Relator was informed that his case would be referred to a committee at Lockheed for a potential disciplinary action.

104. When Relator denied the allegations of the investigation and suggested that the investigation was an attempt to deflect attention from Relator's concerns surrounding the review process, the QTC CEO sent Relator an email accusing him of being sarcastic and unprofessional.

105. On December 4, 2014, Relator was placed on paid administrative leave pending the investigation. On December 10, 2014, Relator received

notice from QTC CEO, Jason Seibel, that his employment with QTC was being terminated.

## X. SCOPE OF THE FRAUD

106. The Relator is informed and believes that QTC submitted claims under its contract based on the completion of each chart, and received payment from the government based on the number of charts "completed" and returned.

107. Relator is informed and believes, and thereon alleges, that QTC received between $300 and $350 per claim filed and reviewed. The value of the *Nehmer* review contracts to QTC therefore is estimated to be between $48 million and $56 million.

## XI. CLAIMS FOR RELIEF

## COUNT I –VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

108. Relator incorporates by reference all paragraphs of this Second Amended Complaint as though the same were set forth herein at length.

109. In performing the acts described above, Defendants through their own acts or through the acts of their officers, intentionally,  knowingly and/or recklessly presented, or caused to be presented, false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

110. Specifically, Defendants knowingly and intentionally submitted claims to the United States Government and its Department of Veterans'

Affairs for performing claim file reviews under the "*Nehmer* Project" claim file review contract when such claim file reviews failed to comply, in any reasonable manner, with the requirements of the contract. The claim file reviewers did not adequately review the medical evidence in the files, and failed to properly provide the VA a meaningful basis to determine which veterans' claim files needed further development or re-adjudication based on newly listed conditions.  These claims were factually false. The contract requirements had not been met in a manner to warrant payment. The claims were submitted in reckless disregard of the actual underlying "product" for which they were submitted.

111. The United States, unaware of the foregoing circumstances and conduct of the Defendants, made payments which resulted in its being damaged in an amount to be determined.

112. In submitting claims, Defendants also expressly and impliedly certified to the VA that the claim was submitted for services performed in compliance with the contractual obligations.

113. All of the representations and certifications, both express and implied, had a natural tendency to influence the VA's decision whether to pay the claims and were material to payment of the claims. Further, had the VA

known of Defendants' intentionally created scheme and the falsity of the

statements contained therein, the VA would not have paid the claims.

114. As a result of these schemes, Defendants caused the VA to incur

significant damages.

## COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)

115. Relator re-alleges and incorporates by reference all paragraphs of

this Second Amended Complaint as if fully set forth herein.

116. In performing the acts described herein, Defendants through their

own acts or through the acts of their officers, knowingly made, used or caused

to be made or used, a false record or statement material to a false or fraudulent

claim in violation of 31 U.S.C. §3729(a)(1)(B).

117. Specifically, Defendants made, used, and caused to be made a false

record which remained in the veteran's claim file. That false record included,

in the IHD/PD/BCL review, certification that the entire claim file (which by its

nature includes medical records in their entirety) had been reviewed, and

similar certification as to the results of that review by both the claims file

analysts and the physician reviewer.

118. In the peripheral neuropathy ("PN") review, the false record

included an affirmative narrative statement signed by the physician reviewer as

part of the Independent Medical Opinion. This statement, routinely added by

physician reviewers, stated that "a review of the evidence of record reveals no complaints, symptoms or diagnoses related to early onset peripheral neuropathy."

119. It also contained certification that no conditions or circumstances, including those in the TL 10-04 Nehmer Training Guide Addendum for Peripheral Neuropathy were present. Such certification was inherently false; the CFAs and Physician Reviewers were not provided the addendum nor were they trained on the circumstanced embodied therein.

120. When the file was returned to the VA, an affirmative document was attached by Defendants to the file stating that the "peripheral neuropathy review has been completed for this case and is being submitted for adjudication purposes." If the file was marked "NO" in the final question, this review itself constituted the adjudication and no further VA claim development took place.

