WATERS, KRAUS & PAUL
Michael Armitage (SBN 152740)
armitage@waterskraus.com
Louisa Kirakosian (SBN 271983)
lkirakosian@waterskraus.com
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California  90245
PH: 310-414-8146

EISENBERG, GILCHRIST & CUTT, P.C.
Robert D. Sherlock (Utah Bar No. 02942)
(Admitted Pro Hac Vice)
rsherlock@egclegal.com
215 South State, Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
ATTORNEYS FOR PLAINTIFF-RELATOR
DAVID VATAN, M.D.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF
AMERICA,
 *ex rel*.
DAVID VATAN, M.D.
Plaintiff-Relator,

v.

QTC MEDICAL SERVICES,
INC, et.al.,
              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV14-8961-PA (SSx)

**PLAINTIFF – RELATOR DAVID VATAN'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT UNDER FED. R. CIV. P. RULES 12(B)(6) AND RULE (9)(B)**

Hearing: February 8, 2016
Time: 1:30 PM
Place: Courtroom 15, Los Angeles –
Spring Street Courthouse
Judge: Hon. Percy Anderson

1
2

## TABLE OF CONTENTS

3      I.      INTRODUCTION…………………………………………………..1
4
       II.     STANDARDS OF REVIEW……………………………….....5
5              A. Rule 12(b)(6)……………………………………………5
6              B. Rule 9 (b)……………………………………………....6
               C. The False Claims Act……………………………….....7
7
8      III.    THE SECOND AMENDED COMPLAINT (SAC) MEETS THE
9              PLEADING REQUIREMENTS OF THE RULE 12 (B)(6) AND
               RULE (9)(B)…………………………………………………9
10
11     IV.     THE SAC MORE THAN ADEQUATELY, AND IN DETAIL,
               PLEADS A HIGHLY PLAUSIBLE SCHEME TO SUBMIT FALSE
12             CLAIMS………………………………………………...11
13
14     V.      RELATOR'S SECOND AMENDED COMPLAINT MEETS THE
               PLEADING REQUIREMENTS OR RULE 12(B)(6) AND RULE
15             (9)(B)……………………………………………...13
                       1. Who…………………………………………13
16                     2. What………………………………………13
17                     3. When………………………………………14
                       4. Where………………………………………14
18                     5. How…………………………………………14
19
20     VI.     RELATOR HAS PROVIDED AMPLE EXAMPLES OF THE
21             SCHEME IN OPERATION FROM WHICH TO INFER
               DEFENDANTS' LIABILITY…………………………15
22              A. Affirmative Steps To Hide Non-Performance ………...15
23              B. Claims for Services Were Submitted…………………16
                C. Evidence of the Scheme's Operation and Results……...16
24

25
26
27
28

VII.   RELATOR SHOULD BE ALLOWED TO FILE AN AMENDED
       COMPLAINT SHOULD THE COURT BE INCLINED TO GRANT
       DEFENDANT'S MOTION…………………………………....19

VIII.   CONCLUSION…………………………………………….20

## TABLE OF AUTHORITIES

*Mendiondo* v. *Centinela  Hospital Medical Center,*
    521 F.3d 1087, 1104 (9th Cir.2008)………………………………5

*Ashcroft v. Iqbal,*
    556 U.S. 662, 678 (2009)………………………….....................……5

*Wyler Summit Partnership* v. *Turner Broad. Sys., Inc.,*
    135 F.3d 658,661 (9th Cir. 1998)……..............…………… ……..5

*U.S. ex rel. Hendow v. Univ. of Phoenix,*
    461 F.3d 1166, 1170 (9th Cir. 2006) ................................................5

*Zimmerman v. City of Oakland,*
    255 F.3d 734, 737 (9th Cir. 2001)..........................................………5

*Gilligan* v. *Jamco Dev. Corp.,*
    108 F.3d 246, 249 (9th Cir.1997)…..........................………...5

*Bly-Magee* v. *California,*
    236 F.3d 1014, 1018 (9th Cir. 2001)…...........................…………6

*Neubronner* v. *Milken,*
    17 F.3d 666,672 (9th Cir. 1993)……...........................……………6

*United States ex rei. Lee* v. *Smithkline Beecham, Inc.,*
    245 F.3d 1048, 1051 (9th Cir.2001)……………………………6, 20

1

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. at 544, 554-56. (2007) ......................................................6

*United States ex rel. Lemmon v. Envirocare of Utah, Inc.*,
    614 F.3d 1163, 1169 (10th Cir. 2010)...............................................6

