CROWELL & MORING LLP
Mark R. Troy (Bar No. 120418)
Jeffrey H. Rutherford (Bar No. 181695)
Megan A. Weisgerber (Bar No. 285271)
515 S. Flower St., 40th Floor
Los Angeles, California 90071
Telephone: 213.622.4750
Facsimile: 213.622.2690
Email:    mtroy@crowell.com
          jrutherford@crowell.com
          mweisgerber@crowell.com

Attorneys for Defendants
QTC MEDICAL SERVICES, INC. and
LOCKHEED MARTIN CORPORATION

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| United States of America, *ex rel.* David Vatan, M.D.,<br><br>    Plaintiff,<br><br>    v.<br><br>QTC Medical Services, Inc. *et al.*,<br><br>    Defendant. | Case No. CV 14-08961-PA (SSx)<br><br>**DEFENDANTS QTC MEDICAL SERVICES, INC. AND LOCKHEED MARTIN CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS [DKT. NO. 30]**<br><br>Hearing:  February 8, 2016<br>Time:     1:30 p.m.<br>Place:    Courtroom 15<br>          Los Angeles – Spring Street<br>Judge:    Hon. Percy Anderson |
|---|---|

**TABLE OF CONTENTS**

**Page**

I. VATAN'S OPPOSITION BRIEF FAILS TO ADDRESS THE DEFICIENCIES IN HIS SECOND AMENDED COMPLAINT ................... 1

    A. Vatan cannot proceed on a false certification theory of liability .......... 2

    B. Vatan does not allege any knowingly false statements ....................... 3

    C. Vatan's allegations do not permit an inference of knowing fraud ....... 5

    D. Vatan's attempt to enumerate particularity falls short .......................... 9

II. VATAN DOES NOT CONTEST THAT LOCKHEED SHOULD BE DISMISSED AS A DEFENDANT ................................................................ 11

III. VATAN'S FCA CLAIMS SHOULD BE DISMISSED WITH PREJUDICE ............................................................................................... 12

# TABLE OF AUTHORITIES
**Page**
**Cases**

*Bly-Magee v. California*,
 236 F.3d 1014 (9th Cir. 2001) ................................................................................ 10

*Cafasso v. Gen. Dynamics C4 Sys., Inc.*,
 637 F.3d 1047 (9th Cir. 2011) ............................................................... 5, 9, 10, 12

*Campie v. Gilead Scis., Inc.*,
 2015 WL 3659765 (N.D. Cal. June 12, 2015) ...................................................... 4

*Ebeid ex rel. United States v. Lungwitz*,
 616 F.3d 993 (9th Cir. 2010) ......................................................................... 2, 3, 5

*Gonzalez v. Planned Parenthood of Los Angeles*,
 759 F.3d 1112 (9th Cir. 2014) ............................................................................... 3

*Hendow v. Univ. of Phoenix*,
 461 F.3d 1166 (9th Cir. 2006) ............................................................................... 3

*Hopper v. Anton*,
 91 F.3d 1261 (9th Cir. 1996) ................................................................................. 3

*Lee v. SmithKline Beecham, Inc.*,
 245 F.3d 1048 (9th Cir. 2001) ............................................................................. 12

*Wilson v. Kellogg Brown & Root, Inc.*,
 525 F.3d 370 (4th Cir. 2008) ............................................................................ 3, 5

**Statutes**

False Claims Act .............................................................................................. *passim*

**Other Authorities**

Fed. R. Civ. Pro. 8 .......................................................................................... 1, 12

Fed. R. Civ. Pro. 9 ..................................................................................... 1, 10, 12

Vatan's opposition brief clarifies his theory in this case: Vatan harbors the *personal* opinion that QTC employees were unqualified and untrained, they worked too quickly, and these things suggest possible fraud. (Dkt. No. 31, Pl.'s Opp'n. Br. ("Opp'n.") at 2-4.) Allegations like that do not state a claim under the False Claims Act ("FCA").

