EISENBERG, GILCHRIST & CUTT, P.C.
Robert D. Sherlock (Utah Bar No. 02942)
(Admitted Pro Hac Vice)
215 South State, Suite 900
Salt Lake City, Utah 84111
PH: 801-366-9100
email: rsherlock@egclegal.com

WATERS, KRAUS & PAUL
Michael Armitage (SBN 152740)
222 North Sepulveda Boulevard, Suite 1900
El Segundo, California 90245
PH: 310-414-8146
email: armitage@waterskraus.com
*Attorneys for Plaintiff-Relator DAVID VATAN, M.D.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br>*ex rel.* David Vatan, M.D.,<br><br>　　　　　　Plaintiff-Relator,<br>　　v.<br><br>QTC Medical Services, Inc., et al.,<br><br>　　　　　　Defendants. | Case No. CV148961-PA (SSx)<br><br>**DECLARATION OF**<br><br>**RICHARD V. SPATARO**<br><br>IN SUPPORT OF PLAINTIFF-RELATOR'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

I, Richard V. Spataro, hereby declare as follows:

1. I have personal knowledge of the facts stated herein, unless stated on information and belief, and if called upon to testify to those facts I could and would competently do so. The facts, observations, and conclusions stated herein are based

1   Declaration of Richard V. Spataro in
Support of Plaintiff's Opposition to
Defendant's Motion for Summary Judgment

on my own observation, actions, perceptions in the course of my employment, and knowledge gained in that context.

2. I am an attorney admitted to the District of Columbia Bar and the Virginia State Bar. Since May 2004, I have been employed by the National Veterans Legal Services Program (NVLSP), a 501(c)(3) nonprofit organization. NVLSP was and is the class counsel for the class of plaintiff veterans and survivors of veterans in *Nehmer v. U.S. Department of Veterans Affairs*, Civ. No. 86-6160 (N.D. Cal.) (herein-after, "Nehmer"). I have served as co-counsel for the plaintiff class in Nehmer since September 2006.

3. I am currently NVLSP's Director of Training and Publications. In that capacity, among other things, I coordinate training seminars regarding various topics in veterans law for attorneys and lay veterans service officers, prepare training materials for such trainings, and conduct such training; I manage a team of two attorneys and a paralegal who conduct training; I am a co-editor and co-author of the *Veterans Benefits Manual*, an over-2000-page treatise on veterans law that is updated annually and published by Lexis Nexis; I represent individual VA claimants before the U.S. Court of Appeals for Veterans Claims, the U.S. Court of Appeals for the Federal Circuit, and the Board of Veterans' Appeals; I mentor, and manage attorneys who mentor, volunteer attorneys who represent veterans before the U.S. Court of Appeals for Veterans Claims and the Board of Veterans' Appeals through The Veterans Consortium Pro Bono Program.

## I. The Department of Veterans Affairs and the Nehmer II Reviews

4. Under the Nehmer Final Stipulation and Order, when the VA adds a disease to its list of diseases presumed to be caused by herbicide exposure under the Agent Orange Act of 1991, the VA must identify all claims for VA disability compensation for that disease that were denied or filed by Vietnam veterans between September 25, 1985, and the date the VA added the disease to its presumptive list. Similarly, VA must also identify all claims for service-connected VA death benefits that were denied or filed by survivors of Vietnam veterans whose deaths were caused by the herbicide-related disease, between September 25, 1985, and the date VA added the disease to its list. The VA must then readjudicate those identified claims pursuant to the requirements of the Nehmer Final Stipulation and Order.

5. On August 31, 2010, the VA formally added ischemic heart disease (IHD), Parkinson's disease (PD), and chronic B-cell leukemias (BCL) to its list of diseases presumed to be caused by herbicide exposure.