121. In both instances, the review required by the VA was not performed. These records, included with the return of the file to the VA, constituted a false record and false statement in support of a claim for payment for the chart review.

122. The VA, unaware of the falsity of the records and statements made or caused to be made by Defendants, and in reliance on the accuracy of these claims and statements, paid for these services.

123. The records and statements, in addition to express and implied certifications with respect to the veterans' files underlying every bill to the government, had a natural tendency to influence the government's decision whether to pay the claim and were material to the payment of the claim. Further, had the government known of the Defendants' intentionally created scheme and the falsity of the statements contained therein, the government could not have lawfully paid said claims.

124. As a result of these schemes, Defendants caused the government to incur significant damages.

## COUNT III – VIOLATION OF 31 U.S.C. 3729(h) (RETALIATION)

125. Plaintiff re-alleges and incorporates by reference all paragraphs contained in this Amended Complaint as though the same were set forth fully herein.

126. Pursuant to 31 U.S.C. § 3730(h), the False Claims Act prohibits an employer from discharging, demoting, suspending, threatening, harassing, or in any other manner discriminating against an employee in the terms and conditions

of employment because of lawful acts done by the employee in furtherance of an action under the Act.

127. Relator expressly and clearly informed appropriate individuals at QTC and Lockheed Martin of the illegality under federal law of the conduct he observed. It was after that point that Relator was terminated.

128. Relator's act of challenging QTC's practices was lawful conduct "in furtherance of" a False Claims Act action.

129. As a result of Defendants' actions, Relator has suffered and continues to suffer substantial damages. Relator's damages include lost earnings and wages, interest on lost wages, and special damages in an amount to be proven at trial.

## XII. PRAYER FOR RELIEF

130. WHEREFORE, Plaintiff/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

A. The amount of the United States' damages in an amount to be proven at trial;

B. Treble the amount of the United States' damages in an amount to be proven at trial;

False Claims Act Second Amended Complaint

C. Maximum civil penalties for each false claim submitted, especially in view of the fact that the Defendants' fraud not only damaged the United States  but caused damage to the Veterans themselves  on whose behalf the VA sought the contractual review;

D.  The maximum allowed to Relators under 31 U.S.C. § 3730(d);

E. Reasonable costs and attorney's fees for bringing and pressing the claims under the Federal False Claims act;

F.  Such further relief as this Court deems to be just and proper.

131. On Count III of this Second Amended Complaint, Relator demands and prays judgment for all proper compensatory damages, special damages, and punitive damages in favor of Relator as a result of Defendants' retaliation and the retaliatory discharge of Relator in violation of 31 U.S.C. § 3730(h), including but not limited to the following:

A. Double back pay and interest on the back pay;

B. Compensation for loss of pension, and other employment benefits;

C. Compensation for all special damages, including emotional distress, mental suffering, humiliation, reputation damage, and inconvenience;

D. Attorneys' fees and costs; and

E. Such other and further relief as the Court deems just and proper as a result of Defendants' retaliation and wrongful discharge.

## XII. DEMAND FOR TRIAL BY JURY

132. Pursuant to Rule 38, Federal Rules of Civil Procedure, a jury trial is demanded.

Respectfully submitted,

**WATERS, KRAUS & PAUL**

_____

Michael Armitage
armitage@waterskraus.com
Louisa Kirakosian
lkirakosian@waterskraus.com
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California  90245
PH: 415-441-8669/888-503-8267

**EISENBERG, GILCHRIST & CUTT, P.C.**

/s/

_____

Robert D. Sherlock *(Admitted Pro Hac Vice)*
rsherlock@egclegal.com
215 South State Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
Fax: 801-350-0065
Attorneys for Plaintiff – Relator

Encl: Exhibits 1-9

False Claims Act Second Amended Complaint