*United States ex rel. Ebeid v. Lungwitz*,
    616 F.3d 993, 998 (9th Cir. 2010) ....................................................7

*United States ex rel. Campie v. Gilead Scis., Inc.*,
    2015 WL 106255, at *6 (N.D. Ca. Jan. 7, 2015) ............................7

*United States v. Neifert-White Co.*,
    390 U.S. 228, 232, 88 S.Ct. 959, 961 (1968) ..................................7

*United States ex rel. Wilkins v. United Health Grp., Inc.*,
    659 F.3d 295, 305-06 (3d Cir. 2011)................................................7

*United States ex rel. Guardiola v. Renown Health*,
    2014 WL 4162201, at *3 (D. Nev. Aug. 20, 2013).......................8

*Hooper v. Lockheed Martin Corp.*,
    688 F.3d 1037 (9th Cir. 2012).........................................................8

*United States v. Science Applications Intl'. Corp.*,
    626 F.3d 1257, 1266 (D.C. Cir. 2010) ...........................................8

*United States ex rel. Siewick v. Jamison Sci. & Eng'g, Inc.*,
    214 F.3d 1372, 1376 (D.C. Cir. 2000) ...........................................8

*Lopez v. Smith*,
    203 F.3d 1122, 1127 (9th Cir. 2000) .............................................19

*Foman v. Davis*,
    371 U.S. 178, 182 (1962)................................................................19

*Bonin v. Calderon,*
   59 F.3d 815, 845 (9th Cir. 1995)....................................................

*Moore, et.al. v. Kayport Package Express, Inc., et.al.*
   885 F.2d 531 (9th Cir. 1989) .........................................................20


## STATUTES

31 U.S.C. § 3729(a) ............................................................................8

31 U.S.C. § 3729(b)(1)(B) ...............................................................8

## RULES

Fed. R. Civ. P. Rule 12(b)(6) ..........................................................passim

Fed. R. Civ. P Rule 9(b) ....................................................................passim

Fed. R. Civ. P Rule 8(a) ....................................................................passim

Fed. R. Civ. P Rule 15(a) ..................................................................passim

# I.

# INTRODUCTION

Relator David Vatan has filed this action to recover damages and civil penalties on behalf of the United States against Defendants for presenting claims for payment to the Department of Veterans Affairs ("VA") that were both factually and legally false and submitted in conscious disregard and/or deliberate ignorance of its obligations under contracts with the Department of Veterans Affairs.

The contracts at issue were not "garden variety" government procurement contracts. As fully and succinctly detailed in the Second Amended Complaint ("SAC"), these contracts were in partial fulfillment of the VA's legally mandated requirement to review the claims files of Vietnam veterans for *possible* entitlement to new or increased benefits arising from exposure to Agent Orange during the Vietnam War.

The VA had little or no discretion over how these reviews were to be performed, the applicable standards for the reviews, and standards relating to the evidence relevant to a "claim." During the course of its longstanding (approximately 30-year) contractual relationship to deliver services to the Department of Veterans Affairs, Defendant QTC received a contract modification and work order to deliver services consisting of "Independent Medical Opinions" concerning potential entitlements for new or further benefits due to these Vietnam Veterans.  These contracts required very specific forms of reviews of the veterans' claims files in order to ascertain, and support a physician's review, constituting an *Independent Medical Opinion* (a term of art specifically used in VA regulations as detailed in the SAC). This opinion and the reviews, to be rendered by competent, qualified medical authority, was to determine whether veterans who were exposed to Agent Orange during the Vietnam War may possibly contain evidence supporting  eligibility for new or

increased benefits associated with conditions related to their exposure. The review resulted in a decision to refer (or not refer) the file to the VA for further review and adjudication.

Despite their ostensible similarity, the two projects /contracts were in fact quite different. The first one (the IHD/BCL/PD/PCL review) dealt with veterans who had been service-connected and granted benefits previously for these conditions. However, they may have been entitled to increased benefits due to earlier effective dates or because their earlier approval had been only secondary to another condition. By contrast, the Peripheral Neuropathy review was necessitated due to a sweeping redefinition of the condition itself. Thus the review needed to be more comprehensive and reflect symptoms consistent with the condition, whether or not formally diagnosed, and involve a review of very old medical records (including service treatment records as old as the Vietnam era itself).

These reviews were to be performed pursuant to specific contractual obligations, and pursuant to VA guidance documents as well as regulations incorporated by reference. The documentation of the tasks was the accurate and truthful completion of a review "checklist" for each veteran's claim file reviewed pursuant to the contract. The completion of the checklist was not the *sine qua non* of the contract. It was merely the documentation of a *substantive process* that resulted in a physician's *Independent Medical Opinion*.