In an effort to distract the Court from the deficiencies in his second amended complaint, Vatan argues that Defendants' motion improperly attempts to interpret and argue the sufficiency of the evidence. (Opp'n. at 4.) Vatan is wrong. Any defendant challenging the adequacy of a complaint at the pleading stage must assume all of the plaintiff's allegations to be true. This is exactly what Defendants have done in their pending motion to dismiss. But even assuming Vatan's allegations to be true, they fail to allege the particular details needed to allow a plausible inference that QTC submitted false claims to the government. Because Vatan already has had three opportunities and plenty of time to plead his FCA claims properly, but has yet to satisfy the pleading requirements of Rules 8 and 9(b), the Court should dismiss Vatan's FCA claims with prejudice.

## I. Vatan's Opposition Brief Fails To Address The Deficiencies In His Second Amended Complaint

This is Defendants second motion to dismiss in this case. In both motions, Defendants explained the deficiencies in Vatan's theories of FCA liability. Neither the second amended complaint (which Vatan filed instead of opposing Defendants' first motion to dismiss), nor Vatan's brief in opposition to Defendants' second motion to dismiss address these deficiencies. Rather, in both filings, Vatan recites only his personal beliefs about QTC's contract performance: employees were unqualified and worked too fast, QTC rewarded speed, and Vatan was fired when he complained about the review process. From this, Vatan offers the speculative conclusion that QTC defrauded the government. He draws this conclusion without identifying a single instance of QTC knowingly or recklessly failing to refer an

eligible c-file to the VA for re-adjudication.

Vatan raises several arguments in his opposition brief. The following sub-sections explain why these arguments cannot save Vatan's FCA claims from dismissal.

### A. Vatan cannot proceed on a false certification theory of liability

To the extent Vatan alleges a false certification theory of liability—and it is unclear from his opposition brief if he is pursuing this—the Court should dismiss this theory from the case.

Vatan has a fundamental misunderstanding of FCA false certifications, *i.e.*, "legally false" claims for payment. To state a claim under a false certification theory, Vatan would need to allege that QTC "certifie[d] compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted," or that QTC had "previously undertaken to expressly comply with a law, rule, or regulation, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). Either way, it is the false certification of compliance—not the underlying violation—that creates liability only "when certification is a prerequisite to obtaining a government benefit." *Id*.

In his opposition brief, Vatan mentions the false certification theory of liability (Opp'n. at 8), but he makes no attempt to tie that theory to the allegations in his complaint. His second amended complaint uses the term "certification" to describe CFA and Physician signatures on the VA-created checklists. (Dkt. No. 29, Second Am. Compl. ("SAC") ¶¶6, 58.) But signatures on checklists—which, on their face, do not certify of compliance with *any* QTC obligation—are not the type of certifications contemplated by this theory of liability. *See Ebeid*, 616 F.3d at 996; *see also United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir.

1996) (explaining that the relevant certification of compliance must be both "a prerequisite to obtaining a government benefit," and a "*sine qua non* of receipt of [government] funding")). Then Vatan offers the speculative conclusion that QTC submitted claims for payment to the government, which contained false express and implied certifications of compliance with unidentified and unspecified contract requirements. (SAC ¶¶ 97-98, 112-13.) Aside from this speculative legal conclusion, the complaint is devoid of any *factual* allegation that QTC violated a law, rule, or regulation, that QTC falsely certified compliance with that obligation, and that that certification was a prerequisite for payment.

Accordingly, to the extent Vatan's FCA claims survive the pleading stage, Defendants ask the Court to make a specific finding that Vatan has failed to state a claim under the false certification theory of FCA liability, precluding Vatan from pursuing this theory in the case by attempting to discover some unknown certification.

### B. Vatan does not allege any knowingly false statements

The bulk of Vatan's opposition brief focuses on his allegations that QTC submitted purportedly *factually false* claims to the government. But he muddles the requirements for adequately pleading a knowing false statement.