6. From November 2010 to August 2015, I served as the Managing Attorney of NVLSP's Nehmer Lawsuit Division. In that capacity, I managed a team of 4 to 5 attorneys and a paralegal in the monitoring of the VA's obligations under the Court orders in Nehmer relating to claims for VA benefits for ischemic heart disease (IHD), Parkinson's disease (PD), and chronic B-cell leukemias (BCL). In that capacity, I oversaw the review by NVLSP during that period of over 1,600 VA claims files of class members to ensure VA compliance with the Nehmer Court Orders. As a result of that review, we identified over 1,300 prejudicial errors committed by the VA in its adjudication of benefit claims under the Nehmer Court

1 Orders and assisted the affected VA claimants and survivors of VA claimants
2 obtain correction of these errors and the additional retroactive U.S. Department of
3 Veterans Affairs (VA) benefits for herbicide-related disabilities to which they were
4 entitled.

6
7. Sometime prior to April 2012, NVLSP discovered a deficiency in the process the
7 VA had used to identify claims for VA benefits for IHD, PD, and BCL that were
8 required to be readjudicated pursuant to the Nehmer Final Stipulation and Order.
9 Specifically, NVLSP discovered that the VA did not identify veterans, living and
10 deceased, who were granted compensation for IHD, PD, and/or BCL between
11 September 25, 1985, and October 13, 2009, for reasons unrelated to the relationship
12 between these three diseases and herbicide exposure. Readjudication of those class
13 members claims under the more favorable terms of the Nehmer Final Stipulation
14 and Order could result in the award of additional benefits or an earlier effective date
15 for benefits.

18
8. In April 2012, I wrote to opposing counsel, U.S. Department of Justice attorney
19 Leslie Farby, to notify her of this deficiency. I requested that the VA agree to
20 rectify this deficiency by, among other things, (a) conducting a search to identify all
21 Vietnam veterans, living or deceased, and all DIC claimants, living or deceased,
22 who were awarded compensation for IHD, PD, and/or BCL between September 25,
23 1985, and October 13, 2009, and (b) reviewing the identified VA claims files of
23 these claimants and applying the readjudication substantive rules and procedures
25 required by the Nehmer Final Stipulation and Order.

27
9. In a letter dated May 7, 2012, Ms. Farby notified counsel for the plaintiff class
28 that the VA agreed to conduct a targeted review of claims files of Vietnam veterans

who were granted service connection for IHD, PD, or BCL between September 25, 1985, and October 13, 2009. She advised us that for individuals who were potentially entitled to additional benefits, the VA planned to readjudicate their claims in order to determine whether they qualified for an earlier effective date for VA benefits. I refer to this review in this declaration as the "Phase II" review.

10. Ms. Farby informed us that the VA had identified approximately 69,000 claims files that required Phase II review, and anticipated assigning a contractor to conduct the initial screening of those files. She informed us that the contractor would be provided extensive instructions and training regarding identification of those claims among the 69,000 claims files where an individual may qualify for an earlier effective date based on the application of the Nehmer effective date criteria. According to Ms. Farby, cases in which the contractor's initial screening indicated potential eligibility for an earlier effective date would be forwarded to VA adjudication staff for review and, when appropriate, issuance of a rating decision.

11. On July 31, 2012, Ms. Farby sent me an email informing me that, in the near future, the VA anticipated signing an agreement with a contractor to screen the approximately 69,000 claims files identified by the VA. She again informed me that cases identified during the contractor's screening as having potential eligibility for an earlier effective date would be forwarded to adjudication VA staff at one of the VA's regional offices for further review. Ms. Farby attached a copy of a checklist for the contractor's use ("Agent Orange Screening Checklist") and guidance regarding use of the checklist (the "Nehmer Training Guide for QTC"). She also stated that the VA planned to begin training contractor staff very soon. Finally, she noted that a sampling of over 300 of these "Phase II" claims indicated that between

1    10% and 15% of the claims identified for screening would require further
adjudicative review by VA adjudication staff.

12. On October 23, 2012, I sent a letter to Ms. Farby identifying incorrect information included in the VA's Nehmer Training Guide for QTC and associated Agent Orange Screening Checklist. I requested that the VA change the Nehmer Training Guide for QTC and Agent Orange Screening Checklist to correct the incorrect information.