The nature of the contract, however, contained a clear incentive for QTC to clear as many checklists as possible as rapidly as possible. QTC was paid on a per file completed basis. Claims file analysts were paid on an hourly basis. Physicians were paid per signature on a file. Profitability could be increased by simply "speeding up the assembly line" in deliberate disregard of the effect of that action on the quality of the product coming out the other end of the line.

In furtherance of the scheme, QTC engaged in the specific conduct as

outlined in the complaint. QTC created a system to complete these files and bill for the files in deliberate ignorance of whether or not the *substantive reviews required by the contract and as explicitly represented in the required documentation* were in fact complied with or supportable.

The SAC in issue in Defendants' Motion[1] more than adequately details (a) this scheme, (b) the personnel who rewarded, created, and executed the scheme, (c) the time frames in which the scheme was carried out, (d) the location, and (e) how the specifics of the scheme occurred. It also details examples of defective performance (despite Defendants' efforts to compartmentalize functions such that no one person – such as Relator—would have enough evidence at hand to articulate a case such as this one).

It further details affirmative actions on the part of supervisory personnel in QTC to obscure, hide and ignore obviously defective performance, and an intentional effort to silence and retaliate against those who would point out these glaring and materially defective performance issues.

This case is first and foremost based upon *factually* false claims for payment submitted to the Department of Veterans Affairs. The act of submitting the claim itself constitutes a representation to the government that the underlying service for which the claim was submitted was performed and rendered pursuant to the material provisions of the contract. Based upon all the evidence and indicia as alleged in the complaint, these representations and the

---

[1] Defendants attempt to make an issue of the fact that this is a Second Amended Complaint. The original complaint was amended while the case was still under seal, primarily to add a retaliation cause of action because Defendant had terminated Relator. The SAC was drafted and filed as a cooperative effort by Relator's counsel to address issues raised by Defendants' counsel during the "meet and confer." It was, of course, no admission that the First Amended Complaint was inadequate. Defendants invite this court to draw such an inference, thus undercutting the entire purpose of good faith compliance with the rule. The Court should firmly reject Defendants' effort to use cooperative results of a 'meet and confer' in this way.

implied representations in the act of billing the government for the service were false, and were both created and used by QTC in reckless disregard of the truth or falsity of the actual performance of the underlying service. The records (such as the checklist) were false because they contained objectively false statements and were knowingly created, constructed, executed, and entered into the QTC database for billing, in reckless disregard of whether they were true or false.

The vast bulk of Defendants' motion and argument consists of challenges to interpretations of evidence and attempts to refute evidentiary examples and instances contained in the SAC. They do so by falling back on the idea that Relator – due to the functional compartmentalization – was not supposed to have access to the contracts or the specifics of an individual bill, or even have access to information necessary to support a claim such as this case. Nonetheless, Relator *does* have that information and, when also supported by reasonable, plausible inferences from that information, it more than adequately states claims under Fed. R. Civ. P. 12(b)(6) and 9(b).

Further, the fact that Defendants are readily able to argue sufficiency of evidence, and interpretations of evidence, clearly demonstrates that Defendant has, through the SAC, clear knowledge of the nature of the fraud with which it is charged and the ability to defend against it. Indeed, Defendants' argument demonstrates that they, in fact, already have the information necessary to respond to the complaint. While Defendants' arguments may or may not be appropriate at a summary judgment stage, they fail as a motion to dismiss at this stage of proceedings.

Defendants have moved this Court to dismiss Relator's SAC, claiming that Relator has failed to state a cause of action under the FCA. In their Motion, Defendants focus on what the Complaint does not say, largely ignoring or

misstating what is alleged and the related facts,[2] and misconstruing the theories under which the case has been brought.

A detailed review of the Complaint reveals that Defendants' Motion to Dismiss should be denied.