The first element of an FCA claim—a false statement or fraudulent course of conduct—requires plausible factual allegations that the statement or conduct "represent an objective falsehood." *Wilson*, 525 F.3d at 377. To satisfy the scienter requirement, a plaintiff must plausibly allege that the defendant made "a palpably false statement, known to be a lie when it is made." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006); *see also Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112, 1115 (9th Cir. 2014) ("The statutory phrase 'known to be false' does not mean scientifically untrue; it means a lie.'"). In the context of an FCA claim involving substandard services—the

conduct Vatan alleges here—a claim can be "factually false when the claimant misrepresents what goods or services it provided to the government." *United States ex. rel. Campie v. Gilead Scis., Inc.*, 2015 WL 3659765, at *8 (N.D. Cal. June 12, 2015)).

In his opposition brief, Vatan attempts to simplify the meaning of "factually false" claims by offering the following hypothetical: a government contract requires the defendant to supply it with gasoline containing an octane rating of 90 or higher, and the contractor knowingly supplied gasoline with an octane rating of 87 and billed the government for it. (Opp'n. at 11-12.) Then Vatan argues that in this case, like in the hypothetical, the government contracted with QTC to provide "competent substantive" reviews of c-files and medical "opinions" as to whether each c-file was potentially eligible for re-adjudication by the VA, and QTC's claims for payment for "non-conforming reviews" were factually false. (Opp'n. at 12-13.)

Vatan's hypothetical is a straight product-substitution allegation: the government contracted for X, but defendant knowingly provided Y, with Y being an objectively different product than X. This is not a product substitution case but a case alleging, at best, a subjective opinion of poor performance of a service. Therefore, Vatan's hypothetical is not on point. Even if an analogy could be made between QTC's service and a product substitution, Vatan's allegations are inadequate. Because Vatan does not identify any contractual provision or VA-specific guideline requiring QTC to conduct a specific type of c-file review, Vatan has identified no X against which to measure QTC's performance (*i.e.*, the Y in Vatan's hypothetical). His assertion that QTC was contractually required to render "competent substantive" reviews and "opinions" does not enable an assessment of QTC's conduct for an *objective* falsehood, which is a requirement under the FCA.

Vatan concedes in his opposition brief that his second amended complaint attacks "performance" issues. (Opp'n. at 3.) In this regard, Vatan's allegations of factually false claims are based on his *subjective* interpretation of QTC's

contractual duties to review c-files and render opinions about eligibility for re-adjudication. Vatan does not even identify the words "competent" and "substantive" as terms in the VA Contract. His subjective claim presents—at best—"a disputed legal question about . . . contractual duties," *i.e.*, a claim for breach of contract. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 377 (4th Cir. 2008) (internal quotation marks and alterations omitted) ("An FCA relator cannot base a fraud claim on nothing more than his own interpretation of an imprecise contractual provision. To hold otherwise would render meaningless the fundamental distinction between actions for fraud and breach of contract."). Vatan cannot convert a breach of contract claim—a claim he has no standing to bring—into "factually false" claims under the FCA because "[t]his is precisely the sort of claim that courts have determined not to be false statements under the FCA." *Id.* (citing *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996) (holding that disputed legal issues about how to interpret imprecise and discretionary statutory language does not support a reasonable inference of falsity under the FCA)).

### C. Vatan's allegations do not permit an inference of knowing fraud

In the absence of objectively false statements, a plaintiff may survive a motion to dismiss if he or she alleges sufficiently particular details of an alleged scheme "paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Ebeid*, 616 F.3d at 998-99. In assessing the plausibility of an inference, courts draw on "judicial experience and common sense and consider obvious alternative explanations." *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1056 (9th Cir. 2011). Vatan's basis for a "scheme" boils down to this: QTC hired people who were unqualified and untrained and worked too fast, and QTC fired Vatan when he complained about employees working too fast. (Opp'n. at 2-3, 10, 13-15.)

Because the "whole" can be no greater than the sum of its parts, the following paragraphs explain why each aspect of the purported "scheme" fails to provide reliable indicia leading to a strong inference that QTC submitted false claims.