13. In a letter dated November 14, 2012, Ms. Farby notified NVLSP that VA had accepted our suggested revisions to the Screening Checklist and made corresponding changes to the Training Guide. She included copies of the updated versions of these documents with her letter. Ms. Farby informed NVLSP that the VA had not yet implemented the Phase II screening process. She also notified us that the VA had conducted supplemental training of the contractor (QTC) on November 6, 2012, and had used the updated Screening Checklist and Training Guide.

14. On January 31, 2013, Ms. Farby sent me an email informing me that a further VA search removed certain claims that had already been adjudicated from the list of 69,000 cases initially identified for Phase II screening, and that there were actually about 67,000 cases eligible for such screening.

15. On February 4, 2013, I sent an email to Ms. Farby requesting information about VA's adjudication of Phase II cases. Specifically, I asked her how many of the 67,000 cases were cases in which the contractors had completed screening, over what time period the contractors completed those screenings, and how many of

6    Declaration of Richard V. Spataro in
Support of Plaintiff's Opposition to
Defendant's Motion for Summary Judgment

those cases did the contractors determine required Nehmer readjudication by VA personnel.

16. On February 7, 2013, Ms. Farby responded that the contractors had completed the screening of 243 Phase II cases between August 9, 2012, and December 7, 2012. Of those 243 cases, 98 were used in the training of the contractor conducting the screening. 73 of the 243 cases were referred to the VA for Nehmer readjudication. Thus, the referral rate of these 243 cases was 30.04%.

17. On February 14, 2013, I sent an email to Ms. Farby requesting that the VA provide NVLSP with its estimated/goal date for completing the contractor screening of the 67,000 Phase II cases. I also requested that the VA provide NVLSP with information about the VA's progress on the screening and readjudication of Phase II cases for the period December 8, 2012, through February 28, 2013, and then on a monthly basis thereafter to ensure that the VA was on pace to complete Phase II in a reasonable time period. Among other things, I requested that the VA inform us of the number of Phase II cases contractors completed screening during the period in question and the number of Phase II cases contractors determined required Nehmer readjudication during the period in question.

18. On February 21, 2013, Ms. Farby sent me an email notifying me that VA would be providing NVLSP with a list of the Phase II cases in the coming week. She informed me that the list now contained 64,425 veterans due to VA's identification of additional veterans who should be excluded from the Phase II review. The following day, a VA attorney delivered a compact disc with identifying information for all Phase II class members to NVLSP.

19. In a letter dated March 28, 2013, U.S. Department of Justice Attorney Joshua E. Gardner provided information about Phase II production for the "start up/training period of Phase II (August 10, 2012 – March 3, 2012);" and "the first three weeks of the Phase II production period (March 4, 2012 – March 26, 2012)." Mr. Gardner reported that during the start-up/training period, the contractors completed the screening of 353 cases and referred 102 of those cases to the VA for Nehmer readjudication. He reported that during the first three weeks of the production period, the contractors completed the screening of 1,605 cases and referred 238 of those cases to the VA for Nehmer readjudication.

20. In a letter dated May 2, 2013, Mr. Gardner provided NVLSP with the second Phase II production report, covering the period March 27, 2013, through April 15, 2013. During that period the contractors completed the screening of 1,982 cases and referred 304 of those cases to the VA for Nehmer readjudication.

21. From June 2013 through January 2015, the U.S. Department of Justice provided NVLSP with monthly production reports covering the 16th day of a month to the 15th day of the following month. The relevant data from those reports is included in the attached spreadsheet. Beginning on January 15, 2015, and approximately every month through October 2015, VA regularly provided NVLSP with spreadsheet containing the status of every case identified for Phase II review. The October 2015 final update to the spreadsheet revealed that the list of Phase II cases had grown to 68,220. Of those 68,220 cases, 67,985 had been screened and 235 cases had not been screened due to lost files. The contractor referred a total of 12,721 cases to the VA for a full Nehmer readjudication, for an overall referral rate of 18.71%.

8   Declaration of Richard V. Spataro in
Support of Plaintiff's Opposition to
Defendant's Motion for Summary Judgment

22. From January 25, 2013, through at least September 4, 2015, the VA regularly provided NVLSP with compact discs containing copies of the VA decisions on the Phase II cases referred to the VA by the contractors after screening.