# II.
## STANDARDS OF REVIEW

**A. Rule 12(b)(6):** Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Mendiondo v. Centinela Hospital Medical Center,* 521 F.3d 1087, 1104 (9th Cir. 2008). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

In considering a 12(b)(6) motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit Partnership* v. *Turner Broad. Sys., Inc.,* 135 F.3d 658,661 (9th Cir. 1998). The Court "assume[s] that the facts as alleged are true, and examine[s] only whether relators' allegations support a cause of action under the False Claims Act..." *U.S. ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1170 (9th Cir. 2006)(citing *Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir. 2001). There is a strong presumption against

---

[2] For example, Defendants claim QTC "voluntarily" created the two-tier review system involving the claims file analysts' review followed by the physician review. However, the VA-created checklists provided with the first contract modification contain this two-tier system with separate signature blocks for the CFA and physician. Regardless of the system employed, it was the "Independent Medical Opinion" of the physician that was a material deliverable under the contract—not a perfunctory physician's signature.

dismissing an action for failure to state a claim. See *Gilligan* v. *Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997) (internal citation omitted).

**B. Rule 9 (b):** Complaints brought under the FCA must comply with the requirements set forth in Rule 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Bly-Magee* v. *California,* 236 F.3d 1014, 1018 (9th Cir. 2001). In its overall application, compliance with Rule 9(b) requires that the plaintiff be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner* v. *Milken,* 17 F.3d 666,672 (9th Cir. 1993) (internal citations omitted).

The Ninth Circuit has determined that Rule 9(b) does not require a plaintiff to allege, in detail, all facts supporting each and every instance of fraud that occurred over a multi-year period. See *United States ex rel. Lee* v. *Smithkline Beecham, Inc.,* 245 F.3d 1048, 1051 (9th Cir.2001); *Cooper* v. *Pickett,* 137 F.3d 616, 627 (9th Cir.1997).

Rule 9(b) looks to an overall view of the Complaint as a whole:

> *The federal rules do not require a plaintiff to provide a factual basis for every allegation. Nor must every allegation, taken in isolation, contain all the necessary information. Rather, to avoid dismissal under Rules 9(b) and 8(a), plaintiffs need only show that, taken as a whole, a complaint entitles them to relief. See, e.g., Twombly, 550 U.S. at 554-56. The complaint must provide enough information to describe a fraudulent scheme to support a plausible inference that false claims were submitted."* *United States ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1169 (10th Cir. 2010).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

While the commonplace parlance of claims of fraud state that the Complaint must be accompanied by "the who, what, when, where, and how of the misconduct charged," *United States ex rel. Ebeid v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010), <u>"this is a pleading requirement, not an evidentiary burden."</u> Id. at 998-99 [Emphasis added].Thus, "it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." Id. Importantly, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pled generally…" *United States ex rel. Campie v. Gilead Scis., Inc.*, 2015 WL 106255, at *6 (N.D. Cal Jan. 7, 2015)

**C. The False Claims Act:**

(1) *Purpose and reach*: Congress expressly stated that the FCA should "reach all fraudulent attempts to cause the Government to pay [out] sums of money or to deliver property or services." S. Rep. No. 99-345, at 9 (1986), reprinted in1986 U.S.C.C.A.N. 5266, 5274; see *also United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S. Ct. 959, 961 (1968) ("[T]he [FCA] was intended to reach all types of fraud, without qualification, that might result in financial loss to the government."). "[A] false claim may take many forms, the most common being a claim for goods or services not provided, or provided in violation of contract terms, specification, statute, or regulation." . . . S. Rep. No. 99-345, at 9, reprinted in1986 U.S.C.C.A.N. 5266, 5274. *United States ex rel. Wilkins v. United Health Grp., Inc.,* 659 F.3d 295, 305-06 (3d Cir. 2011).

(2) *Factual and Legal Falsity*: False claims to the government can be either factual or legally false in nature. A claim is factually false when the claimant misrepresents what goods or services it provided to the government. *United States ex rel. Campie v. Gilead Scis., Inc.,* 2015 WL 3659765, at *8 (N.D. Cal. June 12, 2015). For example, "a certification that a company makes to the government is

factually false if it incorrectly describes the goods or services provided or requests reimbursement for goods or services never provided." Id. "Factual falsity simply means a provider may not bill for something that it does not provide." [Emphasis Added] *United States ex rel. Guardiola v. Renown Health*, 2014 WL 4162201, at *3 (D. Nev. Aug. 20, 2013).

　　　(3) *Knowledge (Scienter):* Liability under the False Claims Act requires that there be a "knowing" presentation of a false claim. 31 U.S.C. § 3729(a). A person demonstrates "knowing" with respect to information if he has "actual knowledge" of the information, or he acts in "deliberate ignorance" or "reckless disregard of the truth or falsity of the information." Id. at 3729(b)(1). The FCA requires no proof of specific intent to defraud and does not require Relator to show Defendants acted with the "intent to deceive." 31 U.S.C. § 3729(b)(1)(B); *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037 (9th Cir. 2012).  The "pertinent inquiry" is "whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1169 (10th Cir. 2010).