*Qualifications and training*.  Vatan argues that as part of QTC's scheme to defraud the government, it hired CFAs who were "not qualified by education or training to perform the contractually required tasks."  (Opp'n. at 14 (citing SAC ¶¶ 51-53).)  This allegation appears to be based on the fact that, unlike Vatan, most of the CFAs did not have medical degrees.  (SAC ¶ 53.)  But Vatan offers no factual basis for why he personally believes that CFAs were unqualified, and he cites no contract requirement or VA expectation that QTC would hire CFAs with only certain qualifications and train them in a particular way.  The obvious alternative explanation for this allegation is that CFAs were not required to have medical degrees—only Physician reviewers were required to be licensed medical professionals (SAC ¶ 53, SAC Ex. 6)—and they received "on the job" training.

*Speed*.  The crux of Vatan's "scheme" allegation is QTC's emphasis on speed and that employees worked too quickly.  (Opp'n. at 2, 10, 16 (citing SAC ¶¶ 61-65).)  First, Vatan argues that the "nature of the contract" contained an "incentive" for speed because the VA paid QTC on a per-file basis, and QTC could increase profitability by reviewing c-files quickly.  (Opp'n. at 2.)  But the VA drafted the contract and selected this type of contract to incentivize its contractor to review the files in a speedy manner.  Vatan cannot plausibly allege an inference that QTC submitted false claims based on the structure of the contract itself simply because that structure provides QTC a theoretical opportunity to increase profitability.

Next, Vatan points to his allegations that QTC rewarded and emphasized

speed over quality.[1] (Opp'n. at 3, 10, 15-16.) But the only factual basis for this allegation is that QTC expected CFAs to meet an individual minimum goal of reviewing 15 c-files per day (SAC ¶ 69); and one time, after the CFAs reviewed a large number of files in a single day, QTC management emailed the review team and told them "very good," and "keep it up." (SAC ¶ 70.) These are not plausible allegations of a fraudulent scheme. Vatan makes no allegation that the contract required any minimum or maximum quota, and he provides no basis to assess whether QTC's quota was reasonable. And there is certainly nothing fraudulent about QTC encouraging employees to work quickly and efficiently.

Finally, Vatan alleges that two unnamed CFAs claimed to have reviewed over 30 c-files in a single day. (SAC ¶¶ 67, 69.) Vatan's factual basis for these allegations is that he saw these numbers on a piece of paper that listed performance statistics. (SAC ¶¶ 67, 69.) But these statistics are meaningless without any indication of the circumstances under which the unnamed CFAs performed the reviews. The most obvious alternative explanation is that these CFAs reviewed only small c-files, *e.g.*, files that were less than an inch thick, on the days in question and perhaps worked overtime those days. Without more context, these incidents are not reliable indications that QTC submitted false claims for payment.

***Examples of the "scheme."*** In his second amended complaint, Vatan offers several examples, which he claims are "evidence" of QTC's purported scheme. These examples involve alleged incidents of Physicians signing off on checklists without realizing the "assignment" sheets were mixed up (SAC ¶ 86); unnamed Physicians quickly reviewing large c-files after Vatan purportedly spent hours

---

[1] Vatan also argues in his opposition brief that QTC expected to hire 60 CFAs to complete the Nehmer and PN Reviews, but QTC decided to "speed up the assembly line" rather than hire all 60 of them. (Opp'n. at 10.) This allegation does not appear anywhere in the second amended complaint.

reviewing them (SAC ¶¶ 67, 69, 86); and the VA returning 184 checklists because the last question on the checklist had not been completed. (SAC ¶¶ 87-89) Vatan then gave six examples of c-files where QTC purportedly "missed" evidence that he claims would have qualified the veteran for potential re-adjudication. (SAC ¶ 92-94.)