23. Referral Rate Summary:

    a. The initial review of 243 Phase II cases (August 9, 2012 to December 7, 2012), the referral rate was of these cases was 30.04%.

    b. During the start-up/training period, the contractor (QTC) had a referral rate of 28.89%.

    c. During the first "production period" (after VA training had been completed and the contractor was performing reviews on their own), that rate had fallen to 14.82%.

    d. During the second "production period" that rate was 15.33%.

    e. The final update total for the Nehmer II project from the VA reflected that the contractor referred 12,721 cases to the VA for Nehmer readjudication, for an overall referral rate of 18.71%.

24. The VA did not provide NVLSP (nor do I understand that they gathered or monitored) "granular" level detail on the identities of the contractors' personnel (whether physician or 'claims file analyst') performing the actual reviews. I am unaware if the VA monitored the training methods for such personnel to perform their duties after the initial training, or otherwise.

25. As noted above, NVLSP had specifically reviewed the training material, checklists, and guidance to be used by the contractor in actually performing the reviews. As noted above, NVLSP did require changes to increase precision and

specificity in that material, changes which were accepted and incorporated by the VA.

26. All elements of the checklist, the specific language used, the training guidance required to be used by the contractor, and the material discussed and referenced in those documents were in my opinion material and relevant to insuring the VA (and its contractor) met its obligations under Nehmer and its agreement with NVLSP.

## II. NVLSP Reviews of Nehmer Claim Files

27. In 2011, I and another attorney in NVLSP's Nehmer Lawsuit Division conducted site visits at four VA regional offices to review the VA's work in adjudicating IHD, PD, and BCL claims under the Nehmer Final Stipulation and Order. Prior to each visit, I would identify cases in which the VA recently issued a Nehmer rating decision. The regional office made the paper claims file available to NVLSP for review. We would then review the claims file and complete a one-page checklist we created (attached) to help us organize the information necessary to determine the effective date for benefits required by the Nehmer Final Stipulation and Order. That information included: the date the veteran first filed a claim for VA benefits for the herbicide-related disease in question; the date the veteran was first diagnosed with that disease; the date the VA first received evidence that the veteran was diagnosed with the disease; and the date the veteran filed the claim that was pending when the VA first received evidence that he or she was diagnosed with the herbicide-related disease in question. This information enabled us to determine if the VA assigned the class member the correct effective date for benefits for the disease in question.

10   Declaration of Richard V. Spataro in
Support of Plaintiff's Opposition to
Defendant's Motion for Summary Judgment

28. The first site visit took place from April 18, 2011, through April 22, 2011, at the Detroit, Michigan VA Regional Office. NVLSP attorney Maria Tripplaar and I reviewed the claims files of 80 Nehmer class members. This review took us a total of 55.7 hours. In cases in which we identified a VA error or in which VA had recently issued a rating decision correcting a prior error, we copied relevant documents from the VA claims file. I estimate that the copying of these documents took approximately 1.3 hours. Thus, the total time actually reviewing claims files was 54.4 hours. The average time it took us to review a claims file was 41 minutes.

29. The second site visit took place from May 9, 2011, through May 12, 2011, at the Cleveland, Ohio VA Regional Office. NVLSP attorney Allison Monyei and I reviewed the claims files of 91 Nehmer class members. This review took us a total of 50.6 hours. In cases in which we identified a VA error, we copied relevant documents from the VA claims file, which I estimate took approximately 3.6 hours. Thus, the total time actually reviewing claims files was 48.6 hours. The average time it took us to review a claims file was 31 minutes.

30. The third site visit took place from June 6, 2011, through June 10, 2011, at the Chicago, Illinois VA Regional Office. Ms. Tripplaar and I reviewed the claims files of 110 Nehmer class members. This review took us a total of 61.5 hours. In cases in which we identified a VA error, we copied relevant documents from the VA claims file, which I estimate took approximately 3.0 hours. Thus, the total time actually reviewing claims files was 58.5 hours. The average time it took us to review a claims file was 32 minutes.