　　　(4) *Certification cases:* "Certification" cases can arise in many ways, but silence by the Defendant when "certification" -- express or implied (as in the act of submitting a bill under a contract)-- is a material part of the contract constitutes such a 'certification'.  "Courts infer implied certifications from silence 'where certification was a prerequisite to the government action sought.'" *United States v. Science Applications International Corporation*, 626 F.3d 1257, 1266 (D.C. Cir. 2010) (quoting *United States ex rel. Siewick v. Jamison Sci. & Eng'g, Inc.,* 214 F.3d 1372, 1376 (D.C. Cir. 2000).

1

2

## III.

3

## THE SECOND AMENDED COMPLAINT (SAC) MEETS THE
## PLEADING REQUIREMENTS OF RULE 12(B)(6) AND RULE (9)(B).

4

5     As demonstrated below, Relator's SAC fully complies with the

6 requirements of Rule 12(b)(6) and Rule 9(b). First, none of the elements pled

7 in this case are based on pure speculation. All are supported by factual

8 allegations and the reasonable inferences from those factual allegations.

9         For example, the contents of the contract are not speculative. In its first

10 pleading, Defendants attached four documents consisting of the "contract

11 modification" (i.e. task orders or work orders) constituting the "contract" under

12 which the services in issue were performed.[3] The first of these documents

13 constituted a broad contract modification, and the exhibit included the "cover

14 sheet" for the contract and a list of modifications.  This exhibit specified that the

15 purpose of the modification was to provide  *"Independent Medical Opinion[s]"*

16 for the Nehmer review. The list of contract modifications also contains specific

17 paragraph numbers and their relevant subject matter.

18         Thus, while the Defendants provided some, but not all, of the relevant

19 contract, they did provide a clear description of the relevant paragraphs. Relator

20 subsequently located the "*Sources Sought Notice / Request for Information*

21 *(RFI)"* relating to the *renewal* of the subject contract (SAC Exhibit 5). The RFI

22 contains the entire contractual obligation for the Nehmer projects. The paragraph

23 numbers, content, changes, etc. matched perfectly with the document provided

24 by Defendants in filings with the court.  Thus, there is at least a strong and

25

26

27 [3] The fact that Defendants were readily able to do so more than demonstrates that

28 they "they can defend against the charge" concerning the contract.  *Neubronner v. Milken,* 17 F.3d 666,672 (9th Cir. 1993).

reasonable inference that the contract terms specified in the SAC are precisely those in issue in this case.[4]

The nature of the scheme is not speculative and is based on Relator's knowledge gained in the workplace. As fully detailed in the SAC, QTC's contract required specific actions, certifications, and specific Independent Medical Opinions. In order to document those opinions and the reviews underlying the opinions, the VA produced relevant checklists that constituted the documentation of the substantive process. A completed checklist required verification of the accuracy of the review and the substance of the conclusion by a qualified medical expert.

As detailed in the SAC, at the time of Relator's hiring it was expected that up to 60 claims file analysts would be required to complete these substantive obligations. However, instead of hiring that many CFAs, the SAC alleges that Defendants instead chose to simply "speed up the assembly line" while consciously omitting any review, process, reward, or incentives relating to the accuracy or quality of the substantive performance. *Only* the speed and volume of charts completed was measured by QTC. No quality monitoring system was ever implemented.

//
//
//
//
//

_____

[4] Further, defendant does not claim that the contract terms specified in the SAC are wrong or untrue. They merely contend that Relator would have had no way to know those contract terms due to his position in QTC. Again, Defendants claim they had successfully compartmentalized functions to keep any individual from having enough knowledge to articulate a case. Nonetheless, the contracts and their requirements as specified in the SAC are not speculative.

# IV.

## THE SAC MORE THAN ADEQUATELY, AND IN DETAIL, PLEADS A HIGHLY PLAUSIBLE SCHEME TO SUBMIT FALSE CLAIMS.

Relator's description of the QTC scheme, based on his duties in the workplace over a 15 month period, and supported by his observations and experiences of the operation of the scheme, more than adequately supports a plausible inference that the fraud was executed as described in the Second Amended Complaint.

A simple example illustrates the nature of this case, the SAC, and the allegations pled by Relator.