In their opening brief, Defendants explained precisely why each example, on its face, failed to provide any reliable indication that QTC had made a mistake in reviewing any of the 160,000 c-files at issue, much less permit an inference that QTC had submitted false claims in support of a scheme to defraud the government. (*See* Dkt. No. 30, Mot. to Dismiss at 17-23.) Rather than address Defendants' arguments, Vatan repeats almost verbatim the examples as they are worded in his second amended complaint. (Opp'n. at 16-19.) QTC is left with allegations that, on their face, lack the details needed to determine whether QTC erroneously failed to refer an eligible c-file to the VA for re-adjudication (*i.e.*, details about when an initial claim was filed, whether it was granted or denied and why, and whether the veteran had earlier diagnoses for one of the service-connect diseases), as well as details allowing QTC to identify the c-files at issue, who reviewed those files, and who in QTC management was aware of the alleged problems.

***Retaliation***. Finally, Vatan argues that QTC ignored, threatened, and terminated "employees" for "continuing" to raise issues of substandard contract performance through internal channels, and this retaliation is reliable evidence of QTC's scheme. (Opp'n. at 15.) As an initial matter, allegations of retaliation—absent other reliable indications of fraud—do not support a plausible inference that false claims were submitted. Otherwise, a retaliation claim (which does not require an adequate allegation of fraud)[2] would supplant the pleading requirements of an

---

[2] To state a claim for retaliation, a plaintiff need only allege that he or she engaged in protected conduct (*e.g.*, he or she complained about fraud), the (Continued…)

FCA violation. In any event, Vatan's argument suggesting that multiple *employees* (plural) were subject to retaliation for *continuing* to raise issues through internal channels is misleading: the second amended complaint mentions only *one* employee (Vatan himself) against whom QTC allegedly retaliated,[3] and it was after Vatan sent a single email in October 2014 to management raising concerns about the review process.[4]  (SAC ¶¶ 79, 100.)

### D. Vatan's attempt to enumerate particularity falls short

With respect to particularity, Vatan argues that Defendants are aware of the contract at issue, and therefore he has satisfied 9(b) pleading requirements because Defendants are "readily able" to identify the services at issue and "defend against the charge." (Opp. at 9 at n.3.)  Vatan misses the point of Defendants' 9(b) argument.  Defendants do not dispute that they are aware of and familiar with the contract at issue.  The problem with Vatan's allegations, however, is he has launched a wholesale attack on the entirety of QTC's services for the Nehmer and PN Reviews, and Defendants are in the dark about what specific conduct Vatan

---

employer knew about the protected conduct, and the employer discriminated against the plaintiff because of the protected conduct.  *Cafasso*, 637 F.3d at 1060 (quoting *Hopper*, 91 F.3d at 1269).

[3]  Vatan also alleges that an unnamed CFA confronted a Physician (Dr. Eisenbach) because he was not reviewing checklists properly, and Dr. Eisenbach then complained to management that the CFA had referred to him by his first name.  QTC management later told the CFA not to refer to Dr. Eisenbach by his first name and then issued the CFA a letter "threatening" disciplinary action due to productivity issues.  (SAC ¶¶ 71-78.)  This is not an allegation of FCA retaliation because Vatan makes no allegation that QTC management *knew* that the CFA has complained about Dr. Eisenbach's alleged improper review of checklists.

[4]  Vatan does allege that he "again communicated" his concerns regarding the review process after the November 2014 incident when the VA returned the 184 checklists (SAC ¶ 102), but he offers no details about this purported communication, *e.g.*, how he communicated his concerns, what he said, and to whom he said it.

claims is fraudulent and how that fraud occurred. "This type of allegation, which identifies a general sort of fraudulent conduct but specifies no particular circumstances of any discrete fraudulent statement, is precisely what Rule 9(b) aims to preclude." *Cafasso*, 637 F.3d at 1057; *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) ("Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect defendants from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.") (internal quotation marks and alterations omitted).