31. The fourth site visit took place from July 19, 2011, through July 22, 2011, at the Des Moines, Iowa VA Regional Office. Ms. Monyei and I reviewed the claims

files of 117 Nehmer class members. This review took us a total of 53.4 hours. In cases in which we identified a VA error, we copied relevant documents from the VA claims file, which I estimate took approximately 3.2 hours. Thus, the total time actually reviewing claims files was 50.2 hours. The average time it took us to review a claims file was 26 minutes.

32. Overall, NVLSP reviewed 398 claims files of Nehmer class members during these four site visits. It took us 210.1 hours to review these claims files (excluding time spent copying documents). The average time it took us to review a claims file was 32 minutes.

33. Based upon my own experience and perception, a well-trained, highly experienced reviewer analyzing veterans' claim files, post-adjudication (as were the files in the Nehmer II project discussed above and Peripheral Neuropathy project discussed below), to determine if the effective date was correct under Nehmer Final Stipulation and Order effective dates could not competently accomplish that task in less than an overall average of 30 minutes per file. Some files could be reviewed quickly and some could take longer, depending on size, scope, conditions, and complexity. But over a period of time, this would be the minimum average necessary for expert attorney reviewers to conduct a quality review of a typical Nehmer-condition claims file.

### III. The Peripheral Neuropathy Review Project

34. On September 6, 2013, the VA updated 38 C.F.R. § 3.309(e) to replace "acute and subacute peripheral neuropathy" with "early-onset peripheral neuropathy" as a disease presumptively related to herbicide exposure. Under this new

characterization of the type of peripheral neuropathy linked to herbicide exposure, a veteran who was exposed to herbicides is entitled to presumptive service connection for peripheral neuropathy if he or she began experiencing peripheral neuropathy to a disabling degree of 10 percent under the VA's rating schedule within one year of his or her last exposure to herbicides during military service and satisfied other general requirements necessary to establish entitlement to VA disability compensation. This change triggered the VA's duties under the Nehmer Final Stipulation and Order to identify and readjudicate previously denied claims for service connection for early-onset peripheral neuropathy ("PN").

35. Contemporaneous evidence that a veteran experienced PN within one year of the date of the veteran's last exposure to herbicides is not required to satisfy the criteria for establishing presumptive service connection. Evidence post-dating that one year period (including lay evidence in the form of a veteran's statements, retrospective medical opinions, etc.) showing that a veteran experienced symptoms of peripheral neuropathy within one year of the veteran's last exposure to herbicides could be sufficient to establish entitlement to presumptive service connection for PN. It could be in the form of a letter, handwritten note, or other evidence in the veteran's VA claims file. Additionally, the evidence could be associated with the claims file at any time, even decades after the veteran filed his or her initial claim for service connection for PN.

36. On February 11, 2014, Ms. Farby wrote a letter to NVLSP in which she notified us that the VA planned to use a contractor to screen for potential PN cases, similar to the process used for Phase II Nehmer cases. She attached a checklist that the contractor would use to screen for possible PN class members. She informed us

1 | that the VA expected that screening by the contractor would begin by the end of
2 | March 2014.

3

4 | 37. On May 1, 2014, Ms. Farby sent me an email notifying me that the VA had recently revised the checklist for contractor screening for potential PN Nehmer cases. She informed me that the VA revised the checklist to facilitate data collection based on feedback obtained during contractor training. She attached a copy of the updated checklist. Among other things, it prompted the screener to identify the date of the earliest PN claim and to determine if there was any objective or lay evidence in the claims folder that "suggests PN manifested itself during military service, within 1 year after last exposure and/or prior to May 8, 1976 (whichever is earliest)."

14 

15 | 38. On May 20, 2014, I sent an email to Ms. Farby suggesting that the VA change certain language in the PN checklist to make it clearer to contractors. Specifically, we requested that VA change the aforementioned language "suggests PN manifested itself during military service . . ." to "suggests PN symptoms or diagnosis during military service . . . ."