*By way of an example freed from the complexities of this case, consider a company that contracts with the government to supply gasoline with an octane rating of ninety-one or higher. The contract provides that the government will pay the contractor on a monthly basis but nowhere states that supplying gasoline of the specified octane is a precondition of payment. Notwithstanding the contract's ninety-one octane requirement, the company knowingly supplies gasoline that has an octane rating of only eighty-seven and fails to disclose this discrepancy to the government. The company then submits pre-printed monthly invoice forms supplied by the government—forms that ask the contractor to specify the amount of gasoline supplied during the month but nowhere require it to certify that the gasoline is at least ninety-one octane. So long as the government can show that supplying gasoline at the specified octane level was a material requirement of the contract, no one would doubt that the monthly invoice qualifies as a false claim under the FCA despite the fact that neither the contract nor the*

*invoice expressly stated that monthly payments were conditioned on complying with the required octane level. United States v. Science Applications International Corporation,* 626 F.3d 1257, 1266 (D.C. Cir. 2010)

Similarly, a slight variation on this hypothetical is also self-evident: assume that the contractor, notwithstanding the ninety-one octane requirement, purchases wholesale gasoline or otherwise procures gasoline for delivery to the government, from whatever source is readily available, of random octane ratings or of no known octane rating. As in the above example, the company nonetheless submits monthly invoice forms that ask the contractor to specify the amount of gasoline supplied.

Just as in the hypothetical above, "so long as the government can show that supplying gasoline at the specified octane level was a material requirement of the contract no one would doubt that the monthly invoice qualifies as a false claim under the FCA . . . ." *Id.* This is true, of course, because the contractor supplied the gasoline in reckless disregard of the contract requirements and submitted the claim in reckless disregard of its truth or falsity.

In both the first and second version of the hypothetical, the government contracted to purchase gasoline of a certain octane. The supplier provided gasoline in complete disregard of whether or not the octane rating of the gasoline met that material requirement. In this case, the government contracted to have a competent substantive review of veterans' medical records and claim files followed by a physician's independent medical opinion as to whether or not that file represented a certain potential eligibility for benefits. Just as the claims for payment for nonconforming gasoline were false, here the claims for non-conforming reviews were false.

These obvious examples precisely describe the Relator's allegations concerning the scheme and its plausibility under the FCA. The contract

requirements, together with the readily applicable regulatory guidance and VA requirements, more than adequately spelled out the substantive reviews required by QTC and the standards to apply to those reviews. As a result of the schemes described in the SAC, QTC submitted claims to the VA in deliberate ignorance and reckless disregard of whether those claims represented a properly completed substantive review of a veteran's claim file. The schemes described herein are supported by factual allegations and observations by Relator garnered during the course of his employment with Defendant.

## V.

### RELATOR'S SECOND AMENDED COMPLAINT MEETS THE PLEADING REQUIREMENTS OF RULE 12(B)(6) AND RULE (9)(B)

Counts I and II More Than Adequately Meet the "Who, What, When, Where, and How" pleading requirement of Rule 9(b) and state a claim for relief under Rule 12(b)(6).

**1. WHO?** *Nehmer* team leaders, Beronica Ramos, Ms. Felishka Ashley (Project Supervisor), Dr. Harry Eisenbach (Physician Reviewer), Frenorgin Ubungen (Vice President of Operations at QTC Management), Jason Seibel (CEO, QTC Management),  Mary Ann Umali-Abitria, (Senior Quality Assurance Monitor), Kerrie Schuster (Ethics Officer at Lockheed Martin), Donna Brown (HR Director for QTC Management), and Ms. An Tanag (Team Mentor).

SAC Paragraphs 17, 38, 68, 70, 73, 75, 77, 80, 81, 83

**2. WHAT?**  QTC created and implemented schemes to knowingly and intentionally submit false claims without regard to whether the underlying services were substantively performed as required. The result was deliberate disregard of the material requirements of the contract, with claims submitted

with *factual falsity, and in reckless disregard and deliberate ignorance* of whether or not the actual reviews underlying those claims complied with the contractual and regulatory requirements of the contracts. All such representations, statements, records, and certifications were material prerequisites to the entitlement to payment from the VA.

SAC Paragraphs 2-6, 38, 39, 84,97, 98,106, 107

**3. WHEN?**  During the course of the *Nehmer* reviews commencing (pursuant to the Contract [SAC Exhibit 1]) in August 2012 and continuing through the Peripheral Neuropathy Review (Summer 2015).