Vatan's attempt to enumerate his "particular" allegations—the who, what, when, where, and how of the alleged fraud—falls short. For example:

***The "who."*** Vatan argues that he has identified several individuals in his complaint: Beronica Ramos, Fleshika Ashley, Dr. Eisenbach, Frenorgin Ubengen, Jason Seibel, Mary Ann Umali-Abitria, Kerrie Schuster, Donna Brown, and An Tanag. (Opp'n. at 13.) But the allegations about these individuals are completely innocuous and do not state their role in any fraudulent scheme. Beronica Ramos, a supervisor, re-arranged the workspaces of CFAs and Physicians (SAC ¶ 75); Felshika Ashely distributed productivity statistics (SAC ¶ 68); Frenorgin Ubungen and Donna Brown were mere recipients of Vatan's email complaining about the review process (SAC ¶¶ 80, 100); Jason Seibel received Vatan's email about the review process and replied, albeit perhaps impolitely, asking Vatan to focus on his own duties (SAC ¶ 81); and Kerrie Schuster received Vatan's email about the review process and replied, thanking him for sending the email and assuring him that she would follow up on the matter (SAC ¶ 82). An Tanag—who Vatan claims was a "Team Mentor" and one of the individuals responsible for the fraud (*see* Opp'n. at 13)—is not mentioned in the second amended complaint at all.

*The "what."* Vatan states that his second amended complaint alleges that QTC implemented schemes to submit knowingly and intentionally false claims to the government. (Opp'n. at 13-14.) This is a legal conclusion and offers no particular details.

*The "when."* Vatan argues that the scheme was throughout the duration of the Nehmer and PN Reviews, starting before he was hired and continuing long after he was fired. (Opp'n. at 14.) This does nothing to narrow when the alleged fraud occurred.

*The "how."* Vatan repeats his personal opinion about CFAs being unqualified and untrained and working too fast, and QTC's emphasis on speed. (Opp'n. at 14-15.) That is the totality of the alleged "scheme." For the reasons discussed at length above, this opinion, even accepted as true for purposes of this motion, is not a "scheme" and does not implicate fraud.

## II. Vatan Does Not Contest That Lockheed Should Be Dismissed As A Defendant

In their opening brief, Defendants argued that Vatan's claims against Lockheed should be dismissed. While Lockheed is QTC's parent corporation, Vatan does not allege that Lockheed is directly liable or liable under an alter ego theory for the alleged submission of knowingly false claims. (*See* Mot. to Dismiss at 23-24.) In his opposition brief, Vatan fails to address the deficiencies in naming Lockheed Martin as a defendant in this case. This failure is tantamount to conceding Defendants' point. Accordingly, the Court should dismiss Lockheed as a defendant in this case.

## III. Vatan's FCA Claims Should Be Dismissed With Prejudice

Vatan argues that the pending motion to dismiss is the "first instance" in which Defendants have been required to respond to this case in any way, and there has been "no burden" on Defendants in this case until this motion. (Opp. at 19.)

Vatan is wrong.

After being served, Defendants conferred with Vatan and explained the deficiencies in his first amended complaint. Vatan refused to amend, and so Defendants undertook the burden of filing a motion to dismiss the first amended complaint. (Dkt. No. 30.) Only *after* Defendants filed their motion did Vatan decide that he would file a second amended complaint in lieu of opposing that motion. (Dkt. No. 27.) Defendants agreed that Vatan could have 29 days in which to file his second amended complaint. Vatan filed his second amended complaint on December 14, 2015, and although it has been edited, it contains the same substantive allegations as his first amended complaint. Vatan's failure to cure the deficiencies in his complaint, despite having the benefit of Defendants' first motion to dismiss, strongly indicates that Vatan does not have the facts necessary to comply with Rules 8 and 9(b), and that granting him leave to amend would be futile. This is more than enough for the Court to dismiss Vatan's FCA claims with prejudice. *Cafasso*, 637 F.3d at 1058; *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001).

Dated:   January 25, 2016                    CROWELL & MORING LLP

                                             */s/ Mark R. Troy*
                                             Mark R. Troy
                                             Jeffrey H. Rutherford
                                             Megan A. Weisgerber
                                             Attorneys for Defendants
                                             QTC MEDICAL SERVICES, INC. and
                                             LOCKHEED MARTIN CORPORATION