20

21 | 39. On May 27, 2014, Ms. Farby sent me an email notifying me that the VA was willing to change the language in the relevant PN checklist question to: "Is there any objective or lay evidence in the Claims Folder that suggests PN manifested itself during military service which, for example, could include PN symptoms or a PN diagnosis within 1 year of last exposure and/or prior to May 8, 1976 (whichever is earliest)"?

40. If a screener were to have found objective or lay evidence in a veteran's VA claims folder that suggested PN manifested itself during military service, including PN symptoms or a PN diagnosis within 1 year of the veteran's last exposure to herbicides and/or prior to May 8, 1976, the screener was required to find that the veteran was potentially eligible for presumptive consideration. Those cases would be forwarded to the VA for readjudication under the Nehmer Final Stipulation and Order. This evidence could have been associated with the claims folder at any time, even decades after the veteran separated from military service. For example, if a veteran presented evidence in 2014 that he or she had been suffering relevant symptoms within one year after exposure to herbicides during Vietnam service in 1975, that file would require referral to the VA for readjudication. Because relevant evidence could have been contained in aging, handwritten service treatment records or any other medical records or lay statements post-dating the veteran's military service, the PN review was more complex and required more time and diligence than the Nehmer II review.

41. On October 23, 2014, the VA delivered to NVLSP a compact disc containing 86 PN Nehmer decisions issued by VA regional offices. The earliest of these decisions was issued in June 2014. The VA continued to regularly provide NVLSP with compact discs containing PN Nehmer decisions through February 2017.

42. In the midst of the PN review, I moved to a different position in NVLSP, the position I now hold. I was thus less involved in the oversight of the ongoing performance of this review.

1 | I declare under penalty of perjury that the foregoing is true and correct.
2 |
3 | Executed this 21st day of December, 2018, at Washington, D.C.
4 |
5 | Respectfully submitted,
6 |
7 | */s/ Richard V. Spataro*
8 |
9 | Richard V. Spataro

**Checklist for C-file Review – Survivor**

Name of Veteran: _____    VARO: _____

C-File Number: _____    SSN: _____

Name of Survivor(s): _____    Survivor SSN: _____

Relation:    Spouse [ ]    Child [ ]    Parent [ ]    Estate [ ]    Other [ ]

Did spouse remarry: \_\_\_\_\_ (Y/N)    When?: _____    Still remarried: \_\_\_\_\_ (Y/N)

Is DIC claimant deceased?    Yes [ ]    No [ ]

Date of notice letter: \_\_\_\_/\_\_\_\_/_____        Date of rating decision: \_\_\_\_/\_\_\_\_/_____
                                 M    D    Y                                                                   M    D    Y

1. Date of death of the veteran:        \_\_\_\_/\_\_\_\_/_____
                                                              M    D    Y

2. Does evidence show death due to IHD, PD, or BCL?    Yes [ ]    No [ ]

3. Was survivor granted DIC?                                              Yes [ ]    No [ ]

4. If yes, what is the effective date for DIC: \_\_\_\_/\_\_\_\_/_____
                                                                              M    D    Y

5. Date of first DIC/death pension claim:    \_\_\_\_/\_\_\_\_/_____    _____
                                                                              M    D    Y

6. Date VA first received evidence showing death by IHD, PD, or BCL:    \_\_\_\_/\_\_\_\_/_____
                                                                                                                                   M    D    Y

7. Dates of other claims and decisions regarding DIC/death pension:

| Claims: | Rating decisions: | BVA decisions: |
|---|---|---|
| \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ |
| \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ |
| \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ |

8. Were service-connected burial benefits awarded?    Yes [ ]    No [ ]

9. Were burial benefits claimed?                                      Yes [ ]    No [ ]

10. Did veteran file a claim for AO disease?    Yes (complete Vet checklist) [ ]    No [ ]

**Conclusion**:    No Errors [ ]    Earlier DIC Claim [ ]    BB Error [ ]    Other Error [ ]

**Comments** (continue on back if necessary):

Reviewer's Name: _____    Date of Review: \_\_\_\_/\_\_\_\_/_____

## **Checklist for C-file Review – Veteran**

Name of Veteran: _____     VARO: _____

C-File Number: _____     SSN: _____

Date of the notice letter:  \_\_\_\_/\_\_\_\_/_____     Date of rating decision: \_\_\_\_/\_\_\_\_/_____
                                               M     D      Y                                             M      D      Y