SAC Paragraphs 35 – 37

**4.  WHERE?** Lockheed Martin's facilities in Diamond Bar, California.

SAC Paragraph 16

**5. HOW?**

a. Advertising for and hiring physician reviewers based on the promise of easy money and hiring claims file analysts not qualified by education or training to perform the contractually required tasks

SAC Paragraphs 51 - 53

b. Failing to provide adequate training to claims file analysts on recognizing the possibility of an informal or inferred claim, on the substantive medical data or records or substantive aspects of evidence of the diseases under consideration, how symptoms may appear, what conditions may be "similar to" those conditions, or how to recognize them.

SAC Paragraphs 55,56

c. Failing to provide  resources or guidance specifically provided by the VA and the references specifically identified in the VA Checklists (e.g., VA training letter 10-04, "Nehmer Training Guide For QTC"), and failing to

provide clinical resources to aid in the determination of a *manifestation* [not "diagnosis"] of the relevant conditions.

SAC Paragraphs 44, 56, 58- 60

d. Creating internal guidance for use by claims file analysts that contradicted and overrode the actual guidance produced by the Veterans Administration.

SAC Paragraphs 61-65

e. Failing to monitor any performance of material elements of the contract, including, but not limited to, the actual review of the medical record and claims file. Establishing a reward and performance monitoring system solely focused upon numbers and speed. QTC emphasized, rewarded, and required only the speed of the "closure" of a chart (review completion and closure in the computer system).

SAC Paragraphs 61 – 65

## VI.

## RELATOR HAS PROVIDED AMPLE EXAMPLES OF THE SCHEME IN OPERATION FROM WHICH TO INFER DEFENDANTS' LIABILITY.

In addition to the evidence of "who, what, when, where and how," Relator has also provided examples of the of the Defendants' actions to perpetrate the scheme and the inevitable results of the scheme. These include each of the following categories:

### A. AFFIRMATRIVE STEPS TO HIDE NON-PERFORMANCE

QTC ignored, threatened, and eventually terminated employees for continuing to internally raise issues, through appropriate channels, concerning this contractual non- performance.

SAC Paragraphs 45-46

## B. CLAIMS FOR SERVICES WERE SUBMITTED

The completion of the computer entries transferred the file electronically to the QTC billing office or billing function, for transmittal to the VA.

SAC Paragraph 49

## C. EVIDENCE OF THE SCHEME'S OPERATION AND RESULTS

(1) Claims file analysts purported to "review" up to 38 charts per day *and* physicians to sign off on over 60 files per day.

(2)  Ten to fifteen accidently mixed-up case assignment sheets had attached incorrect/non-matching checklists. In the pursuit of speed without any consequence for deficient accuracy, all were signed by physician reviewers without even noticing the checklists they were signing did not relate to the claims file attached to them.

(3) June, 2014: Three cases with accompanying claim files each totaling in excess of 2,500 pages, were all signed and returned to the Relator by the physician reviewer in less than 10 minutes (Inference: Physician reviewer could not have substantively reviewed these files).

(4)  August, 2014: Claim file containing nearly 2,500 pages or 10 inches of paper equivalent, which took Relator 4 hours to complete, was signed off by Physician reviewer in five minutes.

(5) At least 184 charts were returned to QTC by the VA within a 4-month period where the checklists had been signed as completed yet material blocks on the checklist were not even marked or filled out.

(6) Specific examples:

**(i)** Of the six examples discussed by Relator in the SAC, one-third of them contained an affirmative declaration of the absence of any evidence of relevant conditions in the claim file:

> "No medical evidence received showing ASHD prior to the date of the claim establishing entitlement. No evidence of PD or BCL found during this review."

> "No medical evidence received showing any Coronary Artery Disease prior to the date of the claim establishing entitlement of 8/07/2006 - No evidence of PD /B cell/ HCL found during this review."

These material declarations were factually false. They were made to support the conclusion that no referral was necessary.

**(ii)  Six veterans' files:** Each file contains a complete description of relevant facts from which a strong and reasonable inference can be drawn that the file should have been referred to the VA for further claim development and adjudication.

**(A) Veteran D.J.B.** The physician reviewer and CFA ignored a Cardiology consult, performed by the VA itself, on 10/09/2003, as reviewable evidence for an earlier effective date for heart disease as a now-primary condition (rather than as merely secondary to diabetes).

**(B) Veteran D.A.V.** This veteran was service connected for Atherosclerotic Heart Disease secondary to Diabetes II with an effective date of 08/21/2002.The evidence shows the physician reviewer and CFA ignored heart-related workups previously received by the VA on

01/19/1993, as reviewable evidence for an earlier effective date for heart disease as a now-primary condition (rather than as merely secondary to diabetes). The physician review also falsely affirmatively stated in Question 7 narrative that "No medical evidence received showing ASHD prior to the date of the claim establishing entitlement. No evidence of PD or BCL found during this review. " This statement was factually false.