Disease:     [  ] Ischemic Heart Disease  (Type: _____)
                  [  ] Parkinson's Disease
                  [  ] Chronic B-Cell Leukemia  (Type: _____)

1. Was veteran granted service connection for the disease?     [  ] Yes     [  ] No
2. Was veteran previously granted direct or secondary SC for disease?     [  ] Yes     [  ] No
3. If yes, was claim granted due to "aggravation"?     [  ] Yes     [  ] No
4. If yes, does rating cover extent of disability (it's not discounted)?     [  ] Yes     [  ] No

5. Current effective date for the disease:     \_\_\_\_/\_\_\_\_/_____
                                               M     D     Y

6. SMC(S) warranted, but not awarded (one 100% + 60%):     [  ] Yes     [  ] No

7. Date of first explicit claim for disease:     \_\_\_\_/\_\_\_\_/_____  _____
                                              M    D     Y

8. Date of first diagnosis/treatment:     \_\_\_\_/\_\_\_\_/_____     source:_____
                                              M    D     Y

9. Date VA first received evidence of dx/tx:  \_\_\_\_/\_\_\_\_/_____   source:_____
                                              M    D     Y

10. Between date of diagnosis and current effective date, did veteran file
     any VA claim or receive any VA rating decision (RD):     [  ] Yes     [  ] No

11. If yes, date of claim that prompted first RD after receipt of evidence:  \_\_\_\_/\_\_\_\_/_____
                                                                                       M    D     Y

12. Dates of other claims and decisions regarding disease:

| Claims: | Rating decisions: | BVA decisions: |
|---|---|---|
| \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ |
| \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ |
| \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ | \_\_\_\_/\_\_\_\_/_____ |

**Conclusion**:     [  ] No Errors     [  ] Earlier Explicit Claim     [  ] FN1 Violation
                     [  ] Rating % Error     [  ] SMC Error     [  ] Other Error (explain)

**Comments** (continue on back if necessary):

Reviewer's Name: _____     Date of Review: \_\_\_\_/\_\_\_\_/_____

**Nehmer Phase II Productivity Report Summary**

| Time Period | Cases Screened by Contractor | Cases Referred to VA for Nehmer Adjudication |
|---|---:|---:|
| 8/10/2012-3/3/2013 | 353 | 102 |
| 3/4/2013-3/26/2013 | 1605 | 238 |
| 3/27/2013-4/15/2013 | 1982 | 304 |
| 4/16/2013-5/15/2013 | 4221 | 682 |
| 5/16/2013-6/15/2013 | 2063 | 715 |
| 6/16/2013-7/15/2013 | 3816 | 707 |
| 7/16/2013-8/15/2013 | 4631 | 934 |
| 8/16/2013-9/15/2013 | 2041 | 506 |
| 9/16/2013-10/15/2013 | 4560 | 947 |
| 10/16/2013-11/15/2013 | 5635 | 1173 |
| 11/16/2013-12/15/2013 | 5751 | 1384 |
| 12/16/2013-1/15/2014 | 7157 | 1510 |
| 1/16/2014-2/15/2014 | 6686 | 1306 |
| 2/16/2013-3/15/2014 | 3360 | 699 |
| 3/16/2014-4/15/2014 | 732 | 240 |
| 4/16/2014-5/15/2014 | 711 | 262 |
| 5/16/2014-6/15/2014 | 557 | 71 |
| 6/16/2014-7/15/2014 | 495 | 86 |
| 7/16/2014-8/15/2014 | 484 | 87 |
| 8/16/2014-9/15/2014 | 60 | 12 |
| 9/16/2014-10/15/2014 | 48 | 15 |
| 10/16/2014-11/15/2014 | 247 | 53 |
| 11/16/2014-12/15/2014 | 73 | 21 |
| Totals: | 57268 | 12054 |