(C) **Veteran J.R.M.** This veteran was service connected for Coronary Artery Disease status post stent effective 03/31/2006. But the Veteran had records showing "chest pain that comes and goes, will last for 30 seconds" since 02/21/1981. The physician reviewer also stated that that there "was no medical evidence received showing any evidence of Coronary Artery Disease" prior to this time. This statement was factually false.

(D) **Veteran N.E.P**. This veteran was service connected for Coronary Artery Disease effective 09/14/2012. However, there is evidence clearly also showing symptoms of Parkinson's disease. The veteran filed a claim for Parkinson's disease in 2012, but the VA rating decision denied service connection for Parkinson's disease (likely because Parkinson's disease was not, at that time a "presumptive condition"). The QTC reviewers missed the evidence and failed to refer it to the VA for re-adjudication.

(E) **Veteran E.L.I.** This veteran was service connected for Coronary Artery Disease, secondary to Diabetes with an entitlement effective January 10, 2008. Defendants acknowledge that QTC "may have made an error" in this review, but dismiss it as a simple mistake rather than as evidence when, taken in context with the other evidence in the SAC, is highly suggestive of a reckless disregard for the substantive contract performance.

(F) **Veteran G.A.R.** Defendants claim that there was no diagnosis of Coronary Artery Disease prior to 2006. However, there is

evidence consisting of a diagnostic imaging report in 1999 with a report showing an overall "diagnostic impression" of atherosclerotic heart disease, signed by a radiologist MD at a VA hospital. The failure of the QTC review and report is further exemplified by the statement in the QTC checklist, signed by the reviewing physician that there was "no medical evidence received showing any Coronary Artery Disease prior to the date of the claim establishing entitlement of 8/0712006 - No evidence of PD /B cell/ HCL found during this review." This statement is factually false.

SAC Paragraphs 67, 69, 70, 85, 86, 87, 88, 94, 95

As can readily be seen, Relator has met his pleading burden under Rules 12(b)(6) and 9(b). Defendants' arguments are based on technical disagreements with the interpretation of evidence and whether Relator has met an *evidentiary* burden, not a *pleading* burden. Defendants' Motion should be denied in its entirety.

## VII.

## RELATOR SHOULD BE ALLOWED TO FILE AN AMENDED COMPLAINT SHOULD THE COURT BE INCLINED TO GRANT DEFENDANTS' MOTION

Despite Defendants' protestations that the subject complaint is the third one filed by Relator, and despite Defendants' "strawman" raising of issues concerning no-longer-operative pleadings, this is the first instance in which Defendants have been required to respond to this case in any way. There has been no burden on Defendants from this case until this Second Amended Complaint and this motion.

As the Ninth Circuit has consistently observed, leave to amend should be granted unless the district court "determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith* , 203 F.3d

1122, 1127 (9th Cir. 2000) (internal quotation marks and citations omitted). This approach is consistent with Fed. R. Civ. P. 15(a) which provides that leave to amend should be freely granted "when justice so requires." See *Foman v. Davis,* 371 U.S. 178, 182 (1962) (Rule 15(a)'s mandate "is to be heeded."). See also *U.S. ex rel. Lee v. SmithKline Beecham, Inc.,* 245 F.3d 1048 (9th Cir. 2001).

In assessing whether leave to amend is proper, courts consider "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *Moore, et.al. v. Kayport Package Express, Inc., et.al.* 885 F.2d 531 (9th Cir. 1989). In this case, there has been no undue delay (or delay of any type), no bad faith, dilatory motive, failures to cure by previous amendments, certainly no prejudice to any party, and no evidence of futility of amendment.

## VIII. CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety. Mr. Vatan also requests leave to amend in the event that the Court is inclined to dismiss any of the counts. See, *Lee*, 245 F 3d 25 1048 at 1052-53.


Respectfully submitted,


**WATERS, KRAUS & PAUL**

_____

Michael Armitage
armitage@waterskraus.com
Louisa Kirakosian
lkirakosian@waterskraus.com
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California  90245
PH: 415-441-8669/888-503-8267

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION
TO DISMISS-- CV 14-08961-PA-SSX

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EISENBERG, GILCHRIST & CUTT, P.C.**

/s/

_____

Robert D. Sherlock *(Admitted Pro Hac Vice)*
rsherlock@egclegal.com
215 South State Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
Fax: 801-350-0065
Attorneys for Plaintiff – Relator